**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **MICHAEL COATES, BRANDON** | § | |
| **RAYBION, and DANIEL VENABLE** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No.** |
| **v.** | § | |
| | § | **7:22-CV-0018-DC-RCG** |
| **TNT CRANE & RIGGING, INC.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Before the Court is Defendant TNT Crane and Rigging Inc.'s Motion for Partial Summary Judgment. (Dkt. 24.) Plaintiffs request that the Court deny TNT's Motion and Plaintiffs show the following in support:

## Table of Contents

I.   INTRODUCTION ............................................................................................................ 2

II.  ARGUMENT AND AUTHORITIES ............................................................................. 2

A.   Work travel that falls within the continuous workday is compensable work time under the NMMWA. ................................................................................................................. 2

B.   This Court has already decided that summary judgment is inappropriate on the compensability of time obtaining ice, water, fuel, and other work supplies. ........................... 6

1.   TNT has not met its initial burden for summary judgment specifically on water and ice because it has not identified any evidence that Plaintiffs ever purchased *only* water and ice.   6

2.   This Court previously held that disputes of material fact prevent summary judgment on whether time spent obtaining fuel or work supplies or picking up and dropping off riggers is compensable. ................................................................................................... 8

3.   Like in *Repass*, TNT again makes numerous false and misleading statements about the testimony in the record. ............................................................................................... 10

4.   Recent persuasive authority holds that driving coworkers under essentially the same circumstances as the present case is a principal activity. ...................................................... 12

C.     The travel time at issue is compensable for other reasons as well. ............................... 15

1.     Driving TNT's company pickups is integral and indispensable because the pickups were used as tools for work on the jobsites. .......................................................................... 15

2.     Fueling pickups in order to run them for hours for work purposes on the jobsite is integral and indispensable, and not incidental to commuting. ............................................. 17

D.     A dispute of material fact exists on the bounds of the "normal commuting area" under the ECFA. ........................................................................................................................................ 18

III.     CONCLUSION ............................................................................................................... 20

## I.     INTRODUCTION

TNT seeks a ruling that no travel whatsoever is compensable work time under the New Mexico Minimum Wage Act (NMMWA), even when an employee travels between worksites within the continuous workday at the employer's behest. Neither this Court nor any other court has ever endorsed TNT's theory. TNT misconstrues a prior opinion by this Court that dealt only with travel between an employee's permanent home and a remote work area where the employee would have to stay overnight—travel that does not fall within any continuous workday.

Additionally, TNT asks the Court to decide, as a matter of law, that obtaining and loading fuel, ice, water, and various work supplies and materials are not compensable work tasks, even though this Court has already ruled in the related *Repass* litigation that those issues involve disputed material facts that cannot be decided on summary judgment.

## II.     ARGUMENT AND AUTHORITIES

### A. Work travel that falls within the continuous workday is compensable work time under the NMMWA.

In its opening argument, Defendant makes the sweeping contention that "[b]ecause travel time is not compensable time under the NMMWA, this Court must grant judgment to TNT on Plaintiffs' NMMWA claims for travel time compensation." (Dkt. 24, *17-*18). This argument proves too much, and the Court should reject it.

First, as Defendant and its counsel know, this case is not about normal commuting travel time. It is, and has always been, about the *commencement of the workday*, after which the Plaintiffs are entitled to compensation no matter what they were doing—including traveling to their jobsites. In other words, this case is about the "continuous workday" rule, and not whether commuting time is compensable. "[U]nder the continuous-workday rule, '[o]nce the work[ ]day starts, all activity is ordinarily compensable until the work[ ]day ends.'"*Aguilar v. Management & Training Corp.*, 948 F.3d 1270, 1279-80 (10th Cir. 2020) (citing and quoting *Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1243 (10th Cir. 2016); and 29 C.F.R. § 790.6(a) (the Portal-to-Portal Act does not apply to activities performed "after the employee commences to perform the first principal activity on a particular workday and before [the employee] ceases the performance of the last principal activity on a particular workday")). Indeed, as Defendant and its counsel also know, the Plaintiffs do not seek to recover for the time they spent traveling before their workday commenced or after it concluded.

It is well-settled that the "continuous workday" rule applies under the NMMWA just as it applies under the FLSA. In fact, in *Aguilar*, the Tenth Circuit specifically relied on the "continuous workday" rule to reverse summary judgment in favor of the employer on the plaintiffs' FLSA and NMMWA claims because the employer failed to pay the plaintiffs for all time after the commencement of the continuous workday. 948 F.3d 1270, 1279-80; *see also Aguilar v. Management & Training Corp.*, Civil No. 16-00050 WJ/GJF, 2017 WL 4804361, *19 (D.N.M., October 24, 2017), *reversed on other grounds*, 948 F.3d 1270 ("The Court finds no legal or factual bar to applying its findings and conclusions regarding Plaintiffs' FLSA claims to the state law claims asserted under the MWA. In fact, there is some basis for looking to the case law regarding

the FLSA for interpretive guidance where the MWA and the FLSA contain similar provisions.")[1] (citing *Segura v. J.W. Drilling, Inc.*, 2015-NMCA-085, ¶ 15, 355 P.3d 845, 850, *cert. denied*, 2015-NMCERT-008, ¶ 15, 369 P.3d 368).

Second, the breadth of Defendant's argument leads to an absurd—and legally incorrect—conclusion. If Defendant is correct—that "travel time is not compensable time under the NMMWA"—then New Mexico employers could refuse to compensate employees for intra-day travel and face no liability under the NMMWA. Yet, under the continuous workday rule and the authority discussed above, that conclusion is clearly wrong. Indeed, in *Garcia v. Crossmark, Inc.*, after undertaking a detailed discussion of the application of the "continuous workday" rule under both the FLSA and the NMMWA, and relying on FLSA authority for guidance,[2] the Court denied the employer's motion for summary judgment on the employee's claim for underpayment for intra-day travel. *Garcia v. Crossmark, Inc.*, 157 F.Supp.3d 1046, 1048-1051 (D.N.M. 2015).

Finally, Defendant contorts the holding of *Barhight v. Terra Oilfield Svcs., LLC*, No.

---

[1] Defendant copies from this Court's opinion in *Barhight* and quotes narrow dicta from the district court's opinion in *Aguilar* but omits from its briefing the actual holding in this section of the *Aguilar* opinion which makes clear that the "continuous workday" rule applies under both the FLSA and the NMMWA. (Dkt. 24, *17). As discussed below, the "continuous workday" rule was not at issue in *Barhight*.

[2] New Mexico courts routinely rely on FLSA authority to interpret the NMMWA where the NMMWA is silent on an issue. *Segura*, 2015-NMCA-085 at ¶ 15, 355 P.3d at 850 ("it is appropriate to look to decisions of federal courts determining the meaning of 'employ' in the federal statute, and to consider those federal decisions as persuasive authority in deciding the meaning of 'employ' in the New Mexico statute")); *Arnold v. Schlumberger Tech. Corp.*, No. 10cv346 MCA/LAM, 2010 WL 9007208, *4 (D.N.M., October 29, 2010) ("In the specific context of the New Mexico Minimum Wage Act, New Mexico courts have determined that where a particular term is left undefined, and state case law does not supply the answer, 'it is appropriate to look to decisions of federal courts determining the meaning of [the undefined term] in the [FLSA], and to consider those federal decisions as persuasive authority in deciding the meaning of [the undefined term] in the New Mexico statute.' " (citing and quoting *Garcia v. Am. Furniture Co.*, 689 P.2d 934, 937 (N.M.App.1984)).

MO:19-CV-214-DC-RCG, 2020 WL 10051745 (W.D. Tex. Dec. 15, 2020) to claim that "travel time is not compensable under the NMMWA." In fact, the specific travel time at issue in *Barhight* was the so-called "travel away from home," or "home-to-work" travel. *Barhight*, 2020 WL 10051745, *2-*3. As the Court noted, the plaintiff there "assert[ed] that he was required to travel from his home during normal work hours to remote jobsites and was required to stay overnight near these remote jobsites for the entirety of his hitch. Therefore, Plaintiff is seeking compensation for travel time that is not included in the definition of ordinary home-to-work travel time under the Portal-to-Portal Act and 29 C.F.R. § 738.35." *Id.*, *3. Consequently, this Court found in *Barhight* that such "home-to-work" travel is compensable under the FLSA. However, because the NMMWA is silent on it, such "travel away from home," or "home-to-work" travel, was not compensable under the NMMWA. *Id.*[3] Given the specific holding under the specific facts of *Barhight*, this Court did not there hold, as Defendant contends, that travel time is *never* compensable under the NMMWA. Importantly, the Court in *Barhight* did not address the "continuous workday" rule. Similarly, *Segura v. J.W. Drilling, Inc.*, 355 P.3d 845 (N.M. Ct. App. 2015) likewise does not stand for the proposition that travel time is never compensable under the NMMWA. The narrow issue in *Segura* was whether there was implied in the NMMWA "a new scheme, similar to the [Employee Commuting Flexibility Act, 29 U.S.C. § 254(a) ("ECFA")], that alters the general rule ['that commuting time to and from a job site is not compensable'] and declares some commuting time compensable." The *Segura* court was "loath to" import an ECFA-type rule into the NMMWA, which was silent on the subject; it did not, however, find that travel time is *never* compensable under the NMMWA.

---

[3] Notably, the Plaintiffs in this case do not seek recovery for their "home-to-work" travel time under the NMMWA; they seek recovery for it only under the FLSA. (Dkt. 21, *7-*8, ¶¶ 36-39).

Travel time that occurs within the "continuous workday" is compensable under the NMMWA; and that is what the Plaintiffs seek here. The Court should reject Defendant's motion to dismiss Count Two from Plaintiffs' First Amended Complaint.

**B. This Court has already decided that summary judgment is inappropriate on the compensability of time obtaining ice, water, fuel, and other work supplies.**

1. <u>TNT has not met its initial burden for summary judgment specifically on water and ice because it has not identified any evidence that Plaintiffs ever purchased *only* water and ice.</u>

TNT "moves for summary judgment on Plaintiffs' FLSA travel time claims which arise out of Plaintiffs' purchasing ice and water for personal use at work." (Dkt. 24, *7.) TNT argues that "time spent purchasing water and ice is not work," (*id.* at *18) (title caps removed); that "purchasing ice and water was not integral and indispensable to their roles as crane operators," (*id.* at *23); and that "stopping to purchase ice, water, or supplies did not convert their non-compensable commuting time to compensable work time." (*Id.* at *19.) TNT moved for partial summary judgment on the same issue in the related *Repass* action: "whether plaintiffs' purchasing ice and water at convenience stores during their commutes renders that time compensable."[4]

In *Repass*, this "Court agree[d] with Plaintiffs' assertion" that "[Defendant's] argument here is premised on its implied assertion that the Plaintiffs made stops to purchase *only* ice and water," but "in the testimony that [Defendant] cites, none of the Plaintiffs indicates that he made stops to purchase *only* water and ice. Instead, the testimony is that they made stops to purchase fuel, water, ice, and other materials needed for their cranes." (*Repass*, Dkt. 190, *9-10.) This Court concluded that it should not "conduct an in-depth analysis based on a hypothetical factual scenario that would result in a de-facto advisory opinion," and consequently denied TNT's motion. (*Id.* at

---

[4] (*Repass v. TNT Crane & Rigging, Inc.*, No. 7:18-CV-00107-DC-RCG, Dkt. 163, 15.).

10.) Likewise, TNT offers no evidence that the Plaintiffs in the present action made stops to purchase *only* ice and water. Therefore, the Court should once again deny TNT's motion on this point for the same reason.

In the event the Court decides to analyze TNT's underlying argument after all, Plaintiffs adopt by reference the plaintiffs' argument in *Repass* that obtaining and loading ice and water was indeed integral and indispensable to their primary activity of operating cranes for long shifts in the heat without access to drinking water on remote oilfield and construction sites. (*Repass*, Dkt. 179, *13-16, attached hereto as Exhibit A.;[5] *see also* Declaration of Plaintiff Michael Coates, attached hereto as Exhibit C, ¶¶ 2-5 (establishing the same facts as in *Repass* regarding why obtaining water and ice was integral and indispensable to their primary activities).)

TNT separately argues that obtaining water and ice is not work. However, as TNT notes, work includes any activity "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." (Dkt. 24, *18 (quoting *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 31 (2014) (quoting *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).) The same fact dispute that prevents summary judgment on the issue of whether obtaining water and ice is integral and indispensable to a primary activity also prevents summary judgment on the issue of whether it constitutes work: there is evidence that Plaintiffs were required to maintain a supply of water and ice for safety reasons due to the acute risks of dehydration and heat injuries working on remote desert oilfield sites. (Ex. C, ¶¶ 2-5.)[6]

---

[5] Page references are to the pagination in the attached exhibit. Exhibit A includes the attachments incorporated by *Repass* Dkt. 179 designated as Exhibits D (Harrison Depo.), P (Repass Decl.), and Z (JSA forms) therein.

[6] TNT argues that "credit card ledgers show[] the relative inconsistency of purchases" of water and ice. (Dkt. 24, *23.) However, that argument is based on an implausible inference that only credit card purchases under $30 could have included water and ice, as though water and ice could

Under those circumstances, doing so is at least arguably primarily for the employer's benefit. Although measures intended to protect employees' health and safety naturally benefit the employees, they still primarily benefit the employer by preserving a productive workforce and preventing the costs involved with workplace accidents. Many courts have found time spent donning safety gear or performing other health and safety preventive measures to be compensable work. *See, e.g.*, *Busk*, 574 U.S. at 37-38  (Sotomayor, J., concurring) ("although a battery plant worker might, for example, perform his principal activities without donning proper protective gear, he could not do so safely") (citing *Steiner* v. *Mitchell*, 350 U.S. 247, 250-253 (1956)); *Tyger v. Precision Drilling Corp.*, 308 F. Supp. 3d 831, 843 (M.D. Pa. 2018) (citing *Busk* concurrence in denying summary judgment and finding that donning and doffing coveralls, boots, and hard hats could be integral and indispensable to oil rig workers because they protect from toxic drilling mud); *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08-C-0488, 2015 U.S. Dist. LEXIS 28471, at *9 (E.D. Wis. Mar. 9, 2015) (citing *Busk* concurrence and holding that changing clothes and showering at work is "required by the nature of the work" of foundry workers if it "will significantly reduce the risk to the health of the employee").[7]

2. <u>This Court previously held that disputes of material fact prevent summary judgment on whether time spent obtaining fuel or work supplies or picking up and dropping off riggers is compensable.</u>

TNT moves for partial summary judgment "as to Plaintiffs' claims for compensation" for

---

not be purchased together with fuel or other items. (*See id.* at *14-15.) Additionally, TNT also acknowledges that Plaintiffs often obtained their water and ice from TNT's yard, (*id.* at 14), but there is no record of the frequency of Plaintiffs' stops at the yard.

[7] TNT cites *Smith v. Aztec Well Servicing Co*., 462 F.3d 1274, 1289–90 (10th Cir. 2006), for the proposition that obtaining ice and water is not integral and indispensable to a principal work activity, but *Smith* did not consider the relevance of facts such as those in the record here establishing that maintaining a supply of water and ice was a required safety measure for reasons unique to this specific work environment.

time spent on "stops to buy miscellaneous supplies like lubricants and [cleaners], to top off their 'drag tanks' with diesel fuel, or to pick up riggers." (Dkt. 24, *8.) TNT argues that these tasks "were not integral and indispensable parts of their crane operation." (*Id.*)

However, in *Repass*—which involved crane operators in TNT's Midland branch, just like the present case—this Court found that "conflicting evidence in the record creates a dispute of material fact for trial as to the activity of stopping for fuel and supplies in relation to Plaintiff's indispensable job activities." (*Repass*, Dkt. 213, *8.) The court also found that "that a genuine issue of material fact exists as to whether picking up supplies at a convenience store constitutes an integral and indispensable activity to Plaintiff's principal activities as crane operators." (*Id.*) Likewise, the Court found that "a dispute of material fact exists as to whether a crane operator commuting to work with another employee—i.e., a rigger—renders the time compensable." (*Id.* at *9.) Therefore, the Court should deny TNT's motion on these points for the same reasons.

In the event the Court decides to reexamine whether a dispute of material fact exists, Plaintiffs adopt by reference the argument and authorities presented by the plaintiffs' in *Repass* that those three activities are integral and indispensable. (*Repass*, Dkt. 164, *8-11, attached hereto as Exhibit B;[8] *see also* Dkt. 191, Mag. Judge's Report and Recommendation, *7-11 (analyzing the parties' evidence and arguments and finding "that those above-mentioned tasks are integral and indispensable to Plaintiff Repass's principal activities as a crane operator for Defendant"), *overruled by* Dkt. 213 (finding a dispute of material fact exists).)

Just as in *Repass*, TNT equipped the company trucks that they assigned to the Plaintiffs

---

[8] Page references are to the pagination in the attached exhibit. Exhibit B includes the Appendix of Undisputed Facts attached to and incorporated by *Repass* Dkt. 164, as well as the exhibits cited at Undisputed Facts 12-22 and designated as Exhibits B (Repass depo.), C (Bell 30(b)(6) depo.), D (Harrison depo.), and E (Harvey depo.) therein.

here with auxiliary "drag" or "L" tanks that the Plaintiffs were required to keep loaded with fuel in order to fuel the cranes on their jobsites.[9] Just as in *Repass*, the Plaintiffs here were also required to obtain various supplies and materials from TNT's yard or from stores or service stations.[10] And, just as in *Repass*, the Plaintiffs here were also required to transport riggers to and from their jobsites.[11]

> 3. Like in *Repass*, TNT again makes numerous false and misleading statements about the testimony in the record.

TNT claims that it "paid Plaintiffs for drive time from the TNT yard to the worksite and vice versa." (Dkt. 24, *11 (citing **TNT Ex. 10**, Coates Depo. I, 11:15-12:2; **TNT Ex. 11**, Venable Depo. I, 12:16-20, 13:18-20).) However, Coates was testifying there only about day jobs—that is, "jobs where [he] would take the crane from the yard out to a job, do the work at the job site, and then bring the crane back to the yard," which were "atypical." (**TNT Ex. 10**, Dkt. 24-11, 11:8-14.)

---

[9] (*See* Deposition of Michael Coates in *Repass*, July 30, 2021, attached as Exhibit D, 28:16-20 (fueled drag tank about every two to three days); Deposition of Michael Coates in *Coates v. TNT*, Sep. 8, 2022, attached as Exhibit E 18:13-16 ("if I wasn't going to the yard, I would have to stop and fuel up the auxiliary fuel tank on my pickup and get ice and water at a gas station"); Deposition of Daniel Venable, attached as Exhibit F, 53:1-11 (purchased fuel or obtained it from TNT's yard both for his pickup and drag tank almost every day); Deposition of Brandon Raybion in *Repass*, Aug. 20, 2020, attached as Exhibit G, 33:1-16, 46:15 – 47:19 (used drag tank to purchase fuel for crane from service stations if too far away to get fuel from TNT's yard).)

[10] (*See* (Ex. E, Coates Depo. (*Coates*), 48:6-22 (would get supplies from TNT yard, including glass cleaner, degreaser, WD-40, "lots of rags on a consistent basis," and books of various work-related forms); Ex. E, Venable Depo., 46:15-20 ("Picking up supplies was a pretty frequent thing that had to be done"; sometimes picked up supplies from yard); 50:15-18 (picked up supplies along the way to the jobsite when possible rather than going to the yard); Ex. G, Raybion Depo., 58:13-22 (unpaid travel time includes time spent getting cleaning supplies for the crane).)

[11] (*See* (Ex. E, Coates Depo. (*Coates*), 38:3-20 (listing jobs on which he had to transport a rigger); Ex. F, Venable Depo., 50:4-6 (riggers could not take their personal vehicles to the jobsite because it was against company policy); Deposition of Daniel Venable in *Repass*, June 29, 2021, attached as Exhibit H, 45:1-8 (was "mandated" or "instructed" by dispatch to pick up riggers at TNT yard for certain jobs); Ex. G, Raybion Depo., 61:17-21 (drove riggers to jobsite on some jobs and not paid for time).

Coates was clear in the same deposition that he was generally not allowed to claim on his timesheet, and did not get paid for, time spent picking up riggers, fuel, ice, or water from TNT's yard or driving from the yard to the jobsite. (**Plaintiffs Ex. D,** Coates Depo. (*Repass*), 20:4 – 21:5.) Likewise, Venable testified only that there were *some times* when he was paid for travel between the year and jobsite, which is consistent with Plaintiffs' testimony that they were paid on the occasions they drove a crane or haul truck. (**TNT Ex. 11,** Dkt. 24-12, Venable Depo. I, 12:16-20, 13:18-20).) TNT similarly omits the crucial "at times" when citing other portions of the Plaintiffs' depositions and discovery responses, suggesting that they were always paid for various tasks or categories of travel time, contrary to their actual testimony. (Dkt. 24, *11-12 (citing Plaintiffs' discovery responses and depositions at Footnotes 20-23.)

TNT also makes false and misleading statements about the Plaintiffs' testimony regarding the frequency with which they performed certain tasks. For example, TNT cites the Plaintiffs' responses to requests for admissions for the proposition that they "frequently commuted directly from their homes to the worksite, at times, without stopping at a TNT yard." (Dkt. 24, *16.) However, the Request for Admission only asked whether "there were times" when this occurred. (**TNT Exs. 7, 8**, Dkt. 24-8, 24-9, RFA No. 22, **Ex. 9**, Dkt. 24-10, RFA No. 23.)

TNT claims that "Venable has admitted that he never drove another Rigger from the Midland yard to the worksite." (Dkt. 24, *16.) That is absolutely false. The Request for Admission only asked whether Venable ever "drove another TNT rigger from TNT's Midland yard *to the rigger's job site before Venable drove to his assigned job site*." (**TNT Ex. 8**, Dkt. 24-9, RFA No. 18.)

TNT claims that "the record is clear that Plaintiffs could go weeks or even months without working on a job involving a rigger." (Dkt. 24, *26.) TNT cites Venables deposition where he

actually testifies that "there might be a month were I picked up a rigger every day and there might be a month where I didn't pick one up at all." (**TNT Ex. 14**, Dkt. 24-15, 45:22-24.)

TNT also quotes Raybion's deposition testimony that it was "very rare" that he had to add fluids to a crane (Dkt. 24, *15), but Raybion's full testimony was that he did so once every week or every other week. (**TNT Ex. 12**, Dkt. 24-13, 48:4-8.)

> 4. <u>Recent persuasive authority holds that driving coworkers under essentially the same circumstances as the present case is a principal activity.</u>

Judge Pulliam of the San Antonio Division recently issued a detailed, thoughtful opinion denying in part the defendant's motion for summary judgment in *Segovia v. Fuelco Energy, LLC*, Case Nos. SA-CV-17-1246-JKP, SA-CV-19-1129-JKP, 2022 WL 4545756 at *23 (W.D. Tex. Sept. 28, 2022). The plaintiffs in *Segovia* were oilfield fueling technicians who worked on crews of four and took turns driving a company van to transport the crew to and from their hotels or man camps and their jobsites. *Id.* at *1-2. One of the issues presented by the defendant's motion for summary judgment was whether the plaintiffs could "show that transporting co-workers is one of the tasks for which Plaintiffs were hired or whether it is integral and indispensable to the principal activities for which Plaintiffs were hired." *Id.* at *19.

The court noted that "[e]mployees may have multiple principal activities and an activity need not predominate over other activities to be considered a principal activity." *Id.* at *14 (citing 29 C.F.R. § 790.8(a)). "It is important to recognize that, 'it is not only an employee's single predominant principal activity (and activities indispensable to it) which are compensable under the F.L.S.A., but rather all principal activities and any tasks incidental to them.' " *Id.* at *15 (quoting *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976)).

"Although *Busk* 'revisited the meaning of "integral and indispensable" and offered a more precise, albeit more restrictive, view' by rejecting tests that 'focus on whether an

employer *required* a particular activity or whether the activity is for the *benefit* of the employer,' *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1370 (S.D. Ga. 2015), *Busk* does not eliminate all reliance on those factors, it simply holds that those factors alone are not determinative . . . ." *Id.*

29 C.F.R. § 785.41 states "that drivetime is worktime for some employees." *Id.* at *16. "The Department of Labor ("DOL") has stated that § 785.41 applies 'when an employee is the operator of a vehicle, or is an assistant or helper to such operator.' " *Id.* (citing *Julian v. Swift Transp. Co. Inc.*, No. CV-16-00576-PHX-ROS, 2019 WL 10948736, at *3 (D. Ariz. Dec. 10, 2019) (quoting a 1979 letter from the DOL)). "And the broad language of the regulation bears that out." *Id.* (citing 29 C.F.R. § 785.41 ("An employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding, except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer.")).

The *Segovia* court reviewed *Knowles v. United States*, 29 Fed. Cl. 393 (1993), which "specifically addresses whether employees are engaging in work when 'driving their coworkers and themselves to and from their place of employment.' " *Id.* at *17. *Knowles* found the "duty to drive others" particularly relevant while also noting the employees lacked the ability to use "the vans for their exclusive use." *Id.* (quoting *Knowles*, 29 Fed. Cl. at 395). Although noting some distinctions, the court found *Knowles* to have persuasive value. *Id.*

The court also reviewed *Scalia v. AWP, Inc.*, No. 1:18-CV-1183, 2020 WL 7639980 (W.D. Mich. Dec. 23, 2020). The *Scalia* court denied summary judgment, finding two separate disputes of material fact: "(1) whether it was part of the employee's job to pick-up and transport passengers, and if not, (2) whether 'transporting a partner [was] integral and indispensable' to the employee's

principal activity." *Segovia*, 2022 WL 4545756 at *18 (quoting *Scalia*, 2020 WL 7639980 at *3). The *Segovia* court found one distinguishing feature in *Scalia*—"Unlike the employees in *Scalia*, Plaintiffs [in *Segovia*] had no need to travel to pick up or drop off any co-worker. Defendant housed all crew members at the same hotel." *Id.* Like *Scalia*, and unlike *Segovia*, the Plaintiffs in the present case were required to drive to TNT's yard or other locations to pick up and drop off their riggers, which strengthens *Scalia*'s persuasive value for this case.

TNT relies on *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1288 (10th Cir. 2006). However, *Segovia* distinguished *Aztec* for reasons that apply equally here: in *Aztec*, "the carpooling occurred in an employee vehicle rather than a company vehicle" and "employees carpooled 'because it was more convenient and less expensive than driving alone.' " *Segovia*, 2022 WL 4545756 at *18. The court emphasized that "Defendant did not provide the van transportation merely for the convenience of the employees. Nor did any employee have the option to use his own transportation." *Id.* at 19.

Likewise, neither the Plaintiffs here nor the riggers could use their own transportation. That is because personal vehicles were not allowed on TNT's jobsites for "liability and reliability" reasons. (**Ex. B**, *10 (citing Undisputed Fact 20 (quoting deposition of TNT Midland Branch Manager John Harrison, *122, 76:3-9)).) TNT often required crane operators to pick up and drop off riggers at TNT's yard and transport them to the jobsite because TNT did not provide riggers with company vehicles. (**Ex. B**, *10 (citing Undisputed Fact 21 (quoting Deposition of Midland crane operator Timothy Repass, *40, 58:2 – 60:17; Deposition of TNT Corporate Representative Antoy Bell, *73, 104:2-18; *83-84,130:10 – 131:7; Harrison Depo., *122, 76:10-22.)

The court concluded that "[u]nder the facts, a reasonable jury could find that Defendant hired Plaintiffs for a variety of tasks, including driving co-workers to and from jobsites. Viewing

the facts in the light most favorable to Plaintiffs, driving the company van to transport co-workers was part of the regular work of the employees in the ordinary course of business. Such work was necessary to Defendant's business, and it was undertaken primarily for the benefit of Defendant in the ordinary course of that business." *Segovia*,  2022 WL 4545756 at *20. "Thus, for a morning driver transporting his fellow co-workers from the hotel, his workday would commence no later than the commencement of the drive." *Id.* (footnote omitted).

For the same reasons set forth at length in *Segovia*, there is ample evidence in this case from which a jury could conclude that the Plaintiffs' work transporting riggers to and from their jobsites is one of the principal activities TNT hired them to perform. Therefore, the Court should deny TNT's motion on that additional basis.

### C.  The travel time at issue is compensable for other reasons as well.

Even if one or more of the activities addressed in TNT's motion were not integral and indispensable to the Plaintiffs' principal activities, there still remains a fact dispute as to whether the travel is compensable.

1.  <u>Driving TNT's company pickups is integral and indispensable because the pickups were used as tools for work on the jobsites.</u>

While driving a vehicle that is used solely for commuting may not be compensable absent other compensable work activities, driving a vehicle that is used as a tool to perform the work is itself a principal activity. *See D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir. 1958) ("employees who transport equipment without which well servicing could not be done, are performing an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities"); *Depew v. Mobile Dredging and Pumping Co.*, CV 15-03080-JMC, 2017 WL 1382307, at *8 (D. Md. Apr. 18, 2017) (plaintiffs were "not using [company] vehicles merely as a means of

getting to the jobsite. Rather . . . . some of the vehicles themselves appear to have had special functionality and, therefore, may have been used as 'tools' at the Blue Plains facility to complete certain projects"); *Segovia*, 2022 WL 4545756 at *23 (distinguishing *Depew* on the basis that "[t]he vehicle here was a normal passenger van, not any type of vehicle that had any special functionality to be used on the jobsite").

The Plaintiffs in this case did not use their company pickup trucks only to commute to and from their jobsites. As discussed above, they used the pickups to transport fuel in specialized auxiliary "drag" or "L" tanks that TNT had installed on the pickups for the purpose of fueling cranes on the jobsite. Additionally, the Plaintiffs' company pickups served as mobile offices with particular functionality that was necessary to perform their work. (Declaration of Michael Coates, attached as Exhibit C, ¶ 6.) The Plaintiffs spent most of the hours of most of their shifts inside their company pickups, and they kept the pickups running most of the shift in order to provide air conditioning or heat in the harsh desert environment, as well as for electric power for the cell phones and tablets they used for work. (*Id.*) That is because the majority of the time on oilfield jobsites the crane is holding something attached to the well and not actively moving anything. (*Id.* at 7.) During the majority of the time on most shifts, the Plaintiffs' job entailed waiting to be called to action, while intermittently cycling the crane on and off at set intervals. (*Id.*) For safety reasons, TNT's customers usually did not permit Plaintiffs to be in the crane or within a certain radius of the wellsite when the Plaintiffs were not actively operating the cranes. (*Id.* at 8.) The Plaintiffs were expected to maintain continuous contact throughout the day by phone and email with TNT and with the customer representatives on the jobsite about their job status and work instructions. (*Id.* at 9.) In order to do so, the crane operators installed cell phone signal boosters on their company pickups because their cell phones did not have a strong enough signal on many remote

oilfield jobsites. (*Id.*) The cell phone signal boosters were wired into and permanently attached to the company pickups, so the Plaintiffs had to be in or near the company pickup in order to use the booster. (*Id.*) Without the cell phone signal booster, the Plaintiffs could not effectively communicate on many jobs. (*Id.*) The Plaintiffs' company pickup trucks also were their only available source of air conditioning, heat, and shelter from the elements when they were not actively operating the cranes. (*Id.* at 10.) There was not enough space, nor were the Plaintiffs allowed to use the other companies' structures or vehicles, apart from momentary visits, if necessary. (*Id.*)

TNT paid its crane operators anytime they were driving cranes, haul trucks, or other commercial vehicles. (Dkt. 24, *11.)); *see also Segovia*, 2022 WL 4545756 at *11 (defendant did not pay plaintiffs overtime for driving company vans, but did pay "the overtime rate when they're headed to a job with the commercial vehicles"). Presumably, TNT did so because transporting the crane to a jobsite is unquestionably integral and indispensable to operating the crane. Likewise, driving a haul truck to transport the crane rigging equipment and counterweights is integral and indispensable to operating cranes. Similarly, since the Plaintiffs used their company pickup trucks not merely for commuting purposes, but also as a necessary piece of equipment that served as their mobile office, communications hub, shelter, and source of air conditioning or heat throughout their work shifts, driving the pickup was also integral and indispensable to the activity of operating cranes. *See Segovia*, 2022 WL 4545756 at *19 (finding the fact that the defendant employer paid the plaintiffs for some drive time provided "some support" on the issue of whether drive time was compensable).

2. Fueling pickups in order to run them for hours for work purposes on the jobsite is integral and indispensable, and not incidental to commuting.

Even if driving the pickup were not itself considered integral and indispensable to a

principal activity, fueling the vehicle in order to run it throughout the shift on the jobsite for work purposes, rather than solely for commuting, is an integral and indispensable work task. (*See* Deposition of TNT Corporate Representative Antoy Bell in *Repass v. TNT*, July 15, 2020, 34:21 – 35:20, attached hereto as Exhibit I (agreeing that loading fuel is a task that would start the continuous workday if it is the first work performed and the fuel is necessary to perform the crane operators' work).)

### D.  A dispute of material fact exists on the bounds of the "normal commuting area" under the ECFA.

TNT argues that "Plaintiffs' use of a company truck does not transform their commuting time into compensable time." (Dkt. 24, \*20.) As TNT notes, generally, under the Portal-to-Portal Act of 1947, "an employee's commute to and from work is non-compensable." (*See* Dkt. 24, \*19.) Under the Employment Commute Flexibility Act ("ECFA"), commuting to and from work and engaging in activity incidental to the commute—which is not compensable under the Portal-to-Portal Act—is not rendered compensable by virtue of using a company vehicle "if two conditions are met. . . . the use of the vehicle and incidental activities must be (1) 'for travel that is within the normal commuting area for the employer's business or establishment'; and (2) 'subject to an agreement on the part of the employer and the employee or representative of such employee.' " *Chambers v. Sears Roebuck and Co.*, 428 Fed. Appx. 400, 410 (5th Cir. 2011) (unpublished) (quoting 29 U.S.C. § 254(a)). In other words, if the ECFA's two conditions are not met, the use of company vehicle renders commute time compensable even though it would not otherwise be compensable under the Portal-to-Portal Act.

The parties agree that the use of the Plaintiffs' work trucks was subject to an agreement. However, the bounds of the "normal commuting area," for ECFA purposes, is a fact question that remains in dispute. TNT notes that "[t]he phrase, 'normal travel,' is not an objective standard of

how far most workers commute or are reasonably expected to commute but rather 'a subjective standard, defined by what is usual within the confines of a particular employment relationship.' " (Dkt. 24, *21 (quoting *Johnson v. RGIS Inventory Specialists*, 554 F. Supp. 2d 693, 703 (E.D. Tex. 2007) (quoting *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 272 (2d Cir. 1999)). For example, in *Chambers*, "Sears conducted studies of employee commutes before establishing a thirty-five minute commute time." 428 Fed. Appx. at 411.

The Fifth Circuit in *Chambers* approvingly cited guidance from the Department of Labor that, under the ECFA, commuting in a company vehicle would not need to be compensated unless "the time involved is extraordinary." *Id.* (quoting U.S. Dep't Lab. Op. Ltr. (January 29, 1999).)

> For example, where a field engineer's commute to the first job site in the morning takes four hours, we would consider the greater portion of travel time compensable under the principles described in 29 C.F.R. § 785.37. That rule allows a portion of the total commute time to be considered non-compensable home-to-home travel. If the employer treated three of the four hours as compensable travel, we would not question such practice.

*Id.* Thus, *Chambers* summarized the DOL guidance as holding "that commute times of up to one hour would comply with" the ECFA. *Id.*

Even if the Court were to find that the normal commuting area can extend beyond an hour in this case, there is evidence from which a jury could conclude that the normal commuting area is no more than an hour and twenty minutes. TNT's corporate representative Antoy Bell testified that he does not think TNT's Midland branch has a normal commuting area, but that one hour and twenty minutes is about the longest time that crane operators would ever drive from TNT's yard to a jobsite. (Deposition of TNT Corporate Representative Antoy Bell in *Sanchez v. TNT*, Sep. 14, 2022, attached hereto as Exhibit J, 47:13-24.) Bell testified that if a job is located more than an hour and twenty minutes from TNT's Midland yard, TNT provides lodging within an hour and twenty minutes of the jobsite. (*Id.* at 48:4-13.) However, Bell clarified that one hour and twenty

minutes is not the normal commuting area; it is *longer than normal.* (*Id.* at 49:2-13.) Therefore, there is ample evidence to support a jury's finding that TNT's normal commuting area is no more than an hour and twenty minutes, and possibly no more than an hour.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Partial Summary Judgment.

Respectfully submitted,

**FAIR LABOR LAW**

By:  */s/ Aaron Johnson*
Aaron Johnson
State Bar No. 24056961
ajohnson@fairlaborlaw.com
314 E. Highland Mall Blvd, Ste. 401
Austin, Texas 78752
Ph: (512) 277-3505
Ph: (512) 277-3254

**MORELAND VERRETT, P.C.**
Edmond S. Moreland, Jr.
State Bar No. 24002644
edmond@morelandlaw.com
Daniel A. Verrett
State Bar No. 24075220
daniel@morelandlaw.com
700 West Summit Drive
Wimberley, Texas 78676
Ph: (512) 782-0567
Fax: (512) 782-0605

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2022, I electronically submitted the foregoing document for filing using the Court's CM/ECF system, which will serve a true and correct copy of the foregoing document upon counsel of record.


<u>*/s/ Aaron Johnson*          </u>
Aaron Johnson