# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **TIMOTHY W. REPASS and WILLIAM SCOTT McCANDLESS, Individually and On Behalf of All Others Similarly Situated,** | § § § § § | **Civil Action No.** |
| **Plaintiffs,** | § § | **7:18-CV-107-DC-RCG** |
| **v.** | § § | |
| **TNT CRANE AND RIGGING, INC.** | § § | |
| **Defendant.** | § | |

**<u>PLAINTIFFS' CORRECTED RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Before the Court is Defendant TNT Crane and Rigging Inc.'s Motion for Partial Summary Judgment. (Dkt. 163.) Plaintiffs filed their Response in Opposition to Defendant's Motion on October 26, 2021. (Dkt. 172.) This Corrected Response corrects several nonsubstantive typographical errors and changes the designation of one of Plaintiff's exhibits—Job Safety Analysis forms—from Exhibit O to Exhibit Z. (See *infra*, 13 n. 7.) That exhibit was missing from Plaintiff's original Response and is attached here. Plaintiffs incorporate by reference the exhibits and the Index of Exhibits and Appendix of Undisputed Facts attached to their original Response. (Dkt. 172-1 – 172-26.) Plaintiffs request that the Court deny TNT's Motion and Plaintiffs show the following in support:

## **Table of Contents**

I.  INTRODUCTION ........................................................................................................ 1

II.  ARGUMENT AND AUTHORITY ............................................................................ 1

A.  Willfulness ........................................................................................................... 1

1.  Liability and willfulness in a collective action can be established by multiple policies or practices that violate the FLSA, rather than only one single policy. .................................. 2

2.  There is compelling evidence that TNT willfully violated the FLSA with regard to each of the policies and practices at issue in this case. ................................................................. 2

a.  TNT maintained and enforced policies at each branch not to pay its crane operators under certain circumstances for certain preparatory and concluding tasks and travel time that it knew to be compensable under the FLSA. ............................................................... 4

b.  TNT instructed Plaintiffs not to record compensable work time and TNT cut Plaintiffs' time when they did record it. ........................................................................... 6

c.  TNT failed to make an adequate inquiry into whether it was in compliance with the FLSA, even after receiving complaints about the unpaid compensable work. ................... 7

B.  Purchasing and Loading Water and Ice ............................................................... 8

1.  TNT has not met its initial burden for summary judgment because it has not identified any evidence that Plaintiffs ever purchased *only* water and ice. ............................................. 8

2.  Purchasing and loading water and ice was integral and indispensable to the Plaintiffs' principal activities of operating cranes for long shifts in the heat without access to drinking water on remote oilfield and construction sites. ................................................................. 11

3.  The time Plaintiffs spent purchasing and loading water, ice, fuel and other work materials was not *de minimis*. ............................................................................................. 14

a.  TNT's argument of administrative difficulty fails because Plaintiffs could easily and sometimes did record the time spent purchasing water, ice, fuel, and other materials on their time sheets. ............................................................................................................... 14

b.  The time spent purchasing ice, water, fuel, and other supplies, in the aggregate, is more than de minimis. ...................................................................................................... 16

c.  TNT required Plaintiffs to purchases water and ice with company credit cards as a regular work assignment. ............................................................................................... 18

III.  CONCLUSION ......................................................................................................... 18

## I.  **INTRODUCTION**

TNT moves for partial summary judgment requesting a ruling that 1) Plaintiffs' cannot prove that TNT willfully violated the FLSA and 2) a finding that "Plaintiffs' travel time claims arising out of Plaintiffs' purchasing ice and water . . . is not compensable and/or is otherwise *de minimis.*" (Dkt. 163, 1.) TNT's motion must be denied. First, there is ample evidence that TNT knew that its policies and practices violated the FLSA. When an employer violates the FLSA through multiple unlawful policies and practices, as TNT did here, plaintiffs in a collective action are not required to show that only one single illegal policy applied to every single class member in order to establish either liability or willfulness.

Second, TNT has not met its initial burden of identifying any evidence that it believes demonstrates the absence of a fact issue with regard to the Plaintiffs' purchases of water and ice. There is no evidence that the Plaintiffs ever stopped to purchase *only* water or ice. In fact, the evidence proves that the Plaintiffs purchased water and ice together with fuel and other materials required to maintain their cranes, which undisputedly makes the stop a compensable work activity. Moreover, TNT has not pointed to any evidence regarding the amount of time it maintains that these tasks took to perform; and there is thus no evidence that the time was *de minimis*. Regardless, even if any TNT crane operators purchased only water or ice on some stops, that activity is integral and indispensable to their work under the particular circumstances of their employment, and it cannot be disregarded as *de minimis.*

## II. **ARGUMENT AND AUTHORITY**

### A.  **Willfulness**

TNT moves for judgment on Plaintiffs' claim that TNT willfully violated the FLSA, which would limit the statute of limitations to two years rather than three. (Dkt. 163, 20.)

**1. Liability and willfulness in a collective action can be established by multiple policies or practices that violate the FLSA, rather than only one single policy.**

TNT's motion on willfulness is based on the minor variances (which TNT repeatedly exaggerates) in the policies and practices in question among the three branches covered by this lawsuit and the fact that not every Plaintiff experienced every permutation of those policies and practices. Even though such variances are typical in collective actions, TNT concludes that "[i]t is not possible for Plaintiffs to establish, *on a class/representative basis*, a singular treatment of them or that that treatment was violative of the FLSA, much less that TNT willfully violated the FLSA across the class with respect to that treatment." (Dkt. 163, 10 (emphasis TNT's.)

However, TNT cites no authority for this sweeping conclusion, undoubtedly because there simply is none. Collective actions often involve multiple, overlapping illegal policies or practices, and there is no requirement that every class member have experienced one single policy in exactly the same way in order to proceed to trial on a collective basis with regard to liability, willfulness, or any other element of the claims.[1] In addition, decertification of a collective action simply means that the differences in the class members' situations overwhelm their similarities to a degree that a court, in its discretion, believes that trial on a collective basis is not the most practical case management tool. It does not mean that none of the class members can prove liability, willfulness, or any other element of their claims.[2]

**2. There is compelling evidence that TNT willfully violated the FLSA with regard to each of the policies and practices at issue in this case.**

An FLSA violation is willful if the employer "knew or showed reckless disregard for the

---

[1] TNT's underlying argument is the same one it makes in its Motion to Decertify (Dkt. 162). Plaintiffs address TNT's arguments about collective treatment in response to TNT's Motion to Decertify, which they incorporate by reference herein under Federal Rule of Civil Procedure 10(c).

[2] For this reason, in the event the Court grants TNT's motion to decertify, it must deny TNT's motion for partial summary judgment because willfulness would then need to be determined on an individual basis.

matter of whether its conduct was prohibited by the statute." *Mohammadi v. Nwabuisi,* 605 Fed. Appx. 329, 332 (5th Cir. 2015) (quoting *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)). Willfulness may be established by evidence that the defendant was "aware that the FLSA governed and affirmatively attempted to avoid complying therewith." *Mohammadi v. Nwabuisi*, 171 F. Supp. 3d 545, 551 (W.D. Tex. 2016), *aff'd*, 673 Fed. Appx. 443 (5th Cir. 2017).

*Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979 (W.D. Tenn. 2011) is instructive here. In that case, the court denied the defendant's motion for summary judgment on willfulness under facts strikingly similar to the facts here. In *Monroe*, the defendants argued "that because Plaintiffs received compensation in accordance with the timesheets Plaintiffs admit they submitted, any FLSA violation would not be willful." *Id.* at 991. "Defendants additionally argue[d] that they have shown that they had in place a series of measures to guarantee FLSA compliance, including a written policy to pay all overtime due, individual and group training for managers on how to ensure that overtime is properly recorded, instruction for technicians on filling out timesheets." *Id.*

The court rejected the defendant's argument and held that "the existence of written policies setting forth proper rules for the payment of overtime does not itself immunize an employer from a finding that the employer willfully violated the FLSA." *Id.* (citing *Reich v. Dep't of Conservation & Nat'l Res.,* 28 F.3d 1076, 1083 (11th Cir.1994); *Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 288–89 (2d Cir.2008); 29 C.F.R. § 785.13 ("[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed....The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.")). Additionally, the plaintiffs "offered substantial evidence that supervisors instructed technicians to omit overtime from their timesheets and otherwise understate their hours" and "that supervisors adjusted hours recorded by technicians to eliminate overtime pay." *Id.* at 991-92. The court found that "[s]uch

evidence suggests the possibility of a company culture in which written policies on overtime were disregarded as a matter of course," which would support a finding at trial of willfulness. *Id.* at 992; *see also Perez v. El Tequila, LLC*, 847 F.3d 1247, 1256 (10th Cir. 2017). This case is very similar to *Monroe*.

> a. *TNT maintained and enforced policies at each branch not to pay its crane operators under certain circumstances for certain preparatory and concluding tasks and travel time that it knew to be compensable under the FLSA.*

Before driving to their jobsites or after driving back, the Plaintiffs routinely performed one or more compensable work tasks that are "principal activities," including: (1) filling or topping off an auxiliary "drag" (or "L") tank with crane fuel (**Undisputed Fact 12.**);[3] (2) loading other equipment and materials, such as Diesel Exhaust Fluid (DEF), grease, and cleaning products needed to maintain their cranes (**Undisputed Fact 13**); and (3) picking up or dropping off riggers who worked with the crane operators on the jobsite. (**Undisputed Fact 14.**)[4]

TNT's corporate representative and managers from each branch admit that they have known throughout the relevant time period that most of the preparatory and concluding tasks at issue and the corresponding travel time that falls within the continuous workday are compensable work under the FLSA. TNT's designated corporate representative, Antoy Bell, who is both a licensed attorney and TNT's Human Resources Director, agrees that obtaining and loading fuel and materials needed for the job at its yards or at services stations is compensable work. (**Undisputed Fact 35.**) Consequently, Bell claims he advised TNT's Midland, San Antonio, and

---

[3] Plaintiffs incorporate by reference their attached Index of Exhibits and Appendix of Undisputed Facts citing to the deposition transcripts and evidence in the summary judgment record, which are also attached as exhibits.

[4] These facts and a discussion of the "continuous workday rule" are set out in detail in Plaintiffs' Motion for Partial Summary Judgment (Dkt. 164), Section II(C), which Plaintiffs incorporate by reference herein under Federal Rule of Civil Procedure 10(c).

Houston Branch Managers that TNT was legally obligated to compensate crane operators for travel from TNT's branch yards to jobsites without exception. (**Undisputed Fact 36.**) Yet it is undisputed that TNT did not do so. Midland Branch Manager John Harrison testified that he understands the continuous workday rule and agrees that loading diesel in an auxiliary ("L") tank and other equipment onto a truck is work time. (**Undisputed Fact 37.**) Likewise, in his role as San Antonio Branch "time approver," Todd testified that he understands the law requires TNT to pay crane operators for their travel time when it falls between other compensable work tasks, but admits that TNT did not, under its written policy, pay for that time under certain circumstances. (**Undisputed Fact 9, 38, 39.**) Houston Branch Manager Alex "Bubba" Murray also testified that he has understood throughout his tenure that the FLSA applies to TNT, that the time crane operators spend loading fuel into auxiliary "drag" tanks or loading supplies needed for work are compensable tasks that can start and end the workday, and that travel within the continuous workday must be paid. (**Undisputed Fact 40.**)

Like the defendant in *Monroe*, TNT claims that its "baseline corporate policies are lawful" and in some corporate policies it purports to pay more than is required by the FLSA. (Dkt. 163, 5-6.) However, TNT's actual practices establish gaping exceptions to TNT's assertion. In fact, TNT maintained policies that violate the FLSA on their face. In particular, TNT issued and followed written and unwritten policies that it would not pay its crane operators for any travel time to and from their jobsites on certain jobs and under certain circumstances, depending mainly on whether TNT's customer paid for the travel time. (*See* **Undisputed Facts 23-30**.)[5]

---

[5] These policies are discussed in greater detail in Plaintiffs' Motion for Partial Summary Judgment (Dkt. 164), Section II(A)(2)(d), which Plaintiffs incorporate by reference. TNT repeats in its Motion for Partial Summary Judgment many of the misstatements of its pay policies and practices and of the Plaintiffs testimony that it made in its Motion to Decertify. Plaintiffs incorporate by reference their Response to TNT's Motion to Decertify, which discusses and corrects many of TNT's numerous misstatements of the record.

   b. *TNT instructed Plaintiffs not to record compensable work time and TNT cut Plaintiffs' time when they did record it.*

Also like the defendant in *Monroe*, TNT suggests it had no way of knowing that crane operators were performing compensable tasks if they did not record the tasks on their time sheets. (*See* Dkt. 163, 8.) However, TNT knew the crane operators had to procure fuel, materials to maintain their cranes, water, and ice, as well as pick up riggers at TNT's instruction on a daily or near daily basis. Even if TNT did not specifically instruct the Plaintiffs to report to the yard on a particular day to pick up a rigger or particular materials or equipment, TNT's managers uniformly "expected" them to stop at the yard or service station on the way to or from their jobsites as often as needed to stock up on fuel and other materials needed to maintain their cranes in good working order. (**Undisputed Facts 16 and 17.**) TNT issued the Plaintiffs company credit cards to purchase those items needed for the job. (**Undisputed Fact 18.**)

Additionally, like the defendant in *Monroe*, TNT admits it instructed and expected Plaintiffs not to record on their time sheets the travel and other work tasks that it refused to compensate under its policies. (**Undisputed Fact 32.**) Although it fails to apprise the Court of this fact in its briefing, TNT's written policies specifically instruct Plaintiffs not to claim time on their time sheets that TNT's policies do not allow. (*E.g.*, **Ex. K**, TNT 005596-97, 005598, Travel Policy Memos ("THE EMPLOYEE **CANNOT** CHARGE TRAVEL TO PAYROLL IF CUSTOMER IS **NOT** CHARGED TRAVEL." (emphasis in original)).

TNT suggests that, despite its emphatic instructions not to record compensable time, if a crane operator were to specifically note clearly compensable work tasks on his time sheet, it would pay it. (*See* Dkt. 163, 8.) However, and to the contrary, TNT's managers admit that even if a crane operator claimed time that was not allowed under TNT's policies, they would (and did) cut it from their time sheets. (**Undisputed Fact 33.**)

TNT also claims that the time sheets included instructions that "reminded them to report all time they spent traveling and performing any pre or post-trip activities and fueling." (Dkt. 163, 8.) However, TNT used many different versions of time sheets, most of which did not include that instruction. (*See*, **Ex. N,** sample of various versions of time sheets.) More importantly, that instruction, coupled with TNT's admonition not to charge for travel time and any compensable tasks before traveling to the jobsite or after traveling back, meant the Plaintiffs were often only allowed to claim that time they spent at their jobsites under TNT's policies; and the Plaintiffs generally followed these instructions. (**Undisputed Fact 32.**)

    c.   *TNT failed to make an adequate inquiry into whether it was in compliance with the FLSA, even after receiving complaints about the unpaid compensable work.*

A plaintiff may prove willfulness by showing that the defendant "had notice of the possibility that their pay policies may have violated the FLSA, but continued to recklessly disregard the possibility that its policies violated the law." *Mohammadi*, 171 F. Supp. 3d at 551. "Reckless disregard of the requirements of the [FLSA] means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104; *Miller v. Centerfold Ent. Club, Inc.*, No. 6:14-CV-6074, 2017 WL 3425887, at *7 (W.D. Ark. Aug. 9, 2017). "An employer's violation of the FLSA is willful when it is on notice of its FLSA requirements, yet takes no affirmative action to assure compliance with them." *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (cleaned up). Failure to seek legal advice after being put on notice that pay practices might violate the FLSA can also demonstrate willfulness. *See id.*; *Mohammadi*, 605 Fed. Appx. at 332. Evidence of notice of possible FLSA violations includes evidence that employees complained or "communicated to Defendant[ ] that [they] believed [they were] not being paid fully." *Mohammadi*, 171 F. Supp. 3d at 551; *see also Mohammadi,* 605 Fed.Appx. at 332 ("[E]mployers act willfully when they . . . ignore complaints brought to their attention.").

It is undisputed that crane operators complained to TNT management numerous times about not being paid travel time under TNT's policies. (**Undisputed Fact 41.**) Nevertheless, TNT did not take any proactive steps to investigate whether its policies violated the FLSA following those complaints. (**Undisputed Fact 42.**) TNT never sought legal advice from any outside counsel to determine whether it was in compliance with the FLSA. (**Undisputed Fact 43.**) And TNT cannot identify any particular legal authority it reviewed on its own to determine whether its policies were in compliance with the FLSA. (**Undisputed Fact 44.**) The Court should deny TNT's motion seeking to dismiss the Plaintiffs' claims that TNT willfully violated the FLSA.

**B.** <u>**Purchasing and Loading Water and Ice**</u>

**1.  TNT has not met its initial burden for summary judgment because it has not identified any evidence that Plaintiffs ever purchased *only* water and ice.**

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[E]ven when the non-movant bears the burden of proof at trial, simply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case." *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993) (cleaned up). "A party asserting that a fact cannot be . . . genuinely disputed must support the assertion" in one of three ways: 1) by "citing to particular parts of materials in the record;" 2) by "showing that the materials cited do not establish the . . . presence of a genuine dispute;" or 3) by showing "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

TNT's seeks partial summary judgment "on Plaintiffs' travel time claims arising out of

Plaintiffs' purchasing ice and water, finding that the time spent is not compensable and/or is otherwise *de minimis*." (Dkt. 163, 1.) TNT frames the question at issue as "whether plaintiffs' purchasing ice and water at convenience stores during their commutes renders that time compensable" (*id.* at 15), and claims that "Plaintiffs . . . cannot prove that the time they spent purchasing ice and water during their commuting is compensable." (*Id.* at 2.)

TNT's argument here is premised on its implied assertion that the Plaintiffs made stops to purchase *only* ice and water. However, in the testimony that TNT cites, *none* of the Plaintiffs indicates that he made stops to purchase *only* water and ice. Instead, the testimony is that they made stops to purchase fuel, water, ice, and other materials needed for their cranes; and in some of the cited testimony, they did not obtain water or ice *at all*. Moreover, there is no indication of the *amount* of time each Plaintiff spent performing the tasks that TNT incorrectly claims they performed. This is important because if TNT makes the argument that the time spent was *de minimis*, it must quantify that time for the Court.

TNT first contends that Baete "testified that he was always paid for a half-hour pre-trip time with his ice purchase falling within that time." (Dkt. 163, 11.) Baete's testimony is about times when he conducted a pre-trip inspection at TNT's yard and he explains that "while [he was] fueling the tank, [he was] able to get the ice within this half an hour." (**TNT Ex. 24,** Dkt. 163-30, Baete Depo., 70:22-25.) Nothing in that testimony supports TNT's contention that he ever stopped to purchase *only* water or ice. TNT next contends that Grimes testified that "when he was in Midland he was paid for the time to purchase ice; i.e., for his entire commute[.]" (Dkt. 163, 11). However, Grimes testified that he was obtaining not just ice, but also fuel and "tools or whatever you need for the job." (**TNT Ex. 3,** Dkt. 163-6, 14:7-18.) As if actively misstating his testimony were not enough, TNT misleadingly takes one portion of Grimes' testimony out of context. Grimes later clarified that his testimony about being paid for travel and obtaining fuel, water, and other

work materials was *what he was told* would be the policy when he was hired. (**Undisputed Fact 45.**) However, he was actually only paid for that time for his first week or so on the job in Midland, after which he sometimes was paid only a portion of his actual travel time and sometimes he was not paid for his travel time at all. (*Id.*)

TNT claims that Nixon "testified that he was sometimes paid for the time it took to stop for ice and water, specifically that he was paid if the job had travel time included[.]" (Dkt. 163, 11.) But the testimony that TNT cites at pages 20-21 does not say anything about ice or water. (*See* **TNT Ex. 25,** Dkt. 163-31, 20-21.) At page 47, Nixon is asked about time spent getting ice, but it is in the context of his testimony about getting "fuel, and ice, water." (*Id.* at 46:17.) While the testimony at page 47 stands for the uncontroversial proposition that Nixon was paid for obtaining ice and other items "if the job had travel time included in the deal[,]" i.e., if the customer was paying for it (lines 5-6), Nixon also testified that "that was part of [the operators'] daily routine, and sometimes [they] didn't get paid for it," (*id.* at 47:1-2.). He also testified that San Antonio "timekeeper" Todd Stevens "told [him] not to put down time on [his] time sheet for gathering ice *and fuel*[.]" (*Id.* at 46:5-7 (emphasis added), Doc. 163-31, 11.) TNT contends that "Ochoa testified he was sometimes paid for ice and water purchases[.]" (Dkt. 163, 11.) But Ochoa does not mention ice or water at all at pages 57-58. (**TNT Ex. 13,** Dkt. 163-16.) Moreover, Ochoa actually testifies on the very next page of his deposition that "he was always told that [he] was supposed to be [paid]" for "stopping at gas stations or truck stops to get supplies[,]" including ice; but that he was, in fact, not paid for stopping to get supplies. (*Id.* at 59:4-20). TNT claims that "Ward testified whether he was paid depended on whether he obtained ice at the yard or purchased it[.]" (Doc. 163, 11.) However, in the excerpt TNT cites, Ward specifically testified about whether he was paid for "fill[ing] up the drag tank [with fuel], maybe get ice and water." (**TNT Ex. 12,** Dkt. 163-15, 19:18-19.) Finally, TNT maintains that "Raybion and Payne testified that they there were not paid

for this time." (Doc. 163, 11.) It is true that Raybion testified he was not paid for time spent obtaining supplies; but he never testified that he ever stopped to purchase *only* ice or water. (**TNT Ex. 5,** Dkt. 163-8, 64:8-65:22, Doc. 163-8, 10-11.) In the excerpt cited by TNT, Payne testified that he was not paid for fueling his truck or filling his drag tank with fuel, but he was not asked about and did not testify about ice or water at all. (**TNT Ex. 11,** Dkt. 163-14, 19.)

### 2. Purchasing and loading water and ice was integral and indispensable to the Plaintiffs' principal activities of operating cranes for long shifts in the heat without access to drinking water on remote oilfield and construction sites.

Assuming *arguendo* that TNT has raised the issue in a way that the Court can properly consider on summary judgment, under the facts of this case, purchasing and loading water and ice is a compensable task because it is integral and indispensable to the Plaintiffs' principal activities.

The integral and indispensable "inquiry is fact-intensive and not amenable to bright-line rules." *Llorca v. Sheriff, Collier Cty.*, 893 F.3d 1319, 1324 (11th Cir. 2018); *accord Perez v. City of N.Y.*, 832 F.3d 120, 124 (2d Cir. 2016) ("this standard is markedly "fact-dependent,"). "No categorical list of 'preliminary' and 'postliminary' activities except those named in the Act can be made, since activities which under one set of circumstances may be 'preliminary' or 'postliminary' activities, may under other conditions be 'principal' activities." 29 C.F.R. § 790.7(b).

"As both Department of Labor regulations and [Supreme Court] precedent make clear, an activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity **_safely_** and effectively." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37-38 (2014) (Sotomayor, J., concurring) (emphasis added) (citing 29 CFR §790.8(c); *Steiner* v. *Mitchell*, 350 U.S. 247, 250-253 (1956);

*Mitchell* v. *King Packing Co.*, 350 U.S. 260, 262-263 (1956)).[6] Although the fact that the employer requires the employee to perform the task is not alone sufficient, it can indicate that the activity is integral and indispensable. *See Perez*, 832 F.3d at 124 ("[t]he more the [pre-or post-shift] activity is undertaken for the employer's benefit, . . . the more likely such work will be found to be compensable.")

The Plaintiffs could not perform their jobs safely or effectively without maintaining a constant supply of water and ice because they worked long shifts at remote oilfield locations and construction sites, usually without access to drinking water. Many of the Plaintiffs' jobsites were in remote areas of the desert and semi-desert Permian Basin and other high-temperature climates in South and Southeast Texas. These conditions present a heightened danger of heat exhaustion and dehydration. As a result, TNT considered stocking up on water and ice to be necessary in order to safely and effectively perform the work of operating cranes on long shifts in remote locations.

---

[6] "Thus, although a battery plant worker might, for example, perform his principal activities without donning proper protective gear, ***he could not do so safely***" (*id.* (citing *Steiner*) (emphasis added)); "likewise, a butcher might be able to cut meat without having sharpened his knives, but he could not do so effectively." *Id.* (citing *King Packing*). By contrast, in *Busk*, "the employees could skip the [security] screenings altogether ***without the safety or effectiveness of their principal activities being substantially impaired***." *Id.* (emphasis added); *accord Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1278-79 (10th Cir. 2020) (citing *Busk* concurrence and finding security screening of detention officers was integral and indispensable because without them "officers could inadvertently or intentionally bring weapons or other contraband into the prison" and "an officer cannot safely and effectively maintain 'custody and discipline of inmates' and 'provid[e] security' " if that were to happen); *Tyger v. Precision Drilling Corp.*, 308 F. Supp. 3d 831, 843 (M.D. Pa. 2018) (citing *Busk* concurrence in denying summary judgment and finding that donning and doffing coveralls, boots, and hard hats could be integral and indispensable to oil rig workers because they protect from toxic drilling mud); *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08-C-0488, 2015 U.S. Dist. LEXIS 28471, at *9 (E.D. Wis. Mar. 9, 2015) (citing *Busk* concurrence and holding that changing clothes and showering at work is "required by the nature of the work" of foundry workers if it "will significantly reduce the risk to the health of the employee"); *Vanhoose v. Waupaca Foundry*, No. 1:17-cv-248, 2018 U.S. Dist. LEXIS 238096, at *16 n. 4 (E.D. Tenn. Jan. 23, 2018) (citing and agreeing with *Dekeyser*); *McAnally v. Ala. Plumbing Contractor*, No. 2:19-cv-02033-RDP, 2021 U.S. Dist. LEXIS 115144, at *11 (N.D. Ala. Apr. 22, 2021) (quoting relevant portion of *Busk* concurrence); *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1371 (S.D. Ga. 2015) (same).

Houston Branch Manager Alex "Bubba" Murray testified that TNT "instructed [crane operators] to keep stocked with ice and water daily so they could hydrate well" and paid for their water and ice because TNT "considered it important for the operators to stay hydrated when they're out there, long hours on these jobs." (**Ex. H**, Murray Depo., 38:7-23.) And while Midland Branch Manager John Harrison disputed that crane operators were *required* to purchase ice, he testified that TNT did pay for it, and he testified that "water is required." (**Ex. D**, J. Harrison Depo., 84:16-21.)

TNT reminded the Plaintiffs routinely in safety meetings and trainings of the risk of dehydration and heat injuries. (**Exs. P - R,** Declarations of Repass, Payne, and Grimes, ¶ 2.) TNT required the Plaintiffs to complete Job Safety Analysis forms on each job identifying the most prominent hazards associated with the work tasks, including dehydration, and the method to prevent dehydration, which was constantly hydrating. (*Id.* at ¶ 3.)[7] "In order to prevent dehydration and heat injuries by constantly hydrating, crane operators including myself obtained water or ice on a daily or near daily basis either from one of TNT's yards or from a store or gas station." (**Exs. P-R,** ¶ 4.) TNT provided the Plaintiffs with company credit cards and instructed them to use the credit cards to purchase water and ice, along with fuel for their cranes and other materials they regularly needed in order to perform their work operating cranes whenever they were working too far away to pick up those items from one of TNT's yards. (**Exs. P-R, ¶ 4.**)

Therefore, the Plaintiffs here were at a particularly high risk of dehydration and heat injuries such that they could not safely and effectively perform their work without constantly maintaining an ample supply of water and ice. At the very least, and even assuming, *arguendo*, that TNT has met its burden to point out the absence of a genuine issue of material fact, there is,

---

[7] **Ex. Z,** sample of JSA forms, e.g., TNT 009140, 009144 (identifying dehydration and heat injuries among the handful of most prominent "hazards associated with the task" of crane operations and "drinking plenty of water" as the method for mitigating those hazards).

at a minimum a genuine issue of material fact that prevents summary judgment on whether
obtaining water or ice is integral and indispensable to their primary job duty and thus compensable.

Finally, TNT argues that "just 10 of the 15 Plaintiffs deposed testified that they ever
stopped for ice or water. If buying ice and water was actually 'integral and indispensable' to
Plaintiffs' principal activities, each operator would have been buying them." (Dkt. 163, 16.)
However, the Plaintiffs who did not testify about purchasing water and ice (including Payne
despite TNT's contrary claim) *were not asked about it in their depositions*. Even assuming,
*arguendo*, that some class members did not have to purchase water and ice on some jobs because
water and ice were provided on the jobsite, TNT's motion would not apply to them because they
would not be claiming unpaid time for a work task they did not perform. This simply underscores
the principle that whether a particular task is integral and indispensable to the principal work
activities depends on the particular factual circumstances of each case. TNT may examine each
class member about those tasks during trial, but it is not entitled to summary judgment.

   3. **The time Plaintiffs spent purchasing and loading water, ice, fuel and other work
      materials was not *de minimis*.**

      a. *TNT's argument of administrative difficulty fails because Plaintiffs could easily and
         sometimes did record the time spent purchasing water, ice, fuel, and other materials
         on their time sheets.*

The *de minimis* "doctrine does not apply to certain time periods merely because they are
short in duration and separable from other compensable work time." *Alexander v. Wackenhut
Corp.*, No. CIV.A. 07-262, 2008 WL 2697163, at *6 (E.D. La. July 1, 2008). "Rather, the doctrine
excuses the employer from compensating employees only for very short periods of work time that
also, as a practical administrative matter, cannot be adequately recorded for payroll purposes." *Id.*
(citing *Mireles v. Frio Foods*, 899 F.2d 1407, 1414 (5th Cir. 1990) (waiting time of less than 15
minutes was not *de minimis* when employer could track this additional time by making minor

changes to the existing administrative procedures).

> ***This rule applies only where*** there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer ***may not arbitrarily fail to count as hours worked any part, however small***, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (emphasis added). "[T]he doctrine focuses on employee work time, occurring outside of the fixed or regular work period, that cannot feasibly be 'captured' for payroll purposes by the employer, using reasonable administrative and time-keeping procedures, because of its short and indefinite duration and uncertain occurrence." *Alexander*, 2008 WL 2697163, *6.

TNT has not identified any reason it would be administratively unfeasible to record the time Plaintiffs spend purchasing water and ice. TNT's timekeeping system consists of having its crane operators note their starting and stopping times on time sheets from any location they are working (provided TNT allows them to claim the time in question). (Dkt. 163, 11.) There is no reason crane operators cannot note their starting or stopping time when they purchase water and ice just like when they perform any other compensable task. (*Id.* (citing TNT Employee Handbook).) Indeed, the crane operators frequently did note on their time sheets when they purchased water, ice, fuel, and other materials.[8] However, when that time and the subsequent travel time to their jobsites was not permitted under TNT's policies, TNT cut the time from their time sheets.[9]

---

[8] *See, e.g., **Ex. D**, Harrison Depo. 84:2-12 (discussing Crane Operator Julio Castillo's time sheet that included time for purchasing fuel and ice); **TNT Ex. 24**, Dkt. 163-30, Baete Depo., 70:8-21 (discussing time sheet where he claimed time at TNT yard for tasks including obtaining fuel and ice).

[9] **Ex. D**, Harrison Depo., 82:13 – 85:10 (Harrison ordered travel time to the jobsite cut from Crane Operator Julio Castillo's time sheet even though he specifically indicated he performed compensable work by filling his auxiliary "L" tank with fuel and loading ice before traveling because it was not allowed "according to our payroll memo.")

Because its timekeeping system relies on reporting by its employees, and those employees can easily report obtaining ice and water, TNT's argument that "[i]n order to accurately capture five to ten minutes of time for buying ice or water, . . . TNT would have to change its timekeeping system so that it did not round up" is nonsensical. (Dkt. 163, 19.)[10] TNT offers no other facts to support its claim of administrative difficulty.

> b. *The time spent purchasing ice, water, fuel, and other supplies, in the aggregate, is more than* de minimis.

The three-factor balancing test cited by TNT, including consideration of the time a task takes to perform, only comes into play when the work time in question is not practically ascertainable as an administrative matter. (*See* Dkt. 163, 17 (discussing test set forth in *Lindow v. U.S.,* 738 F.2d 1057, 1062 (9th Cir. 1984)).) Regardless, the other two factors considered under that test—the amount of compensable time and the regularity of the work—also weigh against application of the *de minimis* doctrine here.

There is no hard-and-fast rule that ten minutes or less of compensable time per day can be disregarded as *de minimis*. Rather, courts consider the aggregate time across all activities in question, as well as across all affected employees and across the statutory time period.[11]

---

[10] Nor can TNT claim that its alleged rounding practice constitutes compliance or an offset for its FLSA violations because when an employer pays fringe benefits or for nonwork time as a matter of agreement, policy, or practice, it cannot claim those payments as an offset. *See, e.g., Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 912–14 (9th Cir. 2004) ("it would undermine the purpose of the FLSA if an employer could use agreed-upon compensation for non-work time (or work time) as a credit so as to avoid paying compensation required by the FLSA. . . . Crediting money already due an employee for some other reason against the wage he is owed is not paying that employee the compensation to which he is entitled by statute. It is, instead, false and deceptive 'creative' bookkeeping that, if tolerated, would frustrate the goals and purposes of the FLSA.")

[11] *See Alexander*, 2008 WL 2697163, *6 (considering "the aggregate amount of the additional compensable time" and finding that pre-shift time donning equipment "likely yields a significant amount of additional time, when considered in the aggregate, for at least some employees"); *Lindow*, 738 F.2d at 1063 ("Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim.") (citing *Addison v. Huron*

As discussed above, TNT does not identify any instances of crane operators stopping to purchase *only* water and ice. (*See* Section II(B)(1) above.) Rather, the record evidence shows that the Plaintiffs purchased water and ice together with fuel and other materials necessary to operate and maintain their cranes. (*Id.*) More importantly for present purposes, TNT does not present *any evidence* on the *amount* of time it took to perform this task in support of its *de minimis* argument, Regardless, the record evidence is undisputed and demonstrates that these stops typically took much longer than ten minutes. (*See, e.g.,* **Ex. S,** Coates Depo., 14:13-18 (stops to purchase items including fuel, water, ice, or other materials often took 30 minutes due to the convenience stores in the area being few and far between and often very busy.)[12] It is impossible to balkanize, as TNT

---

*Stevedoring Corp.,* 204 F.2d 88, 95 (2d Cir. 1953) (less than $1.00 per week not *de minimis* ), *cert. denied,* 346 U.S. 877, 74 (1953); *Glenn L. Martin Nebraska Co. v. Culkin,* 197 F.2d 981, 987 (8th Cir. 1952) (30 minutes per day over 1 ½ years not *de minimis*), *cert. denied,* 344 U.S. 866, 73 (1952); *Landaas v. Canister Co.,* 188 F.2d 768, 771 (3d Cir. 1951) ($21.67 to $256.88 per week over 3 years not *de minimis* )); *see also Aguilar v. Management & Training Corp.*, 948 F.3d 1270, 1283–86 (10th Cir. 2020) (considering "both the aggregate claim for each individual officer as well as the aggregate claim for all the officers combined" and concluding that eight minutes of aggregate preparatory and concluding work time is not de minimis); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 374 (4th Cir. 2011) (noting that in case involving 280 employees, individual claims for $425 per year or $2,550 over six years were "significant"); *Gonzalez v. Farmington Foods, Inc.*, 296 F. Supp. 2d 912, 921 (N.D. Ill. 2003).

[12] TNT again misstates the record when it claims that "[w]ith respect to getting water or otherwise engaging in pre-trip inspections, Plaintiff Repass testified that doing so took '[f]ive, ten minutes at the most.'" (Dkt. 163, 19 n. 43.) That is not what Repass said. Repass testified that it took five to ten minutes to conduct a pre-trip inspection on his company pickup truck "depend[ing] on if you had to stop and get oil or whatever for your—or water, whatever." (Repass Depo., **Ex. B**, 56:3-5.) Repass was clearly referring to water *for the vehicle*. (*Id.* at 54:15-25 (explaining that the pre-trip inspection on his company vehicle included "[a] 360 walk-around, check the oil, check the transmission, check the water. That's all pre-trip.") As Repass explains, Plaintiffs conducted the pre-trip inspections on their company pickup trucks before leaving their home or hotel. (*Id.* at 55:2 (he conducted pre-trip inspections "[e]very day before [he] left.") Repass is then asked what *other* work he did before arriving at the jobsite, and he testifies he would stop either at the TNT yard or at a store "just about every day" to fill up his drag tank with fuel or collect materials such as diesel exhaust fluid, cleaning supplies, spray clean, and glass cleaner. (*Id.* at 56:6-24.) Repass does not suggest that the 5-10 minutes it took to conduct the pre-trip inspection of his company pickup at his home or hotel included the time to make a separate stop to purchase fuel, water, ice, or other materials.

attempts to do, each separate item purchased each day. Nor can employers balkanize each component of each activity that an employee performs throughout the day down to ten-minute increments because doing so would permit them to write everything off as *de minimis.* Yet this is the logical conclusion of TNT's argument. Finally, even assuming, *arguendo,* that a crane operator stopped to purchase *only* water or ice and further assuming, *arguendo,* that there is any evidence that it took approximately five to ten minutes, that time is still substantial when considering TNT's hundreds of crane operators subject to the same policies and practices.

    c.  *TNT required Plaintiffs to purchases water and ice with company credit cards as a regular work assignment.*

TNT argues that Plaintiffs' water and ice purchases were irregular because a few of the Representative Discovery Plaintiffs did not testify about purchasing water and ice in their depositions. (Dkt. 163, 19.) As discussed above, that is simply because they were not asked about it in their depositions. The Plaintiffs who were asked about water and ice gave undisputed testimony that class members at each of TNT's branches obtained water and ice on a daily or near daily basis in order to prevent dehydration and heat injuries, which was corroborated by TNT's managers. (*See* Section II(B)(2) above.)

## III. CONCLUSION

TNT has not demonstrated the absence of a fact dispute as to either issue addressed in its Motion for Partial Summary Judgment. Therefore, Plaintiffs respectfully request that the Court deny the Motion in its entirety.

Respectfully submitted,

**FAIR LABOR LAW**


By:  */s/ Aaron Johnson*
Aaron Johnson
State Bar No. 24056961
ajohnson@fairlaborlaw.com
314 E. Highland Mall Blvd, Ste. 401
Austin, Texas 78752
Ph: (512) 277-3505
Ph: (512) 277-3254

**MORELAND VERRETT, P.C.**
Edmond S. Moreland, Jr.
State Bar No. 24002644
edmond@morelandlaw.com
Daniel A. Verrett
State Bar No. 24075220
daniel@morelandlaw.com
700 West Summit Drive
Wimberley, Texas 78676
Ph: (512) 782-0567
Fax: (512) 782-0605

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2021, I electronically submitted the foregoing document for filing using the Court's CM/ECF system, which will serve a true and correct copy of the foregoing document upon counsel of record.


*/s/ Aaron Johnson*
Aaron Johnson

**Exhibit D**