1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF TEXAS
2            MIDLAND/ODESSA DIVISION

3   TIMOTHY W. REPASS AND        )
    WILLIAM SCOTT MCCANDLESS,     )
4   INDIVIDUALLY AND ON          )
    BEHALF OF ALL OTHERS         )
5   SIMILARLY SITUATED,          ) CIVIL ACTION
                                 )
6            Plaintiffs,         ) NO. 7:18-CV-107-DC-RCG
                                 )
7   VS.                          )
                                 )
8   TNT CRANE AND RIGGING,       )
    INC.,                        )
9                                )
             Defendant.          )
10

11

12          ----------------------------------

13               ORAL DEPOSITION OF

14             JOHN KENNETH HARRISON

15                August 17, 2020

16                   Volume 1

17          ----------------------------------

18

19

20        ORAL DEPOSITION OF JOHN KENNETH HARRISON,

21   Volume 1, produced as a witness at the instance

22   of the Plaintiffs, and duly sworn, was taken in

23   the above-styled and numbered cause on the 17th of

24   August, 2020, from 1:29 p.m. to 4:05 p.m., before

25   Julie A. Jordan, CSR, RPR, in and for the State of

 1 Texas, reported by machine shorthand via Zoom, at

 2 809 County Road 123, Midland, Texas 79706, pursuant to

 3 the Federal Rules of Civil Procedure and any provisions

 4 stated on the record or attached hereto.

 5                     *-*-*-*-*

1    farm construction manager.

2        Q.   And from your first position of employment

3    with TNT through today, can you walk us through your

4    employment history with TNT, please?

5        A.   Yeah.  It was wind farm construction manager

6    from 2010 till -- through 2012.  From 2013 -- in the

7    year 2013, I was operations manager in Longview, Texas,

8    at the Longview branch, and then I transferred from

9    there to the Midland branch and was a branch manager

10   from beginning of 2014 until current.

11       Q.   And where were you located when you held your

12   position from 2010 through 2012?

13       A.   Several places as a construction manager.  We

14   had several different sites that we were building.  So I

15   would be six or eight months -- I was in Pennsylvania

16   for part of the time.  I was in Colorado.  I was in

17   South Texas.  I was in Nebraska part of the time.

18       Q.   Who did you report to as operations manager in

19   Longview?

20       A.   Todd Quattlebaum, David Cooley.  They're both

21   not with the company anymore.

22       Q.   And who, if you know, hired you to -- or

23   promoted you to branch manager in Midland?

24       A.   David Cooley.

25       Q.   And what position was Mr. Cooley in at that

1  time?

2      A.   He's a vice president -- executive vice

3  president.

4      Q.   And was he -- did he office in Midland or in

5  Houston or where did he office?

6      A.   He was in Longview and, you know, I mean, I --

7  it could have been Kregg Lundsford, I guess.  You know,

8  I don't know how it was exactly, but it was through his

9  recommendation or -- or which -- or maybe it was a

10 decision of both of them, but...

11     Q.   And as branch manager in Midland, who do you

12 report directly to?

13     A.   Kregg Lundsford, president of TNT.

14     Q.   Did you say he's the president of TNT?

15     A.   Correct.

16     Q.   Was there ever a time in your employment with

17 TNT that you reported to Gary Harvey?

18     A.   Yes.

19     Q.   And when was that?

20     A.   So, I mean, it was from 2014 -- it was kind

21 of a weird deal.  I got put in as branch over there.

22 David Cooley was still in the picture, but there was a

23 transition period where -- and it all happened pretty

24 quick, but Gary Cooley was pushed out and Gary was put

25 in, and then he was there from middle -- or I guess

Case 7:12-cv-00018-DC-RCG   Document 130-2   Filed 11/26/21   Page 5 of 45

1  April or sometime 2014 until -- I guess it was 2018 --

2  early 2018, I guess, I think is when he left the

3  company.

4       Q.   And when you said "he" was there, you're --

5  "he" is Gary Harvey, is that correct?

6       A.   Oh, I'm sorry.  Yes.  Gary Harvey.  He wasn't

7  here.  He was managing -- he was in San Antonio.  And I

8  guess on the org chart it was -- you know, he was a

9  dotted line or he was kind of a supervisor, but I think

10 I still was direct line to -- to Kregg, but for

11 day-to-day I talked to Gary.

12      Q.   And just so the record is clear, you reported

13 to Mr. Harvey on a dotted line, as you put it, from

14 April of 2014 until Mr. Harvey left in 2018?

15      A.   I believe so, yeah.  Maybe March or April.

16 Probably close enough, though.

17      Q.   By the way, are you a crane operator?

18      A.   No, sir.

19      Q.   Have you ever operated heavy equipment of any

20 kind?

21      A.   I grew up farming and ranching, so I've spent

22 thousands of hours in tractors and loaders and forklifts

23 and all of that.

24      Q.   Who did you work for prior to TNT?

25      A.   It was a service company -- wind farm service

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1    A.    Three or four, five, maybe.

2    Q.    Do you remember who they were for, which crane

3  operator?

4    A.    I mean, I think Julio Castillo is about the

5  only one that sticks out to me.  The rest of them are

6  kind of just like, Yeah, yeah.  You know, I mean -- it

7  was one that had a lot of sticky notes and stuff on it

8  and so I was trying to jog my memory as to -- as the --

9  what all was going on with that one.

10    Q.    What else did you review -- what other

11  documents did you review in preparation for today's

12  deposition?

13    A.    I just glanced over the payroll memos, but

14  that was it.  Oh, there's some text messages too.

15  Levi's text messages.

16    Q.    All right.  Are you familiar with the job

17  duties of the crane operators who work out of the

18  Midland yard?

19    A.    Yes.

20    Q.    And it's -- their primary job duty obviously

21  is to operate TNT's cranes, correct?

22    A.    Correct.

23    Q.    And there are certain fluids, materials, and

24  equipment that they need in order to operate those

25  cranes.  True?

1    A.    Yes.

2    Q.    And among those fluids, equipment, and

3  materials are fuel, BlueDEF, boom grease, window

4  cleaner, stuff like that, is that true?

5    A.    Yes.

6    Q.    What else other than the four things I just

7  named do you think crane operators need to operate their

8  cranes in the field?

9    A.    As far as the crane?

10   Q.    Yes, sir.

11   A.    I mean, that's -- that basically covers what

12 they need to operate the crane.  I mean, they've got to

13 keep the machine serviceable, I guess, if that's what

14 you're asking.

15   Q.    In other words, they need to keep the crane

16 running out in the field, otherwise, TNT won't get paid

17 for --

18   A.    Yes.

19   Q.    -- that operation.  True?

20   A.    Yes.  Yes.

21   Q.    And these fluids, equipment, and materials,

22 these are things that you expect the operator to obtain

23 to be available to them while they're working on their

24 shift at the job site, correct?

25   A.    When needed, yes.

1    Q.   In other words, these aren't things that you

2  have to specifically assign a crane operator to obtain

3  in order to keep his or her -- his crane operating,

4  right?

5    A.   Not on a daily basis, they shouldn't have to

6  be reminded.  They need to -- they're responsible to

7  maintain the -- the -- you know, to keep it.  If it's

8  low or something like that, they should fill it up and

9  do it in their daily checks and -- and report it if it's

10  something above a normal requirement of keeping fuel

11  indefinite.

12            Outside of that, we have mechanics and --

13  you know, and by no means -- the way we operate cranes

14  is it a daily -- in most cases a daily necessity that

15  they put DEF and fuel in it.

16    Q.   Regardless of how often they put these

17  materials or fluids into the crane, just so I'm clear

18  here, you don't have to tell the crane operators, who

19  know very well how to run their crane, to go obtain

20  diesel or BlueDEF or any of these other fluids,

21  materials, or equipment.  True?

22    A.   Correct.

23    Q.   And the operators who are running these

24  cranes, they would grab these materials sometimes from

25  the yard, right?

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1      A.    Yes.  If they were around that yard, yes.

2  Otherwise, they might source it from --

3      Q.    And if they're --

4      A.    -- truck stop or something like that.

5      Q.    Right.

6      A.    Most of the time they just stock up from the

7  yard and not have to come back for a while.

8      Q.    Let's talk about before March of 2020 when

9  things got weird in the world.  Okay?

10            But before that time, how many gallons per

11  week was TNT ordering in -- let me start over.

12            How many -- before March of 2020, how many

13  gallons of diesel was TNT ordering per week to be

14  delivered to its Midland yard?

15      A.    You know, I can't give you an exact number off

16  the top of my head, but roughly about, I don't know, 65

17  per gallons (sic) a week -- well, about every ten days

18  probably.  So maybe 5- or 6,000 gallons on a week.

19      Q.    And how many boxes of BlueDEF, approximately,

20  were y'all ordering to the Midland yard every week?

21      A.     I don't have that information off the top of

22  my head, but, you know, we order a pallet of boxes and

23  it lasts a month.  I don't know how many -- I don't

24  know --

25      Q.    Do you know how many --

1   inspections that we've talked about, eventually you need

2   to have the originals of those documents turned in, is

3   that true?

4        A.   Eventually, yes.

5        Q.   Mr. Harrison, do you see a document up on your

6   screen?

7        A.   Yes, I do.

8        Q.   And I'm showing you TNT [Repass] 5596 at the

9   moment, which is the first page of the -- of a TNT crane

10  memo to "All Operators, Truck Drivers & Riggers" dated

11  "4-1-2018," is that right?

12       A.   Correct.

13       Q.   And is this one of the memos that you referred

14  to earlier today in the deposition?

15       A.   Yes, it is.

16       Q.   And is this the payroll memo that is currently

17  in effect?

18       A.   Yes, it is.

19       Q.   And I'm going to scroll through these.  So

20  this -- the first page and the second page is the memo

21  from April of 2018, is that correct?

22       A.   Yes.

23       Q.   And now I'm showing you TNT [Repass] 5598,

24  which is a similar memo dated March 13th, 2015, is that

25  right?

1    A.    Yes.

2    Q.    Now I'm showing you TNT 8450, which is a

3 previous iteration of this memo from March of 2014, is

4 that right?

5    A.    Yes.

6    Q.    Now, the March 2014 and March 2015 memos, were

7 these applicable to Midland?

8    A.    Can you repeat the question?

9    Q.    Yes, sir.  Were the March 2014 and March 2015

10 memos that I just showed you, did y'all follow those in

11 the Midland yard?

12    A.    So this 2014 one is the San Antonio memo for

13 San Antonio yard only.  And then the 20- --

14    Q.    And so did you --

15    A.    The 2015 --

16    Q.    I apologize, Mr. --

17    A.    The 2015 one is -- is the Midland one.  And

18 then like I said, I think there's a -- a 2014 memo

19 around that same date that's for Midland that I think is

20 in y'all's records.

21    Q.    And the 2015 memo that you just mentioned --

22 or 2014 memo that you just mentioned applicable to

23 Midland, how did it differ from the one that is at

24 TNT 8450?

25    A.    You'd have to throw them back up.  I -- I

Case 7:18-cv-00078-DC-RCG Document 132-5 Filed 11/26/21 Page 12 of 45

1           And also, you know, putting the 60 on

2  there made us pay an extra per diem there.  It also

3  could be good for recruiting people at the -- when

4  you're in a booming market.

5     Q.   That -- the April 2018 memo that we just

6  looked at, that had nothing to do with making sure that

7  these guys were paid according to any applicable laws,

8  is that true?

9     A.   No.  It was due to -- the revision was due to

10  the target logistics addition.  That's why we had to

11  change it.

12     Q.   What was your involvement in creating the

13  March 2015 memo?

14     A.   I -- so we took San Antonio's and revised it

15  to fit Midland.  Basically just took their format and

16  then changed it to what was applicable for Midland.

17  And -- and then I sent it for review to Gary, and then

18  it was reviewed by Gary and then it was also reviewed up

19  the chain to Antoy Bell, and then after approved, it was

20  sent out.

21     Q.   Was there any correspondence that you know of

22  involving that March 2015 memo?

23     A.   Not that I can recall.  I mean, there might

24  have been some phone calls or something like that, but I

25  don't re- -- I don't remember any lengthy e-mail chains

Case 7:122-cv-00010073-DC-RCG Document 1370-25 Filed 110/226/221 Page 134 of 456

1 or anything like that.

2      Q.   And what was your involvement in creating the

3 March -- or excuse me, the April 2018 memo?

4      A.   Again, I revised it according to what I

5 thought the business should be out or how it should work

6 and sent it through the same channels.

7      Q.   Same channels meaning you sent it to

8 Mr. Harvey and then to Antoy Bell for approval?

9      A.   Correct.

10      Q.   What was Mr. Harvey's -- well, did Mr. Harvey

11 have any specific input into the contents of the

12 April 2018 memo?

13      A.   I think he's -- originally had 75 per diem.

14 He said, No, we don't need to do 75.  Do 60.  So that

15 was the only input I remember.

16      Q.   Mr. Harrison, I'm showing you TNT 5607.

17           Do you see that up on your screen?

18      A.   Yeah.

19      Q.   And I'm going to try to make that a little

20 bigger.

21      A.   No, it's good.

22      Q.   Can you see that okay?  Can you read it?

23      A.   Yes.

24      Q.   Okay.  And I'm looking specifically at the

25 e-mail from you to Gary Harvey dated March 28th, 2018.

Case 7:19-cv-00078-DC-RCG   Document 130-25   Filed 11/26/21   Page 14 of 45

```
 1                     Do you see that?
 2      A.    Yes.  Yes.
 3      Q.    And this e-mail is specifically about that
 4 April 2018 TNT crane memo, correct?
 5      A.    Correct.
 6      Q.    And then the second sentence here says, "I
 7 plan to remove the yellow highlights once approved by
 8 all."
 9                     Did I read that correctly?
10      A.    Correct.
11      Q.    And is "by all" -- when you say "by all,"
12 though, are you referring to Gary Harvey and Antoy Bell?
13      A.    Yes.
14      Q.    Is there anyone else?
15      A.    Not that I know of.
16      Q.    I'm going to move this down a little bit I'm
17 referring now to the e-mail from Gary Harvey to you
18 cc'ing Antoy Bell of March 29th, 2018, at 8:42 a.m.
19                     Do you see that there?
20      A.    Yes.
21      Q.    And then the second-to-last sentence of that
22 e-mail talks about -- talks about something called
23 "LEMs," is that right?
24      A.    Yes.
25      Q.    What does that refer to?  What is Mr. Harvey
```

1   referring to in that second sentence?

2       A.   So that's our -- that's where I was talking

3   about earlier the time sheets going electronic and

4   instead of having job tickets or -- or time sheets FCC

5   is our new software that came along in the last half of

6   2018 and it was starting to come along in -- in -- in

7   earlier part of 2018 or that was kind of the transition

8   period there and -- sorry, my doorbell rang.

9           So that's what that is.  Those LEMs are --

10  it's talking about attaching those as opposed to having

11  paper tickets attached.

12      Q.   And you may have just said this, Mr. Harrison.

13  I apologize if you did.  But what does "LEM" stand for?

14      A.   I don't know off the top of my head, to be

15  honest with you.  It's an acronym we use in FCC, but

16  it's basically our job tickets instead of the paper

17  tickets, and -- and this is something here that when

18  Gary -- the reason he kind of put it over with -- the

19  way he put it was that it's something they did in San

20  Antonio about attaching time -- job tickets to all their

21  time sheets for every time that they're putting down on

22  a -- on their tickets, and that's not something I really

23  required at Midland.  And so he was just throwing it in

24  there as a thought and -- and I didn't adopt it.

25      Q.   And going back down to the March 28th e-mail

**JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020**

1  from you to Mr. Harvey, your last sentence there says,

2  "They are" -- "they're only to show the revisions to the

3  old policy."  And "they" are referring to the highlights

4  of the attachment, is that right?

5       A.   That's correct.

6       Q.   And what old policy are you referring to in

7  that sentence?

8       A.   The previous payroll memo.

9       Q.   Is -- from March of 2015?

10      A.   I believe so.  I -- I -- yeah.  Without

11  digging through my computer, I believe that's the one

12  that was in -- was the latest and greatest before 2018.

13  I think we -- we provided all the memos that existed.

14      Q.   I want to direct your attention to TNT 5604

15  and the e-mail from you to Antoy Bell cc'ing Gary Harvey

16  of March 29th, 2018, at 12:33 p.m.

17           Do you see that up on your screen?

18      A.   Yes.

19      Q.   And then we had a -- the last sentence reads,

20  "I probably won't send out the memo till Monday if

21  approved.  I don't want their heads to explode over the

22  weekend."

23           Did I read that correctly?

24      A.   Correct.

25      Q.   What were you referring to when you talked

1       A.   No.   I mean, yes, we discussed the need for

2   the memo.

3       Q.   Do you recall any of those conversations in

4   particular?

5       A.   Not like -- no.   I mean -- I mean, I guess

6   the -- the reason why we had the conversation is -- just

7   thinking back, is if we're going to make a major change

8   and tell everybody that they have to start staying in

9   man camps instead of this, that we needed to explain it

10  and also put a policy in place that basically made it --

11  you know, pretty much directs people into staying in --

12  according to our wishes there.

13      Q.   And was there ever any discussion about

14  whether or not that memo -- the April 2018 memo complied

15  with the laws requiring the payment of overtime or any

16  other wages?

17      A.   Well, the only thing it affected was per diem

18  and the level of per diem paid, so no.

19      Q.   Did y'all specifically discuss per diem in the

20  course of these conversations?

21      A.   Yes, because there was what level of per diem

22  we -- or how much per diem we were going to pay with

23  the -- with the man camps was discussed.   That's how we

24  came up with the --

25      Q.   Was there --

 1    A.    -- 60.

 2    Q.    Okay.  And was there ever any discussion about

 3 whether or not the travel time aspect of those memos or

 4 the April 2018 memo was compliant with federal law

 5 requiring payment of wages?

 6    A.    Well, there wasn't any discussion about it,

 7 but that's part of the reason why we sent it up the

 8 chain and -- and through our legal HR director, so

 9 that's -- that's his expertise.

10    Q.    And I think my question here is -- and I think

11 what you're saying is he never expressed any concern

12 about it, is that true?

13    A.    Correct.

14    Q.    And did he ever -- did he ever talk to you

15 about the requirements of federal law surrounding the

16 payment of wages for travel time or anything else in

17 connection with that April 2018 memo?

18    A.    No.  We weren't changing anything with travel

19 time, so there was no need to discuss it.

20    Q.    And that's the --

21    A.    And --

22    Q.    -- travel time policy --

23    A.    And the travel time -- I'm sorry.  The travel

24 time there is to and from the lodging is what I'm

25 talking about.  We weren't talking -- you know, I'm not

Case 7:12-cv-00178-DC-RCG Document 130-25 Filed 11/26/21 Page 19 of 45

1  talking about travel time with anything else.  Basically

2  commute back and forth from the job site to the lodging

3  is what that memo reflects.

4      Q.   Was that a -- was that a change from the

5  March 2015 policy?

6      A.   No, nothing changed in -- in regards to the

7  payment of time between lodging and work site.

8      Q.   Okay.  Mr. Harrison, I again have TNT 5596 and

9  5597 up on the screen.

10             Do you see that there?

11     A.   Yes.

12     Q.   First of all, this phrase occurs in the memo,

13 and the phrase is "actual hours worked."  And I have

14 blown that up in the memo.

15             Do you see that?

16     A.   Yes.

17     Q.   Can you define "actual hours worked" as that

18 phrase is used in this memo?

19     A.   So -- well, I can use better words, but

20 they're already in that memo to explain it, but it's

21 actual hours worked, actual actions worked.  It's what

22 you actually did is what you should put down is what you

23 should be paid for, what you -- your actual efforts.

24     Q.   And does "actual hours worked" have the same

25 meaning in this 2018 memo as it did in the 2015 memo?

Case 7:18-cv-00178-DC-RCG Document 132-5 Filed 11/26/21 Page 20 of 45

1    A.    Yes.  And as it does today.

2    Q.    How did the 2000- -- and I think you kind of

3  touched on this, Mr. Harrison.  I'm not trying to hound

4  you here, but --

5    A.    No, you're good.

6    Q.    -- I just need to ask you this question

7  directly.

8              How did the 2018 memo differ from the

9  2015 memo?

10    A.    With the target logistics addition, with the

11  extra level of per diem between the hundred, the 60, and

12  the 35, that was the main thing that sticks out to me

13  and -- and I believe is all that was changed.

14    Q.    Was there any change with respect to whether

15  or not the operator would get paid for travel time if

16  the customer was or was not charged for that time?

17    A.    No, nothing changed on that front.  It's

18  always been what it's been.

19    Q.    And how did you all communicate each of these

20  memos to the crane operators?  When I say "each of these

21  memos," I mean the 2015 and the 2018 memos.

22    A.    It's via e- --

23    Q.    Go ahead.

24    A.    Via e-mail, and then if they're brought on

25  after it came out, then it's reviewed during the

1    on-boarding.  When we bring new employees on, it's gone

2    over as well as the employee handbook.

3        Q.    Did you say it's in the employee handbook?

4        A.    As well as with our -- in addition to the

5    employee handbook.

6        Q.    I got it.

7              So the employee handbook is communicated

8    alongside this -- these memos?

9        A.    Correct.

10       Q.    Now, can you explain how per diem, be it a

11   hundred dollars, $60, or $35, relates to the payment of

12   travel time in the April 18th memo?

13       A.    Well, they're -- they're two different things.

14   So it's really per diem is dictated on where -- where

15   you stay, not by travel time or commute time or paid

16   commute time or travel time, whatever you want -- I

17   guess the travel time was the terminology used in the

18   memo, but -- so they're two separate -- separate things.

19   And -- and if we're providing the lodging -- the closest

20   lodging available, then any time it takes you to commute

21   from that job site to that lodging that we're paying for

22   is paid for regardless of whether or not the customer is

23   paying us.

24       Q.    And are you saying that there is -- let's

25   say -- well, let me do it another way.

Case 7:12-cv-00018-DC-RCG   Document 132-5   Filed 11/26/21   Page 22 of 45

1           Let's say a crane operator is paid a
2    hundred dollar per diem.
3           Are you saying that that crane operator
4    would be paid for travel time separate and apart from
5    whether or not they were paid a hundred dollar per diem?
6        A.   No, because a crane operator wouldn't be paid
7    a hundred dollars per diem if he was staying in our
8    lodging.  He'd only get 60 or 35, depending on the
9    lodging, and -- and further back, he'd only have been
10   paid 35 if he was staying in our lodging.
11          And like I said, regardless of whether or
12   not the customer is paying us and they're staying in our
13   lodging that we're paying for, then we would pay
14   their -- their commute time regardless.
15       Q.   And you paid them either 35 or $60 if they're
16   staying in your lodging, right?
17       A.   Correct.
18       Q.   And you paid them a hundred dollar per diem if
19   they're not staying in your lodging.  True?
20       A.   Correct.
21       Q.   And so if TNT is providing the lodging, then
22   TNT will pay the travel time to the job site from the
23   lodging, correct?
24       A.   Correct.
25       Q.   But if it's not providing the lodging, then it

1  will not pay for the travel time from the lodging to the
2  job site and back.  True?
3       A.  The only time that they would get for travel
4  time at a hundred is -- is whatever the customer paid.
5       Q.  And whether the customer paid is reflected in
6  an MSA or similar document, is that true?
7       A.  It can be, but it also can be just an
8  agreement with the customer that calls us out, whether
9  it's the supervisor or whatever job.  If -- if it's
10  negotiated that they'll pay some sort of travel time for
11  people that we can charge, it's done on the front side
12  of the job being bid in some cases.  But in some cases
13  it's an MSA.  So it -- it -- it's different all the way
14  around.  Different customers, different -- different
15  methods.
16       Q.  And were you pretty familiar with the MSAs
17  that the operators were working under out in the
18  field --
19       A.  Yeah.
20       Q.  -- during the, say, time --
21       A.  Just as -- just -- yeah, pretty much.  That is
22  much --
23       Q.  So for example, you would have been
24  knowledgeable about what the MSAs provided with respect
25  to Chevron, correct?

Case 7:12-cv-00018-DC-RCG Document 302-5 Filed 11/26/21 Page 25 of 46

1  cheating or negligence or something like that.

2     Q.   And I'm not talking about cheating or

3  negligence. I'm talking about the criteria that you

4  used, you know, insofar as TNT's policies or practices

5  are concerned, were there any other criteria --

6     A.   No, that's -- that's --

7     Q.   -- that you used --

8     A.   As far as I -- the main thing right there is

9  just, you know, that was -- that's the one that's popped

10  up in the past is where, you know, they're -- it gets

11  claimed and gets removed because it's not according to

12  the payroll memo.

13     Q.   And the payroll memo is that April 2018 and

14  then the March 2015 memo that we talked about earlier

15  today?

16     A.   Correct.

17     Q.   When you did remove travel time from time

18  sheets, did you ever ask the operator whose time sheet

19  it was about the removal of the time sheet or --

20     A.   Yes, there would be conversations. Yes.

21     Q.   Which operators did you talk to about that?

22     A.   I mean, probably -- I don't know. I mean,

23  I -- several of them. I mean, I guess --

24     Q.   Can you name any sitting here today?

25     A.   Scott McCandless. I know I had a conversation

Case 7:22-cv-00018-DC-RCG Document 130-25 Filed 11/06/21 Page 25 of 45

1  with him about the travel time being removed.

2      Q.   Anyone else?

3      A.   I mean, I distinctly remember conversations

4  with him, but others would be -- I mean, I'm sure we had

5  conversations.  I could probably name anybody that's

6  ever worked for me maybe.  I don't know.  I mean -- and

7  some -- whether it was a direct conversation or just a

8  question.

9           I mean, what kind of conversation are you

10  talking about?

11      Q.   Just did you consult with them about the fact

12  that you were removing the travel time and why and did

13  y'all come to an agreement on that?

14      A.   Well, I guess any of them that -- we could go

15  back through all the time cards and look and see if

16  there was a time removed and there was a conversation,

17  whether it was with me or Levi or maybe even Carol

18  and -- you know, and if Carol had the conversation and

19  they didn't understand and they would -- they would call

20  me and -- and we would talk through it.

21           And there was cases where it stayed

22  removed and then there might have been cases where they

23  did something other than just drive back to their --

24  their place and maybe it got reversed or something and

25  it would still be shown on the record.

1          So I guess the best way to find out who

2   all I've had conversations with would be to review every

3   time card that's ever been slashed.

4        Q.   And is it your testimony that you reviewed the

5   slashing of the travel time with every crane operator

6   who ever had travel time removed from his time card?

7        A.   No.  It's not that -- I don't think that I

8   ever had a conversation with every one of them, but

9   between Levi, Carol, or myself, there was a conversation

10  between us.

11       Q.   Okay.  So regardless of whether or not you

12  personally had the conversation, it's your testimony

13  that it's your understanding that any time travel time

14  was removed, there was a conversation with the crane

15  operator about that?

16       A.   It's probably a stretch to go all the way on

17  every one of them.  I would say that there was initial

18  conversations, and if there was repeated behavior where

19  they kept claiming it after they'd been counseled

20  otherwise, maybe there wasn't a conversation later down

21  the road where they kept doing it and we just tolerated

22  them putting on there and they knew it was going to get

23  removed.  You know, I mean, it's their prerogative to

24  write it on there and, I guess, if they want to for

25  whatever sake, it's a free country, I guess, and it --

Case 7:22-cv-00018-DC-RCG   Document 32-5   Filed 11/26/21   Page 28 of 45

1  but it's going to get cut.

2              So there was probably instances with some

3  where we didn't bother following up with them after

4  we've already talked to them once or twice about it and

5  a decision was made to just tolerate it being cut off of

6  there, you know.  I mean, but they expected to.  So, I

7  mean, it's like, Well, I'm going to put it on there

8  anyway.

9              Okay.  Well, put it on there if you want

10  to.

11      Q.   So you would understand why they would stop

12  putting travel time down on their time cards if it's

13  been removed, right?

14      A.   It's a possibility, yeah.

15      Q.   In fact, you expected them to stop putting it

16  down, correct?

17      A.   Well, I mean, that's, yeah, per the policy.  I

18  mean, travel time -- when we're talking about driving

19  from the job site to the lodging or where they chose,

20  it's not a -- it's not compensable according to TNT, our

21  policy, so you shouldn't put time down that you're --

22  that isn't compensable.

23              But if -- you know, there's cases where

24  they said, you know, they had to come back and get --

25  turn in paperwork or get some supplies or stop by the

1    So you've got -- so the conversation --
2  like I said, it's a pretty short conversation.  Put down
3  the money -- the time you expect to get paid for for any
4  work that you do, because that's what I want you to get
5  paid.  And -- and also, it needs to be in accordance
6  with our policy -- our payroll memo policy and here it
7  is.  And that's a conversation that comes on at the
8  first part of their employment.
9      Q.   This is part of the on-boarding?
10     A.   Yes.
11     Q.   Do you recall any such specific conversation
12  with a specific operator sitting here today?
13     A.   Oh, I think I've had the conversation about --
14  no, not specifically, I guess.  But, I mean, I can name
15  just about any operators that work for me when they ask
16  me about time cards or time or -- and that's what I tell
17  them.
18         I said, Look, I want y'all to get paid for
19  every hour that you work and -- and any -- and -- and
20  what -- and put down on your time what you expect to get
21  paid for.  And also, here's our payroll memo for what we
22  don't pay you for, which is basically when you're
23  getting a hundred and you choose to drive three hours
24  back to wherever it is you decide to go to or two or an
25  hour and a half or maybe it's only an hour.  But if you

Case 7:22-cv-00078-DC-RCG Document 132-5 Filed 11/26/21 Page 29 of 45

65

1   make that decision, we're not going to -- and the reason

2   behind that is, is so that we -- we encourage them to

3   stay closer to the job site because you're not going to

4   get -- we're going to be nice and pay for your commute

5   to and from the place that we're paying for you to stay

6   at while you go to work so you get paid.  But if you're

7   on the hundred and then -- and -- and then you're

8   choosing to drive all the way over to wherever it is, we

9   don't want to incentivize you to do that.  We want you

10  to be incentivized to stay closer, and so we don't pay

11  only -- we only pay what is paid for by the customer all

12  the way back to that place.  You know, so that's on

13  their decision to not get paid and -- and to stay in

14  their own bed at night or wherever it is they decide to

15  stay.

16              As far as the conversation, getting back

17  to your question, that's how I'd answer that question,

18  was basically, yes, put it down if you expect to get

19  paid for it, for any work that you do for TNT, and that

20  includes, you know, getting cleaning supplies once a

21  month that I pay for -- that we paid for on the credit

22  card.  Hey, if you need to go get cleaning supplies for

23  the crane, go get your cleaning supplies for the crane.

24  Of course, you know, that's usually about you go get a

25  supply and you have it in your pickup in the toolbox and

Case 7:18-cv-00178-DC-RCG   Document 302-5   Filed 11/26/21   Page 30 of 45

1  be required on a job?

2      A.   That's pretty much it, through customer

3  requirement if they -- on completion work.  It's whether

4  they need it or not.  And then that's really what we're

5  talking about here is the shift work.

6      Q.   Did TNT ever require riggers on jobs for

7  cranes over a certain size?

8      A.   Yeah.  Anything on 90-ton and bigger for day

9  work.  Now, completion work, which is this -- mainly

10  what this is around for travel time where you're going

11  to and from the same place every day, those -- those

12  didn't have a requirement of a rigger.  That was up to

13  the customer once -- because the crane is minimal action

14  out there on those locations.

15      Q.   Did TNT require its operators to come to the

16  yard to pick up certain materials in order to operate

17  their cranes?  And I'm talking about the materials that

18  we talked about earlier today, diesel, DEF, boom

19  grease --

20      A.   So --

21      Q.   -- all of that.

22      A.   So we have the -- earlier on, the first --

23  '14, '15 -- I don't remember.  I think '15 or '16 is

24  when we got the bolt tank in the yard, but -- but, yes,

25  we -- if they were in the area, the -- the counsel or

1    the -- the instruction was if you're around the yard

2    get -- utilize the fuel tank in the yard when you can,

3    but if it makes sense, just get it at the truck stop,

4    you know, out there.  They've all got company credit

5    cards.

6              But we did ask if they were around the

7    Midland yard, get it there.  You know, if you're

8    dropping off paperwork, use the time to get the

9    paperwork and -- and, you know, if you need DEF or cases

10   of water or whatever you need, grab it while you're

11   there.

12             So, yes, there wasn't a hard -- when it

13   made sense, we said, Use it, you know.  We didn't say,

14   You have to be here every day to get your stuff, but it

15   was -- it's there if -- if it made sense.

16   Q.   So if I'm understanding you correctly, just

17   kind of in a nutshell, TNT preferred its operators to

18   pick that stuff up from the yard rather than get it at a

19   service station or elsewhere, right?

20   A.   When it geographically made sense, yes, that's

21   what I -- when it was the smart, prudent thing to do

22   and -- and you're -- it doesn't make sense -- I don't

23   want them to come from Pecos, Orla, or anywhere else to

24   come to the yard to get stuff.  If they're in those

25   areas, get it up there.

1     A.    They've had company pickups as long as I've

2 been there.

3     Q.    And did you allow them -- the operators to use

4 their personal vehicles to get out to the job site?

5     A.    They're not supposed to, no.

6     Q.    Why not?

7     A.    Just liability reasons and reliability

8 reasons.  You know, we have liability and re- --

9 reliability.

10     Q.    Did riggers receive company pickup trucks?

11     A.    No.  They're...

12     Q.    And TNT expected its operators to use the

13 trucks to transport equipment materials and so on out to

14 the job site.  Is that true?

15     A.    Are we speaking about the materials earlier,

16 the DEF?  I mean --

17     Q.    Yes, sir.

18     A.    Yes.

19     Q.    And did it also expect the operators to use

20 the pickup trucks to transport the riggers when required

21 out to the job site?

22     A.    When required, yes.

23     Q.    So it's fair to say that those company trucks

24 assigned to the operators were for the benefit of TNT,

25 true?

1    A.    I'd say it's for both parties, but yes.

2    Q.    Now, we talked a few minute ago about the

3  operator picking up the rigger from the yard.

4              Do you remember that?

5    A.    Yes.

6    Q.    And you'll agree with me that when they picked

7  up the rigger from the yard, that would extend the

8  length of their commute that ultimately ended at the job

9  site, correct?

10    A.    Yes.  In most cases.  Some cases they stayed

11  in line with it so it was on way.

12    Q.    And dispatch directs the operator to pick up

13  the riggers at -- to pick up the riggers when necessary

14  for a job.  Is that true?

15    A.    Yes.  Or they --

16    Q.    And when --

17    A.    -- make arrangements to -- yeah, and which

18  means -- yeah, pick them up at the job site or maybe

19  sometimes they may meet at a truck stop somewhere that's

20  on the way and leave their vehicle there if it didn't

21  make sense to drive by the yard.  It's not required that

22  they meet at the yard, but in some cases it makes sense

23  for them to meet at the yard.

24    Q.    Did dispatch ever direct the operator to pick

25  the rigger up at the yard specifically?

1      A.    Yeah, in a way, shape or form, yes.

2      Q.    And so you understand that, you know, from the

3  time -- well, the law requires that an employee be paid

4  from the time he or she performs the first work of the

5  day until the time that he or she performs the last work

6  of the day with the exception of maybe a meal break,

7  correct?

8      A.    Correct.

9      Q.    And you would also agree that -- we talked

10 about this earlier -- that loading diesel and other

11 equipment onto a truck is work and time, correct?

12     A.    Correct.

13     Q.    Now I'm showing you TNT 4635, which is

14 the -- one of the time sheets for a gentleman named

15 Julio Castillo for the week ending September 11th, 2016.

16              Do you see that there on your screen?

17     A.    Yes.

18     Q.    And did you review this time sheet in

19 preparation for today's deposition?

20     A.    Yes, I've seen it before.

21     Q.    Okay.  And you see that in the second column

22 Monday through Saturday "Travel to location" is removed?

23 Do you see that?

24     A.    Yes.  Yes.

25     Q.    And is that Mrs. Harrison who removed that

Case 7:12-cv-00078-DC-RCG Document 170-25 Filed 11/26/21 Page 35 of 45

1    travel time with a red pen?

2        A.    She marked it out.  I -- I -- it was not

3    removed until I say remove it, so yes.

4        Q.    And then to be clear about that last part,

5    it's removed when you sign it there with your

6    initials --

7        A.    Yes.

8        Q.    -- "JH," correct?

9        A.    "JKH," yeah.

10       Q.    Thank you.  I was going to ask you about

11   that --

12       A.    Yeah.  It's kind of combined.

13       Q.    Got it.

14              So you would have reviewed this time sheet

15   before initialling it JKH, correct?

16       A.    Correct.

17       Q.    And then at the bottom of the time sheet in

18   red it says "NO Travel."

19              Do you see that?

20       A.    Correct.

21       Q.    And that's also Mrs. Harrison's handwriting?

22       A.    Yes.

23       Q.    Is that the explanation for why she has marked

24   through the travel time to location Monday through

25   Saturday?

Case 7:19-cv-00078-DC-RCG Document 130-25 Filed 11/26/21 Page 36 of 45

1    A.    Yes.

2    Q.    And then if you look at -- let's just focus on

3  Tuesday through Friday.  It looks like Mr. Castillo has

4  indicated that he's loading diesel on the L tank and/or

5  loading ice.

6              Do you see that?

7    A.    Yeah he's loading diesel on Tuesday in the

8  L tank and then the other days he's getting ice and

9  putting diesel in his pickup.

10   Q.    Right.  And he's loading ice in September in

11 West Texas, correct?

12   A.    That's -- that's correct.

13   Q.    Okay.  Would you agree with me that it's hot

14 in September in West Texas?

15   A.    Yes, it is.

16   Q.    And so ice would be a necessary bit of

17 equipment in order to perform your job out there in the

18 middle of nowhere, correct?

19   A.    It's a personal preference.  It's not

20 required.  Water is required, but ice is nice and we pay

21 for it.

22   Q.    Do y'all maintain an ice machine at the

23 Midland yard?

24   A.    We do not.

25   Q.    Would you agree that Mr. Castillo is

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1   performing work by putting diesel in his L tank?

2       A.   Yes, that's why we paid him for it.

3       Q.   And in light of the continuous workday rule,

4   why then did you remove the travel to location after he

5   performed that work?

6       A.   Well, according to our payroll memo, he was

7   staying in his own lodging that he wasn't paid for or

8   that we -- that we didn't pay for since he's staying in

9   his own lodging, and therefore, it falls out of line

10  with that, so it wasn't paid.

11           And it's also -- you know, I mean, I guess

12  could you look at it either way.  He's -- on Tuesday

13  anyway he's hauling, I guess -- and I don't know that

14  the ice is part of a continuous workday, getting ice for

15  your cooler when it's not required.  So that's why the

16  judgment was X'd out.  And he wasn't going back to the

17  yard.

18           I remember a conversation with him about

19  it, why he would put that on there.  He didn't come back

20  to the yard.  There was no reason for him to come back

21  to the yard on those other crosses out there, so...

22      Q.   And the other crosses, you're referring to the

23  last time entry column for Monday, Tuesday, Wednesday,

24  Friday, and Saturday.  Is that true?

25      A.   Correct.

1   operators?

2       A.   Not -- not to that extent.  I mean, there's

3   been questions about what is and what isn't or how

4   that -- you know, even though it's in black and white on

5   the memo, I may have had to explain it, you know, in --

6   in example form or whatever, but nothing sticks out

7   really.

8       Q.   What do you mean by that, you had to explain

9   it in example form?

10      A.   Well, just like just go through a day, you

11  know.  If you stay here, it's paid a hundred percent.

12  If you stay in lodging, then we pay it all.  If you

13  choose to drive all the way back to wherever you were

14  at, then you're not going to get paid only -- you're

15  only going to get paid what the customer pays.  We'll

16  pass that along to you and then we'll pay you a hundred

17  for your place that you're staying at and, you know,

18  just -- just put it in, I guess, even more laymen's

19  terms than what's in the black and white right there.

20  It's pretty clear, you know.

21           And that's -- there wasn't any to the

22  extent of where McCandless just got, you know, miffed

23  about it and -- and that was it.

24      Q.   Other than a conversation with McCandless, did

25  you -- did any -- did you ever hear of any other

1  complaints about operators not being paid for drive

2  time?

3      A.   Not specifically.  I mean, they were all --

4  I've heard deals where they've -- well, I think we

5  should get all of that or something like that.

6          And I was, Well, this is what it is and

7  it was this way when you hired on and it's not like

8  something we changed on you on the travel time.  We

9  didn't change anything there.  And you don't have to

10 work here if you don't want to, but it is -- this is --

11 this is how we -- this is our policy.  I don't know what

12 to tell you.

13     Q.   Other than Mr. McCandless, do you recall

14 anyone else who -- specifically recall anyone else who

15 made that -- made those complaint?

16     A.   I don't recall specifically to me or anything

17 like that.  I mean, he was the one that stuck out to me.

18 I just don't --

19     Q.   Did Mr. Hastey -- oh, I'm sorry.  I apologize.

20     A.   Go ahead.

21     Q.   Did Mr. Hastey ever tell you -- say anything

22 to the effect of, Hey, I've received these complaints

23 about the travel time?

24     A.   He's -- he -- he would tell me, Hey, they

25 called wondering why they didn't get this, especially,

**JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020**

1  you know, if they came on new, a week or two in or
2  something like that, they'd be like how come they didn't
3  get this travel time and -- and, you know, we'd have to
4  review the payroll memo with them again and tell them,
5  you know.  So there was cases where, yeah, somebody
6  would bring it up to him about it and we'd have to
7  explain it to him again.
8      Q.   Did he tell you who specifically --
9      A.   I think maybe --
10     Q.   -- expressed those concerns?
11     A.   -- maybe Brandon Raybion is a -- is a name
12  that sticks out that talked to him about it, but there
13  wasn't a -- it wasn't like a serial everybody
14  complaining about it.  I mean, it was -- it's gone
15  through when they hire on and they understand it for the
16  most part, but there's always the one-offs that don't
17  and still want to -- even though it's right there
18  upfront.  It's not like we were trying to hide it or
19  anything.  It's right there e-mailed out for everybody
20  to benefit and know, so we didn't get that many.
21     Q.   Mr. Harrison, I'm showing you TNT 6000.  I'll
22  expand it here in just a second.
23          But do you see it there on your screen?
24     A.   Uh-huh.  I can see it.
25     Q.   And this is a termination report for

1                     CHANGES AND SIGNATURE

2    WITNESS NAME: JOHN KENNETH HARRISON

3    DATE OF DEPOSITION: JULY 23, 2020

4    PAGE LINE          CHANGE                    REASON

5      9 : 24     "Gary Cooley" to "David Cooley    Wrong name

6     11 : 3         "Twin" to "Wind"              Wrong word

7     25 : 16      "pretest" to "pre-task"         Wrong word

8     26 : 23        "p.m." to "a.m."              Misspoke or misunderstood

9     73 : 24        "bolt" to "bulk"              Wrong word

10    87 : 6    Change answer of "That's right." to:    Clarification of answer

11            "No, I do not agree getting ice and filling

12            factory fuel tank with fuel is considered

13            compensable, and I erred on the side of

14            caution and paid it."  -As answered on page 86 line 15.

15

16

17

18

19

20

21

22

23

24

25

```
1          I, JOHN KENNETH HARRISON, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5                              _____

6                              JOHN KENNETH HARRISON

7

8     THE STATE OF Texas        )

9     COUNTY OF Midland         )

10

11         Before me, Dulce Castaneda          , on this day

12    personally appeared JOHN KENNETH HARRISON, known to me

13    (or proved to me under oath or through

14    TX Drivers License        ) (description of identity

15    card or other document)) to be the person whose name is

16    subscribed to the foregoing instrument and acknowledged

17    to me that they executed the same for the purposes and

18    consideration therein expressed.

19         Given under my hand and seal of office this

20    15th   day of December              2020     .

21

22                              _____

23                              NOTARY PUBLIC IN AND FOR

24                              THE STATE OF Texas

25                              COMMISSION EXPIRES: 02/25/2024
```

DULCE SARAI CASTANEDA
Notary Public, State of Texas
Comm. Expires 02-25-2024
Notary ID 132375160

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                 MIDLAND/ODESSA DIVISION

 3   TIMOTHY W. REPASS AND       )
     WILLIAM SCOTT MCCANDLESS,   )
 4   INDIVIDUALLY AND ON         )
     BEHALF OF ALL OTHERS        )
 5   SIMILARLY SITUATED,         ) CIVIL ACTION
                                 )
 6           Plaintiffs,         ) NO. 7:18-CV-107-DC-RCG
                                 )
 7   VS.                         )
                                 )
 8   TNT CRANE AND RIGGING,      )
     INC.,                       )
 9                               )
             Defendant.          )
10
                           Amended
11              REPORTER'S CERTIFICATION
                 ORAL DEPOSITION OF
12               JOHN KENNETH HARRISON
                  August 17, 2020
13                     Volume 1
                 (REPORTED REMOTELY)
14
```

15         I, Julie A. Jordan, Certified Shorthand Reporter in

16   and for the State of Texas, hereby certify to the

17   following:

18         That the witness, JOHN KENNETH HARRISON, was duly

19   sworn by the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by

21   the witness;

22         That the original deposition was delivered to

23   Mr. Edmond S. Moreland, Jr.;

24         That a copy of this certificate was served on all

25   parties and/or the witness shown herein on  8/24/2020  .

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1    That the amount of time used by each party at the

2 deposition is as follows:

3    EDMOND S. MORELAND, JR. - 02 HOUR(S):22 MINUTE(S)
     G. MARK JODON - NONE

4

5    I further certify that pursuant to FRCP Rule 30 (f)

6 (1) that the signature of the deponent:

7    XXXXX was requested by the deponent or a party

8 before the completion of the deposition and that the

9 signature is to be before any notary public and returned

10 within 30 days from date of receipt of the transcript.

11 If returned, the attached Changes and Signature Pages

12 contain any changes and reasons therefore:

13    _____ was not requested by the deponent or a party

14 before the completion of the deposition.

15    I further certify that I am neither counsel for,

16 related to, nor employed by any of the parties or

17 attorneys in the action in which this proceeding was

18 taken, and further that I am not financially or

19 otherwise interested in the outcome of the action.

20    Certified to by me this 24th of August, 2020.

21    Julie A. Jordan, Texas CSR 3203
      Expiration Date:  1/31/22

22    Firm Registration No. 280
      JULIE A. JORDAN & COMPANY

23    7800 North MoPac Expy, Suite 120
      Austin, Texas 78759

24    (512) 451-8243
      (512) 451-7583 (Fax)

25    E-MAIL:  info@jordanreporting.com

1    COUNTY OF TRAVIS )

2    STATE OF TEXAS   )

3

4        I hereby certify that the witness was notified on

5    ____8/24/2020_____ that the witness has 30 days

6    (or _____ days per agreement of counsel) after being

7    notified by the officer that the transcript is available

8    for review by the witness and if there are changes in

9    the form or substance to be made, then the witness shall

10   sign a statement reciting such changes and the reasons

11   given by the witness for making them;

12       That the witness' signature was/~~was not~~ returned as

13   of ____12/22/2020_____.

14       Subscribed and sworn to on this __22nd__ day of

15   _December___, 2020.

16

17   _____

18   Julie A. Jordan, Texas CSR 3203

19   Expiration Date: 1/31/22
     Firm Registration No. 280

20   JULIE A. JORDAN & COMPANY
     7800 North MoPac Expressway

21   Suite 120
     Austin, Texas 78759

22   (512) 451-8243
     (512) 451-7583 (Fax)

23   E-MAIL: info@jordanreporting.com

24

25