# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| TIMOTHY W. REPASS and WILLIAM SCOTT McCANDLESS, Individually and On Behalf of All Others Similarly Situated, | § § § § § | Civil Action No. |
| Plaintiffs, | § § | 7:18-CV-107-DC-RCG |
| v. | § § | |
| TNT CRANE AND RIGGING, INC. | § § | |
| Defendant. | § | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.     INTRODUCTION

Named and Opt-In Plaintiffs (collectively "Plaintiffs") now move for partial summary judgment against Defendant TNT Crane and Rigging, Inc. ("TNT") in this Fair Labor Standards Act and New Mexico Minimum Wage Act off-the-clock case on the following issues:

1.   TNT's liability for unpaid overtime compensation for time Plaintiffs spent performing undisputedly compensable work at the beginning and end of the workday, including undisputedly compensable time traveling to and from jobsites within the continuous workday;

2.   Applicability of the *Mt. Clemens Pottery* burden-shifting scheme due to TNT's undisputed failure to record the unpaid time; and

3.   TNTs' liability for liquidated damages due to TNT's admitted knowledge that it violated the FLSA.

To clarify the scope of this motion, Plaintiffs do not seek summary judgment on the amount of damages nor on TNT's liability for *every factual basis* constituting an instance of unpaid overtime that they intend to prove at trial. [1] Nor do Plaintiffs contend that *every single Plaintiff* experienced *all of* the

---

[1] For example, Plaintiffs allege that Defendant did not allow them to claim all their actual work time on their time sheets for various other tasks and Defendant sometimes altered their time sheets—often surreptitiously—to reduce the hours Plaintiffs logged. Defendant denies those allegations, so they must be adjudicated at trial.

same set of facts. The extent to which each Plaintiff experienced the facts at issue in this motion and the amount of their damages remain for trial. The procedure for trying the remaining issues is the subject of the parties' respective proposed trial plans to be presented in connection with TNTs' Motion for Decertification. Partial summary judgment is appropriate to establish TNT's liability based on the undisputed facts discussed below constituting the core overtime violations at issue in this action, at least as to some of the Plaintiffs, as well as applicability of *Mt. Clemens Pottery* and liquidated damages.[2]

Plaintiffs were employed by TNT as non-exempt crane operators working out of TNT's Houston, San Antonio, and Midland Yards. (Order Adopting Report and Recommendation on Motion for Conditional Certification, Dkt. 29, *2).[3] TNT admits that, as a matter of policy, depending on the arrangement TNT had with its customer, it routinely refused to pay Plaintiffs for undisputedly compensable work that they performed before driving to their jobsites and the time they spent driving to their jobsites after they had performed compensable work. Similarly, TNT admits that it routinely refused to pay Plaintiffs for the time they spent driving back from their jobsites and performing additional compensable work after the drive. These driving times were often significant, including travel to remote oilfield drilling sties in the Permian Basin in Texas and New Mexico and in the Eagle Ford Shale region in Texas, as well as worksites in other regions. For example, drive times from the Midland yard to the Plaintiffs' jobsites were often between one hour and 45 minutes to three hours. (Undisputed Fact 1.)[4]

TNT concedes that it failed to keep records of the unpaid time in question, which undisputedly invokes the burden-shifting rule for proving the amount of damages established by the Supreme Court

---

[2] Consistent with the scope of this motion, Plaintiffs do not attempt to cite all relevant evidence from each of the representative discovery plaintiffs to establish each summary judgment fact, but rather only sufficient representative evidence to establish the violations as to at least some of the Plaintiffs.

[3] Defendant concedes that Plaintiffs are not exempt from the protections of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and therefore that they were entitled to be paid at one and one-half times their regular rates of pay for all hours that they worked over forty in a workweek. 29 U.S.C. § 207(a)(1); (**Ex. A**, Defendant's Response to Plaintiff Repass's Interrogatory No. 16.)

[4] Plaintiffs incorporate by reference their attached Appendix of Undisputed Facts citing to the deposition transcripts and evidence in the summary judgment record, which are also attached as exhibits.

in *Anderson v. Mt. Clemens Pottery Company*, 328 U.S. 680 (1946).

Finally, TNT's officers and managers who were responsible for complying with the overtime pay requirements admit that they have known throughout all the relevant years that the unpaid tasks in question were compensable. Therefore, as a matter of law, TNT cannot establish its good faith defense to liquidated damages.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56; *Canal Ins. Co. v. Flores*, 524 F. Supp.2d 828, 832-34 (W.D. Tex. 2007). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-1047 (5th Cir. 1996). The non-movant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)). Fact disputes are resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Thus, the ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III.    ARGUMENT AND AUTHORITIES

### A. There is no genuine issue of material fact on TNT's liability for some of the Plaintiffs' unpaid compensable work time.

An FLSA plaintiff must prove the following in order to obtain judgment against an employer for unpaid overtime: "(1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379 (5th Cir. 2019) (citations omitted); *see also* Fifth Circuit Pattern Jury Instruction 11.24 (not including damages as an element). Courts interpreting the FLSA are instructed to do so broadly in favor of employees. *See, e.g., Allen v. McWane, Inc.*, 593 F.3d 449, 452 (5th Cir. 2010).

Plaintiffs do not seek summary judgment on the amount of their damages. Therefore, only the first three elements are at issue.

### 1.   TNT admits the first and second elements of the prima facie case.

As for the first element, TNT admits that there was an employee-employer relationship under the FLSA. (Dkts. 77 and 79, ¶¶ 9-10). As for the second element, the FLSA requires employers to comply with its overtime and minimum wage provisions if they have (1) employees engaged in commerce or in the production of goods for "commerce" under 29 U.S.C. §203(b) (known as "individual coverage") or (2) employees "employed in an enterprise engaged in commerce or in the production of goods for commerce" under 29 U.S.C. §203(s)(1) (known as "enterprise coverage"). 29 U.S.C. §207(a)(1). "*Either* individual *or* enterprise coverage is enough to invoke FLSA protection." *Martin v. Bedell*, 955 F.2d 1029, 1032 (5th Cir. 1992) (emphasis in original). Here, TNT admits FLSA coverage. (*Id.*, ¶¶ 11-13, 18; **Ex. A**, No. 20).

2. <u>It is undisputed that TNT violated the FLSA's overtime requirement.</u>

    a. *Under the "continuous workday" or "whistle-to-whistle" rule, Plaintiffs are entitled to overtime compensation for their first and last "principal activities" of the workday, as well as travel time that falls between them.*

As for the third element, Plaintiffs worked over forty hours in a workweek without receiving overtime compensation for (1) the work they performed before driving to their jobsites at the beginning of many workdays or after driving back from their jobsites at the end of the day, as well as (2) the time they spent driving to their jobsites after performing compensable work or back from their jobsites before performing additional compensable work.

    i. <u>The "Continuous Workday," or "Whistle-to-Whistle," Rule</u>

Under the Portal-to-Portal Act of 1947, which amended the FLSA,[5] all working time, including travel time, is compensable if it occurs after the first, but before the last, performance of the "principal activity or activities" which the employee is hired to perform; but an employee's time is non-compensable if it is spent performing preliminary or postliminary activities that do not constitute "principal activities." *See* 29 U.S.C. § 254(a). The employer bears the burden to prove that the Plaintiffs' work time is non-compensable under the Portal-to-Portal Act. *See Bleichner v. Speis Painting & Decorating, Inc.*, No. 08–cv–057–bbc, 2009 WL 281145, *7 (W.D. Wis., Feb. 3, 2009), (*citing Walling v. General Industries Co.,* 330 U.S. 545, 547–48 (1947)). TNT cannot carry that burden here.

It is well settled under the "continuous workday," or "whistle to whistle" rule, that an employee's

---

[5] The Portal-to-Portal Act, 29 U.S.C. § 254(a), reads as follows:

    Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947--

    (1)  walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

    (2)  activities which are preliminary to or postliminary to said principal activity or activities,

    which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

compensable time begins to run when he performs his first principal activity or activities of the day, and it continues to run through the performance of the day's last principal activity or activities. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005) (holding that time spent walking after performing the first principal activities of the day is compensable); 29 C.F.R. §790.6(a) ("Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted.").[6] In short, other than *bona fide* meal breaks under 29 C.F.R. §785.19, an employer must pay its employees for all of the employees' time after they have performed one of their first principal activities of the day until they perform the last principal activity of the day.

Stated another way, all time under the FLSA is compensable when it is "all in a day's work." *See also* 29 C.F.R. §785.38 ("Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice."). Consistent with this notion, as the Fifth Circuit noted in *Vega v. Gasper*:

> Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted.

*Vega v. Gaspar*, 36 F.3d 417, 424 (5th Cir. 1994) (internal quotations omitted) (*citing and quoting* 29 C.F.R. 785.38).[7] Thus, under the FLSA, all of an employee's time is compensable from the time that he

---

[6] *See also Cantu v. Milberger Landscaping, Inc.*, 12 F. Supp. 3d 918, 921-22 (W.D. Tex. 2014) ("Under this rule, an employee's travel time is not compensable unless it is an indispensable part of performing one's job . . . However, where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted." (internal citations and quotations omitted); *Garcia v. Champion Glass, LLC*, Civ. No. SA-12-CA-0703-FB, 2014 WL 12537863, *4 (W.D. Tex. Oct. 23, 2014) (holding that the plaintiffs' evidence that they loaded and unloaded tools and equipment at the defendant's place of business prior to and after their regular work hours was sufficient evidence of principal activities to defeat employer's motion for summary judgment); *Johnson v. RGIS Inventory Specialists*, 554 F. Supp. 2d 693, 703-704 (E.D. Tex. 2007)("[U]nder the continuous workday or whistle to whistle rule, the workday is defined as the period between the commencement and completion on the same workday of an employee's principal activity or activities.").

[7] Notably, although the *Vega* court discusses a "require[ment] to report at a meeting place," (and assuming, *arguendo*, that this phrase refers to the employer "requir[ing]" something of the employee) in *Integrity Staffing Solutions, Inc. v. Busk*, the Supreme Court subsequently and explicitly clarified that the employer need not "require[]," or even benefit from, a principal

performs the first principal activity of the day to the time that he performs the last principal activity of the day.

       ii.  <u>"Principal Activities"</u>

"Principal activities," in turn, includes all "activities [that are] an integral and indispensable part of the principal activities for which covered workmen are employed . . ." *IBP, Inc.* 546 U.S. at 29-30 (*citing Steiner v. Mitchell,* 350 U.S. 247, 256 (1956)). "An activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Busk*, 574 U.S. at 33; *see also* 29 C.F.R. § 790.8 (citing, as an example, the time spent by a chemical plant employee changing clothes would be compensable if he was unable to "perform his principal activities without putting on certain clothes," but would not be compensable if "changing clothes [were] merely a convenience to the employee not directly related to his principal activities." (cited with approval in *Busk*, 574 U.S. at 34)).

"Critically, the integral-and-indispensable inquiry does not turn on whether the employer requires the activity or whether the activity benefits the employer . . . Instead, the question is 'tied to the productive work that the employee is *employed to perform*.' " *Aguilar*, 948 F.3d at 1276-77 and n. 3 (internal footnote and citation omitted; emphasis in *Busk*) (*citing and quoting Busk*, 574 U.S. at 36); *see also, Busk*, 574 U.S. at 36 ("A test that turns on whether the activity is for the benefit of the employer is similarly overbroad."). *See also* 29 C.F.R. § 790.8(a) (explaining that the term "principal activities" was "considered sufficiently broad to embrace within its terms such activities as are indispensable *to the*

---

activity in order for the employee's work to be compensable. *Aguilar v. Management & Training Corp.*, 948 F.3d 1270, 1276-77 and n. 3 (10th Cir. 2020) (*citing Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 36 (2014)). In addition, although "work" is not defined in the FLSA, the Supreme Court has given it a broad reach. "Work" under the FLSA is defined by the Supreme Court as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Busk*, 574 U.S. at 31 (*citing and quoting Tennessee Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *see also Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 164-66 (1945).

*performance of productive work*" (internal quotation marks omitted; emphasis added)); § 790.8(c) ("Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable *to its performance*." (emphasis added)). The focus of the "principal activity" inquiry, therefore, is on the employee's work, and not on whether the employer requires or even directly benefits from it.[8]

> b. *Obtaining and loading materials necessary for the job and picking up and dropping off coworkers required for the job at the employer's office to transport them to a jobsite are integral and indispensable to the principal activities.*

Plaintiffs here are similar to the plaintiffs in the *Cantu*, *Garcia*, and *Johnson* cases, all cited in Footnote 6 above. For example, in *Cantu*, the plaintiffs—landscape workers—went to the employer's yard before their shifts in the morning and loaded lawnmowers, tools, water, ice, and other equipment before they left the yard for the day's work; and, in the evenings, they would unload refuse, equipment, other materials, and generally prepare for the next day's work at the end of the day. *Cantu*, 12 F. Supp. 3d at 922-23. Like the Plaintiffs here, the *Cantu* plaintiffs were also not paid for certain of their travel time that occurred after the first principal activity (loading tools and equipment in the morning), but before the last principal activity (unloading tools and refuse and preparing for the next day's work), of the day. *Id.* The *Cantu* court held that the plaintiffs there performed compensable work before and after their shifts, and granted the plaintiffs' motion for partial summary judgment (and denied the defendant's motion for summary judgment) on the issue of the compensability of some of their travel and work time. *Id.*, 922-23, 924.

Similarly, when an employee is required to report to the employer's facilities to pick up and drop off a coworker and transport them to a jobsite and the coworker is necessary to perform the work, such time is also compensable work. *See Scalia v. AWP, Inc.*, No. 1:18-CV-1183, 2020 WL 7639980, at *11

---

[8] Similarly, the Fifth Circuit has long taken a broad view of the work that makes up an employee's principal activities. They include all of an employee's predominant job responsibilities and any tasks incidental to those responsibilities. *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 399-401 (5th Cir. 1976) (*citing Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721 (5th Cir. 1961)); *see also Vega*, 36 F.3d at 424.

(W.D. Mich. Dec. 23, 2020) ("If two employees are needed to perform a flagging job, and employees are categorically forbidden from parking at the worksite, then the only way a flagging job could be performed is if the flagger with the company truck transported a partner. This would make such partner transportation integral and indispensable to the activity of flagging."); *Thacker v. Halter Vegetation Management, Inc.*, No. 2:13–cv–00378–JMS–WGH, 2015 WL 417713, *10 (Jan. 30, 2015) ("[t]o be sure, picking up and transporting coworkers is compensable if doing so extended [the] commute past the normal commute range, or if [the plaintiff] picked up coworkers and/or transported them to work sites after going to [the employer's] office, and returned them to [the employer's] office at the end of the day."); *Bleichner v. Spies Painting & Decorating, Inc.*, 2009 WL 281145 (W.D.Wis.2009) ("use of the company vehicle to transport other employees to and from the jobsites is properly considered 'work' under the FLSA.")

> c. *It is undisputed that Plaintiffs routinely performed compensable work before traveling to the jobsite at the beginning of the workday and after traveling back from the jobsite at the end of the workday.*

Before driving to their jobsites or after driving back, the Plaintiffs routinely performed one or more compensable work tasks that constitute "principal activities," including: (1) filling or topping off an auxiliary "drag" (or "L") tank on their company provided pickup trucks that they used to fuel their cranes (Undisputed Fact 12.); (2) acquiring and loading other equipment and materials, such as Diesel Exhaust Fluid (DEF), grease, and cleaning products needed to maintain their cranes in working order (Undisputed Fact 13); and (3) picking up or dropping off riggers who worked with the crane operators on the jobsite and were required for many jobs. (Undisputed Fact 14.)[9]

On many days, the Plaintiffs obtained and loaded fuel and necessary work materials at TNT's

---

[9] These are only examples, not an exhaustive list, of some of the most common unpaid compensable tasks that Plaintiffs routinely performed. With this motion, Plaintiffs seek only a finding that Defendant is liable for unpaid overtime because it refused to pay for at least some compensable tasks in overtime weeks. The amount of damages—based on evidence of the full range of unpaid compensable tasks and the frequency with which each plaintiff performed them—is left to be determined at trial.

yard. (Undisputed Fact 15.) Even if TNT did not specifically instruct a Plaintiff to report to the yard on a particular day to pick up a rigger or particular materials or equipment, TNT expected them to stop at the yard on the way to or from their jobsites as often as needed to stock up on fuel and other materials needed to maintain their cranes in good working order. (Undisputed Fact 16.) On jobs that were too far from one of TNT's yards, Plaintiffs were required to stop at a service station or store to purchase and load the same necessary fuel and materials. (Undisputed Fact 17.) TNT issued the Plaintiffs company credit cards to purchase those items needed for the job. (Undisputed Fact 18.)

"The main role of the rigger is to connect whatever is being lifted to the crane hook" and TNT's customers require a rigger on many jobs. (Undisputed Fact 19.) Personal vehicles were not allowed on jobsites for "liability and reliability" reasons. (Undisputed Fact 20.) TNT often required crane operators to pick up and drop off riggers at TNT's yard and transport them to the jobsite because TNT did not provide riggers with company vehicles. (Undisputed Fact 21.) In most cases, stopping at TNT's yard to pick up or drop off a rigger extended the crane operators' commute. (Undisputed Fact 22.)

These activities were all indispensable to the performance of the Plaintiffs' work. After all, (1) without fuel, the Plaintiffs could not run the cranes; (2) without DEF, grease, and cleaning products, the Plaintiffs could not keep the cranes in good working order; and (3) without a rigger, the Plaintiffs could not safely perform their jobs. Therefore, it is undisputed that Plaintiffs performed compensable work before driving to or after driving from their jobsites most days. Consequently, under the continuous workday rule, Plaintiffs' driving time to or from the jobsites is compensable on those legs of the trip bounded on either or both ends by other compensable work.

> d. *TNT admits that, depending on certain circumstances and its arrangement with its customer, it routinely refused to pay Plaintiffs for compensable work before traveling to the jobsite at the beginning of the workday or after traveling back from the jobsite at the end the workday, as well as the compensable travel time.*

TNT issued and followed written and unwritten policies that it would not pay its crane operators for any travel time to and from their jobsites on certain jobs and under certain circumstances, depending

mainly on whether TNT's customer paid for the travel time. (*See* Undisputed Facts 23-30.) These policies applied without regard to whether the operators had performed compensable work that bounded the continuous workday before traveling to the jobsite or after traveling back. (*See id*.) These policies varied slightly from branch to branch and evolved over time. (*See id*.) Under each of the various iterations of its policies, with some exceptions under certain conditions, TNT did not pay crane operators for daily travel time to and from the jobsite in company pickup trucks if TNT's contract with its customer did not include payment for that travel time, and sometimes TNT did not pay the travel time even when the customer did. (*See id*.)[10]

For example, TNT's Midland and San Antonio branches followed written policies stating that travel time would not be paid unless (1) the customer paid for it or (2) the crane operator opted to (a) stay in a hotel and (b) receive a $35 per diem (or $60 if he stayed at a man camp during a certain period at TNT's Midland Branch). (Undisputed Facts 23, 26.) If the crane operator opted to stay in his own lodging, he would receive only a $100 per diem and would not be paid travel time, unless TNT's customer paid for the travel time, regardless of whether the operator performed compensable work before traveling to the jobsite or after returning. (*Id*.) However, at least in San Antonio, even if the customer paid for travel time, TNT still would not pay the crane operators for their travel time if they opted for the $100 per diem. (Undisputed Fact 24.) Some details of these written policies have been amended from time to time. (Undisputed Fact 25.)

Additionally, for "continuous" jobs (i.e., those that lasted longer than one day) in the greater San Antonio area that did not require an overnight stay, TNT's policy was that crane operators were not paid for daily travel time in company pickups. (Undisputed Fact 27.) Instead, they were only paid travel time when driving cranes or haul trucks, which typically occurred only on the first and last day of the job

---

[10] Across all branches, TNT was generally able to charge its customers for time crane operators spent traveling in a crane or haul truck, and TNT generally paid its crane operators for that time. TNT's policies of not paying for certain travel time that are the subject of this motion pertain to days in which crane operators traveled in company pickup vehicles or personal vehicles.

when they mobilized and demobilized the equipment on the jobsite. (*Id.*) For such jobs, TNT instructed operators on their timesheets: "On continued jobs your time STARTS & STOPS at the job except the first and last day." (*Id.*) In spite of that policy, Todd Stevens, who has been in charge of reviewing crane operators' time sheets in the San Antonio Branch throughout the relevant period, claims that on San Antonio-area "continuous" jobs, if an operator had indicated on his time sheet that he performed compensable work, like stopping at a gas station to get necessary work supplies, he would be paid. (Undisputed Facts 7-10, 28.) However, Stevens admits he does not recall anyone ever explaining that to the operators nor any operators ever asking to be paid under those circumstances. (Undisputed Fact 28.)

Similarly, TNT's Houston Branch had an unwritten policy that crane operators were only paid travel time the first and last day of "continuous jobs" (i.e., jobs lasting more than one day) because its contracts with its customers on those jobs did not include daily travel time in pickups. (Undisputed Fact 29.) The same policies regarding travel time pay for the Houston Branch also applied to TNT's Freeport yard because it was a satellite yard to the Houston Branch under Murray's supervision. (Undisputed Fact 30.) This policy applied even though crane operators assigned to TNT's Houston and Freeport yards, like crane operators at TNT's other branches, routinely loaded fuel in their auxiliary tanks to fuel their cranes and loaded other materials needed for their work before traveling to their jobsites or after returning from their jobsites. (*See* Undisputed Facts 18, 31 (TNT provided Houston and Freeport crane operators with credit cards to purchase fuel and supplies needed for the job if it was inconvenient to pick them up from the Houston or Freeport yards.).)

First, TNT's managers instructed crane operators not to claim travel time when TNT's policies precluded it, and operators generally complied by not claiming it. (Undisputed Fact 32.) Second, on occasions when crane operators did claim travel time on their time sheets, and even when they documented particular compensable tasks before traveling to the jobsite or after returning, TNT managers cut that time from their time sheets and refused to pay it. (Undisputed Fact 33.) Perhaps because of these undisputed facts, somee TNT witnesses who claimed the Plaintiffs would have been

paid if they had recorded all compensable time ultimately recanted and admitted that they were not paid or would not be paid even if they had recorded all time. (Undisputed Facts 26, 33 (Harrison), Undisputed Fact 33 (Stevens).

The Plaintiffs worked well over forty hours, and often over 100 hours, most weeks. (Undisputed Fact 34.) Therefore most of that routinely unpaid compensable time occurred in overtime weeks and therefore constituted unpaid overtime hours. Indeed, TNT admitted to cutting compensable tasks and travel time in overtime weeks. (Undisputed Fact 26.)

e. *TNT undisputedly knew, or had reason to believe, that Plaintiffs were working overtime off the clock.*

Under the FLSA,

no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess . . . [of forty] hours . . . at a rate not less than one and one-half times the regular rate at which he is employed."

29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.100-.105. The FLSA defines "employ" very broadly as "to suffer or permit to work." 29 U.S.C. § 203(g). Consequently, "[a]n employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 (5th Cir. 2016) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005). In other words, an employer who knows or has "reason to believe" that an employee is working overtime cannot look the other way, accepting the benefit of that work, without paying the employee in accordance with the FLSA. *Fairchild*, 815 F.3d at 965.

The Fifth Circuit recently reaffirmed that an employer cannot escape liability by claiming "it was unaware that employees were not recording overtime hours" when a "supervisor had actual knowledge or, at a minimum, constructive knowledge that the employees were working, but not reporting, overtime hours." *United States Dep't of Lab. v. Five Star Automatic Fire Prot., L.L.C.*, 987

F.3d 436, 444 (5th Cir.), *reh'g denied*, 997 F.3d 1258 (5th Cir. 2021) (citing *Brennan v. General Motors Acceptance Corporation*, 482 F.2d 825, 827-28 (5th Cir. 1973). "The company cannot disclaim knowledge when certain segments of its management squelched truthful responses." *Id.* (cleaned up); *see also* 29 C.F.R. § 785.13. ("[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed . . . ."). Thus, the Fifth Circuit has repeatedly affirmed district court findings of overtime violations "based on the representative testimony of a de facto policy of underreporting time." *Id.*

Here, TNT admits not only to a *de facto* policy of underreporting time, but to a formal policy of nonpayment for compensable travel and other work tasks that it was aware Plaintiffs performed at the beginning and end of their shifts. TNT instructed and expected Plaintiffs not to record on their time sheets the travel and other work tasks that it refused to compensate. (Undisputed Fact 32.) Furthermore, TNT admits it cut Plaintiffs' time from their time sheets when they claimed travel time on their time sheets in contravention of TNT's policies, regardless of whether they performed compensable tasks. (Undisputed Fact 33.)

Therefore, because it knew (or should have known) that the Plaintiffs were working off the clock, TNT is legally foreclosed from attempting to disclaim knowledge of particular instances when Plaintiffs performed such tasks without recording them.

**B. Plaintiffs are entitled to utilize the *Mt. Clemens Pottery* burden-shifting framework for determining the amount of uncompensated travel time.**

Every employer subject to the FLSA is required to "make, keep, and preserve" records of its employees' hours worked. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. The recordkeeping requirement includes time sheets "on which are entered the daily starting and stopping time of individual employees." 29 C.F.R. § 516.6. "Seventy-five years ago in *Anderson v. Mt. Clemens Pottery Company*, the Supreme Court fashioned a burden-shifting framework for federal wage claims where an employer fails to maintain proper records." *Five Star*, 987 F.3d at 439 (citing *Mt. Clemens*, 328 U.S. 680, 687 (1946)).

"Under *Mt. Clemens*, if 'the employer's records are inaccurate or inadequate,' a plaintiff need only show by 'just and reasonable inference' that she was an employee, worked the hours, and wasn't paid." *Id.* at 439-40. (quoting *Mt. Clemens*). "It's a lenient standard rooted in the view that an employer shouldn't benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable." *Id.* at 440.

Under the *Mt. Clemens Pottery* standard, a plaintiff does not have to "prove each hour of overtime work with unerring accuracy or certainty." *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988). Rather, a Plaintiff is only required to show "the amount and extent of improperly compensated work as 'a matter of just and reasonable inference.' " *Mt. Clemens*, 328 U.S. at 687. "[W]hen assessing damages under the *Anderson* standard, a court may draw inferences from oral testimony, sworn declarations, and whatever relevant documentary evidence a plaintiff is able to provide." *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 8, 13 (D.D.C. 2010). "Where the inaccuracy is due to the employer's failure to keep adequate records as required by statute, imprecise evidence on quantum provides a "sufficient basis" for damages. *Reeves v. International Tel. and Tel. Corp.*, 616 F.2d 1342, 1351 (5th Cir. 1980). Under these circumstances, [the Fifth Circuit has] "in effect ordered the fact finder to do the best he could in assessing damages." *Id.* In *Reeves*, the Fifth Circuit upheld the district court's award of unpaid wages based on the plaintiff's testimony of his estimate of average hours per week based on a "running total of hours" that he conceded "corresponded to the rough computations of his subconscious mind." Id. at 1352. The court held the award "reflected a conscientious adherence to the rule enunciated in *Anderson v. Mt. Clemens*." *Id.*

Once a plaintiff provides an estimate of unpaid hours and wages, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88. If the employer fails to do so, it cannot complain that the resulting calculations of the number of hours worked or back pay owed is too uncertain or approximate. *Id.* at 680; *Marshall v. Partida*, 613 F.2d

1360, 1362 (5th Cir. 1980); *Hodgson v. Ricky Fashions*, 434 F.2d 1261, 1264 (5th Cir. 1970); *Mitchell v. Mitchell Truck Line*, 286 F. 2d 721, 725 (5th Cir. 1970).

To be clear, Plaintiffs do not seek a ruling that they have carried their burden under *Mt. Clemens Pottery* because they have not yet presented their estimates of damages and all supporting evidence to the Court. Damages must be determined at trial. Rather, Plaintiffs seek a ruling simply that the *Mt. Clemens Pottery* burden-shifting rule applies in this case because TNT failed to keep complete and accurate records of their hours.

In *Five Star*, the Fifth Circuit affirmed the district court's application of the *Mt. Clemens* burden-shifting rule based on "consistent testimony that Five Star urged employees not to record their pre- and post-shift work hours," 987 F.3d at 440, and the Court's finding that "while the typical workday ended at 3:30 pm, that was the time employees left the jobsite. And Five Star didn't compensate employees for the required travel time back to the shop." *Id.* at 441. Likewise, both TNT and Plaintiffs have offered consistent testimony that TNT told the Plaintiffs that, depending on its arrangement with its customers, TNT would not compensate Plaintiffs for compensable work tasks before and after traveling to the jobsite or the required travel time. (Sections III(A)(2)(d), above.) Both sides also testify consistently that TNT urged Plaintiffs not to record that time on their time sheets, and that the Plaintiffs routinely did not record the time. (Undisputed Fact 32.) Therefore, the Court must apply the *Mt. Clemens Pottery* burden-shifting rule at trial.

### C. TNT cannot establish its good faith defense to liquidated damages because its officers and managers knew it was violating the FLSA.

"Any employer who violates the [FLSA's overtime provision] shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "Liquidated damages" under the FLSA are compensatory in nature, not punitive. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707-08 (holding that the purpose of the FLSA's liquidated damages provision is to compensate underpaid workers "for

the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages").

"A court *must* grant liquidated damages under Section 216 of the FLSA unless the employer meets its substantial burden of persuading the court that its act or omission was both in good faith and reasonable." *Mohammadi v. Nwabuisi*, 990 F. Supp. 2d 723, 749 (W.D. Tex. 2014), *aff'd in part, rev'd in part and remanded on other grounds*, 605 F. App'x 329 (5th Cir. 2015) (citing *Lowe v. Southmark Corp.,* 998 F.2d 335, 337–38 (5th Cir.1993); *Singer v. Waco,* 324 F.3d 813, 823 (5th Cir.2003); *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 468 (5th Cir.1979)). The good-faith affirmative defense requires defendants to carry the "substantial burden" of proving that they made an attempt to comply with the FLSA that was *both* in subjective good faith *and* objectively reasonable. *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir. 1990) (citing 29 U.S.C. § 260). To support the subjective component of this defense, the employer is required to provide "plain and substantial evidence of at least an honest intention to ascertain what the FLSA requires and to comply with it." *Carmack v. Park Cities Healthcare, LLC*, 321 F. Supp. 3d 689, 707 (N.D. Tex. 2018). "Even if the Court finds that an employer acted with subjective good faith, however, the employer must also demonstrate that it acted with objective good faith. *Campos v. Lone Star Wheel Components, Inc.*, Civil Action No. 3:13-CV-04088-N, 2016 U.S. Dist. LEXIS 195224, at *12 (N.D. Tex. 2016).

Under section 260, "good faith requires some duty to investigate potential liability under the FLSA." *Mohammadi*, 990 F. Supp. 2d at 749 (citing *Barcellona,* 597 F.2d at 469). "Lack of good faith is demonstrated when an employer "knows, or has reason to know, that his conduct is governed by the [FLSA]." *Reeves*, 616 F.2d at 1353 (5th Cir. 1980) (quoting *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir. 1974)); s*ee also Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.1971) ("Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture?").

TNT admits not only that it knew that its conduct is governed by the FLSA, but that it also knew the FLSA required it to pay its employees for the precise work tasks and travel time at issue in this

motion. TNT's designated corporate representative Antoy Bell, who is a licensed attorney and TNT's Human Resources Director, agrees that obtaining and loading fuel and materials needed for the job at its yards or at services stations is compensable work. (Undisputed Fact 35.) Consequently, Bell claims he advised TNT's Midland, San Antonio, and Houston Branch Managers that TNT was legally obligated to compensate crane operators for travel from TNT's branch yards to jobsites without exception. (Undisputed Fact 36.)

TNT Midland Branch Manager John Harrison testified that he understands the continuous workday rule and agrees that loading diesel in an auxiliary ("L") tank and other equipment onto a truck is work time. (Undisputed Fact 37.)

Likewise, in his role as TNT San Antonio Branch "time approver," Todd Stevens understood that crane operators are legally entitled to be paid for time they spend obtaining and loading fuel or supplies needed for work from TNT's yard or stores or gas stations before or after driving to their jobsites, as well as the drive time that falls between other compensable tasks. (Undisputed Facts 9, 38.) Stevens testified clearly that he understood the law requires TNT to pay crane operators for their travel time when it falls between other compensable work tasks, but TNT did not pay that time, following its written policy, when the operator provided his own lodging and received his $100 per diem. (Undisputed Fact 39.)

TNT Houston Branch Manager Alex "Bubba" Murray also testified that he has understood throughout his tenure at TNT that the FLSA applies to TNT, that the time crane operators spend loading fuel into auxiliary "drag" tanks or loading supplies needed for work are compensable tasks that can start and end the workday, and that travel within the continuous workday must be paid. (Undisputed Fact 40.)

Nevertheless, TNT admits that, as a matter of policy, it refused to pay the Plaintiffs for this compensable time, depending on the type of job and arrangement TNT had with its customer. (*See* Section III(A)(d) above.) Therefore, Plaintiffs seek summary judgment denying and dismissing TNT's good faith defense and holding that TNT is liable for liquidated damages. The issue is particularly

appropriate for disposition on summary judgment given the district court's discretion to award liquidated damages even if an employer establishes the good faith defense. *See Mireles*, 899 F.2d at 1415 n. 8 ("Even if a trial court is satisfied that an employer acted both in good faith and reasonably, it may still award liquidated damages at its discretion in any amount up to that allowed by 29 U.S.C. § 216(b)."); 29 U.S.C. § 260 (if the employer proves good faith and reasonable belief, "the court may, in its sound discretion, award no liquidated damages or award any amount thereof").[11]

## IV.   CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Partial Summary Judgment and find, as a matter of law, that:

1.    TNT is liable for unpaid overtime compensation for the unpaid time Plaintiffs spent performing the first and last principal activities of the day and travel time between the Plaintiffs' jobsites and other locations where they performed the first and last principal activities of the day;

2.    TNT's failure to accurately record all the Plaintiffs' travel and other work time entitles the Plaintiffs to the *Mt. Clemens Pottery* burden-shifting framework for determining the amount of compensable time for which TNT owes the Plaintiffs overtime compensation; and

3.    TNT cannot establish its good faith defense to liquidated damages because its officers and managers knew they were violating the law.

---

[11] Defendant's admissions that it refused to pay for travel and work tasks despite knowing the FLSA requires compensation not only foreclose Defendant's good faith defense but also establish that the violations were willful. However, Plaintiffs defer a ruling on their claim of willfulness until trial.

Respectfully submitted,

**FAIR LABOR LAW**


By: */s/ Aaron Johnson*
Aaron Johnson
State Bar No. 24056961
ajohnson@fairlaborlaw.com
314 E. Highland Mall Blvd, Ste. 401
Austin, Texas 78752
Ph: (512) 277-3505
Ph: (512) 277-3254

**MORELAND VERRETT, P.C.**
Edmond S. Moreland, Jr.
State Bar No. 24002644
edmond@morelandlaw.com
Daniel A. Verrett
State Bar No. 24075220
daniel@morelandlaw.com
700 West Summit Drive
Wimberley, Texas 78676
Ph: (512) 782-0567
Fax: (512) 782-0605

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I electronically submitted the foregoing document for filing using the Court's CM/ECF system, which will serve a true and correct copy of the foregoing document upon counsel of record.


*/s/ Aaron Johnson*
Aaron Johnosn

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| TIMOTHY W. REPASS and WILLIAM SCOTT McCANDLESS, Individually and On Behalf of All Others Similarly Situated, | § § § § § | Civil Action No. |
| Plaintiffs, | § § | 7:18-CV-107-DC-RCG |
| v. | § § | |
| TNT CRANE AND RIGGING, INC. | § § | |
| Defendant. | § | |

**Appendix of Undisputed Facts**

1.      **Drive times for crane operators from TNT's Midland yard to Plaintiffs' jobsites were often between one hour and 45 minutes to three hours.** (Ex. B, Depo. of Timothy Repass, 20:23-22:8; *see also* Ex. C, Depo. of TNT Corporate Representative Antoy Bell, 115:16 – 116:5 (estimating drive times in Midland are over one hour at least 50% of the time, in San Antonio 35-40%, and in Houston 15%).)

2.      **TNT's designated corporate representative Antoy Bell is a licensed attorney and has served as TNT's Human Resources Director since 2013.** (TNT Corp. Rep. Bell Depo., 7:19 – 8:25.)

3.      **John Harrison has been the Branch Manager of TNT's Midland Branch since the beginning of 2014.** (Ex. D, Depo. of John Harrison, 8:5-10.)

4.      **Gary Harvey was Branch Manager of TNT's San Antonio Branch from 2011 to July 2018. In 2013 or 2014 he became Vice President, while continuing to serve the Branch Manager role.** (Ex. E, Depo. of Gary Harvey, 9:7-25.)

5.      **Gary Harvey oversaw the Midland Branch until about a year to year and a half after**

**John Harrison took over.** (*Id.* at 10:5 – 12:5.)

6.      **John Johnson was promoted to Branch Manager of TNT's San Antonio Branch in July 2019 and continues to serve in that position. He replaced Kevin Lawson, who served as Branch Manager following Gary Harvey's departure.** (Ex. F, Depo. of John Johnson, 7:17-9:1.)

7.      **Todd Stevens has worked as a Business Analyst in TNT's San Antonio Branch from approximately 2018 or 2019 to the present. From approximately 2013 until he became a Business Analyst, Todd Stevens was the Dispatch manager for TNT's San Antonio Branch.** (Ex. G, Depo. of Todd Stevens, 13:6-23.)

8.      **Todd Stevens' duties as Dispatch Manager included reviewing and approving San Antonio crane operators' time sheets, together with a team of dispatchers whom he supervised, to determine whether they had claimed any time they were not allowed to claim.** (*Id.* at 27:8-23, 37:16-38:8.)

9.      **Once TNT's San Antonio Branch switched from paper to electronic time sheets around 2018, Todd Stevens became the sole "time approver," and he has continued to serve that role through the present in his current position as Business Analyst.** (*Id.* at 31:11 – 32:23, 35:2 – 36:3, 6:16-20.)

10.      **Todd Stevens has reported directly to the San Antonio Branch Manager both in his current position as Business Analyst and in his former position as Dispatch Manager, and Stevens speaks with the Branch Manager about any questions regarding whether to approve time on crane operators' time sheets.** (*Id.* at 15:10-14, 16:1-17, 28:15 – 29:17.)

11.      **Alex "Bubba" Murray was Branch Manager of TNT's Houston Branch, then Vice President of Operations, but still served the role of Houston Branch Manager and also**

oversaw the Freeport yard during the relevant period. (Ex. H, Depo. of Alex "Bubba" Murray, 10:1-21.)

12.    Before driving to their jobsites or after driving back, the Plaintiffs routinely filled or topped off an auxiliary "drag" (or "L") tank on their trucks that they used to fuel their cranes. (Repass Depo., 44:22 – 45:14, 46:11 – 47:8, 56:9-58:1 (Midland); Ex. I, Depo. of Plaintiff William Allen Payne, 19:7-20, 60:11-13 (San Antonio); Ex. J, Depo. of Plaintiff Jonathan Ochoa, 57:6-14, 59:4 – 60:6 (Houston); TNT Corp. Rep. Antoy Bell Depo., 35:3-20, 100:6 – 101:11; Harrison Depo., 73:15 – 74:15; Harvey Depo., 16:5 – 17:6; Murray Depo., 34:21 – 35:3, 36:15 – 17.)

13.    Before driving to their jobsites or after driving back, the Plaintiffs routinely acquired and loaded other equipment and materials, such as Diesel Exhaust Fluid (DEF), grease, and cleaning products needed to maintain their cranes in working order. (Repass Depo., 47:11 – 48:13, 50:23 – 53:7, 56:9-58:1 (Midland); Payne Depo., 55:14 – 56:5 (San Antonio); Ochoa Depo., (45:2-6, 59:4-20 (Houston); *see also* TNT Corp. Rep. Bell Depo., 35:3-20, 100:6 – 101:11; Harrison Depo. 73:15 – 74:15, Harvey Depo., 16:5 – 17:6; Murray Depo., 36:24 – 37:14.)

14.    Before driving to their jobsites or after driving back, the Plaintiffs routinely picked up or dropped off riggers who worked with the crane operators on the jobsite and were required for many jobs. (Repass Depo., 58:2 – 60:17 (Midland); Payne Depo., 57:25 – 58:5 (San Antonio); Ochoa Depo., 41:7 – 43:15 (Houston); TNT Corp. Rep. Bell Depo., 52:12-15, 99:15 – 100:2, 104:2-18, 130:10 – 131:7; Harrison Depo., 76:10-22; Harvey Depo., 43:1-12; Johnson Depo., 26:24 – 27:2.)

15.    On many days, the Plaintiffs obtained and loaded fuel and necessary work materials at TNT's yard. (Repass Depo., 56:9 – 58:1 (Midland);  TNT Corp. Rep. Bell Depo., 100:6 –

101:11.)

16.     Even if TNT did not specifically instruct a Plaintiff to report to the yard on a particular day to pick up a rigger or particular materials or equipment, TNT expected them to stop at the yard on the way to or from their jobsites as often as needed to stock up on fuel and other materials needed to maintain their cranes in working order. (Harrison Depo., 18:20 – 21:5; Harvey Depo., 16:5 – 17:6; *see* Repass Depo., 58:19-25; TNT Corp. Rep. Bell Depo., 100:6 – 101:11.).

17.     On jobs that were too far from one of TNT's yards, Plaintiffs were required to stop at a service station or store to purchase and load the same fuel and materials. (Repass Depo., 44:22 – 45:14; 46:11 – 47:8; Harrison Depo., 21:1-4.)

18.     TNT issued the Plaintiffs company credit cards to purchase those items needed for the job. (Repass Depo., 14:12-17 (Midland); Harrison Depo., 73:15 – 74:15 (Midland); Ex. XX, Johnson Depo., 24:24 – 25:10, 35:16 – 36:12 (San Antonio); Murray Depo., 36:15 – 37:20).

19.     "The main role of the rigger is to connect whatever is being lifted to the crane hook" and TNT's customers require a rigger on many jobs. (TNT Corp. Rep. Bell Depo., 99:15 – 100:2.)

20.     Personal vehicles were not allowed on most jobsites for "liability and reliability" reasons. (Harrison Depo., 76:3-9.)

21.     TNT often required crane operators to pick up and drop off riggers at TNT's yard and transport them to the jobsite because TNT did not provide riggers with company vehicles or vehicle badges needed to access jobsites. (Repass Depo., 58:2 – 60:17; Ochoa Depo., 41:19-24; TNT Corp. Rep. Bell Depo., 104:2-18, 130:10 – 131:7; Harrison Depo., 76:10-22.)

22.     In most cases, stopping at TNT's yard to pick up or drop off a rigger extended the

**crane operators' commute.** (Harrison Depo., 77:2-11.)

23.     **TNT's written policies for its Midland and San Antonio branches stated that travel time would not be paid unless the customer paid for it or the crane operator opted to stay in a hotel and receive a $35 per diem (or $60 if he stayed at a man camp during a certain period at TNT's Midland Branch). If the crane operator opted to stay in his own lodging, he would receive only a $100 per diem and would not be paid travel time, unless TNT's customer paid for the travel time.** (Ex. K, TNT 5596-99, 8450, TNT Memos re Payroll Policies.)

24.     **However, at least in San Antonio, even if the customer paid for travel time, TNT still would not pay the crane operators for their travel time if they opted for the $100 per diem.** (Ex. K, TNT 8450 (Memo regarding "our policy for San Antonio" states "$100 per diem is paid to the employee . . . when you work 'out of town' and do not charge for travel . . . you cannot charge travel to payroll."); Stevens Depo., 159:20-24 (under the $100 per diem option, operators are not paid daily travel time even if customer pays for it).)

25.     **Some details of these written policies have been amended from time to time.** (Ex. K, TNT 5596-99, 8450, TNT Memos re Payroll Policies; TNT Corp. Rep. Bell Depo., 81:25 – 85:10; Harrison Depo., 27:8 – 28:13, 41:8-13.)

26.     **TNT's San Antonio and Midland branches followed those written policies. When a crane operator provided his own lodging in the Midland Branch or on out-of-town jobs in the San Antonio Branch, TNT paid a $100 per diem and did not pay for his daily travel time to and from the jobsite, regardless of whether the operator performed compensable work before traveling to the jobsite or after returning.** (Repass Depo., 19:18-25; 97:22 – 98:1 (Midland); Harrison Depo., 42:10-44:4 (Midland), 82:13 – 85:10 (Harrison ordered travel time to the jobsite cut from operator's time sheet even though operator specifically indicated he performed

compensable work by filling his auxiliary "L" tank with fuel before traveling because "according to our payroll memo, he was staying in his own lodging . . . so it wasn't paid"); Payne Depo., 12:15 – 13:13 (San Antonio); Johnson Depo., 43:2 – 45:12 (San Antonio); Stevens Depo., 50:8 – 51:19; 73:15 – 74:22; 86:7-88:22, 159:20-24 (San Antonio).)

**27.     For "continuous" jobs (i.e., those that lasted longer than one day) in the greater San Antonio area that did not require an overnight stay, TNT's policy was that crane operators were not paid for daily travel time in company pickups. Instead, they were only paid travel time when driving cranes or haul trucks, which typically occurred only on the first and last day of the job when they mobilized and demobilized the equipment on the jobsite. For such jobs, TNT instructed operators on their timesheets: "On continued jobs your time STARTS & STOPS at the job except the first and last day."** (Ex. L, TNT 1804 (time sheet with instructions); Stevens Depo., 127:6 – 131:21, 72:17 – 73:14, 77:2 – 78:10, 61:22 – 62:9 (defining daily/day jobs versus "continuous" jobs); Harvey Depo., 49:10 – 50:3; *see* Payne Depo., 12:15 – 13:13 (was never paid travel time in San Antonio; Gary Harvey said TNT does not pay it), 23:17-22 (was trained to only include travel time on time sheet when driving crane per Gary Harvey's instructions.)

**28.     In spite of that policy, Stevens claims that on San Antonio-area "continuous" jobs, if an operator had indicated on his time sheet that he performed compensable work, like stopping at a gas station to get necessary work supplies, he would be paid. However, Stevens admits he does not recall anyone ever explaining that to the operators nor any operators ever asking to be paid under those circumstances.** (Stevens Depo., 131:22 – 133:13.)

**29.     Similarly, TNT's Houston Branch followed an unwritten policy that crane operators were only paid travel time the first and last day of "continuous jobs" (i.e., jobs lasting more**

than one day) because its contracts with its customers on those jobs did not include daily travel time in pickups. (Murray Depo., 17:14 – 18:14, 39:9-19; Ochoa Depo. 15:20 – 16:10 (unpaid for certain travel time when the customer did not pay for it), 36:24 – 37:22 (not paid for drive time more often than paid), 38:14-18 (sometimes not paid between hotel and jobsite).)

30.    **The same policies regarding travel time pay for the Houston Branch also applied to TNT's Freeport yard because it was a satellite yard to the Houston Branch under Murray's supervision.** (*Id*. at 10:3-21, 20:12-19.)

31.    **TNT provided Houston and Freeport crane operators with credit cards to purchase fuel and supplies needed for the job if it was inconvenient to pick them up from the Houston or Freeport yards.** (Murray Depo., 36:15 – 38:23.)

32.    **TNT's managers instructed crane operators not to claim travel time when TNT's policies precluded it, and operators generally complied by not claiming it.** (Repass Depo., 20:8-20 (Midland); Harrison Depo., 61:11-22 (Midland); Payne Depo., 23:17-22 (San Antonio - was trained to only include travel time on time sheet when driving crane per Gary Harvey's instructions); Stevens Depo., 52:1 – 53:17 (San Antonio); *see also* Murray Depo., 19:20 – 20:5 (Houston – we did not have to tell crane operators what time they could claim on their time sheets because "operators and employees knew our policies, knew the rules").)

33.    **On occasions when crane operators did claim travel time on their time sheets in overtime weeks, and even when they documented particular compensable tasks before traveling to the jobsite or after returning, TNT managers cut that time from their time sheets and refused to pay it.** (Repass Depo., 19:18-25 (Midland); Harrison Depo., 58:2 – 61:10, 82:13 – 85:10 (Midland); Payne Depo., 28:3-22 (San Antonio); Stevens Depo., 52:1-24 (San Antonio); Ochoa Depo., 14:1-17 (Houston – got in heated arguments when told he could not charge for travel

time), 47:9-18 (would realize not paid for all time claimed by comparing pay stubs to ledger he kept); Murray Depo., 31:24 – 33:17 (Houston – claims allowed if actual work time but admits edited timesheets if found travel time operators were not allowed to claim).)

**34.     The Plaintiffs worked well over forty hours, and often over 100 hours, most weeks.** (*See* Declarations of Timothy Repass, William Scott McCandless, Allen Payne, and Daniel Venable, Dkt. Nos. 20-1 – 20-4.)

**35.     Bell admits that obtaining and loading fuel and materials needed for the job at its yards or at services stations is compensable work** (TNT Corp. Rep. Bell, 35:3-20).

**36.     Bell advised TNT's Midland, San Antonio, and Houston Branch Managers that TNT was legally obligated to compensate crane operators for travel from TNT's branch yards to jobsites without exception.** (*Id.* at 20:8 – 23:15.)

**37.     TNT Midland Branch Manager John Harrison understands the continuous workday rule and agrees that loading diesel in an auxiliary ("L") tank and other equipment onto a truck is work time.** (Harrison Depo., 82:2-11, 84:25 – 85:2.)

**38.     In his role as TNT San Antonio Branch "time approver," Todd Stevens understood that crane operators are legally entitled to be paid for time they spend obtaining and loading fuel or supplies needed for work from TNT's yard or stores or gas stations before or after driving to their jobsites, as well as the drive time that falls between other compensable tasks.** (Stevens Depo., 67:1 – 69:12.)

**39.     Stevens testified clearly that he understood the law requires TNT to pay crane operators for their travel time when it falls between other compensable work tasks, but TNT did not pay that time, following its written policy, when the operator provided his own lodging and received his $100 per diem.** (*Id.* at 88:23 – 89:21.)

40.      **TNT Houston Branch Manager Alex "Bubba" Murray has understood throughout his tenure at TNT that the FLSA applies to TNT, that the time crane operators spend loading fuel into auxiliary "drag" tanks or loading supplies needed for work are compensable tasks that can start and end the workday, and that travel within the continuous workday must be paid.** (Murray Depo., 34:9 – 36:14.)

# Exhibit

1

IN HE UNI ED   A E  DI  RIC  COUR
FOR  HE  E ERN DI  RIC  OF  EXA
MIDLAND DIVI ION

```
                              )
 IMO HY  . REPA   AND         )
 ILLIAM  CO                   )
MCCANDLE  ,                   )
INDIVIDUALLY AND ON           )
 EHALF OF ALL O HER           )
 IMILARLY  I UA ED            )
                              )    NO. 7 18-CV-107-DC
                              )
V .                           )
                              )
                              )
 N  CRANE AND RIGGING,        )
INC.                          )
```

ORAL AND VIDEO APED DEPO I ION OF
IMO HY  . REPA
Au u   2 , 201

ORAL AND VIDEO APED DEPO I ION OF

 IMO HY  . REPA  ,      u

        D        ,      u1y      ,

  y1        u        u      Au u   2 , 201 ,

12 57  . .    4 11  . .,                  P       C u

R        , 05  .      A   u , M  1   ,      ,

A  1 y H.   1    , C                 R         Nu

 8252                           ,            y

    u          y  , u  u         F   1 Ru1

 C  1 P    u .

TIMOTHY W. REPASS

**14**

1  Q.  Is it your testimony that -- well, did Levi say
2  anything about being paid from your home to the yard?
3  A.  From my home to the yard, that -- I live -- I
4  don't believe so.  I live five minutes from the TNT
5  yard.
6  Q.  Okay.  Now, how about if you are going directly
7  from your home to the job?
8  A.  Which --
9  Q.  Would you expect that -- to be paid for that?
10  A.  If I had to just go by the yard to pick up
11  material and whatnot, yes, I do.
12  Q.  What if you didn't have to go by the yard?
13  A.  I still have to stop and buy fuel, which is on
14  comp -- my time, which assumably is on company time.  If
15  I have to go from my house, buy fuel or material,
16  whatever, with a company credit card, that's company
17  time.  Am I misconstruing this?
18  Q.  Let me ask it another way.  Let's say you're
19  going from your home to the job --
20  A.  Yes, sir.
21  Q.  -- and not doing anything for the company
22  between those two places.  Okay?  Did -- based on your
23  conversation with Levi, did -- would you expect to be
24  paid for that?
25  A.  If I --

**1**

1  anything for the company on the way, that you would be
2  paid for that time?
3  A.  That's what was understood as drive time
4  from -- to and from the location.
5  Q.  All right.  So it's your testimony that any
6  time you're going to the location, whether it was
7  from --
8  A.  Yes, sir.
9  Q.  -- your home or from the yard, Levi said you
10  would get paid for that?
11  A.  Over the phone when I took the job, yes.  And a
12  lot of time -- sorry, I shouldn't.  I'm -- I'll just
13  stop right there.
14  Q.  So is -- is it your understanding that that's
15  what TNT's company policy is, to pay for any time that
16  you were going from any place to the job site?
17  A.  From -- that's what I was about to state a
18  while ago and you just asked the question.  A lot of
19  times we were dispatched from home.
20  Q.  All right.  And so we -- you say when you're
21  dispatched from home, you're going from home to the job
22  site?
23  A.  Yes, sir.
24  Q.  Okay.  Not stopping at the yard?
25  A.  Not stopping at the yard.

**15**

1  Q.  I'm just trying to make -- I'm just trying to
2  understand your testimony as to what Levi told you.
3  A.  Does the job require me to drive from my home
4  to -- to -- this is how I want to -- I want to clarify
5  this.  Is -- my company that I was working for telling
6  me that I'm dispatched from -- from point A to point B,
7  and I don't have to go by the yard because I fueled up
8  the night before or whatever at the yard.
9  Q.  Sure, uh-huh.
10  A.  Sometimes there was times that I drove directly
11  because I took care of my business the night before.
12  Q.  Okay.  And so -- so if you were going from you
13  home to the job --
14  A.  Yes, sir.
15  Q.  -- and didn't have to stop at the yard, didn't
16  have to stop anyplace else --
17  A.  Yes, sir.
18  Q.  -- based on your conversation with Levi, did
19  you expect to be paid for that time?
20  A.  Yes, I do.
21  Q.  Okay.  And what did he tell you about that?
22  A.  That's the way the cookie crumbles.  I wasn't
23  getting paid for it.
24  Q.  So it was your understanding that even if you
25  were going from your home to the job site and not doing

**17**

1  Q.  Okay.  And if you're dispatched from home, do
2  you expect to be paid for travel time to the -- to the
3  work site?
4  A.  That's when your time should start if you're
5  dispatched and you're told to go to a job site, yes.
6  Q.  So when you say that's what your -- that's when
7  your time should start?
8  A.  Yes, sir.
9  Q.  Is that your personal opinion?
10  A.  No, sir, that's by what Levi told me when I
11  hired in.  If we're dispatched, we're -- we're basically
12  on the clock.
13  Q.  And when you say "dispatched," you're just --
14  that means told someone told you go to the work site?
15  A.  Dispatcher calls you on your personal phone.
16  Q.  Okay.
17  A.  Says, "You're needed to go here," and that's
18  what we did.
19  Q.  Did you ever discuss with anyone else at TNT,
20  other than Levi, whether it was the company policy to be
21  paid as soon as you were dispatched?
22  A.  Levi was pretty much my contact there.  I've
23  talked to John maybe three, four times the entire time I
24  was there.
25  Q.  Did you ever talk to John about travel time?

**5 (P    14    17)**

TIMOTHY W. REPASS

**18**

1    A.  I take -- well, I was always taught being in
2  the military to take it up the chain of command.  So
3  Levi was my chain of command.
4    Q.  Okay.  So my question is, did you ever talk to
5  John about it?
6    A.  No, sir.
7    Q.  Okay.  Did you ever talk to anyone, other than
8  Levi, about not -- about the travel time policy?
9    A.  No.
10    Q.  Okay.
11    A.  There was -- I didn't know there was a policy
12  except for what I was told.
13    Q.  Were you aware of there being any written
14  policy?
15    A.  Towards the end of the -- my term there, yes,
16  there was a policy that come out.
17    Q.  And what was -- as you understood it, what was
18  the policy that came out near the end of your term?
19    A.  Like I said, I really didn't pay much attention
20  to it because I knew I was on my way out.
21    Q.  All right.  And other than Levi, you didn't
22  talk to anyone else about the travel time -- about how
23  you were to be paid for travel time?
24    A.  After -- after I talked to Levi and he made the
25  statement I wasn't going to get paid for it and that was

**1**

1  the way the cookie crumbled, I never addressed anything
2  else.  I started looking for a new job.
3    Q.  So there's the conversation where you talked to
4  Levi over the phone, right?
5    A.  Yes, I've talked to Levi twice about it.
6    Q.  Okay.  So the first time was on the phone --
7    A.  Yes, sir.
8    Q.  -- before you took the job?  And the second
9  time was -- well, when was the second time?
10    A.  In the office.
11    Q.  When did that conversation take place?
12    A.  I can't remember the exact date, but probably
13  I'd say halfway between starting and ending.
14    Q.  Okay.  So halfway into your employment?
15    A.  Yes, sir.
16    Q.  A few months in?  All right.  And tell me what
17  you and Levi discussed during this conversation.
18    A.  During the conversation, I was very livid about
19  my drive time being removed from my check without even
20  contacting me to ask me or tell me why.  I have to find
21  a discrepancy on my paycheck, and that's when I called
22  Levi and said, "Hey, what's up with the drive time?"
23        He told me that that customer does not pay
24  drive time, therefore he does not pay drive time and
25  that's the way the cookie crumbles.  That was my exit

**20**

1  strategy right there, be gone.
2    Q.  Which customer was that?
3    A.  I believe it was ConocoPhillips.
4    Q.  So is it your testimony that you were paid for
5  drive time for some customers but not for others?
6    A.  For -- that's the way Levi made it sound, yes,
7  sir.
8    Q.  But in terms of what you received for pay,
9  you --
10    A.  I've never seen drive time, period, until --
11  till the end of my termination or my exit.
12    Q.  So is it your testimony that you were never
13  paid time driving to the -- the client's site?
14    A.  After that conversation, I quit putting it on
15  my time sheets, because I was -- if it was going to be
16  taken off, I wanted to rely on what's on my time sheets.
17    Q.  And is it your testimony that prior to this
18  when you would put it on your time sheets, it would be
19  cut?
20    A.  Yes, sir.
21    Q.  Every time?
22    A.  Yes, sir.
23    Q.  And now when you say "drive time," are you
24  talking about -- well, why don't you tell me exactly
25  what you're talking about, like --

**21**

1    A.  Drive -- travel from Midland to Orla, Texas,
2  two-and-a-half-hour drive time, one way.
3    Q.  All right.  I'm sorry, you said travel from
4  Midland to --
5    A.  Orla, Texas.
6    Q.  Okay.  What were the locations that you worked
7  at for TNT?
8    A.  I do not remember them all.  I do remember
9  working at Pecos, Orla, Texas, and Hayhurst, New Mexico.
10    Q.  Okay.  For Pecos, what -- what client was that
11  for?
12    A.  I'm not exactly sure, because there's so many
13  of them.
14    Q.  And about how far was the Pecos site from your
15  home?
16    A.  Hour and 45 minutes, one way.
17    Q.  For Orla, Texas, what was the -- what client
18  was that for?
19    A.  That was for Conoco.
20    Q.  And what was the -- what was the drive time to
21  Orla?
22    A.  Every bit of two and a half hours or -- depends
23  on traffic.  Going up 285 is a nightmare.
24    Q.  All right.  It's your testimony that it's two
25  and a half hours each way?

TIMOTHY W. REPASS

22

1   A.  Yes, sir.
2   Q.  Okay.  And where in New Mexico did you work?
3   A.  Hayhurst, which is just south of Carlsbad.
4   Q.  What client was that for?
5   A.  I want to say that was Chevron.  I might be
6   mistaken on that, but I want to say it was Chevron.
7   Q.  Okay.  And how far was that from your home?
8   A.  That was right at three hours.
9   Q.  Now, did you ever stay at a hotel or a man camp
10  closer to the site?
11  A.  I wasn't -- no, sir, until the end of the -- we
12  had an accident on a job from somebody driving back and
13  forth and they come up with this corporate policy or
14  company policy saying we had to stay in a man camp, or
15  if we lived so far, we had to do this or -- but they
16  were going to take our per diem and stuff away from us.
17  Q.  So after the -- when about did this policy come
18  out?
19  A.  I want to say it was towards the end of my --
20  my stay there.
21  Q.  Last month or two?
22  A.  Yes, sir, somewhere around in there.
23  Q.  But you said that you never stayed in a man
24  camp?
25  A.  I stayed at a hotel for a couple times.

23

1   Q.  Okay.
2   A.  That was out of Hayhurst, which was the
3   Carlsbad.
4   Q.  And how often did you stay at the hotel?
5   A.  I stayed there for approximately two weeks.
6   Q.  And what was your -- how far away was the hotel
7   from the job site?
8   A.  An hour and a half.  Hour, hour and a half,
9   depends on, like I said, traffic.
10  Q.  And it's your testimony that you weren't paid
11  for that travel time either?
12  A.  I'm not sure exactly how that -- that played
13  out on there.
14  Q.  All right.  So when you were staying at the
15  hotel, you were -- it's possible you were paid for
16  travel time?
17  A.  Possible, but I don't -- it doesn't reflect on
18  my check.
19  Q.  Well, so what do you mean it doesn't reflect on
20  your check?
21  A.  Hours on the job, hours back and forth, it
22  doesn't reflect the -- the travel time.
23  Q.  Oh, you mean it's not broken out?
24  A.  Yes, sir.
25  Q.  Okay.  All right.  So you're saying you can't

24

1   tell from the check whether the travel time was
2   included?
3   A.  According to the hours I put on my time sheet,
4   that was about the only time my time was correct.
5   Q.  Okay.  And so this would have been in the last
6   month or two of your employment; is that correct?
7   A.  Yes, sir.
8   Q.  So I'm a little confused.  You testified
9   earlier that you stopped putting your drive time on your
10  time sheets about halfway through your employment, but
11  now you're saying you might have been paid for drive
12  time during the last month or two?
13  A.  The last -- when I was staying in a hotel room,
14  I quit putting -- I quit stating it as drive time,
15  because I was told not to by Mr. Levi.  Put it on there,
16  straight time is 15 hours or whatnot, and if I got paid
17  for it, I got paid for it.
18  Q.  So I was -- so Mr. Levi told you to --
19  A.  Because I was --
20  Q.  Let me just --
21  A.  Yes, sir.
22  Q.  Did Mr. -- did Levi tell you to put all your
23  hours on your time sheet, including drive time, but not
24  break it out?
25  A.  What it -- no.

25

1   Q.  Okay.
2   A.  What it was is I was allowed this much time
3   because I stayed in a hotel room.
4   Q.  Okay.
5   A.  Which would include my drive time --
6   Q.  Okay.
7   A.  -- and on-the-job time, because I stayed in --
8   away from home.
9   Q.  Okay.  I see.  So you were -- so your hours
10  included the time it would take to go to the job site --
11  A.  Yes, sir.
12  Q.  -- when you were staying in the hotel?
13  A.  Yes, sir.
14  Q.  Okay.  And was it your understanding that, you
15  know, when you were -- that you always had the option to
16  stay at a hotel and have those drive time hours paid
17  for?
18  A.  No, sir, that come out towards the end of
19  the -- when they come up with this drive time man camp
20  policy thing.
21  Q.  You said earlier that you received a per diem?
22  A.  Yes, sir.
23  Q.  What was the per diem that you got?
24  A.  It was -- I believe it was $100 a day there.
25  Q.  Was it your understanding that you could elect

7  (P    22    25)

TIMOTHY W. REPASS

**42**

1  Q. Okay.
2  A. That I -- that I was aware of.
3  Q. Okay. Did you ever have the option to stay at
4  a man camp before that, before it was required?
5  A. We had a corporate credit card that we could
6  stay -- if it was deemed that we could stay in a hotel
7  room. They would take our per diem after that.
8  Q. So the -- the choice was to stay in a hotel but
9  lose the per diem?
10  A. Yes, sir.
11  Q. Okay. And that was your understanding of the
12  policy of -- until the time they --
13  A. Yes, sir.
14  Q. -- changed it? Okay. And when you were
15  staying at a hotel, you'd be paid travel time, right?
1(6)  A. Yes, sir.
17  Q. Okay. And prior to the new policy requiring,
18  you know, staying at a man camp or hotel, was it your
1(9)  choice to do that?
20  A. Yes, sir.
21  Q. Okay. So before they put in the new policy,
22  you could have chosen to stay at a man camp or hotel and
23  been paid for your travel time from the man camp or
24  hotel to the job site, correct?
25  A. That's -- that was the understanding I had with

**43**

1  Levi when I hired in.
2  Q. And -- well, and that was -- that was how it
3  worked? I mean, if you were staying in a hotel, you
4  would be paid the travel time, right?
5  A. Not that I understand -- understood. It was --
6  they would pay the -- on that particular job, if I
7  stayed in a hotel room, before the man camp situation
8  come about, that we would get paid for hour from the
9  hotel to the job.
10  That's why a lot of times we would --
11  instead of driving six hours roundtrip that we wouldn't
12  get paid for, we'd take the hour and stay in a hotel
13  room.
14  Q. So you could stay in a hotel room and be paid
15  an hour of travel time to the job site?
1(6)  A. Yes, sir, and lose our per diem.
17  Q. Prior to the -- the new man camp policy, how
18  often did you stay in a hotel?
1(9)  A. Staying at Hayhurst, it was -- like I said,
20  it's three hours one way. That's six hours a day, 12
21  hours on the job, that's 18 hours a day. Six hours of
22  sleep isn't going to cut it. So, yeah, I elected to
23  stay in a hotel room occasionally.
24  Q. You -- you elected to stay at a hotel and what?
25  A. Occasionally.

**44**

1  Q. Occasionally.
2  A. So I can get my rest.
3  Q. Okay. And when you did stay in a hotel room,
4  you were paid the -- the hour of travel time?
5  A. Yes, sir.
6  Q. And when you were -- when you were staying in a
7  hotel, you didn't break out the hour of travel time on
8  your time sheet?
9  A. No.
10  Q. Okay. It was just --
11  A. Yes, sir.
12  Q. -- part of the -- okay. And that was
13  predominantly when you were working in New Mexico?
14  A. Yes, sir.
15  Q. Okay. But you had the -- you had the
16  opportunity to do that even when you weren't working in
17  New Mexico, correct?
18  A. If I deemed that I needed to rest or if it was
1(9)  unsafe for me to drive, yes, I could get a hotel room.
20  Q. Okay. So -- so it was up to your judgment?
21  A. Yes, sir.
22  Q. Okay. So -- so when you were staying at a
23  hotel, would you drive straight from the hotel to the
24  work site?
25  A. Yes, sir.

**45**

1  Q. Okay. And would you do any work along the way?
2  A. Fuel for the drag-out tank for the crane, and
3  whatever -- whatever I needed for -- in that aspect,
4  yes, sir.
5  Q. I'm sorry, fuel for the --
6  A. L tank. It's a drag tank in the back of the
7  truck for --
8  Q. Okay.
9  A. -- carrying fuel to and from the crane.
10  Q. Okay. So you might have to -- you might have
11  to fill up the fuel tank for the crane along the way?
12  A. Yes.
13  Q. Okay. How often would you have to do that?
14  A. Just about every day.
15  Q. And when -- when you were in the hotel, you
1(6)  were out in New Mexico, right?
17  A. Yes, sir.
18  Q. Okay. Any other times you stayed in a hotel
1(9)  when you worked --
20  A. No, sir.
21  Q. Okay. And about how -- how far is the gas
22  station from the work site?
23  A. From the work site? It was probably ten
24  minutes from the hotel room and then an hour to the job
25  site.

TIMOTHY W. REPASS

**4**

1  Q.  Did you use the same gas station every time?
2  A.  No, sir.  A lot of times gas stations in that
3  area are very busy.  You find one that is not busy.
4  Q.  Okay.  So sometimes you'd find one that was
5  closer to the work site?
6  A.  They were all in the same area, within blocks
7  of each other.
8  Q.  So every time you filled up the gas tank, it
9  was about ten minutes from the hotel; is that --
10  A.  Roughly that.
11  Q.  And if you were working -- well, let's say you
12  were working six days in a week.  How many times would
13  you have to fill up the gas tank on the crane on the
14  way to the work site out of those six days?
15  A.  It wasn't every six days a week.  It was seven
16  days a week, but --
17  Q.  Okay.  Well, let's go -- let's -- so seven days
18  a week, how many --
19  A.  I would say if I had -- if I had leftover fuel,
20  there's times that I would top off the drag tank in case
21  something happened and we had to move the crane, because
22  that crane never stayed on the same location.  We'd do a
23  job; we move the crane.
24        If I needed fuel for the drive or the
25  upper, which was a -- the crane controls.  There's two

**48**

1  whenever we get a chance, get to a stopping point?
2        MR. LITTLE:  Sure.  It's going to be a
3  minute or two.
4        THE VIDEOGRAPHER:  Oh, yeah, sure.
5        MR. LITTLE:  Okay.
6  Q.  (By Mr. Little)  How often did you stop at
7  Wal-Mart to buy cleaning materials?
8  A.  Once, twice a week, maybe.  Excuse me.
9  Q.  And where was the Wal-Mart located?
10  A.  Depends on where I was working at.
11  Q.  Oh, so it was just whatever Wal-Mart you were
12  near?
13  A.  Yes, sir, whatever is closest or --
14  Q.  All right.  Why -- why don't we take a break to
15  change the tape?
16        THE VIDEOGRAPHER:  Off the record at 1:58.
17        (BREAK)
18        THE VIDEOGRAPHER:  On the record at 2:16.
19  Q.  (By Mr. Little)  Mr. Repass, you understand
20  you're still under oath?
21  A.  Yes, sir.
22  Q.  Thank you.  Mr. Repass, did you have a company
23  phone when you worked for TNT?
24  A.  Honestly, I can't remember if I did or not.
25  Q.  Okay.

**47**

1  fuel tanks on there.  I'd say probably every day we top
2  off our tanks just to be on the safe side.
3  Q.  So it's your testimony that every day that you
4  worked, you stopped at the gas station on the way to the
5  work site?
6  A.  Pretty much.  Pretty much, yes, sir.
7  Q.  What does "pretty much" mean?
8  A.  Well, yes, sir.  It means yes.
9  Q.  Okay.
10  A.  I --
11  Q.  Aside from filling up the gas tank, any --
12  anything you did on the way to -- we're just talking
13  about when you're staying in a hotel right now.  Any --
14  anything you did on the way that you would categorize as
15  company work?
16  A.  Yes, sir, we -- because if we needed cleaning
17  materials to clean the windshield or -- or the inside of
18  the crane, we would stop with our comp -- company card.
19  We were allowed to stop at Wal-Mart or wherever to buy
20  cleaning material.
21  Q.  And that's to clean your truck?
22  A.  No, sir, clean the crane.
23  Q.  Clean the crane.  Okay.
24        THE VIDEOGRAPHER:  Mr. Little, we're
25  getting close to an hour.  Do you mind taking a break

**4**

1  A.  I want to say I did, but I couldn't honestly
2  say that I did.  It was too long ago.
3  Q.  All right.  What was your -- what was your cell
4  phone number at that time?
5  A.  The same as it is now.
6  Q.  And -- and what is that?
7  A.  832-577-5602.
8  Q.  Thank you.  You testified earlier that when the
9  new man camp policy came out, you got a copy of that,
10  right?
11  A.  It was sent over e-mail, yes, sir.
12  Q.  Okay.  Do you remember ever receiving any other
13  written policies before that about how travel time was
14  paid?
15  A.  No, sir.
16  Q.  Do you remember receiving any written policies
17  regarding pay at all?
18  A.  Not really.  We went through orientation so
19  quick and -- I honestly couldn't tell you if there was a
20  policy for travel time except for what I was told over
21  the phone.
22  Q.  And is it -- it's your testimony that what you
23  were told over the phone was that you'd be paid for all
24  travel time?
25  A.  Yes, sir.

**13 (P    4    4 )**

TIMOTHY W. REPASS

**50**

1    Q.  Is it possible that during that call Levi said

2  that you'd be paid for travel time only under certain

3  circumstances or would --

4    A.  No, sir.  I wouldn't have took the job.

5    Q.  You said you wouldn't have --

6    A.  I wouldn't have took the job if it was only

7  partial travel time.

8    Q.  Okay.  So the travel time was an important part

9  of it for you?

10    A.  Yes, sir.

11    Q.  Okay.  But you don't remember any discussion of

12  travel time or written policies regarding travel time

13  during your on-boarding?

14    A.  No, sir.

15    Q.  Do you think you would have remembered if you'd

16  gotten a written policy given how important the travel

17  time was to you?

18    A.  Yes, sir.

19    Q.  All right.  And I'll just ask that you let me

20  get my whole question out.

21        MR. MORELAND:  I was just about to say,

22  you almost let him get it all the way out.  That's okay.

23    Q.  Okay.  You were -- before the break, you were

24  talking about buying cleaning materials at Wal-Mart, you

25  said, one to two times per week?

**51**

1    A.  We were allowed a certain amount that we could

2  spend on cleaning material, and that's where we'd

3  normally buy it because it was cheaper.

4    Q.  A certain amount of money?

5    A.  Yeah, we were allowed --

6    Q.  Okay.

7    A.  I'm not exactly sure if it was $150 a month or

8  some -- some number like that, that we were allowed in

9  cleaning materials for the month.

10    Q.  Okay.  So you were -- you were talking earlier

11  about how pretty much every day you'd stop on the way

12  to -- the way from the hotel to the job site to fill up

13  the fuel tank for the crane, right?

14    A.  Yes, sir.

15    Q.  When would you -- when would you go to

16  Wal-Mart?  Would it be on the way to the job site?

17    A.  Depends on if I was working days or nights.

18    Q.  Okay.

19    A.  I'd usually do it in the afternoon, depending

20  on -- on whatever.  You could say it was your afternoon

21  and my morning or -- because I had more time.  I could

22  be more leisure and look better.  Does that make sense?

23    Q.  Not yet, but I'm sure we'll get there.

24    A.  Say, in the afternoons, instead of rushing back

25  to the hotel room and taking my time, I'd go to

**52**

1  Wal-Mart, take my time, go through the -- the aisles and

2  actually look at what I've -- instead of rush in there

3  and just throw stuff in the basket and run out.

4    Q.  Okay.  So you -- you're saying that you were --

5  you'd be more likely to stop at Wal-Mart on the way back

6  to the hotel?

7    A.  Yes, sir.

8    Q.  Okay.  Going back to you were talking about

9  getting gas on the way to the job site.  Any other work

10  you did on the way to the job site or anything else that

11  you would characterize as work for the company that you

12  did on the way to the job site that you can think of?

13    A.  Not offhand, I can't.

14    Q.  Okay.  And on the way back is when you would be

15  more likely to stop at Wal-Mart?

16    A.  Yes, sir.

17    Q.  Okay.  Any other -- anything else you'd

18  consider as work that you would do on the way back?

19    A.  Well, most of the time, I'd get to the hotel

20  room and I'd do my paperwork for the day.  And I would

21  do the same -- if I was working, I would do my paperwork

22  most of the time at the -- at the RV.

23    Q.  And about how long did the paperwork take?

24    A.  Depends on if it was the -- you had to keep it

25  with your job tickets to get the customer to sign it.

**53**

1  And then you had your time sheets and then you had your

2  JSAs and -- you know, we'd do our crane inspection on

3  the job, but the JSA, you could generally fill it out

4  beforehand.

5    Q.  Okay.

6    A.  And just update it as the job went on.  But

7  that's the paperwork and stuff that I'm referring to.

8    Q.  And how often would you do paperwork either at

9  the hotel or at your RV?

10    A.  Just about every day.  That way, you keep up

11  with it.

12    Q.  And approximately, how long would the paperwork

13  take?

14    A.  15, 20 minutes at the max.

15    Q.  Did you ever report that time on your time

16  sheets?

17    A.  It wouldn't have done no good.

18    Q.  Objection, nonresponsive.

19        Did you ever report that time on your time

20  sheets?

21    A.  No, sir.

22    Q.  Did anyone ever tell you that you were supposed

23  to do this paperwork either at the hotel or at your RV?

24    A.  No, sir.  I was -- the paperwork was pretty

25  much mandatory.  It depends on where I wanted to do it

14  (P    50    53)

TIMOTHY W. REPASS

**54**

1    is where I --
2    Q.  So it was up to you where you did it?
3    A.  Yes, sir.
4    Q.  Okay.  And did you ever -- did you ever let any
5    of your supervisors know that you were doing the
     paperwork either at the hotel or at your RV?
7    A.  No, sir.
8    Q.  Now, we've been talking quite a bit about you
     going from the hotel to the work site out in New Mexico,
10   right?
11   A.  Yes, sir.
12   Q.  When you're driving from your -- from your RV
13   to the work site, anything that you felt was work that
14   you were doing along the way?
15   A.  Yes, sir.  My -- my pre-trip on my vehicle.
1    Q.  Okay.  And can you describe to me what that is?
17   A.  A 360 walk-around, check the oil, check the
18   transmission, check the water.  That's all pre-trip.
1    Q.  And -- and would -- would -- which vehicle are
20   we talking about?
21   A.  The company vehicle.
22   Q.  Your company truck?
23   A.  Yes, sir.
24   Q.  Okay.  And that was, sorry, checking the oil?
25   A.  Transmission, water, tires.

**5**

1    A.  Yes, sir.
2    Q.  Okay.  About how long would the pre-trip take?
3    A.  Five, ten minutes at the most.  Five minutes.
     Depends on if you had to stop and get oil or whatever
5    for your -- or water, whatever.
     Q.  Any other -- any other work you were -- that
7    you feel like you were doing before you got to the job
8    site?
     A.  If -- if I was working local, I'd go by the
10   yard and get fuel or DEF or whatever.  Otherwise, it
     would be bought, like I said, at Wal-Mart or whatnot.
12   Q.  All right.  So you'd go by the yard to get fuel
13   or what?
14   A.  DEF.  It was a diesel additive for the cranes.
15   Or we would go and get cleaning supplies, spray clean,
1    glass cleaner, whatever the yard stocked.
18   Q.  So when you were working at the hotel, you'd
18   get that stuff from the gas station or from Wal-Mart?
1    A.  Yes, sir.
20   Q.  Here, you'd get it from the yard?
21   A.  Yes, sir.
22   Q.  And how often would you do that?
23   A.  Just about every day you fill up drag tank or
24   collect materials.
25   Q.  And how long would that take?

**55**

1    Q.  And how often would you do this?
2    A.  Every day before I left.
3    Q.  Were you instructed to do that every day?
4    A.  It's a given for equipment -- for care of
5    equipment whether it's -- I do the same thing to the
     crane when I get to the job site.
7    Q.  Okay.  But did anyone ever instruct you to do
8    the pre-trip on your truck every day before you --
     before you left?
10   A.  I cannot say that any -- that I was instructed,
11   no.
12   Q.  And did you ever inform anyone that you were
     doing pre-trip on your truck every day before you left?
14   A.  We were -- we would have to do the same
15   pre-trip and they expected it on the -- on the haul
1    trucks, if we took a haul truck out of the yard.  So I
17   was expecting it to be expected on our personal -- not
18   our personal, but our -- our company trucks also.
1    Q.  Well -- okay, be that as it may, did you ever
20   inform anyone that you were doing a pre-trip on your
21   truck before you left each day?
22   A.  Why would I inform somebody when you think it's
23   expected of you?
24   Q.  All right.  So I'll take that as, no, you did
25   not inform anyone; is that correct?

**57**

1    A.  I couldn't estimate time because the -- if I
2    got fuel, it would take quite a substantial amount more
     time because a tank only pumps so fast.  And then if it
4    was a normal day, go in there, drop off paperwork, pick
5    up material, 15 minutes.
     Q.  All right.  So a normal day would be you
7    weren't getting fuel and just doing those -- drop off
8    paperwork and pick up materials?
     A.  Yes, sir.
10   Q.  And that would be 15 minutes?
11   A.  Yes, sir.
12   Q.  All right.  And on an -- I guess, an abnormal
13   day, you'd also be getting fuel?
14   A.  Yes, sir.
15   Q.  Okay.  So how often would -- how often would
1    you be adding fuel to that trip?
17   A.  The fuel pump, it would -- it would vary.
18   It -- 20 minutes to get fuel, depends on if somebody was
     sitting there waiting in line and you had to wait on
20   them.
21   Q.  And -- and how often would you get fuel from
22   the yard?
23   A.  Just every day or every other day.
24   Q.  And not to be too picky here, but was it closer
25   to every day or closer to every other day?

**15  (P     54     57)**

**58**

1    A.  Closer to every other day.
2    Q.  Anything else that you felt was work that you'd
3  do on the way from your RV to the work site?
4    A.  Yes, sir, picking up rigger, if the rigger was
5  required on the job.
6    Q.  Okay.  And how often would that happen?
7    A.  Every day.
8    Q.  Where would you pick up the rigger from?
9    A.  Well, it depends on what job it was and who I
10  had.  Some -- some guys would like to park their vehicle
11  at my -- my RV because I was close.  Other riggers we'd
12  pick up at the yard.
13    Q.  All right.  So that would be either at your RV
14  or at the yard --
15    A.  Yes, sir.
16    Q.  -- which is -- what was it, five minutes from
17  your RV?
18    A.  Yes, sir.
19    Q.  Okay.  And going back to your trips to the yard
20  to get fuel and materials, did anyone instruct you to do
21  that?
22    A.  It was -- I can't say that nobody instructed
23  me, but it was looked upon that it would benefit the
24  company to buy bulk from the yard or get bulk from the
25  yard than it would be to buy it at a gas station.

**0**

1  back to your home, back to your RV?
2    A.  To go by the yard, and like I said, just drop
3  the rigger off.  You're asking for things that I can't
4  remember from a year and a half ago.
5    Q.  So other than dropping the rigger off at the
6  yard, was there anything that you felt was work that
7  you'd do on the way from the job site back to your RV?
8    A.  Not that I can recall.
9    Q.  And how often -- you said you -- well, how
10  often would you be dropping a rigger off at the yard?
11    A.  Every day that the job required it.
12    Q.  And how often did the job require it?
13    A.  The jobs that I was on, ConocoPhillips and
14  Chevron, both required riggers -- riggers every day.
15    Q.  Were you ever on jobs that didn't require
16  riggers?
17    A.  Few and far between, yes, sir.
18    Q.  Mr. Repass, I will hand you what I'm marking as
19  Exhibit 1 to your deposition.
20    A.  Yes, sir.
21        (Deposition Exhibit 1 marked)
22    Q.  Sorry, did I give you two?  I think I might
23  have.
24    A.  Yes.
25        MR. MORELAND:  Is one of these for me?

**5**

1    Q.  All right.  And the riggers, did anyone
2  instruct you to pick up the riggers?
3    A.  Yes, sir.
4    Q.  Who?
5    A.  Dispatch.
6    Q.  And who worked as dispatch?
7    A.  I can't ever remember their names.
8    Q.  Okay.  Was it more than one person?
9    A.  Yes, sir.
10    Q.  Okay.  And picking up the rigger, since -- did
11  that add any time to your trip?
12    A.  Yes, sir, I'd have to go by the yard to pick
13  him up, unless it was, like, the one occasion Sonny
14  would drop his truck off at my RV because he didn't
15  trust the parking lot at the yard.
16    Q.  So -- but you testified earlier that you were
17  going to the yard most every day anyway?
18    A.  Yes, sir.
19    Q.  Okay.  So it was during these yard trips that
20  you would also get the rigger?
21    A.  Yes, sir.
22    Q.  Anything else that you felt was work that you
23  would do on the way to the job site?
24    A.  Not really.  I can't think of anything else.
25    Q.  How about on the trip from -- from the job site

**1**

1        MR. LITTLE:  Yes.
2        MR. MORELAND:  Thank you.
3    Q.  (By Mr. Little)  And do you recognize these
4  documents?
5    A.  Yes, sir.
6    Q.  Okay.  And these are the time sheets that you
7  filled out while working for TNT; is that correct?
8    A.  Yes, sir.
9        MR. MORELAND:  Review the document just to
10  make sure, if you would.
11        (PAUSE)
12        MR. MORELAND:  I'm not trying to
13  interfere.  I just want to make sure --
14        MR. LITTLE:  No, no, no.
15        MR. MORELAND:  -- it's a complete exhibit.
16        MR. LITTLE:  No problem at all.
17    Q.  (BY Mr. Little)  So Mr. Repass, have you
18  reviewed Exhibit 1?
19    A.  Yes, sir.
20    Q.  Okay.  And do you recognize these as time
21  sheets that you filled out --
22    A.  Yes, sir.
23    Q.  -- while working for TNT?
24    A.  Yes, sir.
25    Q.  Great.  So if you look at the first page, see

1  (P  58  1)

TIMOTHY W. REPASS

94

1    Q.  Okay.  And where was this?
2    A.  In Baytown.
3    Q.  And you're not sure if you were convicted or
4  not or --
5    A.  I don't believe I was because it was -- it was
6  kind of a rough situation.  I got the mess beat out of
7  me by the cops.
8    Q.  Okay.
9    A.  And I think -- I think it was thrown out of
10  court.
11    Q.  Okay.  And -- and that's -- other than -- other
12  than the public intoxication charge, there was nothing
13  other than driving with a suspended license as a
14  teenager?
15    A.  Yes, sir, back -- back when I was a kid.
16    Q.  Okay.
17    A.  That was in Florida, long, long time ago.
18    Q.  Other than your attorney, because I don't want
19  to hear about anything you've said to them, have you
20  discussed this lawsuit with, the lawsuit that you're
21  bringing against TNT Crane?
22    A.  Just -- just -- the other complainant on the --
23  on the case, Scott McCandless.  He's a good friend of
24  mine.
25    Q.  And when did you talk to Mr. McCandless?

95

1    A.  When we worked together on the same job.
2    Q.  Right.  And so which job was that?
3    A.  It depends on what -- what -- if we're on the
4  same crane working a different part of the -- the day --
5    Q.  Uh-huh.
6    A.  -- we would have to do our rollovers, we would
7  talk about what was going on, what have you heard, stuff
8  like that.  That's about it.
9    Q.  And when you say "what have you heard," like,
10  what do -- can you flush that out for me a little bit?
11    A.  Yes, sir.  Say, "Have you heard anything about
12  the case," stuff like that --
13    Q.  Okay.
14    A.  -- because I work different hours.  Sometimes I
15  work nights, sometimes he works days.  He sees things
16  before I do or I see things before he does.
17    MR. MORELAND:  Hold on.  I need to -- I
18  was under the impression that this was happening before
19  we were anticipating litigation or litigation was going
20  on.
21    Since you're getting into an area where
22  these two guys are talking after the lawsuit has been
23  filed, I'm going to go ahead and object on the ground of
24  privilege.  These two guys share privilege.  They are
25  co-plaintiffs in this case.

96

1    Q.  And -- sorry, and to -- to clarify, when you --
2  when you say that you would talk to Mr. McCandless, it's
3  my impression that was when you were working at TNT?
4    A.  No, sir.  No, sir.
5    Q.  Oh, okay.  And that is -- do you currently work
6  at the same -- do you currently work with
7  Mr. McCandless?
8    A.  Yes, I do.
9    Q.  Okay.  I understand.  And that's -- remind me
10  where you currently work?
11    A.  Allegiance Crane.
12    Q.  Okay.  And Mr. McCandless is also employed with
13  Allegiance Crane?
14    A.  Yes, sir.
15    Q.  Okay.  Other than your discussions with
16  Mr. McCandless after the lawsuit was filed, did you
17  discuss the -- well, let me back up.
18    While you were at TNT, did you talk to
19  Mr. McCandless about drive time issues?
20    A.  We all talked about drive time issues.
21    Q.  Okay.  And when you say "we all did," who are
22  you referring to?
23    A.  It's whoever we worked with, yes, sir.
24    Q.  And who was that?
25    A.  I can't -- I don't remember the names, but

97

1  there are many people that we talked about it before,
2  you know, back and forth, "Did you get paid for this,"
3  you know, we -- we'd throw it back and see where the
4  problem was.
5    Q.  Other than Mr. McCandless, you don't remember
6  any names of people that you talked to about this?
7    A.  I know so many people there.  Gary Grossnickle.
8  Randy Tennison.  I mean, really, there's a lot of them.
9    Q.  Anyone else that you can think of sitting here
10  today?
11    A.  Not -- not directly offhand.
12    Q.  At Allegiance Crane, how much are you making?
13    A.  35 -- well, yeah, I think it's 35.02 or
14  something -- somewhere around in there.
15    Q.  Per hour?
16    A.  Yes, sir.
17    Q.  Okay.  And what's the -- what's -- what's the
18  drive time policy at Allegiance?
19    A.  We get paid drive time.
20    Q.  All drive time?
21    A.  Yes, sir.
22    Q.  We were talking earlier you had the -- you had
23  the option to live at a hotel or a man camp and be paid
24  for travel time, correct?
25    A.  If we give up our per diem or a portion of our

TIMOTHY W. REPASS

98

1    per diem, yes, sir.
2        Q.  Okay.  And you took advantage of that at
3    different times, correct?
4        A.  When I felt it was -- that I wasn't getting
5    enough rest, yes, sir.
6        Q.  Okay.
7        A.  Safety reasons.
8        Q.  Do you -- do you know of other crane operators
9    who took advantage of that option to stay at a man camp
10   or a hotel and be paid travel time?
11       A.  I can't say on their behalf.
12       Q.  Okay.  You don't know?
13       A.  No, sir.
14       Q.  And when you were staying at the hotel, TNT
15   would pay for the hotel, correct?
16       A.  Yes, sir.
17           (Deposition Exhibit 3 marked)
18       Q.  Mr. Repass, I'm going to mark this as Exhibit 3
19   to your deposition.  Please review this document and let
20   me know when you're ready.
21       A.  Yes, sir.
22           (PAUSE)
23       A.  Okay.
24       Q.  This is your declaration, correct?
25       A.  Yes, sir.

99

1        Q.  Okay.  And that's your signature on page 4 of
2    the declaration, correct?
3        A.  Yes, sir.
4        Q.  Okay.  I wanted to -- if you could look at
5    paragraph 6 on the second page.  If you look at the --
6    about the middle of the paragraph, do you see the
7    sentence starting, "But neither I nor TNT's other crane
8    operators"?  Do you see that sentence?
9        A.  Yes, sir.
10       Q.  Okay.  And it says, "But neither I nor TNT's
11   other crane operators were paid for many of these hours
12   because we were only paid for time spent at TNT's
13   customers' job sites."
14           Did I read that correctly?
15       A.  Yes, sir.
16       Q.  Now, we went through your time sheets, correct?
17       A.  Yes, sir.
18       Q.  We saw that on numerous occasions you were paid
19   for travel time, right?  For drive time?
20       A.  Yes, sir.
21       Q.  And at other times, you were paid for
22   pre-checks, right?
23       A.  Yes, sir.
24       Q.  And yard time, correct?  So this statement here
25   that you were only paid for time spent on the customer's

100

1    site is incorrect; is that right?
2        A.  No, sir.  At the point that I'm not putting it
3    on my time sheets, this is correct.  If I am not getting
4    paid for it, why would I write it on my time sheets?
5            And the only other way that I could see
6    that I'm not getting paid for it is if I compare my time
7    sheets and my paycheck stubs, and I neither have my
8    check stubs here.
9        Q.  Well, so you agree that there's time for drive
10   time and --
11       A.  When I was in --
12       Q.  Wait, let me finish my question.  You agree
13   that there's time for drive time and yard time and
14   pre-checks on your time sheets that, you know, have not
15   been crossed out, right?
16       A.  Yes, sir.
17       Q.  And those are all activities that are not done
18   at the customer's job site, right?
19       A.  Yes, sir.
20           (Deposition Exhibit 4 marked)
21       Q.  Okay.  Mr. Repass, I'm going to hand you
22   Exhibit 4 to your deposition.  Do you recognize this
23   document?
24       A.  Not word for word, but, yes, sir.
25       Q.  Okay.  This is the -- this is the lawsuit that

101

1    we're talking about today?
2        A.  Yes, sir.
3        Q.  Okay.  If you can turn to page 6 and look at
4    paragraph 22.  In the last sentence, you see where it
5    says, "As a result, each crane operator performed the
6    same or similar job duties throughout defendant's
7    operations."
8        A.  Yes, sir.
9        Q.  Do you see that?  Did you ever work at any yard
10   other than the Midland yard?
11       A.  No, sir.
12       Q.  So were you --
13       A.  Well, I'm sorry, I -- in the past before I come
14   to work for TNT the second time, I had -- I had worked
15   in Houston.
16       Q.  So back in 2004, you were working in Houston?
17       A.  Yes.
18       Q.  Okay.  But, so, you don't -- are you familiar
19   with the policies and procedures for the Houston and San
20   Antonio branches of TNT?
21       A.  The policies and procedures?
22       Q.  Yes.
23       A.  I can't say that I am because I -- it's
24   been back -- you're talking 15 years --
25       Q.  Sure.

26  (Pages 98 to 101)

## 10

1 or not you were paid for all that time without looking
2 at your pay stubs?
3    A.  No, sir.
4    Q.  To your recollection, did your pay stubs match
5 up to what you put on your time sheets while working at
 TNT?
7    A.  No.
8    Q.  Okay.  And that was a "no," you said?
    A.  No.  Yes, sir.
10    Q.  Now, Mr. Little also asked you, do you have any
11 records or documents that would show how much you're
12 owed for the off-the-clock work that you performed at
13 T -- that you're alleging you performed at TNT.  Do you
14 remember that?
15    A.  Yes, sir.
16    Q.  And you also said -- you said in response to
17 that line of questioning that you didn't have any
18 documents?
19    A.  No, sir.
20    Q.  Do you believe TNT has -- has such documents?
21    A.  They have documents of when I worked, and I'm
22 pretty sure they would have documents of how long it
23 takes to get back and forth to the job site.
24    Q.  Do they have documents showing what crane you
25 were assigned to on --

## 108

1          CHANGES AND SIGNATURE
2 WITNESS NAME: TIMOTHY W. REPASS
3 DEPOSITION DATE: AUGUST 29, 2019
4
5 PAGE LINE  CHANGE OR CORRECTION   REASON FOR CHANGE
  ____ ____ _____ _____
7 ____ ____ _____ _____
8 ____ ____ _____ _____
  ____ ____ _____ _____
10 ____ ____ _____ _____
11 ____ ____ _____ _____
12 ____ ____ _____ _____
13 ____ ____ _____ _____
14 ____ ____ _____ _____
  ____ ____ _____ _____
17 ____ ____ _____ _____
18 ____ ____ _____ _____
  ____ ____ _____ _____
20    I, TIMOTHY W. REPASS, have read the foregoing
21 deposition and hereby affix my signature that the same
22 is true and correct, except as noted above.
23
24
                         _____
25          TIMOTHY W. REPASS

## 107

1    A.  Yes, sir.
2    Q.  -- any given day?
3    A.  Yes, sir, that would -- that would go to your
4 job tickets.
5    Q.  And do they also have documents that would show
 where that crane was on that day?
7    A.  Yes, sir, that also goes back to your job
8 tickets.
 Q.  What other documents other than the job tickets
10 would show this?
11    A.  JSAs, crane inspections.
12    Q.  Anything else you can think of?
13    A.  Not offhand, I don't.
14    Q.  Okay.
15          MR. MORELAND:  No further questions.
 MR. LITTLE:  Nothing further.
17          MR. MORELAND:  You are done.  Thank you
18 very much.
 THE VIDEOGRAPHER:  Off the record at 4:11.
20          (WITNESS EXCUSED)
21
22
23
24
25

## 10

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                MIDLAND DIVISION
3                        )
 TIMOTHY W. REPASS AND       )
4 WILLIAM SCOTT MCCANDLESS,   )
 INDIVIDUALLY AND ON         )
5 BEHALF OF ALL OTHERS        )
 SIMILARLY SITUATED          )
                          ) NO. 7:18-CV-107-DC
7 VS.                         )
                          )
8                            )
 TNT CRANE AND RIGGING,      )
 INC.                        )
10 _____
11          REPORTER'S CERTIFICATE
            ORAL DEPOSITION OF
12          TIMOTHY W. REPASS
            Taken August 29, 2019
13 _____
14    I, Ashley H. Scaglione, Certified Shorthand
15 Reporter in and for the State of Texas, do hereby
 certify to the following:
17    That the witness, TIMOTHY W. REPASS, was duly
18 sworn by the officer and that the transcript of the oral
 deposition is a true record of the testimony given by
20 the witness;
21    I further certify that pursuant to FRCP Rule
22 30(f)(1) that the signature of the deponent:
23    XXX was requested by the deponent or a party
24 before the completion of the deposition and returned
25 within 30 days from date of receipt of the transcript.

TIMOTHY W. REPASS

**110**

1    If returned, the attached Changes and Signature Page
2    contains any changes and the reasons therefor;
3        _____ was not requested by the deponent or a
4    party before the completion of the deposition.
5        I further certify that I am neither attorney
     nor counsel for, related to, nor employed by any of the
7    parties to the action in which this testimony was taken.
8    Further, I am not a relative or employee of any attorney
     of record in this cause, nor am I financially or
10   otherwise interested in the outcome of the action.
11       Subscribed and sworn to on this the 18th day of
12   September, 2019.
13
14

15       ASHLEY H. SCAGLIONE
         CSR No. 8252, Expires 10/31/21
1        Firm Registration No. 155
         Permian Court Reporters, Inc.
17       605 W. Texas
         Midland, Texas 79701
18       (432) 683-3032
1
20
21
22
23
24
25

**Exhibit**

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                MIDLAND/ODESSA DIVISION

 3   TIMOTHY W. REPASS AND      )
     WILLIAM SCOTT MCCANDLESS,  )
 4   INDIVIDUALLY AND ON        )
     BEHALF OF ALL OTHERS       )
 5   SIMILARLY SITUATED,        ) CIVIL ACTION
                                )
 6           Plaintiffs,        ) NO. 7:18-CV-107-DC-RCG
                                )
 7   VS.                        )
                                )
 8   TNT CRANE AND RIGGING,     )
     INC.,                      )
 9                              )
             Defendant.         )
10

11     -----------------------------------

12              ORAL DEPOSITION OF

13                 ANTOY BELL

14      AS DESIGNATED REPRESENTATIVE OF

15        TNT CRANE   RIGGING, INC.

16              July 15, 2020

17                 Volume 1

18     -----------------------------------

19      ORAL DEPOSITION OF ANTOY BELL, Volume 1, produced

20   as a witness at the instance of the Plaintiffs, and duly

21   sworn, was taken in the above-styled and numbered cause

22   on the 15th of July, 2020, from 10:03 a.m. to 2:58 p.m.,

23   before Julie A. Jordan, CSR, RPR, in and for the

24   State of Texas, reported by machine shorthand via Zoom,

25   at the offices of TNT Crane   Rigging, Inc., 925 South
```

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1  Loop West, Houston, Texas 77054, pursuant to the Federal

2  Rules of Civil Procedure and any provisions stated on

3  the record or attached hereto.

4                        *-*-*-*-*-*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1   going to assume that you both heard and understand the
2   question.  Okay?
3       A.   Okay.
4       Q.   I'm not trying to make this a marathon
5   session, so if you need a break at any time feel free to
6   ask for one.  The only thing that I would ask you to do
7   is answer any question that's on the table before we
8   break.
9            Is that acceptable?
10      A.   That's fine.
11      Q.   Okay.  And we're taking this deposition
12  pursuant to Rule 30(b)(6), and so there's some weirdness
13  in the meaning of "you" I found in these depositions.
14           Unless I indicate otherwise, when I say
15  "you" during this deposition, I'm referring to TNT as
16  the witness here today.
17           Is that acceptable?
18      A.   Yes, sir.
19      Q.   My understanding is you're a lawyer, is that
20  right, Mr. Bell?
21      A.   That is correct.
22      Q.   Are you licensed to practice in the state of
23  Texas?
24      A.   I am.
25      Q.   How long have you been licensed?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
1        A.   Since 2005.
2        Q.   And what year did you graduate law school?
3        A.   2004.
4        Q.   And where did you go to law school?
5        A.   The University of Iowa.
6        Q.   And where did you go to college?
7        A.   Morehouse College.
8        Q.   And what year did you graduate from Morehouse?
9        A.   1996 -- I'm sorry, 2000.
10       Q.   So you started in 1996 and graduated in 2000,
11  is that right?
12       A.   That is correct.
13       Q.   By the way, one thing we didn't talk about is,
14  if you -- if I ask you a question, please try to give me
15  a verbal response.  It's hard for the court reporter to
16  take down a shake of the head.
17            Have you ever -- well, let me ask a
18  different question.
19            By whom are you currently employed?
20       A.   TNT Crane and Rigging, Inc.
21       Q.   And you are its general counsel currently, is
22  that true?
23       A.   No, sir.
24       Q.   What is your position?
25       A.   Director of human resources.
```

1    A.    Yes.

2    Q.    And when was that?

3    A.    That was prior to the issuance of these memos.

4    Q.    So the same time you advised it about the

5 preparatory concluding work, you advised it about travel

6 time.  Is that true?

7    A.    That was one of the times, yes.

8    Q.    And what did you tell TNT insofar as the

9 legality of what it proposed to do was concerned?

10            MR. JODON:  I want to object to the form

11 of the question.  I think it's vague with respect to

12 the -- you know, the particular issue of travel that

13 you're talking about.

14            MR. MORELAND:  Okay.  I'll rephrase.

15 That's fair.

16    Q.    (BY MR. MORELAND)  What is it that you told

17 TNT about whether or not it was obligated to pay travel

18 time?

19    A.    I told TNT when obligations to pay travel took

20 place.

21    Q.    And what specifically did you tell them in

22 that regard?

23    A.    We -- we spoke of when traveling from the

24 branch location to a job site and when traveling from

25 location to location.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    Q.    And what did you tell them about the travel
2  from branch to job site?
3    A.    I told them when -- when an employee leaves
4  the branch and travels to a job site, that we must pay
5  for that time.
6    Q.    Were there any exceptions to that rule that
7  you conveyed to the company?
8    A.    No, I don't recall there being any exceptions.
9    Q.    And who specifically at the company did you
10 advise this?
11   A.    There was more than one person.  Particularly
12 I remember speaking with Houston branch manager and at
13 the time San Antonio branch manager Gary Harvey.
14   Q.    Was this before or after Mr. Harrison began
15 working at TNT?
16   A.    This would have been during the time he was
17 working at TNT.
18   Q.    Did you tell him or convey this advice to him
19 as well?
20   A.    Yes, I have conveyed this advice to him.
21   Q.    On how many occasions?
22   A.    I don't recall.
23   Q.    And you conveyed this advice to him before
24 Mr. Repass filed this lawsuit, is that true?
25   A.    That is true.

1      Q.    And I assume that with respect to the travel

2  from location to location you gave them the same advice

3  that the company should pay for it, is that right?

4      A.    Yes.

5      Q.    And did you give that same advice to the same

6  people?

7      A.    To the same three people that I spoke about?

8      Q.    Yes, sir.

9      A.    Yes.

10      Q.    I just want to make sure the record is clear

11  on this.

12             So before this lawsuit was filed -- well,

13  let me start over.

14             Did you give this advice starting in, say,

15  2015?

16      A.    I couldn't tell you the exact year.  It could

17  have been prior to that as well.

18      Q.    Did you convey this advice in connection with

19  discussions about the drive time memos we've touched on

20  today?

21      A.    That was one time that I did, yes.

22      Q.    On what other occasions did you give this

23  advice?

24      A.    I spoke with the branch manager in

25  Ratliff City, Oklahoma, about travel time.

1    Q.    Let me just limit it to branch managers in

2   Texas just to make it a little easier on everybody.

3   Okay?

4              On what other occasions did you convey

5   this advice to branch managers in the state of Texas?

6    A.    As I reference, I don't recall every single

7   time what date that was going on.  So I spoke with a

8   branch manager in Beaumont on the same topic as well.

9    Q.    So for now, we know that prior to the

10  institution of this lawsuit, you advised Mr. Murray in

11  Houston, Mr. Harvey in San Antonio, and Mr. Harrison in

12  Midland that you -- it was your opinion that TNT was

13  obligated to pay for the travel time from the branch to

14  the job site.  Is that true?

15   A.    That is correct.

16   Q.    And did you give TNT any advice about whether

17  or not it was obligated to pay for the travel time from

18  the job site to the branch -- back to the branch?

19   A.    I did.

20   Q.    And what was your advice in that regard?

21   A.    We went through scenarios and in scenarios I

22  advised this is when we compensate for the time from the

23  branch back -- from the job site back to the branch.

24   Q.    And what were those scenarios?

25   A.    I couldn't recall each and every scenario we

1  this advice?

2      A.    They said okay.

3      Q.    And having reviewed the documents in the case,

4  do you feel like they followed your advice?

5      A.    I do.

6      Q.    I want to talk to you a little bit about the

7  reporting relationships at TNT.

8              Now, my understanding is there's a branch

9  manager over each branch, is that right?

10     A.    That is correct.  That is --

11     Q.    There's an operations -- go ahead.

12     A.    That is -- in general, yes.  Some branches do

13  not have a branch manager.

14     Q.    Houston, San Antonio, Midland, they had branch

15  managers, right?

16     A.    Yes.

17     Q.    And do each of those three branches also have

18  operations managers and operations supervisors?

19     A.    No.

20     Q.    Midland has an operations manager, correct?

21     A.    They did, yes.

22     Q.    Okay.  Is that position no longer in

23  existence?

24     A.    Correct.

25     Q.    Okay.  And that was occupied by Mr. Hastey, is

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
 1  that right?
 2       A.    Correct.
 3       Q.    Is he still employed by TNT?
 4       A.    Yes.
 5       Q.    In what position?
 6       A.    Sales.
 7       Q.    Who did the operators report to?
 8       A.    Depends on the branch.
 9       Q.    Who do they report to in Midland?
10       A.    In Midland they report to the operations
11  manager.
12       Q.    Who is that now?
13       A.    So now there is no operations manager.  They
14  report directly to the branch manager.
15       Q.    Okay.  Who do the crane operators report to in
16  San Antonio?
17       A.    To the branch manager.
18       Q.    And who do they report to in Houston?
19       A.    To the operations manager.
20       Q.    And who does the operations manager report to?
21       A.    In Houston?
22       Q.    Yes, sir.
23       A.    To the branch manager.
24       Q.    And who do the branch managers report to?
25       A.    Branch managers report to -- it depends.
```

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    Q.    Explain that, please.

2    A.    There are times and -- and some branch

3 managers will report to a vice president.  Then there

4 are some times branch managers will report directly to

5 the president or another branch manager.

6    Q.    Who does -- did you say "or another branch

7 manager"?

8    A.    Correct.

9    Q.    Who does the Midland branch manager report to?

10    A.    The president.

11    Q.    And who does the San Antonio branch manager

12 report to?

13    A.    The president.

14    Q.    And who does the Houston branch manager report

15 to?

16    A.    The president.

17    Q.    And who is the president?

18    A.     regg Lundsford.

19    Q.    Did you get -- did you say Lundsford?

20    A.    Lundsford, yes, sir.

21    Q.    And did you give Mr. Lundsford the same advice

22 that you gave to the branch managers about the

23 compensability of drive time that we've discussed?

24    A.    I would have.  I don't recall off the top of

25 my head having any direct conversations with him about

1    first work of the day?

2        A.    Yes.

3        Q.    And the first work of the day could involve

4    loading tools, getting fuel, loading ice or other

5    supplies that they needed in order to perform their

6    duties as crane operators.  True?

7        A.    It could -- some of those things it could

8    start the day, yes.

9        Q.    Which ones do you believe do not start the

10   first work -- do not constitute the first work of the

11   day?

12       A.    I think loading ice is required as a duty of

13   the crane operator.

14       Q.    Anything else?

15       A.    I'm trying to remember if -- all you said.

16   You said tools, ice.

17       Q.    The fuel or other supplies necessary to

18   perform their work.

19       A.    Yeah.  If it's necessary to perform their work

20   yes.

21       Q.    So you would agree with me that if it's

22   necessary to perform their work, the operators loading

23   that -- those items, when they do, that they're

24   performing the first work of the day, correct?

25       A.     If it's necessary to perform their work, yes.

1 fair to conclude that dispatchers could -- well, at

2 least sign off on time sheets for operators, right?

3     A.   Based on this memo, yes.

4     Q.   And what other types of authority did

5 dispatchers have over operators?  What could dispatchers

6 tell operators to do insofar as their work is concerned?

7     A.   Dispatchers tell crane operators which job to

8 go and -- and what time to be there.

9     Q.   So dispatchers can tell crane operators when

10 to be and where to be.  Is that true?

11     A.   Yes.

12     Q.   And dispatchers can also and do direct crane

13 operators to, for example, pick up their riggers if a

14 rigger is required on a job, right?

15     A.   Sometimes.

16     Q.   Mr. Bell, I'm showing you a memo dated

17 June 15th, 2015, TNT Bates No. TNT 6166.

18           Take a moment to review it and let me know

19 when you're ready to discuss it.

20     A.   Scroll -- scroll down a little bit.  I want to

21 see the top of it.

22     Q.   There you go.  Here, let me --

23     A.   Okay.

24     Q.   -- pull it back a little bit.

25           How -- how's that?

1  operators in this case that they were specifically told

2  that?  Is that what you're saying?

3      A.   I'm saying that someone specifically told all

4  38 of those crane operators that they must put down all

5  hours worked as well as our handbook reads that if they

6  expect to be compensated for it, they should put that

7  down on their time sheet.

8      Q.   That's what you think the policy says, the

9  handbook says?

10     A.   Yes.

11     Q.   By the way, this memo is dated April 1st,

12  2018.

13          How long had this policy been in effect?

14     A.   This -- which -- which part of this policy are

15  you referring to?

16     Q.   Okay.  Fair question.

17          There -- it's my understanding -- let me

18  see if I can hurry this along.

19          It's my understanding that some version of

20  this policy has been in -- in effect since at least

21  March of 2014.  Is that right?

22     A.   Some version of this policy was in effect

23  since we started working out of Midland.

24     Q.   And when was that?

25     A.   Oh, I believe in 2012.

1    Q.   And this was before Mr. Harrison was employed

2 with the company?

3    A.   Yes.  Well I won't say employee.

4    Q.   What was the arrangement --

5    A.   Before he was branch manager --

6    Q.   Sorry.

7    A.   Okay.  I'm sorry.  I wouldn't say employee,

8 but before he was branch manager there.

9    Q.   The earliest version of this policy, I'll tell

10 you, is -- that I've seen is one from 2014, which is

11 there.

12              Do you see that?

13    A.   Yes, sir.

14    Q.   And are you saying there's one earlier from

15 2012?

16    A.   I'm saying that was the policy earlier.

17    Q.   And so this was the first written version of

18 this -- of this policy, is that correct?

19    A.   Yes, sir.

20    Q.   So what is the reason or reasons -- what are

21 the reasons for this policy?

22    A.   To explain the timekeeping policies -- to

23 further explain the timekeeping policies and how per

24 diem is paid.

25    Q.   Anything else?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1  cut off at midnight and started work the next day.

2       Q.   All right.  Do you see anything else that

3  insures compliance with the FLSA?

4       A.   If you could scroll down some.

5       Q.   (Scrolling.)

6       A.   (Reviewing document.)  Scroll a little bit

7  more for me.

8       Q.   (Scrolling.)

9       A.   (Reviewing document.)  4 here at the bottom,

10  "Safety meeting time should be documented accurately."

11       Q.   Is that all?

12       A.   1, "Lable (sic) equipment that is being

13  pre-tripped."  And that's all I see.  He's on 8450.

14       Q.   By the way, referring back to 1, TNT expected

15  its operators to pretrip their vehicles before heading

16  out into the field, right?

17       A.   Before driving a vehicle, yes.

18       Q.   All right.  I just want to -- so we've seen

19  the one from March of 2014.  I'm going to show you the

20  others just to get them on record here.

21       A.   I'm sorry about that beeping.  I can't figure

22  out how to shut that program off.

23       Q.   Oh.  That's -- I'm not going to complain about

24  you and technology in this deposition.

25            Okay.  I'm showing you 5598 through 5599.

1  And this -- 5598 is an iteration of this policy from

2  March of 2015, is that right?

3       A.   Yes.

4       Q.   And then 5599 is an iteration from

5  April of 2016, correct?

6       A.   Correct.

7       Q.   And as each of these policies came out, they

8  changed things slightly.  Is that true?

9       A.   Yes, sir.

10      Q.   And did later ones supplant earlier ones?

11      A.   Yes.

12      Q.   And was -- were these policies applicable to

13  all three of the yards at issue in this case?

14      A.   No, sir.

15      Q.   Which yards were they applicable to?

16      A.   Depended on who the policy came from, so I'd

17  have to look at each one of them to see.

18      Q.   Okay.  I'm showing you TNT 5602 through 5610.

19  Okay?  And this appears to be a series of e-mails among

20  Mr. Harvey, Mr. Harrison, and you regarding these

21  policies.

22           Do you see that?

23      A.   Yes, sir.

24      Q.   And -- so we know that you, Mr. Harvey, and

25  Mr. Harrison were involved in these -- in the creation

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1   of these -- of at least the 2018 policy.

2                   Does that help you to answer the question

3   which of the three yards at issue in this case these

4   memos applied to?

5        A.   Not all of them.  For this particular memo, it

6   helped me answer that question.

7        Q.   And how did it help you?  What's the answer to

8   the question?

9        A.   This would have been applicable to the Midland

10   yard.

11        Q.   Okay.  What about San Antonio?  Why not San

12   Antonio?

13        A.   This wouldn't have involved the San Antonio

14   yard.

15        Q.   Mr. Harvey is involved in a discussion about

16   it.

17                   He was over the San Antonio yard, correct?

18        A.   He was over the San Antonio yard, and at this

19   time he was supervising John Harrison.

20        Q.   So it's your contention that San Antonio

21   followed a different policy than Hou- -- than Midland,

22   is that right?

23        A.   Can you scroll down some?  I want to read the

24   rest of the e-mail chain back and forth.

25        Q.   (Scrolling.)

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1      A.   (Reviewing document.)  Yes, sir.

2      Q.   So I'm sorry.  Are you saying that the memo is

3   applicable to San Antonio and Midland?

4      A.   No, sir.  Only Midland.

5      Q.   Okay.  San Antonio had a similar policy

6   whereby it paid certain amounts of per diem, and if it

7   paid you a hundred dollars per diem, say, you would not

8   get drive time, right?

9      A.   I have to look at it and see.  It did have a

10   similar memo.

11      Q.   Okay.  Has that memo been produced?

12      A.   Yes.  It's one of the memos you have from

13   '15 or '14, one of those years.

14      Q.   Okay.  So when we're looking at 5599, that's a

15   April 2016 memo.

16           Was that applicable to San Antonio?

17      A.   Just looking here, I can't tell.

18      Q.   But you think the memo regarding San Antonio

19   has been produced, is that right?

20      A.   Yes, sir.

21      Q.   Is this memo regarding San Antonio 8450 --

22   TNT 8450?

23      A.   This one is, yes.

24      Q.   Okay.  And has this memo been in effect from

25   2014 until the present in San Antonio?

```
 1        A.    May I see the '16 memo again?

 2        Q.    (Scrolling.)

 3        A.    Scroll down, please.

 4        Q.    There it is.

 5              Do you have it there on your screen,

 6   Mr. Bell?

 7        A.    Yes.  I'm following you.

 8              Yes.  The '14 memo is -- is one that would

 9   be in effect with the possibility of some one-off e-mail

10   changing something in there.

11        Q.    And if that one-off e-mail exists, it would

12   have been produced in this case, right?

13        A.    It should -- should have been produced, yes,

14   sir.

15        Q.    Now, insofar as the 2018 memo is concerned,

16   you, Mr. Harvey, and Mr. Harrison were involved in

17   promulgating that policy.  True?

18        A.    True.

19        Q.    And, in fact, you corrected the policy at some

20   point, right?  You had input into that policy by making

21   changes to it, right?

22        A.    Yes, I had input into the policy.

23        Q.    And at this time, did you advise Mr. Harrison

24   and Mr. Harvey that TNT had to pay drive time for the

25   operators if they performed compensable work before
```

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1      A.    No, sir, I don't.

2      Q.    Did anybody keep any notes about the telephone

3  call?

4      A.    No.

5      Q.    Did -- okay.

6      A.    Let me say -- let me back up.  I didn't keep

7  any notes about it.  I can't speak for what the other

8  two did.

9      Q.    Fair enough.

10            What, if anything, did TNT do to ensure

11  that each version of this drive time policy that we've

12  looked at today was lawful under the Fair Labor

13  Standards Act?

14      A.    I reviewed the policy in comparison with the

15  Fair Labor Standards Act to make sure that we were

16  following the law.

17      Q.    And what specific authority did you review

18  in -- to ensure that you were following the law?

19      A.    That would have been the actual Fair Labor

20  Standards Act.  That would have been case law checked on

21  in CLEs.

22      Q.    Anything else?

23      A.    I don't believe so.

24      Q.    Did you keep a file on your research?

25      A.    In -- in this particular case?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
 1        Q.   Yes, sir.

 2        A.   No, I would not have kept a file on my

 3   research.

 4        Q.   Did you draft a memo?

 5        A.   No, I wouldn't have drafted a memo.

 6        Q.   Is there anything in writing about your

 7   deliberations about whether or not this policy was

 8   compliant with the Fair Labor Standards Act?

 9        A.   I'd have to review the e-mails that we turned

10   over.  It may be some language in those e-mails where I

11   told them, Hey, this -- this looks good.  This is --

12   this is fine.

13        Q.   I'm showing you an e-mail at TNT 5602.

14             Well, do you see that there?

15        A.   Yes, sir.

16        Q.   Can you take a moment to review this and I'll

17   represent to you that I believe this was the last e-mail

18   that you sent about this particular drive time policy.

19        A.   Let me go to the top of it, see what the very

20   top says, or is it cut off?

21        Q.   (Scrolling.)

22        A.   Okay.

23        Q.   Yeah.  That's the very top of it there,

24   Mr. Bell.

25        A.   Okay.  (Reviewing document.)
```

```
 1        Q.   (Scrolling.)
 2        A.   (Reviewing document.)  Scroll down a little
 3   bit.
 4        Q.   (Scrolling.)
 5        A.   A little bit more.
 6        Q.   (Scrolling.)
 7        A.   That's the end?
 8        Q.   Let's see.  This is the next page.
 9        A.   Okay.  Any other pages?
10        Q.   That's 5603.
11        A.   I'm fine with that page.
12             Is there another page?
13        Q.   (Scrolling.)  This is -- I'm showing you now
14   5604.
15        A.   (Reviewing document.)  I'm fine with that
16   page.
17        Q.   5605 is the first page of an attachment.
18        A.   (Reviewing document.)  I'm fine with that
19   page.
20        Q.   Is that right?
21        A.   Yes, sir.
22        Q.   5606 is the second page.
23        A.   I'm fine with that page as well.
24        Q.   And we've already looked at 5607.
25        A.   Okay.  So this -- this e-mail would indicate
```

1  that this was sent to me to make sure that this was

2  compliant, and when I replied back with things

3  highlighted and the changes that I made letting them

4  know that this e-mail was good.

5      Q.   And the e-mail that you're referring to is at

6  5602 dated April 4th, 2018, at 11:38 a.m.?

7      A.   That is correct.

8      Q.   And it's your contention that that e-mail

9  constituted your opinion that this was compliant with

10  the FLSA?

11      A.   Yes, sir.

12      Q.   And this is the only writing in which you

13  express that opinion, is that right?

14      A.   I believe so.

15      Q.   Now, if I'm understanding your testimony

16  correctly, it is that in order for an operator to be

17  paid, that operator must detail the time that he or she

18  spends working in his or her time sheet, is that right?

19      A.   The operator must explain what work they've

20  done for the time they want to be paid, yes.

21      Q.   I want to go back to this April 2018 drive

22  time memo.

23           Can you explain in your own words how this

24  policy works?

25           MR. JODON:  Is there a particular aspect

1    the shorter side than the longer.

2                    MR. MORELAND:  Okay.  I'll do my best.

3                    MR. JODON:  Okay.

4                    THE REPORTER:  Off the record.

5                    (Recess from 1:00 p.m. to 1:38 p.m.)

6        Q.   (BY MR. MORELAND)  Mr. Bell, you testified a

7    little while ago before we broke that insofar as

8    insuring that the drive time memo was compliant with the

9    Fair Labor Standards Act you reviewed the statute and

10   case law interpreting the statute.

11                   Do you recall that testimony?

12       A.   Yes, sir.

13       Q.   Do you remember what cases you reviewed?

14       A.   I do not remember the particular cases.

15       Q.   Now, what is the role of a rigger on a crane

16   operator's job site?

17       A.   The rigger could have several roles.  The main

18   role of the rigger is to connect whatever is being

19   lifted to the crane hook.

20       Q.   And is a rigger required on most job sites?

21       A.   Just really depends on the -- on the customer.

22       Q.   Is it required on most job sites in the oil

23   field?

24       A.   Depends on the customer.

25       Q.   Can you think of a customer that doesn't

1  require a rigger on its job sites?

2      A.   I'm not in the -- in the details.

3      Q.   Do you know who would know that better than

4  you?

5      A.   One of the branch managers would know.

6      Q.   Now, we talked earlier today about certain of

7  the supplies that the crane operator needs in order to

8  keep his crane in good working order and to be able to

9  operate the crane, fuel being one of them.

10            Do you recall that?

11      A.   Yes, sir.

12      Q.   And in addition to fuel, there's also diesel

13  exhaust fluid, lubricants, belts, filters, brake

14  cleaner, window cleaners.

15            These are all items that the crane

16  operator might require in order to keep his or her --

17  his crane in good working order so that he can perform

18  his job, right?

19      A.   Some of them, yes, sir.

20      Q.   And these items, they're maintained at each

21  branch location, is that right?

22      A.   Some of the items.

23      Q.   Is fuel maintained there?

24      A.   At some of our branches.

25      Q.   How about Midland, San Antonio, Houston?  Is

1  fuel maintained there?

2      A.    Yes.

3      Q.    How about oil?  Does Midland, San Antonio,

4  Houston stock those items?

5      A.    Yes.

6      Q.    And lubricants?

7      A.    Yes.

8      Q.    How about brake cleaner?

9      A.    I'm not sure on brake cleaner.

10      Q.    How about window cleaner?

11      A.    Yes.

12      Q.    Who at each of the three yards is responsible

13  for maintaining the inventory of those items?

14      A.    For fuel, it would be the operations manager

15  for -- or branch manager.  Operation manager, branch

16  manager is the same.

17              For the brake cleaner -- or for the oil

18  or -- or window cleaner, it would be a shop manager.

19      Q.    Did you say a shop manager?

20      A.    Yes.

21      Q.    Okay.  It -- I'm not being difficult.  In

22  addition, to the -- kind of the video or the online

23  aspect of this deposition, you're also wearing a mask --

24      A.    Yeah.

25      Q.    -- and I can see your mouth.  So --

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    required to be there.

2        Q.   Did the -- did TNT require the rigger and the

3    operator to meet at the yard to ride to the job site

4    together?

5        A.   That is not a blanket requirement, no.

6        Q.   Under what circumstances would TNT impose that

7    requirement?

8        A.   If they are dispatched that way.

9        Q.   And that would be up to the dispatcher to do

10   that, is that true?

11       A.   That would be up to the dispatcher to

12   communicate that.

13       Q.   Okay.  So if the dispatcher tells an operator,

14   Meet at such and such a day at such and such a time at

15   the yard in order to pick up your rigger, the operator

16   is required to do that.  Is that true?

17       A.   Yes.  The operator should follow those

18   instructions.

19       Q.   Now, TNT assigns company trucks to at least

20   most of the plaintiffs in the case, I believe, is

21   that -- is that correct?

22       A.   All right.  So depending on the branch some of

23   our operators do get company trucks.

24       Q.   And how about Midland and San Antonio?  Are

25   the operators assigned company trucks out of those two

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1  San Antonio branch?

2      A.   As far as tie to --

3      Q.   About -- let me just start that over because

4  that was probably an objectionable question.

5                   MR. MORELAND:  You're welcome, Mark.

6      Q.   (BY MR. MORELAND)  Insofar as the timekeeping

7  practices is concerned, does the Houston yard follow the

8  same timekeeping practices and policies that we've

9  talked about today with respect to the San Antonio and

10  Midland yard?

11      A.   It would depend on which exact policies we're

12  referring to.  I would say some are -- some are

13  followed.  Some are not.

14      Q.   So let me give you a concrete example.  If an

15  operator out of the Houston yard does not put on his or

16  her time sheet that he's performing work in the yard

17  prior to driving to the job site, would they get paid

18  for that drive time to the job site if they don't put

19  that down?

20      A.   So if the customer is paying for drive time,

21  similarly, they will get paid for drive time.

22      Q.   And would you say that this is similar to the

23  policy that we looked at from 2018 applicable to the

24  Midland yard?

25      A.   I'd say that portion of it, that customer

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1  paying, is -- is similar.

2      Q.   Is there any other way that it's -- that it's

3  similar?

4      A.   I don't want to do you like this, but I've got

5  to look at it so -- to make sure I'm not missing

6  anything.

7      Q.   Well, honestly, I'm asking because I have not

8  seen a memo about the Houston yard.  That -- that's why

9  I'm asking this question.  So if I had something to show

10 you, I would show it to you.

11           Are you aware of a memo?

12     A.   No, there is -- there is no memo.

13     Q.   So what is it you would need to look at in

14 order to compare?  You would need to --

15     A.   I need to look at the 2018 memo so I could see

16 if the practices are the same as in the memo.

17     Q.   Okay.  Are you seeing it?

18     A.   Yes.  We can start at the top.  Or is this the

19 area we'd be --

20     Q.   Well, I don't know.

21           My question to you is, reviewing this

22 memo at Bates Number 5596, how is the Houston

23 timekeeping policy similar to the Midland time keeping

24 policy?

25     A.   No. 1 is -- is similar under, "BELOW IS AN

ANTOY BELL  -  VOLUME 1 - July 15, 2020

```
 1   OUTLINE FOR YOU TO FOLLOW CONCERNING PAYROLL."
 2                  No. 2 is similar under that same section.
 3       Q.   Okay.
 4       A.   No. 4 is similar.
 5       Q.   Let me know when you're ready for me to
 6   scroll.
 7       A.   Okay.  Yes, sir.  (Reviewing document.)
 8       Q.   Are you ready?
 9       A.   Not yet.  No. 6 is similar.
10                  Now I'm ready for you to scroll.
11       Q.   (Scrolling.)
12       A.   The -- the deadline to turn in time is
13   similar, but I think the time is different.
14       Q.   Okay.
15       A.   So this -- this gets tricky to tell you which
16   parts are similar and which parts are not similar here
17   because there's not this great distinction of a hundred
18   dollars,  35,  60 per diem.
19       Q.   Well, as I understand it, in Houston and in
20   Midland at least, the company pays a  35 per diem in
21   both locations if it provides lodging, right?
22       A.   Correct.
23       Q.   And it a pays hundred dollars per diem if it
24   does not provide lodging, right?
25       A.   I said correct.  That's not exactly correct.
```

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1   So Midland has man camps.  Houston does not have man
2   camps.  So there's another tier there.
3        Q.    Okay.
4        A.    So Houston is a -- just a different animal
5   from Midland.
6        Q.    Regardless, insofar as the policy requiring
7   operators to put down all compensable time before
8   driving is concerned, those policies are the same.  Is
9   that true?
10        A.    Oh, Houston you must put down all compensable
11   hours, that's right.
12        Q.    By the way, just so -- to be fair here, I want
13   to make sure.  Because this is a two-page memo, I want
14   to go to the second page at TNT 5597 and ask you, is the
15   Houston policy similar to this one?
16        A.    Part 1, pre-trip/post-trip is similar.
17              Part 3 is similar.
18              That would be it, 1 and 3.
19        Q.    Okay.  Thank you.  Getting back to the
20   company-assigned trucks for a moment, are these trucks
21   equipped or are any of these trucks equipped with GPS?
22        A.    As a general rule, no.
23        Q.    Okay.  You know what my next question is going
24   to be.
25              What do you mean by "as a general rule"?

1    Q.   Other than that, are there any other

2  agreements surrounding the use of the company truck?

3    A.   Not that I am aware of.

4    Q.   And by the way, the commutes that the

5  operators are making in the company truck are often in

6  excess of one hour.

7              Would you agree with that?

8    A.   No, sir.

9    Q.   Why not?

10    A.   It depends on the branch.

11    Q.   So people in the branch would be better suited

12  to testify about that than you, is that right?

13    A.   No.  I can testify to it.  It just depends on

14  the branch whether that commute is going to be over an

15  hour or not.

16    Q.   Okay.  Let's take Midland.  Midland, it's

17  often the case that the commutes are over an hour,

18  right?

19    A.   I would say, yes, greater than 50 percent of

20  the time the commute's over an hour in Midland.

21    Q.   And how about San Antonio?  How often is the

22  commute over an hour?

23    A.   That I would say is -- commute over an hour is

24  probably 40, 35 percent of the time.

25    Q.   35 to 40 percent of the time the commutes are

1    greater than an hour out of San Antonio?

2        A.    Right.

3        Q.    And how about Houston?  How often are the

4    commutes greater than an hour?

5        A.    Maybe 15 percent of the time.

6        Q.    Is there any way that you're aware of using

7    TNT's data to link up an individual operator, say the

8    plaintiffs in this case, to a truck that the company had

9    assigned them?

10       A.    Is there a way to see which truck was assigned

11   to that operator?  Is that what you're asking?

12       Q.    Yes, sir.

13       A.    Yes.

14       Q.    Can you explain how that -- how we might do

15   that?

16       A.    So TNT keeps an equipment list on the

17   corporate level, and if the information is relayed to

18   the corporate equipment manager of who gets assigned the

19   truck, it will be listed on the equipment list.  But the

20   information is not always relayed that way.

21       Q.    Who is responsible for relaying that

22   information?

23       A.    That would be the operations personnel at the

24   branch, so it would vary from branch to branch.

25       Q.    How about out of Midland?  Who's the person

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    facilities, and I think that's the only additional thing
2    I needed to add.
3         Q.   Did TNT consult with outside counsel about
4    whether or not its drive time policies were compliant
5    with the FLSA?
6         A.   No.
7         Q.   Did TNT receive any complaints about the
8    failure to pay drive time?
9         A.
10                   MR. JODON:  Objection to form, vague.
11                   What do you mean by "complaints"?
12        Q.   (BY MR. MORELAND)  Did any operator ever lodge
13    any oral or written complaints about TNT not paying them
14    for travel time?
15        A.   Yes.
16        Q.   Can you tell me about those, please?
17        A.   Employees wanted to know, you know, why you
18    can get paid travel time going to a man camp site and
19    not travel time going to their own lodging.
20        Q.   Do you remember which employees registered
21    those concerns?
22        A.   I do not.
23        Q.   Are these concerns reflected in text messages
24    that TNT has produced?
25        A.   I'd have to review it.  I'm not certain.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    Q.    Were any of these complaints in writing?

2    A.    I'd have to review the text messages to see if

3 it was that way.  Barring that, no, I do not believe so.

4    Q.    And when these complaints were -- or concerns

5 were registered with TNT, did TNT undertake a -- a

6 review of any of its compensation policies?

7    A.    That would have been shortly after the memo

8 was -- was put out, so the review would have taken place

9 prior to the -- the concern being raised.

10    Q.    And you've testified about everything you did

11 to review it back then, right?

12    A.    Yes.

13    Q.    What written administrative regulations did

14 TNT rely on in formulating its drive time policies to

15 make sure it complied with the FLSA?

16    A.    Couldn't recall.

17    Q.    Are there any orders or rulings by the

18 Department of Labor that TNT relied on to make sure that

19 its drive time policies were compliant with the FLSA?

20    A.    I wouldn't be able to tell you the exact --

21 exact ones.

22    Q.    Okay.  All of the operators in this case

23 are -- well, at least while working with TNT, were

24 working under the same job description.  Is that true?

25    A.    Yeah.  While they were operators, yes, all the

1  operators would -- would have the same general job

2  description, yes.

3      Q.   Okay.  And TNT has produced one job

4  description in this case and that applies to all of the

5  operators while they were operators, correct?

6      A.   That is correct.

7      Q.   And the operators all performed the same

8  general work, correct?

9      A.   Yes, sir.

10     Q.   And they did so all in the state of Texas,

11  correct?  Well, and New Mexico to some extent?

12     A.   I need to look at the plaintiff list again.

13  It could have been in other states as well.

14     Q.   Well, all of the -- the plaintiffs in this

15  case right now, they all worked out of either Houston,

16  San Antonio, or Midland, correct?

17     A.   Correct.

18     Q.   And all of the plaintiffs were paid by the

19  hour with the possibility of receiving a per diem,

20  correct?

21     A.   Correct.

22     Q.   And all of the crane operators were required

23  to follow the drive time policies applicable to the

24  three yards in the case that we have discussed today,

25  correct?

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1        A.    No, sir.

2               MR. MORELAND:  Can we take a quick break?

3    I am reaching the end.

4               MR. JODON:  Sure.

5               (Recess from 2:36 p.m. to 2:47 p.m.)

6        Q.    (BY MR. MORELAND)  Okay.  Mr. Bell, has TNT

7    been subject to any investigations for any alleged wage

8    and hour violations?

9        A.    No, sir.

10       Q.    And did the riggers have vehicles assigned to

11   them by TNT if they were working at a TNT -- or the

12   Midland, San Antonio, or Houston yards?

13       A.    They would not regularly have a vehicle

14   assigned to them, no, sir.

15       Q.    Are you aware of any rigger who had a vehicle

16   assigned to him?

17       A.    Assigned to him, no, sir.

18       Q.    And what I mean by "vehicle" is a company

19   vehicle assigned by TNT.

20       A.    Correct.

21       Q.    So if the operator had a vehicle assigned and

22   a job required a rigger on site, it was up to the

23   operator to transport the rigger to the job site,

24   correct?

25       A.    Incorrect.

ANTOY BELL  -  VOLUME 1 - July 15, 2020

1    Q.    What's incorrect about that?

2    A.    It's not up to -- it wasn't up to the operator

3  to transport the rigger to the job site.

4    Q.    If the dispatcher told the operator to

5  transport the rigger to the job site, then it became

6  incumbent on the operator to do that.  Is that true?

7    A.    Yes, sir.

8    Q.    But you have -- without getting into the

9  substance of the documents, y'all have produced some

10  price lists and some MSAs and some other similar

11  documents concerning whether or not certain customers of

12  yours paid drive time, overtime and per diem.

13          Do you remember that -- those documents?

14    A.    Yes, sir.

15    Q.    It's fair to say that certain customers pay

16  drive time, overtime, and per diem and others don't.  Is

17  that right?

18    A.    Yes, sir.

19    Q.    And the documents that you have produced in

20  this case, do those documents accurately reflect which

21  customers paid overtime, drive time, and per diem?

22    A.    The documents that we produced are accurate,

23  yes, sir.

24    Q.    And do those documents accurately reflect all

25  of the customers who paid overtime, drive time, and per

ANTOY BELL - VOLUME 1 - July 15, 2020

1                    CHANGES AND SIGNATURE
2    WITNESS NAME: ANTOY BELL
3    DATE OF DEPOSITION: JULY 15, 2020
4    PAGE LINE        CHANGE              REASON
5    35    12    "is not required"        add the word not
6    112   12    replace "claim" with "crane"    wrong word
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

1     I, ANTOY BELL, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted above.

4

5                              _Antoy M_____

6                              ANTOY BELL

7

8  THE STATE OF _Texas___ )

9  COUNTY OF _Harris_____ )

10

11     Before me, _Ashton Garza_____, on this day

12  personally appeared ANTOY BELL, known to me (or proved

13  to me under oath or through _Known to me_____)

14  (description of identity card or other document)) to be

15  the person whose name is subscribed to the foregoing

16  instrument and acknowledged to me that they executed the

17  same for the purposes and consideration therein

18  expressed.

19     Given under my hand and seal of office this

20  _22___ day of _December_____, _2020___ .

21

22                              _____

23     ┌─────────────────────────┐   NOTARY PUBLIC IN AND FOR
        │   ASHTON GARZA          │
24     │ Notary Public, State of Texas │   THE STATE OF _Texas_____
        │ Comm. Expires 06-11-2022 │
25     │ Notary ID 129842768      │   COMMISSION EXPIRES: _6/11/22_
        └─────────────────────────┘

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                 MIDLAND/ODESSA DIVISION

3    TIMOTHY W. REPASS AND      )
     WILLIAM SCOTT MCCANDLESS,   )
4    INDIVIDUALLY AND ON        )
     BEHALF OF ALL OTHERS       )
5    SIMILARLY SITUATED,        )  CIVIL ACTION
                                )
6            Plaintiffs,        )  NO. 7:18-CV-107-DC-RCG
                                )
7    VS.                        )
                                )
8    TNT CRANE AND RIGGING,     )
     INC.,                      )
9                               )
             Defendant.         )
10
```

**Amended**
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
ANTOY BELL
July 15, 2020
Volume 1
(REPORTED REMOTELY)

I, Julie A. Jordan, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ANTOY BELL, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to Mr. Edmond S. Moreland, Jr.;

That a copy of this certificate was served on all parties and/or the witness shown herein on  7/27/2020 .

That the amount of time used by each party at the

AN OY ELL  -  VOLUME 1 - July 15, 2020

1   deposition is as follows:

2       EDMOND S. MORELAND, JR. - 04 HOUR(S):00 MINUTE(S)
        G. MARK JODON - NONE
3

4       I further certify that pursuant to FRCP Rule 30 (f)

5   (1) that the signature of the deponent:

6       XXXXX was requested by the deponent or a party

7   before the completion of the deposition and that the

8   signature is to be before any notary public and returned

9   within 30 days from date of receipt of the transcript.

10  If returned, the attached Changes and Signature Pages

11  contain any changes and reasons therefore:

12       _____ was not requested by the deponent or a party

13  before the completion of the deposition.

14       I further certify that I am neither counsel for,

15  related to, nor employed by any of the parties or

16  attorneys in the action in which this proceeding was

17  taken, and further that I am not financially or

18  otherwise interested in the outcome of the action.

19       Certified to by me this 27th of July, 2020.

20       _____
         Julie A. Jordan, Texas CSR 3203
21       Expiration Date:  1/31/22
         Firm Registration No. 280
22       JULIE A. JORDAN & COMPANY
         7800 North MoPac Expressway
23       Suite 120
         Austin, Texas 78759
24       (512) 451-8243
         (512) 451-7583 (Fax)
25       E-MAIL:  info@jordanreporting.com

1   COUNTY OF TRAVIS )

2   STATE OF TEXAS   )

3

4        I hereby certify that the witness was notified on

5   ____7/27/2020_____ that the witness has 30 days

6   (or _____ days per agreement of counsel) after being

7   notified by the officer that the transcript is available

8   for review by the witness and if there are changes in

9   the form or substance to be made, then the witness shall

10  sign a statement reciting such changes and the reasons

11  given by the witness for making them;

12       That the witness' signature was xxxxxxxx returned as

13  of ____12/22/2020_____ .

14       Subscribed and sworn to on this 22nd day of

15  December , 2020.

16

17

18  Julie A. Jordan, Texas CSR 3203
19  Expiration Date:  1/31/22
    Firm Registration No. 280
20  JULIE A. JORDAN & COMPANY
    7800 North MoPac Expressway
21  Suite 120
    Austin, Texas 78759
22  (512) 451-8243
    (512) 451-7583 (Fax)
23  E-MAIL:  info@jordanreporting.com

24

25

# Exhibit

Case 7:23-cv-00107-DC-RCG   Document 30-4-5  Filed 11/01/2021  Page 2 of 153
Case 7:18-cv-00107-DC-RCG   Document 30-4-5  Filed 11/01/2021  Page 12 of 146

1

**JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020**

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                   MIDLAND/ODESSA DIVISION

3    TIMOTHY W. REPASS AND      )
     WILLIAM SCOTT MCCANDLESS,  )
4    INDIVIDUALLY AND ON        )
     BEHALF OF ALL OTHERS       )
5    SIMILARLY SITUATED,        ) CIVIL ACTION
                                )
6              Plaintiffs,      ) NO. 7:18-CV-107-DC-RCG
                                )
7    VS.                        )
                                )
8    TNT CRANE AND RIGGING,     )
     INC.,                      )
9                               )
               Defendant.       )
10

11

12        ----------------------------------

13               ORAL DEPOSITION OF

14          JOHN  ENNETH HARRISON

15             August 17, 2020

16                  Volume 1

17        ----------------------------------

18

19

20        ORAL DEPOSITION OF JOHN  ENNETH HARRISON,

21   Volume 1, produced as a witness at the instance

22   of the Plaintiffs, and duly sworn, was taken in

23   the above-styled and numbered cause on the 17th of

24   August, 2020, from 1:29 p.m. to 4:05 p.m., before

25   Julie A. Jordan, CSR, RPR, in and for the State of
```

1  Texas, reported by machine shorthand via Zoom, at

2  809 County Road 123, Midland, Texas 79706, pursuant to

3  the Federal Rules of Civil Procedure and any provisions

4  stated on the record or attached hereto.

5                           *-*-*-*-*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  farm construction manager.

2      Q.   And from your first position of employment

3  with TNT through today, can you walk us through your

4  employment history with TNT, please?

5      A.   Yeah.  It was wind farm construction manager

6  from 2010 till -- through 2012.  From 2013 -- in the

7  year 2013, I was operations manager in Longview, Texas,

8  at the Longview branch, and then I transferred from

9  there to the Midland branch and was a branch manager

10  from beginning of 2014 until current.

11      Q.   And where were you located when you held your

12  position from 2010 through 2012?

13      A.   Several places as a construction manager.  We

14  had several different sites that we were building.  So I

15  would be six or eight months -- I was in Pennsylvania

16  for part of the time.  I was in Colorado.  I was in

17  South Texas.  I was in Nebraska part of the time.

18      Q.   Who did you report to as operations manager in

19  Longview?

20      A.   Todd Quattlebaum, David Cooley.  They're both

21  not with the company anymore.

22      Q.   And who, if you know, hired you to -- or

23  promoted you to branch manager in Midland?

24      A.   David Cooley.

25      Q.   And what position was Mr. Cooley in at that

1  time?

2      A.   He's a vice president -- executive vice

3  president.

4      Q.   And was he -- did he office in Midland or in

5  Houston or where did he office?

6      A.   He was in Longview and, you know, I mean, I --

7  it could have been  regg Lundsford, I guess.  You know,

8  I don't know how it was exactly, but it was through his

9  recommendation or -- or which -- or maybe it was a

10  decision of both of them, but...

11      Q.   And as branch manager in Midland, who do you

12  report directly to?

13      A.    regg Lundsford, president of TNT.

14      Q.   Did you say he's the president of TNT?

15      A.   Correct.

16      Q.   Was there ever a time in your employment with

17  TNT that you reported to Gary Harvey?

18      A.   Yes.

19      Q.   And when was that?

20      A.   So, I mean, it was from 2014 -- it was kind

21  of a weird deal.  I got put in as branch over there.

22  David Cooley was still in the picture, but there was a

23  transition period where -- and it all happened pretty

24  quick, but Gary Cooley was pushed out and Gary was put

25  in, and then he was there from middle -- or I guess

Case 7:23-cv-00107-DC-RCG Document 307-4-5 Filed 11/01/2021 Page 95 of 153

1  April or sometime 2014 until -- I guess it was 2018 --

2  early 2018, I guess, I think is when he left the

3  company.

4      Q.   And when you said "he" was there, you're --

5  "he" is Gary Harvey, is that correct?

6      A.   Oh, I'm sorry.  Yes.  Gary Harvey.  He wasn't

7  here.  He was managing -- he was in San Antonio.  And I

8  guess on the org chart it was -- you know, he was a

9  dotted line or he was kind of a supervisor, but I think

10  I still was direct line to -- to  regg, but for

11  day-to-day I talked to Gary.

12      Q.   And just so the record is clear, you reported

13  to Mr. Harvey on a dotted line, as you put it, from

14  April of 2014 until Mr. Harvey left in 2018?

15      A.   I believe so, yeah.  Maybe March or April.

16  Probably close enough, though.

17      Q.   By the way, are you a crane operator?

18      A.   No, sir.

19      Q.   Have you ever operated heavy equipment of any

20  kind?

21      A.   I grew up farming and ranching, so I've spent

22  thousands of hours in tractors and loaders and forklifts

23  and all of that.

24      Q.   Who did you work for prior to TNT?

25      A.   It was a service company -- wind farm service

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1      A.    Three or four, five, maybe.

2      Q.    Do you remember who they were for, which crane

3 operator?

4      A.    I mean, I think Julio Castillo is about the

5 only one that sticks out to me.  The rest of them are

6 kind of just like, Yeah, yeah.  You know, I mean -- it

7 was one that had a lot of sticky notes and stuff on it

8 and so I was trying to jog my memory as to -- as the --

9 what all was going on with that one.

10      Q.    What else did you review -- what other

11 documents did you review in preparation for today's

12 deposition?

13      A.    I just glanced over the payroll memos, but

14 that was it.  Oh, there's some text messages too.

15 Levi's text messages.

16      Q.    All right.  Are you familiar with the job

17 duties of the crane operators who work out of the

18 Midland yard?

19      A.    Yes.

20      Q.    And it's -- their primary job duty obviously

21 is to operate TNT's cranes, correct?

22      A.    Correct.

23      Q.    And there are certain fluids, materials, and

24 equipment that they need in order to operate those

25 cranes.  True?

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1    A.    Yes.

2    Q.    And among those fluids, equipment, and

3  materials are fuel, BlueDEF, boom grease, window

4  cleaner, stuff like that, is that true?

5    A.    Yes.

6    Q.    What else other than the four things I just

7  named do you think crane operators need to operate their

8  cranes in the field?

9    A.    As far as the crane?

10   Q.    Yes, sir.

11   A.    I mean, that's -- that basically covers what

12 they need to operate the crane.  I mean, they've got to

13 keep the machine serviceable, I guess, if that's what

14 you're asking.

15   Q.    In other words, they need to keep the crane

16 running out in the field, otherwise, TNT won't get paid

17 for --

18   A.    Yes.

19   Q.    -- that operation.  True?

20   A.    Yes.  Yes.

21   Q.    And these fluids, equipment, and materials,

22 these are things that you expect the operator to obtain

23 to be available to them while they're working on their

24 shift at the job site, correct?

25   A.    When needed, yes.

1    Q.   In other words, these aren't things that you

2  have to specifically assign a crane operator to obtain

3  in order to keep his or her -- his crane operating,

4  right?

5    A.   Not on a daily basis, they shouldn't have to

6  be reminded.  They need to -- they're responsible to

7  maintain the -- the -- you know, to keep it.  If it's

8  low or something like that, they should fill it up and

9  do it in their daily checks and -- and report it if it's

10 something above a normal requirement of keeping fuel

11 indefinite.

12          Outside of that, we have mechanics and --

13 you know, and by no means -- the way we operate cranes

14 is it a daily -- in most cases a daily necessity that

15 they put DEF and fuel in it.

16   Q.   Regardless of how often they put these

17 materials or fluids into the crane, just so I'm clear

18 here, you don't have to tell the crane operators, who

19 know very well how to run their crane, to go obtain

20 diesel or BlueDEF or any of these other fluids,

21 materials, or equipment.  True?

22   A.   Correct.

23   Q.   And the operators who are running these

24 cranes, they would grab these materials sometimes from

25 the yard, right?

1      A.    Yes.   If they were around that yard, yes.

2  Otherwise, they might source it from --

3      Q.    And if they're --

4      A.    -- truck stop or something like that.

5      Q.    Right.

6      A.    Most of the time they just stock up from the

7  yard and not have to come back for a while.

8      Q.    Let's talk about before March of 2020 when

9  things got weird in the world.  Okay?

10              But before that time, how many gallons per

11 week was TNT ordering in -- let me start over.

12              How many -- before March of 2020, how many

13 gallons of diesel was TNT ordering per week to be

14 delivered to its Midland yard?

15     A.    You know, I can't give you an exact number off

16 the top of my head, but roughly about, I don't know, 65

17 per gallons (sic) a week -- well, about every ten days

18 probably.  So maybe 5- or 6,000 gallons on a week.

19     Q.    And how many boxes of BlueDEF, approximately,

20 were y'all ordering to the Midland yard every week?

21     A.    I don't have that information off the top of

22 my head, but, you know, we order a pallet of boxes and

23 it lasts a month.  I don't know how many -- I don't

24 know --

25     Q.    Do you know how many --

Case 7:23-cv-00107-DC-RCG Document 30-4-5 Filed 11/02/2021 Page 100 of 153

1  inspections that we've talked about, eventually you need

2  to have the originals of those documents turned in, is

3  that true?

4      A.    Eventually, yes.

5      Q.    Mr. Harrison, do you see a document up on your

6  screen?

7      A.    Yes, I do.

8      Q.    And I'm showing you TNT Repass 5596 at the

9  moment, which is the first page of the -- of a TNT crane

10  memo to "All Operators, Truck Drivers  Riggers" dated

11  "4-1-2018," is that right?

12     A.    Correct.

13     Q.    And is this one of the memos that you referred

14  to earlier today in the deposition?

15     A.    Yes, it is.

16     Q.    And is this the payroll memo that is currently

17  in effect?

18     A.    Yes, it is.

19     Q.    And I'm going to scroll through these.  So

20  this -- the first page and the second page is the memo

21  from April of 2018, is that correct?

22     A.    Yes.

23     Q.    And now I'm showing you TNT  Repass  5598,

24  which is a similar memo dated March 13th, 2015, is that

25  right?

1    A.    Yes.

2    Q.    Now I'm showing you TNT 8450, which is a

3  previous iteration of this memo from March of 2014, is

4  that right?

5    A.    Yes.

6    Q.    Now, the March 2014 and March 2015 memos, were

7  these applicable to Midland?

8    A.    Can you repeat the question?

9    Q.    Yes, sir.  Were the March 2014 and March 2015

10 memos that I just showed you, did y'all follow those in

11 the Midland yard?

12   A.    So this 2014 one is the San Antonio memo for

13 San Antonio yard only.  And then the 20- --

14   Q.    And so did you --

15   A.    The 2015 --

16   Q.    I apologize, Mr. --

17   A.    The 2015 one is -- is the Midland one.  And

18 then like I said, I think there's a -- a 2014 memo

19 around that same date that's for Midland that I think is

20 in y'all's records.

21   Q.    And the 2015 memo that you just mentioned --

22 or 2014 memo that you just mentioned applicable to

23 Midland, how did it differ from the one that is at

24 TNT 8450?

25   A.    You'd have to throw them back up.  I -- I

1          And also, you know, putting the 60 on
2    there made us pay an extra per diem there.  It also
3    could be good for recruiting people at the -- when
4    you're in a booming market.
5          Q.   That -- the April 2018 memo that we just
6    looked at, that had nothing to do with making sure that
7    these guys were paid according to any applicable laws,
8    is that true?
9          A.   No.  It was due to -- the revision was due to
10   the target logistics addition.  That's why we had to
11   change it.
12         Q.   What was your involvement in creating the
13   March 2015 memo?
14         A.   I -- so we took San Antonio's and revised it
15   to fit Midland.  Basically just took their format and
16   then changed it to what was applicable for Midland.
17   And -- and then I sent it for review to Gary, and then
18   it was reviewed by Gary and then it was also reviewed up
19   the chain to Antoy Bell, and then after approved, it was
20   sent out.
21         Q.   Was there any correspondence that you know of
22   involving that March 2015 memo?
23         A.   Not that I can recall.  I mean, there might
24   have been some phone calls or something like that, but I
25   don't re- -- I don't remember any lengthy e-mail chains

1   or anything like that.

2       Q.   And what was your involvement in creating the

3   March -- or excuse me, the April 2018 memo?

4       A.   Again, I revised it according to what I

5   thought the business should be out or how it should work

6   and sent it through the same channels.

7       Q.   Same channels meaning you sent it to

8   Mr. Harvey and then to Antoy Bell for approval?

9       A.   Correct.

10      Q.   What was Mr. Harvey's -- well, did Mr. Harvey

11  have any specific input into the contents of the

12  April 2018 memo?

13      A.   I think he's -- originally had 75 per diem.

14  He said, No, we don't need to do 75.  Do 60.  So that

15  was the only input I remember.

16      Q.   Mr. Harrison, I'm showing you TNT 5607.

17              Do you see that up on your screen?

18      A.   Yeah.

19      Q.   And I'm going to try to make that a little

20  bigger.

21      A.   No, it's good.

22      Q.   Can you see that okay?  Can you read it?

23      A.   Yes.

24      Q.   Okay.  And I'm looking specifically at the

25  e-mail from you to Gary Harvey dated March 28th, 2018.

1              Do you see that?

2      A.    Yes.  Yes.

3      Q.    And this e-mail is specifically about that

4  April 2018 TNT crane memo, correct?

5      A.    Correct.

6      Q.    And then the second sentence here says, "I

7  plan to remove the yellow highlights once approved by

8  all."

9              Did I read that correctly?

10     A.    Correct.

11     Q.    And is "by all" -- when you say "by all,"

12 though, are you referring to Gary Harvey and Antoy Bell?

13     A.    Yes.

14     Q.    Is there anyone else?

15     A.    Not that I know of.

16     Q.    I'm going to move this down a little bit I'm

17 referring now to the e-mail from Gary Harvey to you

18 cc'ing Antoy Bell of March 29th, 2018, at 8:42 a.m.

19              Do you see that there?

20     A.    Yes.

21     Q.    And then the second-to-last sentence of that

22 e-mail talks about -- talks about something called

23 "LEMs," is that right?

24     A.    Yes.

25     Q.    What does that refer to?  What is Mr. Harvey

1  referring to in that second sentence?

2      A.   So that's our -- that's where I was talking

3  about earlier the time sheets going electronic and

4  instead of having job tickets or -- or time sheets FCC

5  is our new software that came along in the last half of

6  2018 and it was starting to come along in -- in -- in

7  earlier part of 2018 or that was kind of the transition

8  period there and -- sorry, my doorbell rang.

9            So that's what that is.  Those LEMs are --

10  it's talking about attaching those as opposed to having

11  paper tickets attached.

12      Q.   And you may have just said this, Mr. Harrison.

13  I apologize if you did.  But what does "LEM" stand for?

14      A.   I don't know off the top of my head, to be

15  honest with you.  It's an acronym we use in FCC, but

16  it's basically our job tickets instead of the paper

17  tickets, and -- and this is something here that when

18  Gary -- the reason he kind of put it over with -- the

19  way he put it was that it's something they did in San

20  Antonio about attaching time -- job tickets to all their

21  time sheets for every time that they're putting down on

22  a -- on their tickets, and that's not something I really

23  required at Midland.  And so he was just throwing it in

24  there as a thought and -- and I didn't adopt it.

25      Q.   And going back down to the March 28th e-mail

Case 7:23-cv-00107-DC-RCG Document 30-5 Filed 11/10/2021 Page 106 of 153

1  from you to Mr. Harvey, your last sentence there says,

2  "They are" -- "they're only to show the revisions to the

3  old policy."  And "they" are referring to the highlights

4  of the attachment, is that right?

5       A.   That's correct.

6       Q.   And what old policy are you referring to in

7  that sentence?

8       A.   The previous payroll memo.

9       Q.   Is -- from March of 2015?

10      A.   I believe so.  I -- I -- yeah.  Without

11 digging through my computer, I believe that's the one

12 that was in -- was the latest and greatest before 2018.

13 I think we -- we provided all the memos that existed.

14      Q.   I want to direct your attention to TNT 5604

15 and the e-mail from you to Antoy Bell cc'ing Gary Harvey

16 of March 29th, 2018, at 12:33 p.m.

17           Do you see that up on your screen?

18      A.   Yes.

19      Q.   And then we had a -- the last sentence reads,

20 "I probably won't send out the memo till Monday if

21 approved.  I don't want their heads to explode over the

22 weekend."

23           Did I read that correctly?

24      A.   Correct.

25      Q.   What were you referring to when you talked

 1        A.    No.   I mean, yes, we discussed the need for

 2   the memo.

 3        Q.    Do you recall any of those conversations in

 4   particular?

 5        A.    Not like -- no.   I mean -- I mean, I guess

 6   the -- the reason why we had the conversation is -- just

 7   thinking back, is if we're going to make a major change

 8   and tell everybody that they have to start staying in

 9   man camps instead of this, that we needed to explain it

10   and also put a policy in place that basically made it --

11   you know, pretty much directs people into staying in --

12   according to our wishes there.

13        Q.    And was there ever any discussion about

14   whether or not that memo -- the April 2018 memo complied

15   with the laws requiring the payment of overtime or any

16   other wages?

17        A.    Well, the only thing it affected was per diem

18   and the level of per diem paid, so no.

19        Q.    Did y'all specifically discuss per diem in the

20   course of these conversations?

21        A.    Yes, because there was what level of per diem

22   we -- or how much per diem we were going to pay with

23   the -- with the man camps was discussed.   That's how we

24   came up with the --

25        Q.    Was there --

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1  A.    -- 60.

2  Q.    Okay.  And was there ever any discussion about

3  whether or not the travel time aspect of those memos or

4  the April 2018 memo was compliant with federal law

5  requiring payment of wages?

6  A.    Well, there wasn't any discussion about it,

7  but that's part of the reason why we sent it up the

8  chain and -- and through our legal HR director, so

9  that's -- that's his expertise.

10  Q.    And I think my question here is -- and I think

11  what you're saying is he never expressed any concern

12  about it, is that true?

13  A.    Correct.

14  Q.    And did he ever -- did he ever talk to you

15  about the requirements of federal law surrounding the

16  payment of wages for travel time or anything else in

17  connection with that April 2018 memo?

18  A.    No.  We weren't changing anything with travel

19  time, so there was no need to discuss it.

20  Q.    And that's the --

21  A.    And --

22  Q.    -- travel time policy --

23  A.    And the travel time -- I'm sorry.  The travel

24  time there is to and from the lodging is what I'm

25  talking about.  We weren't talking -- you know, I'm not

Case 7:23-cv-00107-DC-RCG   Document 30-4   Filed 11/01/2021   Page 20 of 153

1  talking about travel time with anything else.  Basically

2  commute back and forth from the job site to the lodging

3  is what that memo reflects.

4      Q.   Was that a -- was that a change from the

5  March 2015 policy?

6      A.   No, nothing changed in -- in regards to the

7  payment of time between lodging and work site.

8      Q.   Okay.  Mr. Harrison, I again have TNT 5596 and

9  5597 up on the screen.

10             Do you see that there?

11     A.   Yes.

12     Q.   First of all, this phrase occurs in the memo,

13  and the phrase is "actual hours worked."  And I have

14  blown that up in the memo.

15             Do you see that?

16     A.   Yes.

17     Q.   Can you define "actual hours worked" as that

18  phrase is used in this memo?

19     A.   So -- well, I can use better words, but

20  they're already in that memo to explain it, but it's

21  actual hours worked, actual actions worked.  It's what

22  you actually did is what you should put down is what you

23  should be paid for, what you -- your actual efforts.

24     Q.   And does "actual hours worked" have the same

25  meaning in this 2018 memo as it did in the 2015 memo?

1    A.    Yes.  And as it does today.

2    Q.    How did the 2000- -- and I think you kind of

3 touched on this, Mr. Harrison.  I'm not trying to hound

4 you here, but --

5    A.    No, you're good.

6    Q.    -- I just need to ask you this question

7 directly.

8              How did the 2018 memo differ from the

9 2015 memo?

10    A.    With the target logistics addition, with the

11 extra level of per diem between the hundred, the 60, and

12 the 35, that was the main thing that sticks out to me

13 and -- and I believe is all that was changed.

14    Q.    Was there any change with respect to whether

15 or not the operator would get paid for travel time if

16 the customer was or was not charged for that time?

17    A.    No, nothing changed on that front.  It's

18 always been what it's been.

19    Q.    And how did you all communicate each of these

20 memos to the crane operators?  When I say "each of these

21 memos," I mean the 2015 and the 2018 memos.

22    A.    It's via e- --

23    Q.    Go ahead.

24    A.    Via e-mail, and then if they're brought on

25 after it came out, then it's reviewed during the

1   on-boarding.  When we bring new employees on, it's gone

2   over as well as the employee handbook.

3        Q.   Did you say it's in the employee handbook?

4        A.   As well as with our -- in addition to the

5   employee handbook.

6        Q.   I got it.

7             So the employee handbook is communicated

8   alongside this -- these memos?

9        A.   Correct.

10        Q.   Now, can you explain how per diem, be it a

11   hundred dollars, 60, or 35, relates to the payment of

12   travel time in the April 18th memo?

13        A.   Well, they're -- they're two different things.

14   So it's really per diem is dictated on where -- where

15   you stay, not by travel time or commute time or paid

16   commute time or travel time, whatever you want -- I

17   guess the travel time was the terminology used in the

18   memo, but -- so they're two separate -- separate things.

19   And -- and if we're providing the lodging -- the closest

20   lodging available, then any time it takes you to commute

21   from that job site to that lodging that we're paying for

22   is paid for regardless of whether or not the customer is

23   paying us.

24        Q.   And are you saying that there is -- let's

25   say -- well, let me do it another way.

1          Let's say a crane operator is paid a
2  hundred dollar per diem.
3          Are you saying that that crane operator
4  would be paid for travel time separate and apart from
5  whether or not they were paid a hundred dollar per diem?
6      A.   No, because a crane operator wouldn't be paid
7  a hundred dollars per diem if he was staying in our
8  lodging.  He'd only get 60 or 35, depending on the
9  lodging, and -- and further back, he'd only have been
10  paid 35 if he was staying in our lodging.
11          And like I said, regardless of whether or
12  not the customer is paying us and they're staying in our
13  lodging that we're paying for, then we would pay
14  their -- their commute time regardless.
15      Q.   And you paid them either 35 or  60 if they're
16  staying in your lodging, right?
17      A.   Correct.
18      Q.   And you paid them a hundred dollar per diem if
19  they're not staying in your lodging.  True?
20      A.   Correct.
21      Q.   And so if TNT is providing the lodging, then
22  TNT will pay the travel time to the job site from the
23  lodging, correct?
24      A.   Correct.
25      Q.   But if it's not providing the lodging, then it

1    will not pay for the travel time from the lodging to the

2    job site and back.   True?

3        A.    The only time that they would get for travel

4    time at a hundred is -- is whatever the customer paid.

5        Q.    And whether the customer paid is reflected in

6    an MSA or similar document, is that true?

7        A.    It can be, but it also can be just an

8    agreement with the customer that calls us out, whether

9    it's the supervisor or whatever job.  If -- if it's

10   negotiated that they'll pay some sort of travel time for

11   people that we can charge, it's done on the front side

12   of the job being bid in some cases.  But in some cases

13   it's an MSA.  So it -- it -- it's different all the way

14   around.  Different customers, different -- different

15   methods.

16       Q.    And were you pretty familiar with the MSAs

17   that the operators were working under out in the

18   field --

19       A.    Yeah.

20       Q.    -- during the, say, time --

21       A.    Just as -- just -- yeah, pretty much.  That is

22   much --

23       Q.    So for example, you would have been

24   knowledgeable about what the MSAs provided with respect

25   to Chevron, correct?

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1  cheating or negligence or something like that.

2      Q.   And I'm not talking about cheating or

3  negligence.  I'm talking about the criteria that you

4  used, you know, insofar as TNT's policies or practices

5  are concerned, were there any other criteria --

6      A.   No, that's -- that's --

7      Q.   -- that you used --

8      A.   As far as I -- the main thing right there is

9  just, you know, that was -- that's the one that's popped

10 up in the past is where, you know, they're -- it gets

11 claimed and gets removed because it's not according to

12 the payroll memo.

13     Q.   And the payroll memo is that April 2018 and

14 then the March 2015 memo that we talked about earlier

15 today?

16     A.   Correct.

17     Q.   When you did remove travel time from time

18 sheets, did you ever ask the operator whose time sheet

19 it was about the removal of the time sheet or --

20     A.   Yes, there would be conversations.  Yes.

21     Q.   Which operators did you talk to about that?

22     A.   I mean, probably -- I don't know.  I mean,

23 I -- several of them.  I mean, I guess --

24     Q.   Can you name any sitting here today?

25     A.   Scott McCandless.  I know I had a conversation

1   with him about the travel time being removed.

2        Q.   Anyone else?

3        A.   I mean, I distinctly remember conversations

4   with him, but others would be -- I mean, I'm sure we had

5   conversations.  I could probably name anybody that's

6   ever worked for me maybe.  I don't know.  I mean -- and

7   some -- whether it was a direct conversation or just a

8   question.

9             I mean, what kind of conversation are you

10  talking about?

11       Q.   Just did you consult with them about the fact

12  that you were removing the travel time and why and did

13  y'all come to an agreement on that?

14       A.   Well, I guess any of them that -- we could go

15  back through all the time cards and look and see if

16  there was a time removed and there was a conversation,

17  whether it was with me or Levi or maybe even Carol

18  and -- you know, and if Carol had the conversation and

19  they didn't understand and they would -- they would call

20  me and -- and we would talk through it.

21            And there was cases where it stayed

22  removed and then there might have been cases where they

23  did something other than just drive back to their --

24  their place and maybe it got reversed or something and

25  it would still be shown on the record.

1          So I guess the best way to find out who
2  all I've had conversations with would be to review every
3  time card that's ever been slashed.
4       Q.   And is it your testimony that you reviewed the
5  slashing of the travel time with every crane operator
6  who ever had travel time removed from his time card?
7       A.   No.  It's not that -- I don't think that I
8  ever had a conversation with every one of them, but
9  between Levi, Carol, or myself, there was a conversation
10 between us.
11      Q.   Okay.  So regardless of whether or not you
12 personally had the conversation, it's your testimony
13 that it's your understanding that any time travel time
14 was removed, there was a conversation with the crane
15 operator about that?
16      A.   It's probably a stretch to go all the way on
17 every one of them.  I would say that there was initial
18 conversations, and if there was repeated behavior where
19 they kept claiming it after they'd been counseled
20 otherwise, maybe there wasn't a conversation later down
21 the road where they kept doing it and we just tolerated
22 them putting on there and they knew it was going to get
23 removed.  You know, I mean, it's their prerogative to
24 write it on there and, I guess, if they want to for
25 whatever sake, it's a free country, I guess, and it --

1    but it's going to get cut.

2              So there was probably instances with some

3    where we didn't bother following up with them after

4    we've already talked to them once or twice about it and

5    a decision was made to just tolerate it being cut off of

6    there, you know.  I mean, but they expected to.  So, I

7    mean, it's like, Well, I'm going to put it on there

8    anyway.

9              Okay.  Well, put it on there if you want

10   to.

11        Q.   So you would understand why they would stop

12   putting travel time down on their time cards if it's

13   been removed, right?

14        A.   It's a possibility, yeah.

15        Q.   In fact, you expected them to stop putting it

16   down, correct?

17        A.   Well, I mean, that's, yeah, per the policy.  I

18   mean, travel time -- when we're talking about driving

19   from the job site to the lodging or where they chose,

20   it's not a -- it's not compensable according to TNT, our

21   policy, so you shouldn't put time down that you're --

22   that isn't compensable.

23              But if -- you know, there's cases where

24   they said, you know, they had to come back and get --

25   turn in paperwork or get some supplies or stop by the

1          So you've got -- so the conversation --
2   like I said, it's a pretty short conversation.  Put down
3   the money -- the time you expect to get paid for for any
4   work that you do, because that's what I want you to get
5   paid.  And -- and also, it needs to be in accordance
6   with our policy -- our payroll memo policy and here it
7   is.  And that's a conversation that comes on at the
8   first part of their employment.
9        Q.   This is part of the on-boarding?
10       A.   Yes.
11       Q.   Do you recall any such specific conversation
12  with a specific operator sitting here today?
13       A.   Oh, I think I've had the conversation about --
14  no, not specifically, I guess.  But, I mean, I can name
15  just about any operators that work for me when they ask
16  me about time cards or time or -- and that's what I tell
17  them.
18          I said, Look, I want y'all to get paid for
19  every hour that you work and -- and any -- and -- and
20  what -- and put down on your time what you expect to get
21  paid for.  And also, here's our payroll memo for what we
22  don't pay you for, which is basically when you're
23  getting a hundred and you choose to drive three hours
24  back to wherever it is you decide to go to or two or an
25  hour and a half or maybe it's only an hour.  But if you

 1   make that decision, we're not going to -- and the reason
 2   behind that is, is so that we -- we encourage them to
 3   stay closer to the job site because you're not going to
 4   get -- we're going to be nice and pay for your commute
 5   to and from the place that we're paying for you to stay
 6   at while you go to work so you get paid.  But if you're
 7   on the hundred and then -- and -- and then you're
 8   choosing to drive all the way over to wherever it is, we
 9   don't want to incentivize you to do that.  We want you
10   to be incentivized to stay closer, and so we don't pay
11   only -- we only pay what is paid for by the customer all
12   the way back to that place.  You know, so that's on
13   their decision to not get paid and -- and to stay in
14   their own bed at night or wherever it is they decide to
15   stay.
16              As far as the conversation, getting back
17   to your question, that's how I'd answer that question,
18   was basically, yes, put it down if you expect to get
19   paid for it, for any work that you do for TNT, and that
20   includes, you know, getting cleaning supplies once a
21   month that I pay for -- that we paid for on the credit
22   card.  Hey, if you need to go get cleaning supplies for
23   the crane, go get your cleaning supplies for the crane.
24   Of course, you know, that's usually about you go get a
25   supply and you have it in your pickup in the toolbox and

Case 7:23-cv-00107-DC-RCG  Document 30-4-5 Filed 11/02/21 Page 201 of 453

1    be required on a job?

2        A.   That's pretty much it, through customer

3    requirement if they -- on completion work.  It's whether

4    they need it or not.  And then that's really what we're

5    talking about here is the shift work.

6        Q.   Did TNT ever require riggers on jobs for

7    cranes over a certain size?

8        A.   Yeah.  Anything on 90-ton and bigger for day

9    work.  Now, completion work, which is this -- mainly

10   what this is around for travel time where you're going

11   to and from the same place every day, those -- those

12   didn't have a requirement of a rigger.  That was up to

13   the customer once -- because the crane is minimal action

14   out there on those locations.

15       Q.   Did TNT require its operators to come to the

16   yard to pick up certain materials in order to operate

17   their cranes?  And I'm talking about the materials that

18   we talked about earlier today, diesel, DEF, boom

19   grease --

20       A.   So --

21       Q.   -- all of that.

22       A.   So we have the -- earlier on, the first --

23   '14, '15 -- I don't remember.  I think '15 or '16 is

24   when we got the bolt tank in the yard, but -- but, yes,

25   we -- if they were in the area, the -- the counsel or

1   the -- the instruction was if you're around the yard

2   get -- utilize the fuel tank in the yard when you can,

3   but if it makes sense, just get it at the truck stop,

4   you know, out there.  They've all got company credit

5   cards.

6              But we did ask if they were around the

7   Midland yard, get it there.  You know, if you're

8   dropping off paperwork, use the time to get the

9   paperwork and -- and, you know, if you need DEF or cases

10  of water or whatever you need, grab it while you're

11  there.

12             So, yes, there wasn't a hard -- when it

13  made sense, we said, Use it, you know.  We didn't say,

14  You have to be here every day to get your stuff, but it

15  was -- it's there if -- if it made sense.

16  Q.   So if I'm understanding you correctly, just

17  kind of in a nutshell, TNT preferred its operators to

18  pick that stuff up from the yard rather than get it at a

19  service station or elsewhere, right?

20  A.   When it geographically made sense, yes, that's

21  what I -- when it was the smart, prudent thing to do

22  and -- and you're -- it doesn't make sense -- I don't

23  want them to come from Pecos, Orla, or anywhere else to

24  come to the yard to get stuff.  If they're in those

25  areas, get it up there.

1        A.    They've had company pickups as long as I've
2   been there.
3        Q.    And did you allow them -- the operators to use
4   their personal vehicles to get out to the job site?
5        A.    They're not supposed to, no.
6        Q.    Why not?
7        A.    Just liability reasons and reliability
8   reasons.  You know, we have liability and re- --
9   reliability.
10       Q.    Did riggers receive company pickup trucks?
11       A.    No.  They're...
12       Q.    And TNT expected its operators to use the
13  trucks to transport equipment materials and so on out to
14  the job site.  Is that true?
15       A.    Are we speaking about the materials earlier,
16  the DEF?  I mean --
17       Q.    Yes, sir.
18       A.    Yes.
19       Q.    And did it also expect the operators to use
20  the pickup trucks to transport the riggers when required
21  out to the job site?
22       A.    When required, yes.
23       Q.    So it's fair to say that those company trucks
24  assigned to the operators were for the benefit of TNT,
25  true?

1    A.    I'd say it's for both parties, but yes.

2    Q.    Now, we talked a few minute ago about the

3  operator picking up the rigger from the yard.

4          Do you remember that?

5    A.    Yes.

6    Q.    And you'll agree with me that when they picked

7  up the rigger from the yard, that would extend the

8  length of their commute that ultimately ended at the job

9  site, correct?

10   A.    Yes.  In most cases.  Some cases they stayed

11  in line with it so it was on way.

12   Q.    And dispatch directs the operator to pick up

13  the riggers at -- to pick up the riggers when necessary

14  for a job.  Is that true?

15   A.    Yes.  Or they --

16   Q.    And when --

17   A.    -- make arrangements to -- yeah, and which

18  means -- yeah, pick them up at the job site or maybe

19  sometimes they may meet at a truck stop somewhere that's

20  on the way and leave their vehicle there if it didn't

21  make sense to drive by the yard.  It's not required that

22  they meet at the yard, but in some cases it makes sense

23  for them to meet at the yard.

24   Q.    Did dispatch ever direct the operator to pick

25  the rigger up at the yard specifically?

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1    A.    Yeah, in a way, shape or form, yes.

2    Q.    And so you understand that, you know, from the

3 time -- well, the law requires that an employee be paid

4 from the time he or she performs the first work of the

5 day until the time that he or she performs the last work

6 of the day with the exception of maybe a meal break,

7 correct?

8    A.    Correct.

9    Q.    And you would also agree that -- we talked

10 about this earlier -- that loading diesel and other

11 equipment onto a truck is work and time, correct?

12    A.    Correct.

13    Q.    Now I'm showing you TNT 4635, which is

14 the -- one of the time sheets for a gentleman named

15 Julio Castillo for the week ending September 11th, 2016.

16           Do you see that there on your screen?

17    A.    Yes.

18    Q.    And did you review this time sheet in

19 preparation for today's deposition?

20    A.    Yes, I've seen it before.

21    Q.    Okay.  And you see that in the second column

22 Monday through Saturday "Travel to location" is removed?

23 Do you see that?

24    A.    Yes.  Yes.

25    Q.    And is that Mrs. Harrison who removed that

1  travel time with a red pen?

2       A.   She marked it out.  I -- I -- it was not

3  removed until I say remove it, so yes.

4       Q.   And then to be clear about that last part,

5  it's removed when you sign it there with your

6  initials --

7       A.   Yes.

8       Q.   -- "JH," correct?

9       A.   "J H," yeah.

10      Q.   Thank you.  I was going to ask you about

11  that --

12      A.   Yeah.  It's kind of combined.

13      Q.   Got it.

14           So you would have reviewed this time sheet

15  before initialling it J H, correct?

16      A.   Correct.

17      Q.   And then at the bottom of the time sheet in

18  red it says "NO Travel."

19           Do you see that?

20      A.   Correct.

21      Q.   And that's also Mrs. Harrison's handwriting?

22      A.   Yes.

23      Q.   Is that the explanation for why she has marked

24  through the travel time to location Monday through

25  Saturday?

1    A.    Yes.

2    Q.    And then if you look at -- let's just focus on

3  Tuesday through Friday.  It looks like Mr. Castillo has

4  indicated that he's loading diesel on the L tank and/or

5  loading ice.

6              Do you see that?

7    A.    Yeah he's loading diesel on Tuesday in the

8  L tank and then the other days he's getting ice and

9  putting diesel in his pickup.

10    Q.    Right.  And he's loading ice in September in

11  West Texas, correct?

12    A.    That's -- that's correct.

13    Q.    Okay.  Would you agree with me that it's hot

14  in September in West Texas?

15    A.    Yes, it is.

16    Q.    And so ice would be a necessary bit of

17  equipment in order to perform your job out there in the

18  middle of nowhere, correct?

19    A.    It's a personal preference.  It's not

20  required.  Water is required, but ice is nice and we pay

21  for it.

22    Q.    Do y'all maintain an ice machine at the

23  Midland yard?

24    A.    We do not.

25    Q.    Would you agree that Mr. Castillo is

1  performing work by putting diesel in his L tank?

2      A.   Yes, that's why we paid him for it.

3      Q.   And in light of the continuous workday rule,

4  why then did you remove the travel to location after he

5  performed that work?

6      A.   Well, according to our payroll memo, he was

7  staying in his own lodging that he wasn't paid for or

8  that we -- that we didn't pay for since he's staying in

9  his own lodging, and therefore, it falls out of line

10 with that, so it wasn't paid.

11          And it's also -- you know, I mean, I guess

12 could you look at it either way.  He's -- on Tuesday

13 anyway he's hauling, I guess -- and I don't know that

14 the ice is part of a continuous workday, getting ice for

15 your cooler when it's not required.  So that's why the

16 judgment was X'd out.  And he wasn't going back to the

17 yard.

18          I remember a conversation with him about

19 it, why he would put that on there.  He didn't come back

20 to the yard.  There was no reason for him to come back

21 to the yard on those other crosses out there, so...

22     Q.   And the other crosses, you're referring to the

23 last time entry column for Monday, Tuesday, Wednesday,

24 Friday, and Saturday.  Is that true?

25     A.   Correct.

Case 7:23-cv-00107-DC-RCG   Document 30-4-5 Filed 11/10/2021   Page 239 of 453

97

1  operators?

2       A.   Not -- not to that extent.  I mean, there's

3  been questions about what is and what isn't or how

4  that -- you know, even though it's in black and white on

5  the memo, I may have had to explain it, you know, in --

6  in example form or whatever, but nothing sticks out

7  really.

8       Q.   What do you mean by that, you had to explain

9  it in example form?

10      A.   Well, just like just go through a day, you

11  know.  If you stay here, it's paid a hundred percent.

12  If you stay in lodging, then we pay it all.  If you

13  choose to drive all the way back to wherever you were

14  at, then you're not going to get paid only -- you're

15  only going to get paid what the customer pays.  We'll

16  pass that along to you and then we'll pay you a hundred

17  for your place that you're staying at and, you know,

18  just -- just put it in, I guess, even more laymen's

19  terms than what's in the black and white right there.

20  It's pretty clear, you know.

21           And that's -- there wasn't any to the

22  extent of where McCandless just got, you know, miffed

23  about it and -- and that was it.

24      Q.   Other than a conversation with McCandless, did

25  you -- did any -- did you ever hear of any other

1   complaints about operators not being paid for drive
2   time?
3        A.   Not specifically.  I mean, they were all --
4   I've heard deals where they've -- well, I think we
5   should get all of that or something like that.
6             And I was, Well, this is what it is and
7   it was this way when you hired on and it's not like
8   something we changed on you on the travel time.  We
9   didn't change anything there.  And you don't have to
10  work here if you don't want to, but it is -- this is --
11  this is how we -- this is our policy.  I don't know what
12  to tell you.
13       Q.   Other than Mr. McCandless, do you recall
14  anyone else who -- specifically recall anyone else who
15  made that -- made those complaint?
16       A.   I don't recall specifically to me or anything
17  like that.  I mean, he was the one that stuck out to me.
18  I just don't --
19       Q.   Did Mr. Hastey -- oh, I'm sorry.  I apologize.
20       A.   Go ahead.
21       Q.   Did Mr. Hastey ever tell you -- say anything
22  to the effect of, Hey, I've received these complaints
23  about the travel time?
24       A.   He's -- he -- he would tell me, Hey, they
25  called wondering why they didn't get this, especially,

1    you know, if they came on new, a week or two in or

2    something like that, they'd be like how come they didn't

3    get this travel time and -- and, you know, we'd have to

4    review the payroll memo with them again and tell them,

5    you know.  So there was cases where, yeah, somebody

6    would bring it up to him about it and we'd have to

7    explain it to him again.

8         Q.   Did he tell you who specifically --

9         A.   I think maybe --

10        Q.   -- expressed those concerns?

11        A.   -- maybe Brandon Raybion is a -- is a name

12   that sticks out that talked to him about it, but there

13   wasn't a -- it wasn't like a serial everybody

14   complaining about it.  I mean, it was -- it's gone

15   through when they hire on and they understand it for the

16   most part, but there's always the one-offs that don't

17   and still want to -- even though it's right there

18   upfront.  It's not like we were trying to hide it or

19   anything.  It's right there e-mailed out for everybody

20   to benefit and know, so we didn't get that many.

21        Q.   Mr. Harrison, I'm showing you TNT 6000.  I'll

22   expand it here in just a second.

23             But do you see it there on your screen?

24        A.   Uh-huh.  I can see it.

25        Q.   And this is a termination report for

JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020

1                    CHANGES AND SIGNATURE

2  WITNESS NAME: JOHN KENNETH HARRISON

3  DATE OF DEPOSITION: JULY 23, 2020

4  PAGE LINE            CHANGE                    REASON

5     9 : 24      "Gary Cooley" to "David Cooley"    Wrong name

6    11 : 3          "Twin" to "Wind"               Wrong word

7    25 : 16       "pretest" to "pre-task"          Wrong word

8    26 : 23          "p.m." to "a.m."              Misspoke or misunderstood

9    73 : 24          "bolt" to "bulk"              Wrong word

10   87 : 6    Change answer of "That's right." to:    Clarification of answer

11           "No, I do not agree getting ice and filling

12           factory fuel tank with fuel is considered

13           compensable, and I erred on the side of

14           caution and paid it."  -As answered on page 86 line 15.

15

16

17

18

19

20

21

22

23

24

25

**JOHN KENNETH HARRISON - VOLUME 1 - August 17, 2020**

1    I, JOHN KENNETH HARRISON, have read the

2  foregoing deposition and hereby affix my signature that

3  same is true and correct, except as noted above.

4

5                                      _____

6                          JOHN KENNETH HARRISON

7

8  THE STATE OF _Texas_____)

9  COUNTY OF _Midland_____)

10

11    Before me, _Dulce Castaneda_____, on this day

12  personally appeared JOHN KENNETH HARRISON, known to me

13  (or proved to me under oath or through

14  _TX Drivers License_____) (description of identity

15  card or other document)) to be the person whose name is

16  subscribed to the foregoing instrument and acknowledged

17  to me that they executed the same for the purposes and

18  consideration therein expressed.

19    Given under my hand and seal of office this

20  _15th___ day of _December_____ _2020_____ .

21                                      _____

22  [SEAL: DULCE SARAI CASTANEDA
       Notary Public, State of Texas
23     Comm. Expires 02-25-2024
       Notary ID 132375160]    NOTARY PUBLIC IN AND FOR

24                          THE STATE OF _Texas_____

25                          COMMISSION EXPIRES: _02/25/2024_

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                    MIDLAND/ODESSA DIVISION

 3    TIMOTHY W. REPASS AND      )
      WILLIAM SCOTT MCCANDLESS,   )
 4    INDIVIDUALLY AND ON         )
      BEHALF OF ALL OTHERS        )
 5    SIMILARLY SITUATED,         ) CIVIL ACTION
                                  )
 6            Plaintiffs,         ) NO. 7:18-CV-107-DC-RCG
                                  )
 7    VS.                         )
                                  )
 8    TNT CRANE AND RIGGING,      )
      INC.,                       )
 9                                )
              Defendant.          )
10                              Amended
11                    REPORTER'S CERTIFICATION
                       ORAL DEPOSITION OF
12                   JOHN KENNETH HARRISON
                        August 17, 2020
13                         Volume 1
                      (REPORTED REMOTELY)
14
15         I, Julie A. Jordan, Certified Shorthand Reporter in
16    and for the State of Texas, hereby certify to the
17    following:
18         That the witness, JOHN KENNETH HARRISON, was duly
19    sworn by the officer and that the transcript of the oral
20    deposition is a true record of the testimony given by
21    the witness;
22         That the original deposition was delivered to
23    Mr. Edmond S. Moreland, Jr.;
24         That a copy of this certificate was served on all
25    parties and/or the witness shown herein on  8/24/2020  .
```

1  That the amount of time used by each party at the

2  deposition is as follows:

3  EDMOND S. MORELAND, JR. - 02 HOUR(S):22 MINUTE(S)
   G. MARK JODON - NONE

4

5  I further certify that pursuant to FRCP Rule 30 (f)

6  (1) that the signature of the deponent:

7  XXXXX was requested by the deponent or a party

8  before the completion of the deposition and that the

9  signature is to be before any notary public and returned

10 within 30 days from date of receipt of the transcript.

11 If returned, the attached Changes and Signature Pages

12 contain any changes and reasons therefore:

13 _____ was not requested by the deponent or a party

14 before the completion of the deposition.

15 I further certify that I am neither counsel for,

16 related to, nor employed by any of the parties or

17 attorneys in the action in which this proceeding was

18 taken, and further that I am not financially or

19 otherwise interested in the outcome of the action.

20 Certified to by me this 24th of August, 2020.

21 Julie A. Jordan, Texas CSR 3203
   Expiration Date: 1/31/22

22 Firm Registration No. 280
   JULIE A. JORDAN & COMPANY

23 7800 North MoPac Expy, Suite 120
   Austin, Texas 78759

24 (512) 451-8243
   (512) 451-7583 (Fax)

25 E-MAIL: info@jordanreporting.com

```
 1   COUNTY OF TRAVIS )

 2   STATE OF TEXAS   )

 3

 4        I hereby certify that the witness was notified on

 5   ___8/24/2020_____ that the witness has 30 days

 6   (or _____ days per agreement of counsel) after being

 7   notified by the officer that the transcript is available

 8   for review by the witness and if there are changes in

 9   the form or substance to be made, then the witness shall

10   sign a statement reciting such changes and the reasons

11   given by the witness for making them;

12        That the witness' signature was/wasxxnot returned as

13   of ___12/22/2020_____.

14        Subscribed and sworn to on this _22nd_ day of

15   _December__, 2020.

16

17

18   _____
     Julie A. Jordan, Texas CSR 3203
19   Expiration Date: 1/31/22
     Firm Registration No. 280
20   JULIE A. JORDAN & COMPANY
     7800 North MoPac Expressway
21   Suite 120
     Austin, Texas 78759
22   (512) 451-8243
     (512) 451-7583 (Fax)
23   E-MAIL: info@jordanreporting.com

24

25
```

**Exhibit E**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                   MIDLAND/ODESSA DIVISION

 3    TIMOTHY W. REPASS AND      )
      WILLIAM SCOTT MCCANDLESS,  )
 4    INDIVIDUALLY AND ON        )
      BEHALF OF ALL OTHERS       )
 5    SIMILARLY SITUATED,        ) CIVIL ACTION
                                 )
 6              Plaintiffs,      ) NO. 7:18-CV-107-DC-RCG
                                 )
 7    VS.                        )
                                 )
 8    TNT CRANE AND RIGGING,     )
      INC.,                      )
 9                               )
                Defendant.       )
10

11

12          ----------------------------------

13                    ORAL DEPOSITION OF

14                 GARY ELDON HARVEY, JR.

15                     July 23, 2020

16                        Volume 1

17          ----------------------------------

18

19

20        ORAL DEPOSITION OF GARY ELDON HARVEY, JR.,

21    Volume 1, produced as a witness at the instance

22    of the Plaintiffs, and duly sworn, was taken in

23    the above-styled and numbered cause on the 23rd of

24    July, 2020, from 9:54 a.m. to 12:01 p.m., before

25    Julie A. Jordan, CSR, RPR, in and for the State of
```

GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020

1   Texas, reported by machine shorthand via Zoom, at

2   7780 FM 3175, Somerset, Texas 78069, pursuant to the

3   Federal Rules of Civil Procedure and any provisions

4   stated on the record or attached hereto.

5                    *-*-*-*-*-*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020

1    A.    It was 2006.  I think it was early part of the

2  year.  I don't remember the exact date, but I think

3  April.

4    Q.    And did you work for Louisiana Crane out of

5  San Antonio?

6    A.    Yes, sir.

7    Q.    Now, can you walk us through the positions you

8  held with TNT Crane from September -- or from February

9  of 2011 until July of 2018, please?

10    A.    Yes, sir.  I was -- I came over in a branch

11  manager role.  They currently had a branch manager, so

12  we kind of were splitting duties on it for about the

13  first six to eight months and then I was moved to branch

14  manager by myself.

15          And then a few years later, I don't

16  remember if it was '14 or something -- maybe it was '13

17  or '14 I got moved up to vice president role.

18    Q.    And were you still branch manager while you

19  were vice president starting in 2013 or 2014?

20    A.    Yes, sir.  I worked out of San Antonio office.

21  I had operations manager, but, yeah, I did both.  Yes,

22  sir.

23    Q.    And did you hold both roles until you left the

24  company in July of 2018?

25    A.    Yes, sir.

**GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020**

 1    Q.   How did your duties change when you became a

 2  vice president?

 3    A.   I was just -- I was more involved with -- with

 4  other branches throughout the company.

 5    Q.   What other branches were you involved with?

 6    A.   I mean, to some degree just about all of them.

 7  I mean, I was -- I was -- I was part of the incident

 8  injury free management team and I -- so I traveled

 9  around to all the branches.  I mean, it -- primarily

10  took care of San Antonio and Midland.

11    Q.   And have you been in San Antonio the entire

12  time with TNT from February of '11 until July of 2018?

13    A.   Yes, sir.  Yeah.

14         There's a -- there's a slight delay.  When

15  you start talking, it -- I'm missing the very beginning

16  of it, just to let you know of.

17    Q.   Okay.  Thank you for letting me know.  That --

18  if you -- again, this is why it's so important, if you

19  don't hear it, please ask me and I'll repeat the

20  question.  Okay?

21    A.   Yes, sir.

22    Q.   Was there ever a time when you were branch

23  manager over both Midland and San Antonio?

24    A.   No.

25    Q.   When did John Harrison start as branch manager

GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020

1   in Midland?

2       A.   I don't remember the exact date.  I mean, we

3   had a branch manager in Midland.  He -- he left or

4   got -- he got repositioned to another branch or

5   something and I went in there for probably a month

6   while -- so I guess technically I did run the branch for

7   about a month until we hired John Harrison while I was

8   up there just -- I was actually mostly just there to

9   interview the -- the potential branch managers.

10      Q.   And who was the branch manager who preceded

11  John Harrison?

12      A.   His name was Colby.  I don't even remember his

13  last name.

14      Q.   And did John Harrison come on as branch

15  manager in Midland about the time you received the VP

16  title?

17      A.   I don't -- I don't recall.  I really don't

18  remember.  It was -- I don't -- I don't think it was the

19  same time.

20      Q.   Did you ever oversee John Harrison in Midland

21  while he was branch manager there?

22      A.   Yes, sir.

23      Q.   Did you do that throughout your employment

24  with TNT from the time he started until the time you

25  left?

1    A.   I did in the beginning when he first started

2 for the first probably year, year -- year and a half,

3 kind of helping him out.  And then he pretty much took

4 it over after that.  And most of the time -- most of the

5 time after that point, we would just talk on the phone.

6    Q.   Did you still have input into the operations

7 over there in Midland even after that year to year and a

8 half?

9    A.   Yes, sir.

10    Q.   Now, the San Antonio yard for TNT was in

11 Schertz for a while, is that correct?

12    A.   Yes, sir.

13    Q.   How long was it in Schertz?

14    A.   From the time I got there until right -- just

15 prior to me leaving, so it was probably April or May of

16 '18 they moved to a different -- different location.

17    Q.   Do you remember the address in Schertz?

18    A.   No, sir.

19    Q.   As the branch manager over the San Antonio

20 yard, did you supervise the crane operators working out

21 of that yard?

22    A.   Yes, sir.

23    Q.   Did the operations manager also supervise

24 those crane operators?

25    A.   Yes, sir.

GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020

1    A.    No, sir.

2    Q.    And when you reviewed these time sheets when

3 these issues were brought to you, did you follow TNT's

4 policies and procedures regarding time reporting?

5    A.    Yes, sir.

6    Q.    To your understanding, were crane operators

7 required to sign their time sheets?

8    A.    I -- I don't remember.  I think they -- I

9 think they were, but I'm not a hundred percent sure.  I

10 don't remember that part of it.

11    Q.    Do you ever remember seeing a time sheet that

12 a crane operator had signed?

13    A.    I don't remember, no.

14    Q.    How long was Johnny Johnson the operations

15 manager out of the San Antonio yard?

16    A.    We hired him probably in -- I don't remember

17 if it was 2012 or '13 and he was -- he came in as a

18 safety manager for a short period of time and then

19 became a branch manager shortly after that.

20    Q.    You mean an operations manager?

21    A.    I mean operations manager.

22    Q.    What did you do to prepare for today's

23 deposition?

24    A.    I haven't done anything.

25    Q.    Did you review any documents?

**GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020**

1  talking about.

2      Q.   So other than Mr. Bell and Mr. Jodon, did you

3  talk to anybody else?

4      A.   No, sir.

5      Q.   I want to talk to you a little bit about the

6  crane operator's work.  Their primary job duty was to

7  operate the cranes obviously, correct?

8      A.   Yes, sir.

9      Q.   And in order to operate the cranes, they

10  needed certain things like fuel and boom grease and

11  other supplies and equipment to do so, is that right?

12      A.   Yes, sir.

13      Q.   And these are things that as the branch

14  manager of San Antonio, you expected them to obtain as

15  professional crane operators and to know what they

16  needed in order to keep their cranes in good working

17  order, is that right?

18      A.   Yes, sir.

19      Q.   And you didn't have to specifically assign

20  them the task to go get these things that they needed to

21  keep their cranes in good working order, correct?

22      A.   That's fair to say, yeah.  Some of them we had

23  to tell them to do it, but...

24      Q.   But by and large, being professional crane

25  operators, you expected them to get what they needed.

1  True?

2      A.    True.

3      Q.    And if the cranes were operating correctly,

4  you had a pretty good idea that they were obtaining

5  these things in order to keep them running, right?

6      A.    Correct.

7            MR. JODON:  Edmond, can you hear me?  It

8  looks like my screen is frozen again.

9            MR. MORELAND:  I can hear you fine, and

10  yes, your screen is frozen.

11            MR. JODON:  Okay.

12            MR. MORELAND:  Do you want to take a

13  break and see if we can fix that, Mark?

14            MR. JODON:  I'm fine moving ahead.  I

15  just want to make sure that I still have the audio.

16            THE REPORTER:  You're coming through

17  good.

18            MR. JODON:  Okay.  Thank you.

19      Q.    (BY MR. MORELAND)  Mr. Harvey, do you see a

20  document up on your screen at this moment?

21      A.    Yes, sir.

22      Q.    And I am showing you what has been produced by

23  TNT as TNT Repass 5596.

24            Do you see that?

25      A.    Yes, sir.

1    Q.    Now, I'm going to zoom in on it just a little
2   bit and move it down so you can see it.
3             And can you tell me what it is we're
4   looking at here, Mr. Harvey?
5    A.    Yeah.  I mean, it's basically a memo that's
6   outlining the -- the payroll and policies for and the
7   different -- I guess the different ways it could be paid
8   or might get paid.  Basically telling the guys how to --
9   how to -- how to do their time sheets.
10   Q.    Can you explain this policy in your own words?
11            MR. JODON:  Objection to the form of the
12  question.  The document speaks for itself.
13   Q.    (BY MR. MORELAND)  Let me withdraw that
14  question and ask a different question.
15            Did you help create this memo regarding
16  payroll per diem and pre-trip?
17   A.    Yes.  I -- I helped -- I helped create it.
18  I -- I went to Antoy, which was the HR director, and
19  told him that I'd like to -- to clarify some things with
20  the guys.  So we were -- we were having issues.  I don't
21  remember all the exact issues.  That's probably your
22  next question.
23            But we needed to get something out there
24  because it was -- it just wasn't being done correctly.
25  And so he helped put it together.  It went out with my

1  name on it, but Antoy primarily put it -- put it

2  together for us.

3      Q.   What wasn't being done correctly that gave

4  rise to this memo?

5      A.   That's why I say I don't remember everything.

6  I just remember there was -- we were having issues with

7  time.  I don't remember all the issues.

8      Q.   And was this memo applicable both to San

9  Antonio and Midland?

10      A.   That I don't remember.  I'd have to -- yeah, I

11  don't remember.  I have to read the whole thing, I

12  guess, and look at it.

13      Q.   Would you like to take a moment to do that and

14  I'll scroll through it with you?

15      A.   Sure.  (Reviewing document.)  You can scroll,

16  please.

17           Okay.  So -- so, yeah, it does apply to

18  Midland.  I see that down there at the bottom.

19      Q.   And also San Antonio?

20      A.   Yes, sir.

21      Q.   I'm now showing you a memo that looks somewhat

22  similar regarding payroll per diem and pre-trip from

23  March 25th of 2014.  Do you see that?

24      A.   Yes, sir.

25      Q.   Did you have any involvement in creating this

Case 7:23-cv-00107-DC-RCG Document 30-4 Filed 11/02/21 Page 48 of 153

 1      Q.   Yeah.   The question was, were they ever
 2  required to come to the yard in order to pick up a
 3  rigger?
 4      A.   I mean, I'm sure that -- I'm sure that
 5  happened before, yes, sir.
 6      Q.   And was dispatch responsible for directing the
 7  operator to come to the yard to pick up a rigger?
 8      A.   Yes, sir.   Yeah, dispatch --
 9      Q.   And do you agree with -- go ahead, Mr. Harvey.
10      A.   Dispatch, I mean, they -- basically, they give
11  all the orders to the operators.   So, I mean, yes, it
12  would have been -- it would have been through them.
13      Q.   Did you consider the timekeepers or the
14  dispatchers to be supervisors of the operators?
15      A.   Yes.   Not the timekeeper, but the -- the --
16  the dispatchers, yes.
17      Q.   Could a dispatcher remove time without -- let
18  me -- let me start over.
19           Could the dispatcher remove any time on a
20  crane operator's time sheet without your approval?
21      A.   So I don't know -- so let me limit -- so if
22  they called -- if they had a problem with the time
23  sheet, somebody had, you know, something on their time
24  that wasn't -- that they didn't think was correct and
25  they called the -- the operator, and said, Hey, why do

**GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020**

1    I think that's what that was for was for -- for the

2    lunch breaks when they're working in the yard.

3         Q.   (BY MR. MORELAND)  But according to the terms

4    of that policy, it's not limited to yard work, is it?

5         A.   I don't -- I don't see that.  I'd have to --

6    well, on the -- the first about bullet point says if

7    you're in the yard, and I don't know if -- I haven't

8    read the whole thing, but I think it -- that is for the

9    yard.  (Reviewing document.)

10        Q.   The third bullet point says, "On continued

11   jobs your time starts and stops at the job except the

12   first and last day."

13             Did I read that first sentence correctly?

14        A.   (Reviewing document.)  Yes.

15        Q.   And what does that refer to?

16        A.   So their time when they -- when they moved

17   into the job on the first day of the job, they had

18   travel time in the crane, probably taking it out to the

19   job site, which was all part of the ticket time.  And

20   then -- and then when they got done with the job on the

21   last day, it was part of the ticket time coming in.

22   Other than that, they needed to start their time and

23   stop their time when they left the job site.

24        Q.   So they started their time site -- time --

25   they started their time when they arrived at the job

1    site and stopped their time when they left the job site.

2    Is that true?

3         A.   Yes.  Yes, sir.

4         Q.   And that's what this memo or this time sheet

5    is telling them to do, correct?

6         A.   Yeah.  I mean -- yeah.  Yeah.  That's what it

7    looks like.  They all know that if they have anything

8    else, like if they had to go fuel up or get fuel or

9    whatever, that they put that on their time sheet, but it

10   had to be marked on their time sheet for us to pay them.

11              MR. MORELAND:  I'll respectfully object

12   as nonresponsive with everything starting with "they all

13   know."

14        Q.   (BY MR. MORELAND)  Now, going down to the

15   sixth bullet point, it starts by saying, "All employees

16   receiving yard time, excluding pre-trip, post-trip, must

17   receive prior approval from dispatch."

18              Do you see that bullet point there?

19        A.   Yes, sir.

20        Q.   Now, that language is very similar to the

21   language we looked at earlier today in that June 18th,

22   2015, memo.

23              Do you remember that?

24        A.   Yes, sir.

25        Q.   Now, I asked you earlier whether or not that

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                 MIDLAND/ODESSA DIVISION

 3   TIMOTHY W. REPASS AND       )
     WILLIAM SCOTT MCCANDLESS,   )
 4   INDIVIDUALLY AND ON         )
     BEHALF OF ALL OTHERS        )
 5   SIMILARLY SITUATED,         ) CIVIL ACTION
                                 )
 6            Plaintiffs,        ) NO. 7:18-CV-107-DC-RCG
                                 )
 7   VS.                         )
                                 )
 8   TNT CRANE AND RIGGING,      )
     INC.,                       )
 9                               )
              Defendant.         )
10

11                REPORTER'S CERTIFICATION
                  ORAL DEPOSITION OF
12              GARY ELDON HARVEY, JR.
                    July 23, 2020
13                     Volume 1
                  (REPORTED REMOTELY)
14

15       I, Julie A. Jordan, Certified Shorthand Reporter in

16   and for the State of Texas, hereby certify to the

17   following:

18       That the witness, GARY ELDON HARVEY, JR., was duly

19   sworn by the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by

21   the witness;

22       That the original deposition was delivered to

23   Mr. Edmond S. Moreland, Jr.;

24       That a copy of this certificate was served on all

25   parties and/or the witness shown herein on   8/5/2020   .
```

GARY ELDON HARVEY, JR. - VOLUME 1 - July 23, 2020

1    That the amount of time used by each party at the

2 deposition is as follows:

3    EDMOND S. MORELAND, JR. - 01 HOUR(S):49 MINUTE(S)
     G. MARK JODON - 06 MINUTE(S)
4

5    I further certify that pursuant to FRCP Rule 30 (f)

6 (1) that the signature of the deponent:

7    XXXXX was requested by the deponent or a party

8 before the completion of the deposition and that the

9 signature is to be before any notary public and returned

10 within 30 days from date of receipt of the transcript.

11 If returned, the attached Changes and Signature Pages

12 contain any changes and reasons therefore:

13    _____ was not requested by the deponent or a party

14 before the completion of the deposition.

15    I further certify that I am neither counsel for,

16 related to, nor employed by any of the parties or

17 attorneys in the action in which this proceeding was

18 taken, and further that I am not financially or

19 otherwise interested in the outcome of the action.

20    Certified to by me this 5th of August, 2020.

21    *Julie A. Jordan*
      Julie A. Jordan, Texas CSR 3203
      Expiration Date:  1/31/22
22    Firm Registration No. 280
      JULIE A. JORDAN & COMPANY
23    7800 North MoPac Expy, Suite 120
      Austin, Texas 78759
24    (512) 451-8243
      (512) 451-7583 (Fax)
25    E-MAIL:  info@jordanreporting.com

```
 1   COUNTY OF TRAVIS )

 2   STATE OF TEXAS   )

 3

 4       I hereby certify that the witness was notified on

 5   _____8/5/2020_____ that the witness has 30 days

 6   (or _____ days per agreement of counsel) after being

 7   notified by the officer that the transcript is available

 8   for review by the witness and if there are changes in

 9   the form or substance to be made, then the witness shall

10   sign a statement reciting such changes and the reasons

11   given by the witness for making them;

12       That the witness' signature ~~was~~ (was not) returned as

13   of ____9/9/2020_____.

14       Subscribed and sworn to on this _9th_ day of

15   _September_, 2020.

16

17

18                   Julie A. Jordan
                    _____
19                   Julie A. Jordan, Texas CSR 3203
                    Expiration Date:  1/31/22
                    Firm Registration No. 280
20                   JULIE A. JORDAN & COMPANY
                    7800 North MoPac Expressway
21                   Suite 120
                    Austin, Texas 78759
22                   (512) 451-8243
                    (512) 451-7583 (Fax)
23                   E-MAIL:  info@jordanreporting.com

24

25
```