# Exhibit C

## DECLARATION OF MICHAEL COATES

1. I am over the age of 18 and am competent to testify to the facts contained in this declaration. I have personal knowledge of all of the facts contained in this declaration, and they are all true and correct.

2. TNT supervisors reminded me and other crane operators routinely in safety meetings and trainings of the risk of dehydration and heat injuries.

3. TNT required me and other crane operators to complete Job Safety Analysis forms on each job identifying the most prominent hazards associated with the work tasks, including dehydration, and the method to prevent dehydration, which was constantly hydrating.

4. In order to prevent dehydration and heat injuries by constantly hydrating, crane operators including myself obtained water or ice on a daily or near daily basis either from one of TNT's yards or from a store or gas station.

5. TNT provided me and other crane operators with company credit cards and instructed us to use the credit cards to purchase water and ice, along with fuel for our cranes and other materials we regularly needed to purchase in order to perform our work operating cranes whenever we were working too far away to pick up those items from one of TNT's yards.

6. The company pickups that TNT assigned to me and other crane operators served as mobile offices with particular functionality that was necessary to perform our work. TNT crane operators, including myself, spent most of the hours of most of our shifts inside our company pickups, and we kept the pickups running most of the shift in order to provide air conditioning or heat in the harsh desert environment, as well as for electric power for the cell phones and tablets we used for work.

7. That is because the majority of the time on oilfield jobsites the crane is holding something attached to the well and not actively moving anything. During the majority of the time

on most shifts, our job entailed waiting to be called to action, while intermittently cycling the crane on and off at set intervals.

8. For safety reasons, TNT's customers usually did not permit crane operators to be in the crane or within a certain radius of the wellsite when we were not actively operating the cranes.

9. TNT's crane operators, including myself, were expected to maintain continuous contact throughout the day by phone and email with TNT and with the customer representatives on the jobsite about our job status and work instructions. In order to do so, the crane operators installed cell phone signal boosters on our company pickups because our cell phones did not have a strong enough signal on many remote oilfield jobsites. The cell phone signal boosters were wired into and permanently attached to our company pickups, so we had to be in or near the company pickup in order to use the booster. Without the cell phone signal booster, we could not effectively communicate on many jobs.

10. Our company pickup trucks also were our only available source of air conditioning, heat, and shelter from the elements when we were not actively operating the cranes. There was not enough space, nor were we allowed to use the other companies' structures or vehicles, apart from momentary visits, if necessary.

11. On occasions when cranes ran out of fuel on a jobsite and the crane operator did not have sufficient fuel in his drag tank, TNT would pay an employee to transport fuel in a company pickup equipped with a drag tank to refuel the crane. TNT assigned and paid me to transport fuel to refuel a crane for another operator on at least one occasion using my company pickup's drag tank. However, TNT generally did not pay me to transport fuel to my own jobsites when I was not allowed to claim travel time under TNT's policies.

I declare under penalty of perjury that the foregoing statements are true and correct.

Date: Nov 21, 2022

                                                Michael Coates (Nov 21, 2022 16:45 CST)

                                                      Michael Coates