```
                                                                   Page 1
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                    MIDLAND/ODESSA DIVISION

 3   MICHAEL COATES, BRANDON      )
     RAYBION, DANIEL VENABLE,     )
 4                                )
             Plaintiffs,          )
 5                                )
     VS.                          ) CIVIL ACTION NO.
 6                                ) 7:22-CV-00018
     TNT CRANE & RIGGING, INC.,   )
 7                                )
             Defendant.           )
 8

 9      ****************************************************
                         ORAL DEPOSITION OF
10
                           MICHAEL COATES
11
                         SEPTEMBER 8, 2022
12
                         (Reported Remotely)
13      ****************************************************

14          ORAL DEPOSITION OF MICHAEL COATES, produced as

15   a witness at the instance of DEFENDANT, and duly sworn,

16   was taken in the above-styled and numbered cause on

17   Thursday, SEPTEMBER 8, 2022, from 10:01 a.m. to 11:41

18   a.m., before Kathleen Rossi Tyler, CSR in and for the

19   State of Texas, recorded by machine shorthand, pursuant

20   to the Federal Rules of Civil Procedure and the

21   provisions stated on the record or attached hereto;

22   that the deposition shall be read and signed before any

23   notary public.

24

25                     JOB NO. 6220644-001
```

Page 18
1  your average commute to a job site from the parks where
2  you're staying?
3      A.   On -- on average, it was two hours each way.
4      Q.   And did you normally drive straight to the job
5  sites, or did you go to the yard first?
6      A.   That varied quite a bit depending on whether I
7  needed to pick up a rigger.  Also I had to turn in
8  paperwork, you know, at least three times a week.
9  Three times a week they wanted to get tickets for
10 billing.
11          So a lot of days I would either, you
12 know, stop at the yard before work, go to the yard
13 after work, one of the two.  And if I wasn't going to
14 the yard, I would have to stop and fuel up the
15 auxiliary fuel tank on my pickup and get ice and water
16 at a gas station.
17          If I went to the yard, I wouldn't have no
18 reason to go to the convenient store because I could --
19 most of times I could get ice and water there.  They
20 kept a pretty good stock of water.  They had a pallet.
21 Very rarely were they out of water at the yard.
22     Q.   Okay.  So the yard had ice, water, and fuel?
23     A.   Ice, water, and fuel, correct.
24     Q.   So about what percentage of the time do you
25 think you went to the yard and what percentage of the

Page 19
1  time did you skip the yard and go from the camper to
2  the job site?
3      A.   I would say probably a good -- between 30 and
4  40 percent of the time it would be going to the yard.
5      Q.   And if you went to the yard, did you start
6  recording your time for the day when you arrived at the
7  yard or at some other time?
8      A.   We were not allowed to start at the yard when I
9  was driving the company pickup to location.  That was
10 considered nonbillable hours, and we were instructed
11 not to put it on the time sheet because it was not
12 going to be paid.
13     Q.   And how did you receive that instruction?
14     A.   I was not happy about it.  But that -- it
15 wasn't my call to make.  And I did -- I did understand.
16 I had worked there before.  Anyone that kind of argues
17 with management doesn't last very long or did not last
18 very long.
19     Q.   Why do you say that?
20     A.   That branch had a lot of turnover, and it
21 seemed like it was very petty as far as people -- you
22 know, you get on management's bad side, they're going
23 to find violation of company policy and they're going
24 to terminate you.  That -- that was -- that was very
25 common.  That was very common.

Page 20
1      Q.   Do you remember any specific instances of
2  somebody complaining about an employment practice and
3  then being terminated because of that?
4      A.   Not -- not specifically.  So there were quite a
5  few people -- and I'm not -- not good with names.  I
6  didn't work with a lot of different people.  But there
7  were -- there were people that would leave either
8  because they were terminated or because they were --
9  they stopped getting hours.  That was -- anecdotally
10 that was amongst the fuel hands is just -- you know,
11 you just go along or -- go along to get along.
12     Q.   Okay.  So you don't remember any specific
13 people who were terminated.  Do you remember any
14 specific anecdotes of someone's hours being reduced or
15 some other negative employment action being taken
16 because somebody complained?
17     A.   There was a -- to my best recollection, there
18 was a -- there was a rigger that was, I believe, from
19 the Dallas-Fort Worth area that -- that told me his
20 hours had gotten cut, that he wasn't even getting 40
21 hours a week.  And he ended up -- he ended up leaving.
22 Everything -- even that was just hearsay.  I can't --
23 I can't prove that.  That was just what someone told me
24 or that he told me personally, but I can't prove
25 that.  I don't have proof of that.  It just was -- it

Page 21
1  was inspired to -- you were inspired to not really buck
2  management, don't write travel time on your time sheet.
3  Those kind of things would -- it didn't get you very
4  far.
5      Q.   Do you remember that rigger's name?
6      A.   Not sure if it was Bret or Brad is what it
7  seemed like.  I'm not sure exactly what his name was.
8  And like I said, this was five years ago.  I didn't --
9  I worked with him on a couple of jobs, and he knew an
10 operator that I worked with in the Houston area.
11 That's why I remember him.  But I don't remember his
12 name.  I haven't talked to him in over five years,
13 so --
14     Q.   Okay.  But did he tell you he -- his hours were
15 cut specifically because he complained?
16     A.   He -- he said that he had complained about not
17 getting travel time, and then a week or two later he
18 wasn't even getting 40 hours a week.
19     Q.   And --
20     A.   And by saying -- allow me to elaborate.  By
21 saying that -- he was a rigger, and I don't -- you
22 know, that could very well be someone just complaining.
23 There could have been other factors in that.  I don't
24 know, so I just -- that is -- those are the types of
25 stories that would go around.

Page 38

1  majority were Chevron jobs and were -- was the Murphy
2  Oil.
3      Q.  Do you remember about when you worked at those
4  jobs where you picked up riggers?
5      A.  Murphy Oil was the last -- was the last job
6  that I worked.  Chevron, that was the long location I
7  told you that was the max, you know, three hour -- it's
8  a good three-hour drive out in that region off of
9  Highway 285 between Pecos and Carlsbad.  They also had
10 some closer locations that were outside of the Midland
11 area.  They had some closer locations that were outside
12 of the mid zone area.  But when you -- when you went to
13 -- when you went to Chevron, you had to take a rigger
14 because they were paying for a rigger.
15     Q.  Do you remember any other jobs that you
16 specifically weren't taking a rigger?
17     A.  Conoco Phillips outside of Orla I had a rigger
18 on the night shift for a good week.  Maybe it was a
19 little bit less than a week.  But I did have a rigger
20 for that job.  Any other specifics, I'm not sure.
21          I mean, it -- it might have just --
22 because I did a lot of filling in for days, you know,
23 for operators who might have taken off or might have
24 gotten in trouble and suspended, so there were -- there
25 were several of those jobs that I would get pulled and

Page 39

1  -- and -- and sent to for just a day or two.  So that
2  -- those -- those I don't really recall having a
3  rigger.  I don't think I had a rigger but maybe around
4  25 percent of my jobs.
5      Q.  Okay.  And you picked him up at the yard except
6  for that one -- that one job that you picked him up at
7  his apartment, right?
8      A.  At his apartment, correct.
9      Q.  And that was because that was easier and
10 quicker than going by the yard, right?
11     A.  Right.  It would have been -- it would have
12 been -- he lived on the north side of Midland, and this
13 particular job was in the Patricia area, which was
14 northeast of Midland.  So it was -- it was just -- it
15 would have been out of both of our ways to -- to go to
16 the yard.  And -- and why would you want to go out of
17 your way when you know you're not going to get paid for
18 that?
19     Q.  Who decided where you picked up the riggers?
20     A.  We had some leeway on that.  Typically it was
21 -- typically -- on a typical basis it was easier to
22 pick them up from the yard because they had a place
23 where their vehicle would be safe.  You didn't have to
24 meet them at like a Walmart parking lot or something or
25 you didn't have to drive out of your way into town to

Page 40

1  get caught in Midland traffic or Odessa traffic,
2  depending on where they were staying.  So typically we
3  would -- we would be in the yard.
4          But we were given leeway if you want to
5  pick them up from their apartment.  I know the rigger
6  in question that I would pick up from his apartment, I
7  -- the first night I met him at the yard and he rode
8  with me and he told me where he lived, we just decided,
9  hey, we'll just -- I'll just come pick you up there,
10 and that'll probably be easier than having to -- either
11 one of us to drive to the yard.  It would be a lot
12 quicker for both of us.
13     Q.  Let's see.  How often did you stop at a
14 convenient store or a truck stop or something along
15 those lines on the way to job sites?
16     A.  I would say at least four times a week.  I
17 would say at least four times a week.
18     Q.  Okay.  So that's in addition to making stops at
19 the yard; is that right?
20     A.  Yes -- well, no.  If I stopped at the yard, I
21 would not stop at a -- at a gas station for any kind of
22 company purchases.  If I stopped -- if I went to the
23 yard and stopped at a gas station, it would not --
24 there would not be a charge on the company credit card.
25 And that typically didn't happen.  Most of the time I

Page 41

1  had a lunch packed, like I said.  That was one of the
2  privileges of having the family with you in a camper.
3          So it -- there was -- if I went to the
4  yard, 99 times out of a hundred I would not stop at a
5  gas station for anything because I could get my fuel,
6  water, and ice at the yard.
7      Q.  Okay.  So there were on average in your
8  testimony four times a week that you would stop at a
9  gas station because you weren't stopping at the yard?
10     A.  That -- that's -- that's my best estimate.  On
11 average, that -- that -- that seems pretty legit.
12     Q.  Okay.  And what did you get when you were at
13 the convenience stores or gas stations?  What'd you
14 buy?
15     A.  Fuel, ice, and water.
16     Q.  Anything else typically?
17     A.  A candy bar or, you know, a drink, something
18 like that that wasn't water, you know, that I could
19 drink on the way to location.  But I didn't eat out
20 very often, so there was no sense in getting -- to get
21 food in the Midland and Odessa area, you're already
22 taking a good 30 minutes by the time you're able to get
23 fuel, get ice, water, and check out because the lines
24 are crazy.  There's so many people trying to use so few
25 stores.

Page 46
1  shift.  I'm on location for 12 and a half hours.  I got
2  a two to two and a half hour drive.  I'm not going to
3  take an extra 30 minutes to stop just to put fuel in
4  the pickup when I could get to location and during
5  downtime on location I can fill up the pickup truck out
6  of the auxiliary tank.  Is there any way we can take a
7  break for about five minutes?
8          MR. BULLER:  Sure.  Let me run off and
9  head back and get some coffee.
10         THE WITNESS:  Okay.
11         MR. BULLER:  All right.  Get off at 11:10
12 and get back at 11:20.
13         (Break.)
14  Q.  (BY MR. BULLER)  All right.  Mr. Coates, thank
15 you for telling me when you needed to take a break.  I
16 needed to take one too.  Before we get back in -- I'll
17 ask you this at the end of the deposition too --
18 anything in your mind, any answers that you've given
19 that -- that after a break sort of you realize maybe
20 you want to expound upon or anything you want to
21 correct?
22  A.  Not -- nothing stands out.
23  Q.  Okay.
24  A.  I am -- I am at work right now, and I had a
25 coworker of mine -- I didn't realize where we were at

Page 47
1  on the clock, so I apologize for the inconvenient
2  timing.
3  Q.  No, no.  That wasn't inconvenient at all.
4  A.  No, sir.  I'm doing my best to be honest to the
5  best of my recollection for something that happened
6  five years ago, so I'm pretty comfortable with my
7  answers.
8  Q.  Awesome.  Well, no.  I appreciate your -- your
9  best efforts to give your best testimony.  All right.
10 Some specific questions, stuff we were just talking
11 about.  In terms of filling up the drag tank, what
12 percentage of the time would you say you filled up the
13 drag tank at a -- at the yard as opposed to at a
14 convenience store or truck stop?
15 A.  30 to 40 percent of the time.  I would have to
16 go to the yard three times a week to turn in paperwork,
17 so it -- you know, three out of seven, probably 30 to
18 40 percent of the time.
19 Q.  30 to 40 percent of the time when you filled up
20 the drag tank it was at the yard and then the
21 remainder --
22 A.  I would say probably closer to 30 percent of
23 the time, but, yeah, best guesstimation.
24 Q.  Okay.  30 percent of the time filling up the
25 drag tank was at the yard?

Page 48
1  A.  Correct.
2  Q.  And then about 70 percent of the time that you
3  filled up the drag tank would have been at a convenient
4  store or gas station, right?
5  A.  Correct.
6  Q.  You mentioned a few things about the yard.  Is
7  there anything you haven't mentioned that you used to
8  do when you would stop by the yard?
9  A.  Well, our supplies -- on these jobs we were
10 doing wire line or tubing.  These jobs typically spew a
11 lot of residual oil all over the windshield because we
12 are in pretty close proximity to the wellhead.  So we
13 would -- not only would we have to get glass cleaner,
14 we'd have to get a degreaser or a citrus degreaser,
15 something like that.
16         We had to have lots of rags on a
17 consistent basis.  WD-40 did a pretty good job of
18 cutting through some of the soil, and then you have to
19 go back over it with glass cleaner.  So there were, you
20 know, ticket books, JSA books.  I believe we had a wind
21 logbook and crane inspection books.  We would have to
22 pick those up from the yard periodically.
23 Q.  Okay.  Is there anything else that you would do
24 at the yard during those jobs?
25 A.  Most of the time, no, that pertained to the

Page 49
1  crane.  Like I said, when I did day jobs, we would take
2  the crane from the yard to a job, you know, make
3  whatever lists were required, and then bring the yard
4  -- the crane back into the yard at the end of the day.
5          We were paid for that time collecting
6  rigging, specialty rigs, or something like that.  When
7  I would go to a crane out in the field out in -- you
8  know, doing specifically wire line coil tubing, if they
9  had damaged rigging, I would have to replace that.  And
10 that would usually be on my own time, but that was more
11 the exception than the rule.  The --
12 Q.  How long --
13 A.  The typical stop was for ice, water, fuel, and
14 then, like I said, our paperwork, books, turning in
15 paperwork, and -- and our cleaning supplies.
16 Q.  How long did the typical stop at the yard take
17 on the way to the job site?
18 A.  I would say right around -- right around 30
19 minutes total.
20 Q.  Did you stop by the yard on the way back from
21 the job site at all?
22 A.  It just varied.  It varied depending on how
23 much paperwork I had to turn in.  That would typically
24 be at the end of the day or paperwork had been turned
25 in and I had a couple days, it would be -- it would be