# Exhibit H

### Page 1

```
1   J7218095 eb
2
3         IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
4               MIDLAND DIVISION
5   TIMOTHY W. REPASS AND WILLIAM     *
    SCOTT MCCANDLESS, INDIVIDUALLY    *
6   AND ON BEHALF OF ALL OTHERS       *
    SIMILARLY SITUATED                *
7                                     *
    VS.                               * NO. 7:18-CV-107-DC
8                                     *
    TNT CRANE AND RIGGING, INC.       *
9
10
11
12  ***********************************************************
              VIDEOCONFERENCED ORAL DEPOSITION OF
13                    DANIEL DALE VENABLE
                          6-29-2021
14
         (Reported Remotely pursuant to the Emergency
15       Order Regarding the COVID-19 State of Disaster)
16
    ***********************************************************
17
18
19
20  Date                 Edith A. Boggs, CSR
21
22  6-29-2021            HOUSTON, TEXAS
23
24
25
```

### Page 2

```
8            DEPOSITION OF DANIEL DALE VENABLE

11      DEPOSITION AND ANSWERS of DANIEL DALE VENABLE,
12  taken before Edith A. Boggs, a certified shorthand
13  reporter in Harris County for the State of Texas, taken
14  via videoconference with the witness being present from
15  Midland, Texas, on the 29th day of June, 2021, between
16  the hours of 9:57 a.m. and 11:34 a.m.
```

### Page 3

```
1              A P P E A R A N C E S
2
3   ATTORNEY FOR PLAINTIFFS:
4
        Johnson Law Firm
5       314 East Highland Mall Boulevard, Suite 401
        Austin, Texas  78752
6
        By:  Aaron Johnson, Esquire
7       (Present via videoconference)
8
9   ATTORNEYS FOR DEFENDANT:
10      Littler Mendelson, PC
        1301 McKinney Street, Suite 1900
11      Houston, Texas  77010
12      By:  Jonathan A. Sprague, Esquire
        (Present via videoconference)
13      and G. Mark Jodon, Esquire
        (Present via videoconference)
14
15  REPORTED REMOTELY BY:
16      Ms. Edith A. Boggs
```

### Page 4

```
1                  EXAMINATION INDEX
2
3      QUESTIONS BY                          PAGE
4
       Mr. Sprague                            5
5
6      Mr. Johnson                            70
7
8                   INDEX OF EXHIBITS
9
10  NO.        MARKED    DESCRIPTION
11
    Exhibit 1    26      Weekly time reports
12
    Exhibit 2    58      Declaration of Daniel Venable
```



Page 45

1  house and then go pick up -- and I was mandated as my
2  dispatch to go pick up a rigger or equipment at the
3  yard, which wasn't on my way to the job site, then yeah,
4  I should have gotten paid for it.
5      Q.  So are you claiming that there were times when
6  you were instructed that you must pick up a rigger
7  before work?
8      A.  Yes.
9      Q.  And were you instructed not to put that time on
10 your timesheet?
11     A.  Yes.
12     Q.  Were there times when you would pick up a
13 rigger and put the time on your timesheet?
14     A.  I don't recall.
15     Q.  Were there times when you were paid for time
16 spent traveling with a rigger or picking up a rigger or
17 dropping off a rigger?
18     A.  Can you repeat that question?
19     Q.  Sure.  Were there times where you were paid for
20 time spent transporting a rigger to or from a job site?
21     A.  Yes, on the -- like I stated previously, if
22 there was an allotted amount of time, you have 14 hours
23 for each day is what you can bill the customer, if part
24 of that 14 hours had me driving the rigger, then part of
25 that time was paid, but whatever time we were together

Page 46

1  or I had to go pick him up that wasn't approved time,
2  then I wasn't paid for it.
3      Q.  What was the acceptable amount of time for
4  transporting a rigger that you would get paid for?
5      A.  It varied.  It varied from job to job.  Like I
6  said, if it was -- if they said you have 13 hours a day
7  with this job, this Chevron job, you get 13 hours a day,
8  okay, well, if the next Chevron job, you get 15 hours a
9  day, well, we're on the job site for 12 and a half to
10 13 hours and then, you know, the next day -- or the next
11 job site, if it's 15, then we get 2 hours.  Do you
12 understand what I'm saying?
13     Q.  Uh-huh.  Are there any jobs that you would have
14 gotten 18.5 hours, 19 hours for?
15     A.  There may have been.
16     Q.  And you stated that the amount of time that you
17 could put down for transporting riggers varied.  What
18 was the range that it could vary from?
19     A.  I mean, I don't know.
20     Q.  We'll take a look at another one of these
21 timesheets.  This is 3801.  Would you agree that this is
22 a document that appears to be a weekly time report for
23 the week ending March 11, 2018?
24     A.  Yes.
25     Q.  If you look down the first column, second row,

Page 47

1  for Tuesday, it has an entry for 2:30 a.m. to 5:00 a.m.,
2  "picking up rigger and driving to Chevron in Orla,
3  Texas."  Would you have been paid for this time?
4      A.  Where is this?
5      Q.  The first column, second row, Tuesday,
6  2:30 a.m. to 5:00 a.m.
7      A.  Okay.  So there are other situations where if
8  a -- I may have had to pick up a rigger for other crane
9  operators from different locations.  It just depends
10 where I was coming in from.
11         If you look on the day prior, I was back at
12 the yard.  So I was back in Midland.  I finished my day
13 in Midland, so I came home on Monday.
14         On Tuesday, I had to pick up a rigger and
15 drive them to a location.  So I had to go from here and
16 pick up a rigger in Orla, is what it appears to say, and
17 then drive to location.
18     Q.  Okay.  So let's go back to the last entry you
19 had for Monday, 7:30 p.m. to 9:00 p.m., "driving back to
20 yard," does that reflect time that you spent driving
21 from Rosetta back to the Midland yard?
22     A.  Driving a crane, yes.
23     Q.  You would have been paid for that time,
24 correct?
25     A.  Yes.  I was driving a crane.

Page 48

1      Q.  Then the very next entry, 2:30 a.m. to
2  5:00 a.m., "picking up rigger and driving to Chevron,"
3  you would have been paid for that time as well, correct?
4      A.  Yes.
5      Q.  Would you have been instructed by someone to go
6  pick up that rigger or would that have been an
7  arrangement that was made for convenience sake on your
8  own end?
9      A.  No, it wouldn't have been a convenience thing.
10 If it was a convenience thing, they would have driven
11 themselves.
12         The thing is is riggers weren't allowed to
13 take their own vehicles.  Early on when I started
14 working there, I was able to take my personal vehicle.
15 In fact, they actually paid me to take my vehicle
16 because I used it for work, but later, they changed that
17 rule to where riggers had to ride in company vehicles
18 with a crane operator.  So any time there was a crane
19 operator and a rigger on a job, the crane operator had
20 to go pick up the rigger.
21     Q.  For this entry, the 2:30 a.m. to 5:00 a.m.,
22 "picking up rigger and driving to Chevron," were you
23 instructed by anyone to go pick up that rigger?
24     A.  I would have had to have been.
25     Q.  And who would have given you that instruction?

