**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **MICHAEL COATES, BRANDON RAYBION, and DANIEL VENABLE** | § § § | |
| **Plaintiffs,** | § § | |
| | § | **Civil Action No.** |
| **v.** | § § | |
| | § | **7:22-CV-0018-DC-RCG** |
| **TNT CRANE & RIGGING, INC.,** | § § | |
| **Defendant.** | § § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE,
MOTION FOR A NEW TRIAL AND RELIEF FROM JUDGMENT**

Before the Court is Defendant TNT Crane and Rigging Inc.'s Renewed Motion for Judgment as a Matter of Law Or, in the Alternative, Motion for a New Trial and Relief from Judgment. (Dkt. 94.) Plaintiffs request that the Court deny TNT's Motion, and Plaintiffs show the following in support:

**Table of Contents**

I.   INTRODUCTION ........................................................................................................ 2

II.  ARGUMENT AND AUTHORITIES ....................................................................... 3

   A.   More than sufficient evidence supported the jury's finding that the tasks at issue in this trial were compensable. ........................................................................................................ 3

      1.   Obtaining Fuel to Operate Cranes ............................................................................ 10

      2.   Obtaining Supplies to Clean and Service Cranes ...................................................... 13

      3.   Transporting Required Riggers to Operate Cranes.................................................... 14

      4.   *De Minimis* Doctrine ................................................................................................ 16

   B.   Plaintiffs presented ample evidence that TNT willfully violated the FLSA................. 19

   C.   Plaintiffs' damage models and their testimony providing estimates of unpaid wages were admissible....................................................................................................................... 22

      1.   Plaintiffs damage models properly illustrate how they calculated their estimates of unpaid wages using the available data from their timesheets and estimated averages of the

missing variables..................................................................................................... 23

2.      TNT has not identified any errors in Plaintiffs' damage models, and TNT
misrepresents what they reflect.................................................................................... 24

3.      Expert testimony is not required to establish the arithmetic underlying Plaintiffs'
estimates of unpaid wages. ........................................................................................... 28

D.      Plaintiffs do not oppose reducing Plaintiff Raybion's award. ....................................... 30

III.    CONCLUSION.............................................................................................................. 31

## I.      INTRODUCTION

TNT's motion is mostly a repetition of its prior Motion for Partial Summary Judgment and Oral Motion for Judgment as a Matter of Law, both of which this Court denied as to the issues TNT raises again in its present Motion. (Dkt. Nos. 36, 70, respectively.) TNT raises no significantly new arguments or authority on the compensability of Plaintiffs' time obtaining fuel and supplies to operate and service their cranes, nor of their time spent transporting riggers. Therefore, the Court should reject TNT's arguments for the same reasons it has in the past.

TNT argues that it offered evidence that it did not willfully violate the FLSA, but Plaintiffs offered abundant evidence supporting the jury's verdict on willfulness.

TNT's argument that there were errors in Plaintiffs' damage model and that Plaintiffs' estimates of their unpaid wages were otherwise inadmissible are premised on a misunderstanding of the simple math presented in the damage model.

Plaintiffs do not dispute one issue raised by TNT: that it appears the jury incorrectly added the amount of Raybion's unpaid wages for weeks he worked in New Mexico to his total unpaid wages, in effect double-counting that portion. Therefore, Plaintiffs do not oppose TNT's request to reduce Plaintiff Raybion's award accordingly. Since the resulting award does not include any damages under the NMMWA, TNT's argument about whether travel time that falls within the continuous workday constitutes work under the NMMWA is moot.

## II.    STANDARD OF REVIEW

"A motion for judgment as a matter of law . . . in an action tried by a jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Thomas v. Hughes*, 27 F.4th 995, 1008 (5th Cir. 2022) (quoting *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997)). The "jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039–40 (5th Cir. 2011) (quoting *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008)) (citing Fed. R. Civ. P. 50(a)(1)). The court must "draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party." *Tercero v. Texas Southmost College Dist.*, 989 F.3d 291, 299 (5th Cir. 2021) (quoting *Foradori*, 523 F.3d at 485 (5th Cir. 2008). "A post-judgment motion for judgment as a matter of law should only be granted when the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Id.* (quoting *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005)).

"Special argument-forfeiture rules apply in this context." *Thomas*, 27 F.4th at 1008. [T]o properly raise an issue in a Rule 50(b) motion, the movant must have already raised it in her Rule 50(a) motion during the trial." *Id.* (citing *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676, 680 (5th Cir. 2016) ("Any argument made in a renewed motion for judgment as a matter of law under Rule 50(b) must have been previously made in a motion for judgment as a matter of law under Rule 50(a).").

## III.    ARGUMENT AND AUTHORITIES

### A.  The continuous workday rule applies.

TNT argues for the first time in its Rule 50(b) motion that "[e]ven if obtaining miscellaneous supplies could be considered work" the continuous workday rule does not apply because, TNT argues, "Plaintiffs could obtain any and all of those items, as well as fuel for the

drag tank, at any time from any number of places." (Dkt. 94, *14.) TNT did not raise that argument in its Rule 50(a) motion at trial, so it is waived. (*See* Trial Tr., vol. 2, 203-206, 212-215.)

Regardless, the continuous workday rule applies in this case. It is well settled under the "continuous workday," or "whistle to whistle" rule, that an employee's compensable time begins to run when he performs his first principal activity or activities of the day, and it continues to run through the performance of the day's last principal activity or activities. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005) (holding that time spent walking after performing the first principal activities of the day is compensable); 29 C.F.R. §790.6(a) ("Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted."). Consistent with this notion:

> Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted.

*Vega v. Gaspar*, 36 F.3d 417, 424 (5th Cir. 1994) (*quoting* 29 C.F.R. 785.38).

TNT relies entirely on a single district court case from New Mexico in arguing that no reasonable jury could find the continuous workday rule applied here. (Dkt. 94, *14-15 (citing *Garcia v. Crossmark, Inc.*, 157 F.Supp.3d 1046 (D.N.M. 2015)).) TNT is wrong. A closer examination reveals that both cases are distinguishable from this case in crucial respects.

In that case, as TNT notes, the Court granted the employer's motion for summary judgment where the plaintiff sought compensation for her morning commute. *Garcia*, 157 F.Supp.3d at 1049. The plaintiff in *Garcia* "worked for Crossmark as a 'Retail Representative,' which entailed . . . 'receiv[ing] job assignments on her home computer,' loading 'materials sent to her by Defendant' into her car, and then visiting client retail establishments to execute Defendant's plan

for in-store displays, after which she was required to log her time in Defendant's system." *Garcia*, 157 F.Supp.3d at 1048. Crucially, as the court noted (but as TNT does not), the plaintiff in *Garcia* did not "dispute that the conditions of her employment permitted [her] to structure her mornings according to her own designs[.]" *Id.*

Additionally, "nothing in terms of [Garcia's] employment *required* that she perform her administrative tasks *immediately* prior to beginning her workday. *Id.*, 1048-49 (emphasis in original). And "given that [Garcia] could access her employer's online portal from *virtually anywhere*, *Plaintiff could have begun her day from nearly wherever she chose*, so long as she timely arrived at her first appointment of the day." *Id.* at 1049 (emphasis added).[1] The *Garcia* court further and carefully explained that "while Garcia undoubtedly performs some preparatory and administrative work *at home*, because she is able to perform these tasks *from any number of locations* [i.e., 'virtually anywhere'] *and is free to schedule her time so as to 'use the time effectively for [her] own purposes,'* she is, in effect, fully relieved of duty before she arrives at her first location and after she departs the last." *Id.* (emphasis added). "She could have," the court explained, "elected to prepare her materials, then exercise, eat breakfast, watch television, or engage in any number of personal activities prior to beginning her commute[.]" *Id.* As a result, the court held that, "[o]n these undisputed facts,"—i.e., that Garcia could do these work tasks *anytime and virtually anywhere*—the "continuous workday" "is interrupted and the intervening time [including her travel time] need not be compensated." *Id.*

TNT claims that "Plaintiffs here assert that they have the sole discretion and power to perform an alleged work routine – acquiring supplies or fuel – whenever and wherever they

---

[1] TNT emphasizes the court's later language stating that the plaintiff could do her work "from any number of locations," but glosses over the court's previous and more emphatic observation that she could do so from "virtually anywhere," including from her home. (Dkt. 94, *14).

choose." Plaintiffs asserted no such thing.

First, there was no evidence suggesting that Plaintiffs could obtain fuel and supplies for their cranes "from any number of places," as TNT contends. (Dkt. 94, *15.) Rather, Plaintiffs had to obtain fuel from TNT's yard or from convenience stores or truck stops that supply diesel (which not all convenience stores do); and they had to obtain the other supplies (like cleaning materials and oil for the crane) either from TNT's yard or from stores that carried those items. On a route between each Plaintiff's lodging and his jobsite each day, there are not "any number of places" to obtain those items, much less could they be obtained from "virtually anywhere." Moreover, TNT Midland Branch Manager John Harrison testified that "[w]e prefer if you get it from the yard, due our discounts with fuel and supplies. That's why we kept it there. And if they're anywhere in the Midland area, it made sense to come by and grab it from the yard." (Trial Tr., vol. 2, 24:17-21.) By contrast, the *Garcia* plaintiff could perform her administrative tasks from home or from any other place with internet access.

Second, Plaintiffs could not obtain fuel or supplies "at any time." Plaintiffs typically worked at least twelve to thirteen hours each shift on their jobsites, in addition to the 1.75 to 2.5 hours on average that they spent performing compensable tasks and driving *each way*. (*See* Trial Exs. 4-6 (timesheets); Trial Tr., vol. 1, 146:22 – 147:2 (Coates); vol. 2, 103:13-21 (Venable); vol. 2, 158:7-12 (Raybion).) That totals about 13.75 to 15.5 hours per day on average of total daily work and travel time, leaving only about 8.5 to 10.25 hours per day on average to drive between home and the location where they performed the preparatory and concluding tasks, eat, shower, attend to personal obligations, sleep, and get ready for work again.

TNT's theory presupposes that Plaintiffs could have elected to interrupt their minimal off-duty hours to leave home and travel to TNT's yard or a truck stop to obtain fuel or supplies, then

return home again. Even assuming *arguendo* that such a routine were realistically feasible, which it is not under these facts, the mere theoretical possibility of interrupting the continuous workday with some off-duty time does not render travel time non-compensable. Such a sweeping expansion of *Garcia* would nullify the continuous workday in a broad swath of cases. It would allow employers to sidestep the continuous workday rule by simply issuing a policy (or deploying the theoretical argument, as TNT has done here for the first time since the filing of the *Repass* case in June 2018) that employees may—and should—elect to perform work for their employers in the middle of their off-duty time, regardless of the practical impossibility of doing so.

Not only is TNT's new argument contrary to reason; it is also contrary to Supreme Court precedent. For example, the employees in *IBP, Inc. v. Alvarez* theoretically could have donned their protective gear then played cards for an hour before walking to their workstations, which, under TNT's theory, would nullify the continuous workday rule and render their travel time non-compensable. *See* 546 U.S. 21 (2005). But, theoretical possibilities aside, the facts in *IBP* were that the plaintiffs traveled immediately after donning their gear and immediately before doffing it. *Id.* at 31-33. Therefore, "consistent with the continuous workday rule . . . the walking time between the locker room and the production floor was also compensable because it occurs during the workday." *Id.* at 31.

Finally, it is simply not true that Plaintiffs somehow gamed the system in order to "unilateral[ly] convert their otherwise ordinary commute time into compensable work time." Dkt. 94, *15.) Indeed, Defendant offered no evidence that any of the Plaintiffs or any other crane operator has ever done any such thing. And why would they want, or even know, to do so when, unlike Garcia's employer, Defendant did not pay its operators to do any of that work anyway? If employees gaming the system were a problem in reality, which it is not in this case, an employer

could simply regulate when and where the employees are allowed to perform the tasks in question.

In short, TNT's reliance on *Garcia* is, as a matter of both fact and law, misplaced. Even if the facts could support TNT's theory, which they do not, the jury was not required to, and did not, draw the inferences that TNT presses.

**B.    The ECFA is irrelevant to this case.**

TNT argues that "Plaintiffs' use of a company truck does not transform their non-compensable commuting time into compensable time." (Dkt. 94, *15-16 (title case removed).) That is not Plaintiffs' claim, and the jury was properly instructed that "[t]he use of an employer-provided vehicle does not make an employee's time spent commuting to and from work or engaging in activity incidental to their commute compensable" unless the ECFA's requirements are met. (Dkt. 72, *10.) Plaintiffs' claim is that they were not paid for performing some of the principal activities they were hired to perform, as well as for adjacent travel time that fell within the continuous workday.

**C.    More than sufficient evidence supported the jury's finding that the tasks at issue in this trial were compensable.**

TNT argues, as it did at trial, that Plaintiffs' time obtaining fuel or supplies or transporting riggers was not integral and indispensable to their principal activities, and therefore such tasks could not start or end the continuous workday. (Dkt. 94, *17-21; Trial Tr., vol. 2, 203-205, 212.) This Court denied that portion of TNT's Rule 50(a) motion, finding that "a reasonable and rational jury could find for [Plaintiffs]." (*Id.* at 217:25 – 218:5; Dkt. 70.)

In order to determine which tasks are compensable, "the ***critical first step*** requires determining the general principal activities for which the employee was employed." *Segovia v. Fuelco Energy LLC*, No. SA-17-CV-1246-JKP and No. SA-19-CV-1129-JKP, 2022 WL 4545756, *14 (W.D. Tex. Sept 28, 2022) (emphasis added). "Employees may have multiple principal

activities and an activity need not predominate over other activities to be considered a principal activity." *Id.* (citing 29 C.F.R. § 790.8(a)). "It is important to recognize that, 'it is not only an employee's single predominant principal activity (and activities indispensable to it) which are compensable under the F.L.S.A., but rather all principal activities and any tasks incidental to them.' " *Id.* at *15 (quoting *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976)).

Additionally, "principal activities," includes all "activities [that are] are an integral and indispensable part of the principal activities for which covered workmen are employed." *IBP, Inc.* 546 U.S. at 29-30 (*citing Steiner v. Mitchell,* 350 U.S. 247, 256 (1956)). "Thus, a second step requires determining whether an activity that differs from the hired activities is nonetheless a principal activity by virtue of it being integral and indispensable to the hired activities." *Segovia*, 2022 WL 4545756 at *14.

As TNT notes, "[w]hether a particular activity is integral and indispensable under the FLSA is a question of law, but [t]he nature of the employees' duties . . . is a question of fact." (Dkt. 94, *13 (quoting *Segovia*, 2022 WL 4545756 at *10) (cleaned up).) "Inferences about the nature of an employee's work are also treated as questions of fact." *Smith v. Ochsner Health System*, 956 F.3d 681, 684 (5th Cir. 2020) (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990)); *accord Segovia*, 2022 WL 4545756 at *10. In other words, ***it is the jury's province to determine the principal activities an employee was hired to perform***, provided the evidence is sufficient to support such an inference.

TNT entirely skips the "crucial first step" of addressing what multiple principal activities the jury could have found the Plaintiffs were hired to perform and discusses only whether the tasks in question were integral and indispensable to operating cranes. (*See* Dkt. 94, *17 (arguing that "to determine whether a task in question is compensable, a court must determine whether the task is

integral and indispensable part of [the employee's] principal activities" and nothing else) (internal quotes and citation omitted)). However, the evidence was sufficient for the jury to find that obtaining fuel and supplies to operate and service their cranes and transporting required riggers *were among the principal activities* Plaintiffs were hired to perform. Therefore, *the Court need not even decide whether those tasks were <u>also integral and indispensable</u>* to the activity of operating cranes. At any rate, the evidence was sufficient to establish that those tasks were also integral and indispensable to operating cranes.

    1.   <u>Obtaining Fuel to Operate Cranes</u>

First, TNT argues that "federal courts find that stopping to purchase fuel during a commute is not compensable and does not render a commute compensable." (Dkt. 94, *18 (citing *Chambers v. Sears Roebuck and Co.*, 428 F. App'x 400, 410-21 (5th Cir. 2011); *Ahle v. Veracity Rsch. Co.*, 738 F. Supp. 2d 896, 916 (D. Minn. 2010). However, the cases TNT cites only hold that fueling a vehicle *for the purpose of commuting* is not compensable when the commuting time itself is non-compensable. Here, TNT equipped the Plaintiffs' company pickups with auxiliary "drag" tanks (aka "L" tanks) specifically so they could transport fuel to their cranes when the cranes were left on remote drilling locations for days or weeks at a time. (Trial Tr., vol. 1, 45:17 – 46:5; 147:10 – 148:9; vol. 2, 22:13 – 23:1.)[2] That was the primary purpose for which Plaintiffs loaded fuel into their drag tanks. (*Id.*) Therefore, *Chambers* and *Ahle* are inapposite.

TNT identifies "[f]uel[ing] and service[ing] assigned crane/truck every day at the end of

---

[2] TNT also argues that "Plaintiffs testified that sometimes they used fuel from the drag tanks for their trucks, effectively admitting the drag tanks were extensions of their trucks' gas tanks used to fuel their daily commutes." However, Coates testified that was "very seldom," (vol. 1, 213:6), and Venable testified it was "[o]n a rare occasion." (vol. 2, 140:21.) The fact remains that the primary function of the drag tanks, and the reason TNT had them installed, was to transport fuel to the cranes.

the shift" as one of the "essential functions" on its official job description for its crane operators. (Trial Ex. P-38.) If Plaintiffs had not transported the fuel themselves, TNT would have had to "make other arrangements" to pay someone else to transport it. (Trial Tr., 25:3-12; 44:18-21.) Therefore, the jury could reasonably infer that obtaining and transporting fuel in their drag tanks was among the primary activities Plaintiffs were hired to perform.

TNT does not discuss whether fueling or obtaining fuel is itself a principal activity, but instead asserts that "[g]iven the plethora of other ways in which the cranes can be fueled, including stopping at TNT's Midland yard, these stops are not integral and indispensable to their principal activities as crane operators." (Dkt. 94, *18.) First, Plaintiffs testified there was no such "plethora of other ways." (*See* Trial Tr., vol. 1, 166:15 – 167:21 (Coates had a runner bring him fuel on only one occasion because he was left working on location for 37 hours); 213:20 – 214:1 (Coates never had a third-party fuel vendor provide fuel on location); vol. 2, 104:3-15 (no one ever brought fuel to Venable on a jobsite).) Second, even if another employee or vendor had occasionally brought Plaintiffs fuel, it would not render the task non-compensable when Plaintiffs performed it.[3] Under TNT's logic, no task is ever integral or indispensable for any employee if another employee ever helps perform the task. That is, of course, absurd.

TNT next argues that "filling a drag tank with diesel fuel for a crane does not differ in any meaningful respect from filling up the fuel tank of the company pickup truck." (Dkt. 94, *18.) That is wrong. The crucial difference is that, under the Portal-to-Portal Act, Plaintiffs are not considered

---

[3] *See Garcia v. Champion Glass, LLC*, Civ. No. SA-12-CA-0703-FB, 2014 WL 12537863, *4 (W.D. Tex. Oct. 23, 2014) (rejecting defendant's argument that it "usually utilizes separate vehicles, loaded and driven by employees who are not Field Employees and are based out of the Champion Glass shop, to transport tools and supplies to job sites" because "someone had to drive the truck daily, and . . . there were materials, tools, etc. that needed to be transported from the shop to the job site" and plaintiffs testified they sometimes performed those tasks).

to have been hired to commute nor to fuel their vehicles just to commute; but the evidence was sufficient for the jury to find that they were hired, in part, to obtain and transport fuel in their drag tanks to fuel their cranes. TNT cites no authority, because none exists, for its implicit proposition that any tasks *similar in nature* to commuting or to tasks incidental to commuting are, by extension, never compensable. That proposition conflicts with the rule established by the Supreme Court that all of the principal activities an employee is hired to perform, including tasks integral and indispensable to those principal activities, are compensable work. *See Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 33 (2014). Under TNT's logic a truck driver would never perform compensable work because driving, fueling, and servicing trucks are similar to commuting and tasks incidental to commuting. Of course, driving is compensable for a truck driver, 29 C.F.R. § 785.41, as is servicing and fueling the truck. *See Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 725 (5th Cir. 1961). Likewise, TNT's own corporate representative concedes that driving cranes and haul trucks is compensable work, (Trial Tr., vol. 1, 52:9 – 53:6), and that fueling cranes is among the crane operators' principal activities. (44:3-17.) Therefore, it cannot be that obtaining fuel is categorically non-compensable.

Even if the jury could not consider loading fuel into the drag tank to be a principal activity itself, which it certainly could, it is still integral and indispensable both to fueling cranes (which TNT identifies as an "essential function" of the crane operators' job) and to operating cranes. Of course, Plaintiffs cannot operate cranes at all without fuel, and it is well established that loading and transporting materials, tools, and equipment necessary for an employee's work is integral and indispensable to the principal activity.[4]

---

[4] *See Vega*, 36 F.3d at 424; 29 C.F.R. 785.38); *Cantu v. Milberger Landscaping, Inc.*, 12 F. Supp. 3d 918, 921-22 (W.D. Tex. 2014) (finding that loading and unloading lawnmowers, tools, water,

2.  <u>Obtaining Supplies to Clean and Service Cranes</u>

Among the "essential functions" on its own job description for crane operators, TNT identifies "servic[ing] assigned truck every day" and "clean[ing] the outside and cab area of assigned vehicle daily." (Tr. Ex. P-38.) Plaintiffs testified that they regularly were required to obtain supplies such as diesel exhaust fluid, lubricants, and other supplies and equipment to service their cranes, as well as cleaning solutions, and rags or towels to clean their cranes. (vol. 1, 149:15-23; vol. 2, 104:25 – 105:10; 156:11-19.) Coates testified in detail about how the equipment and methods used on frack sites produced a stick substance known as "honey oil" that "flies out of the top of that lubricator and gets over everything within two to 300 feet of the well" and covers the crane window, requiring them crane operators to constantly clean the cranes. (vo. 1, 149:24 – 150:13.) Therefore, the jury could reasonably infer that obtaining the supplies needed to clean and service their cranes was also among the principal activities Plaintiffs were hired to perform, or at least that it was integral and indispensable to their other principal activities.

TNT argues that "[a]cquiring generic supplies for vehicle maintenance does not constitute an integral and indispensable primary activity of a crane operator." (Dkt. 94, *19 (citing *Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 808–09 (D. Md. 2014); *Chambers*, 428 F. App'x at 420).) Again, these cases hold that maintaining vehicles used for commuting is not compensable work if the commute is also non-compensable. They say nothing about stopping at a store or company facility to obtain supplies or equipment in order to maintain a specialized vehicle, like a

---

ice, and other equipment and cleaning and fueling trucks before they left the yard for the day's work and after returning was "'integral and indispensable' to the Plaintiffs' work as landscape laborers"); *Garcia v. Champion Glass, LLC*, 2014 WL 12537863 at *4 (holding that loading and unloading tools, materials, and equipment at the defendant's place of business prior to and after their regular work hours were integral and indispensable to their principal activities of installing glass).

crane, that was not used for commuting but as a tool to perform the principal work activities. Nor does either case even mention the word "generic," much less make any distinction between generic and specialized supplies.

### 3. Transporting Required Riggers to Operate Cranes

On many of Plaintiffs' jobs, a coworker called a "rigger" was required. (Trial Tr., vol. 1, 61:15-25; vol. 2, 27:13-25.) The rigger's job was to "hook up the slings to the crane hook, give hand signals as needed, . . . flag when [they] spotted the crane, [and] make sure [they] didn't run over or back into anything." (vol. 1, 145:4-7.) When riggers were required on a job, "the crane operator's essential job functions include[d] working safely and competently with those riggers." (vol. 1, 61:15-25) TNT generally did not assign company vehicles to its riggers, (vol. 1, 63:20-23; vol. 2, 28:1-7), and TNT's customers generally did not allow workers to park at or near the lease properties in personal vehicles. (vol. 2, 28:8-23; 157:16 – 158:6.) Therefore, when a rigger was required on a job, TNT generally required the crane operator to transport the rigger. (vol. 2, 28:8-23; 157:16 – 158:6.) TNT dispatchers instructed the crane operators when they were required to transport a rigger, and often specified to pick them up at TNT's yard or at another location. (vol. 2, 26:19-27:6; 86:12-19; 108:24 – 109:1; 157:12-15.) Transporting the rigger was not at all convenient for the crane operators. (108:16 – 109:1.) Picking up a rigger from TNT's yard significantly extended the crane operator's commute to the jobsite. (27:7-12; 109:8-10.)

TNT Midland Branch Manager John Harrison testified that there "shouldn't be any situations where TNT would not pay for an operator to pick up a rigger" from TNT's yard (vol. 2, 29:3-25.) He testified that "the act of" picking up riggers was compensable work, although he thought the riggers "riding in the vehicle" was not. (vol. 2, 25:25 – 26:18.) Regardless, the jury was entitled to infer from his testimony that Plaintiffs were hired, in part, to transport the riggers, or at least that picking them up and dropping them off would start and end the continuous workday

because doing so was integral and indispensable to their other principal activities.

Judge Pulliam of the San Antonio Division recently issued a detailed, thoughtful opinion denying in part the defendant's motion for summary judgment in *Segovia v. Fuelco Energy, LLC*, 2022 WL 4545756 at *23. The plaintiffs in *Segovia* were oilfield fueling technicians who worked on crews of four and took turns driving a company van to transport the crew to and from their hotels or man camps and their jobsites. *Id.* at *1-2. One of the issues presented by the defendant's motion for summary judgment was whether the plaintiffs could "show that transporting co-workers is one of the tasks for which Plaintiffs were hired or whether it is integral and indispensable to the principal activities for which Plaintiffs were hired." *Id.* at *19.

"Although *Busk* 'revisited the meaning of "integral and indispensable" and offered a more precise, albeit more restrictive, view' by rejecting tests that 'focus on whether an employer *required* a particular activity or whether the activity is for the *benefit* of the employer,' *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1370 (S.D. Ga. 2015), *Busk* does not eliminate all reliance on those factors, it simply holds that those factors alone are not determinative . . . ." *Id.*

The *Segovia* court reviewed *Knowles v. United States*, 29 Fed. Cl. 393 (1993), which "specifically addresses whether employees are engaging in work when 'driving their coworkers and themselves to and from their place of employment.' " *Id.* at *17. *Knowles* found the "duty to drive others" particularly relevant while also noting the employees lacked the ability to use "the vans for their exclusive use." *Id.* (quoting *Knowles*, 29 Fed. Cl. at 395). Although noting some distinctions, the court found *Knowles* to have persuasive value. *Id.*

The court also reviewed *Scalia v. AWP, Inc.*, No. 1:18-CV-1183, 2020 WL 7639980 (W.D. Mich. Dec. 23, 2020). The *Scalia* court denied summary judgment, finding two separate disputes

of material fact: "(1) whether it was part of the employee's job to pick-up and transport passengers, and if not, (2) whether 'transporting a partner [was] integral and indispensable' to the employee's principal activity." *Segovia*, 2022 WL 4545756 at *18 (quoting *Scalia*, 2020 WL 7639980 at *3). The *Segovia* court found one distinguishing feature in *Scalia*—"Unlike the employees in *Scalia*, Plaintiffs [in *Segovia*] had no need to travel to pick up or drop off any co-worker. Defendant housed all crew members at the same hotel." *Id.* Like *Scalia*, and unlike *Segovia*, the Plaintiffs in the present case were required to drive to TNT's yard or other locations to pick up and drop off their riggers, which strengthens *Scalia*'s persuasive value for this case.

TNT relies on *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1291 (10th Cir.2006), for its argument that "[t]he fact that only company trucks might be allowed on worksite, and riggers may not have them, does not make transporting them compensable." (Dkt. 94, *20.) However, *Segovia* distinguished *Aztec* for reasons that apply equally here: in *Aztec*, "the carpooling occurred in an employee vehicle rather than a company vehicle" and "employees carpooled 'because it was more convenient and less expensive than driving alone.' " *Segovia*, 2022 WL 4545756 at *18. The court emphasized that "Defendant did not provide the van transportation merely for the convenience of the employees. Nor did any employee have the option to use his own transportation." *Id.* at 19.

The *Segovia* court concluded that "[u]nder the facts, a reasonable jury could find that Defendant hired Plaintiffs for a variety of tasks, including driving co-workers to and from jobsites. Given John Harrison's testimony that he considered picking up riggers at the yard to be compensable work, and given the many other factual similarities between this case and *Segovia*, the jury had ample evidence from which it could reasonably reach the same conclusion.

### 4.  *De Minimis* Doctrine

TNT argues in the alternative that Plaintiffs' time spent fueling their drag tanks and

obtaining supplies for their cranes should be disregarded as *de minimis.* (Dkt. 94, *21-26.) However, TNT failed to raise that argument at trial, so it is waived. (*See* Trial Tr., vol. 2, 203-206, 212-215.) If the Court considers the argument, it should be rejected.

### a. *Plaintiffs' compensable work time cannot be disregarded because it was not administratively difficult to record.*

The *de minimis* "doctrine does not apply to certain time periods merely because they are short in duration and separable from other compensable work time." *Alexander v. Wackenhut Corp.*, No. CIV.A. 07-262, 2008 WL 2697163, at *6 (E.D. La. July 1, 2008). "Rather, the doctrine excuses the employer from compensating employees only for very short periods of work time that also, as a practical administrative matter, cannot be adequately recorded for payroll purposes." *Id.* (citing *Mireles v. Frio Foods*, 899 F.2d 1407, 1414 (5th Cir. 1990) (waiting time of less than 15 minutes was not *de minimis* when employer could track this additional time by making minor changes to the existing administrative procedures).

> ***This rule applies only where*** there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer ***may not arbitrarily fail to count as hours worked any part, however small***, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (emphasis added). "[T]he doctrine focuses on employee work time, occurring outside of the fixed or regular work period, that cannot feasibly be 'captured' for payroll purposes by the employer, using reasonable administrative and time-keeping procedures, because of its short and indefinite duration and uncertain occurrence." *Alexander*, 2008 WL 2697163, *6.

TNT has not identified any reason it would be administratively unfeasible to record the time Plaintiffs spent obtaining fuel or supplies. TNT argues that "[i]n order to accurately capture" the unpaid time at issue in the lawsuit, "TNT would have to alter its timekeeping system. Doing so would result in TNT losing the benefits administratively derived from rounding." (Dkt. 94,

*23.) That makes no sense.

TNT's timekeeping system consists of having its crane operators note their starting and stopping times on time sheets from any location they are working (provided TNT allows them to claim the time in question). Antoy Bell testified that it would not have been "difficult, as an administrative matter, for TNT to allow its crane operators to start their time on the timesheet when they do the first work of the day at the TNT yard or a gas station, instead of telling them that they can't start it until they get to the job site." (Trial Tr., vol. 1, 79:18 – 80:7.) Indeed, the crane operators sometimes did start their time on their timesheets when they performed their first compensable task. However, when that time and the subsequent travel time to their jobsites was not permitted under TNT's policies, TNT cut the time from their time sheets. (vol. 2, 35:22-25; 44:1-7.)

> b.  _Plaintiffs testified that their unpaid work time was more than ten minutes at a time._

Again, the amount of time the tasks took is irrelevant because TNT cannot show any administrative difficulty in recording it. Regardless, TNT is incorrect to claim that "the time was 10 minutes or less." (Dkt. 94, *22.) TNT cites Venable's testimony that "[t]he act of pumping" fuel could take 10 minutes or less. (_Id._ (citing Trial Tr., vol. 2, 132:11-22).) However, Venable testified there that the pumping alone could be 10 minutes or less _if he were only pumping 10 gallons._ However, he testified, "But I don't know how long it would take at the actual facility." For example, that did not include waiting in line at the pump or at the register. And Venable testified that there was no typical amount he would pump, "[i]t could be 10 gallons, it could be 40 gallons." (_Id._) Coates testified that it took on average about 30 minutes to stop at the yard or gas stations to get fuel and supplies, and he explained several reasons why it took so long. (vol. 1, 151:1 – 152:22.)

Additionally, courts consider the aggregate time across all activities in question, as well as across all affected employees and across the statutory time period.[5] The jury's award demonstrates that, in the aggregate, Plaintiffs' unpaid wages were no trifling amount.

c.   *Plaintiffs testified that they performed the unpaid tasks regularly.*

TNT claims that its credit card ledgers "objectively clarify that the infrequent times Plaintiffs spent purchasing supplies and/or "topping off" their drag tanks were irregular activities." (Dkt. 94, *24.) But TNT ignores the fact that they often fueled and obtained supplies at TNT's yard where they would not use a credit card nor otherwise document the task. (Trial Tr., vol. 1, 128:3-15.) The Plaintiffs testified that they stopped either at TNT's yard or at a gas station about every other day to get fuel or supplies for their cranes. (vol. 1, 150:19-25 (Coates); vol. 2, 105:19-21 (Venable); 155:24 – 156:23 (Raybion)).

**D. Plaintiffs presented ample evidence that TNT willfully violated the FLSA, and the jury's finding of willfulness makes liquidated damages mandatory.**

TNT argues that there was insufficient evidence to establish willfulness. (Dkt. 94, *27.)

---

[5] *See Alexander*, 2008 WL 2697163, *6 (considering "the aggregate amount of the additional compensable time" and finding that pre-shift time donning equipment "likely yields a significant amount of additional time, when considered in the aggregate, for at least some employees"); *Lindow v. U.S.,* 738 F.2d 1057, 1063 (9th Cir. 1984) ("Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim.") (citing *Addison v. Huron Stevedoring Corp.,* 204 F.2d 88, 95 (2d Cir. 1953) (less than $1.00 per week not *de minimis* ), *cert. denied,* 346 U.S. 877, 74 (1953); *Glenn L. Martin Nebraska Co. v. Culkin,* 197 F.2d 981, 987 (8th Cir. 1952) (30 minutes per day over 1 ½ years not *de minimis*), *cert. denied,* 344 U.S. 866, 73 (1952); *Landaas v. Canister Co.,* 188 F.2d 768, 771 (3d Cir. 1951) ($21.67 to $256.88 per week over 3 years not *de minimis* )); *see also Aguilar v. Management & Training Corp.*, 948 F.3d 1270, 1283–86 (10th Cir. 2020) (considering "both the aggregate claim for each individual officer as well as the aggregate claim for all the officers combined" and concluding that eight minutes of aggregate preparatory and concluding work time is not de minimis); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 374 (4th Cir. 2011) (noting that in case involving 280 employees, individual claims for $425 per year or $2,550 over six years were "significant"); *Gonzalez v. Farmington Foods, Inc.*, 296 F. Supp. 2d 912, 921 (N.D. Ill. 2003).

This is yet another issue that TNT failed to raise in its Rule 50(a) motion at trial, and it is therefore

waived. Regardless, Plaintiffs offered ample evidence of willfulness.

"[W]illfulness occurs where the employer "knew or showed reckless disregard for the

matter of whether its conduct was prohibited by the [FLSA] . . ." *Mohammadi v. Nwabuisi*, 605

Fed. Appx. 329, 332 (5th Cir. 2015) (unpublished) (quoting *McLaughlin v. Richland Shoe Co.*,

486 U.S. 128, 33 (1988)). "For example, employers act willfully when they know their pay

structures violate the FLSA *or ignore complaints brought to their attention*." *Id.* (emphasis added)

(citing *Ikossi–Anastasiou v. Bd. of Supervisors of La. State Univ.,* 579 F.3d 546, 553 & n. 24 (5th

Cir.2009).[6] Even where an employer's policies are facially compliant, "the existence of written

policies setting forth proper rules for the payment of overtime does not itself immunize an

employer from a finding that the employer willfully violated the FLSA." *Monroe v. FTS USA,*

*LLC*, 763 F. Supp. 2d 979, 991 (W.D. Tenn. 2011).

TNT's written travel time policy memo violates the FLSA on its face. It states that when a

crane operator provides his own lodging, "THE EMPLOYEE **CANNOT** CHARGE TRAVEL TO

PAYROLL IF CUSTOMER IS **NOT** CHARGED TRAVEL." (Ex. P-1, *1,2; Ex. P-2, *1.)

TNT argues that HR Director Antoy Bell, an attorney, reviewed its policies and "advised

the Branch Managers to pay for travel between job sites and for driving from the yard to the job

site." (Dkt. 94, *27.) Indeed, Mr. Bell testified that he advised TNT multiple times (1) about how

to comply with the FLSA, (2) about whether it needed to pay its crane operators for travel time,

(3) about whether it needed to pay for preparatory and concluding work before and after traveling

---

[6] *See also Cruz v. Maverick County*, 957 F.3d 563, 573 (5th Cir. 2020) (upholding finding of
willfulness based on complaints by sheriff's deputies about unpaid overtime at a public meeting,
as well as a prior DOL investigation); *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994)
(affirming finding of willfulness where DOL informed defendant company representative that its
pay practices violated the FLSA and defendant "continued a substantially similar arrangement").

to their job sites, and (4) that when an employee travels from a TNT yard to a job site, TNT was "required to pay for that time" without exception. (Trial Tr., vol. 1, 30:15-31:17.) Mr. Bell further testified that he told this to John Harrison, Defendant's branch manager in Midland. (*Id.* at 31:19-32:1.) Mr. Bell testified that he was familiar with the continuous workday rule. (*Id.* at 37:1-38:4.) He testified that he was also familiar with the regulation illustrating the continuous workday rule, and that is why he advised John Harrison that TNT must pay crane operators when they drive from TNT's yard to a jobsite or from one work location to another. (*Id.* at 32:2-33:9.) He testified that stopping at a service station en route to a jobsite to purchase necessary supplies is a compensable task that starts the continuous workday. (*Id.* at 54:12-16.) And he admitted that he previously testified that loading fuel for cranes in an "L" tank (also known as a "drag tank") is compensable work, (*id.* at 43:10-22), but later stated he was "changing his answer" to testify "now it's not compensable work." (*Id.* at 123:10-18.)

TNT claims that Midland Branch Manager John Harrison "testified that he followed the policy." (Dkt. 94, *27.) However, Mr. Harrison testified just the opposite. He testified that he agrees that loading fuel and other supplies to operate cranes and picking up riggers count as work time. (*Id.* at 25:19 – 26:15.) But despite Mr. Bell's supposed advice, Mr. Harrison testified that his practice was to refuse to pay crane operators for travel time when the pay was not allowed under TNT's policy, even when they performed compensable work tasks before traveling to the jobsite. (Trial Tr., vol. 2, 44:1-13; 78:24-80:1.)

TNT's Midland Branch Operations Manager Levi Hastey testified that he "received complaints all the time" from crane operators about not being paid their travel time. (Vol. 2, 188:6-20; *see also* 187:20-22 (Raybion complained several times to Hastey); 50:9-12 (Hastey conveyed Plaintiff Raybion's complaint to John Harrison of not being paid travel time); 86:20-23 (there were

times that crane operators complained to Carol Harrison about not receiving travel time).) Hastey's response was simply to refer the crane operators back to the policy memo. (*Id.* at 188:6-10.)

TNT Senior Vice President and General Counsel Thi Tran, a licensed attorney whose primary practice areas include labor and employment law, testified that she is the "head person in charge of ensuring that TNT complies with the [FLSA]." (*Id.* at 180:14 – 182:1-3.) She testified that she reviewed the policies and practices at issue in this lawsuit, but "to date, TNT has not changed those policies or practices." (*Id.* at 182:11-16; *see also* Vol. 1, 90:14-91:6 (Bell: policies remain unchanged).)

Therefore, the evidence was sufficient to show that TNT knew the unpaid time in question was compensable and that it intentionally, or at least with reckless disregard to the law, refused to pay for it, even after numerous complaints, including this very lawsuit.

TNT additionally requests relief from the Court's award of liquidated damages, arguing that it offered evidence that it acted in good faith. However, as set forth in more detail in Plaintiffs' Response to TNT's Motion Opposing Liquidated Damages Award, which Plaintiffs incorporate herein by reference, a finding of willfulness means the employer cannot prove good faith defense to avoid the imposition of liquidated damages. (Dkt. 86, *2-3.)

### E. Plaintiffs' damage models and their testimony providing estimates of unpaid wages were admissible, and the jury's award of damages was consistent with the evidence.

TNT seeks a new trial, arguing that the jury's award of damages was "against the weight of the evidence that it was prejudicial error for the Court to admit Plaintiffs' damage models, Exhibits P-3A, P-3B, and P-3C. (Dkt. 94, *28.) TNT claims that the exhibits "confused the jury in several ways." (Dkt. 94, *9.) However, each of TNT's arguments is based on a misunderstanding or a misrepresentation of Plaintiffs' testimony and the information reflected in Plaintiffs' damage models. Even if one of the many arrows TNT lobs at the Plaintiffs' damage models were to find a

target and demonstrate some minor discrepancy with their testimony, which they have not, those arguments go to the weight of Plaintiffs' testimony, not to admissibility. The jury was correctly instructed that "[i]f your recollection of the evidence differs from the exhibits, rely on your recollection," (Dkt. 72, *5), and that "summaries are not evidence" and "[y]ou should determine the facts from the evidence." (*Id.* at *6.) They considered not only Plaintiffs' damage models but also the timesheets and testimony underlying the evidence. TNT attempted to poke holes in Plaintiffs' damage models at trial but failed to persuade the jury.

1. Plaintiffs damage models properly illustrate how they calculated their estimates of unpaid wages using the available data from their timesheets and estimated averages of the missing variables.

If an employer fails to keep records required by the FLSA, an employee carries his burden of proof by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946). *Mt. Clemens* applies here because, on many days, TNT prohibited Plaintiffs from recording the time at issue on their timesheets, so there is no record of the precise amount of their off-the-clock work. The Fifth Circuit recently reaffirmed the longstanding principle that estimated averages of off-the-clock hours are sufficient to carry a plaintiff's burden. *United States Dep't of Lab. v. Five Star Automatic Fire Prot., L.L.C.*, 987 F.3d 436 (5th Cir.), *reh'g denied*, 997 F.3d 1258 (5th Cir. 2021). The defendant in *Five Star* "contested that the damages award was an approximated number" because the "calculations failed to account for variations in the employees' schedules." *Id.* at 445. The Fifth Circuit rejected that argument because "that's what *Mt. Clemens* allows when, as here, FLSA-required time records are incomplete." *Id.*[7]

---

[7] *See also Monroe v. FTS USA, LLC*, 860 F.3d 389, 412 (6th Cir. 2017) (observing that "[o]ther circuits and district courts have explicitly approved of an estimated average") (citing, inter alia, *Donovan v. Hamm's Drive Inn*, 661 F.2d 316, 318 (5th Cir. 1981) (affirming as "accepted practice"

Under *Mt. Clemens Pottery*, Plaintiffs could have simply testified about their estimated averages without providing any summary exhibit or damage model. But Plaintiffs exceeded their burden of proof. They calculated their damages with as much precision as reasonably practicable given the available data, testified to explain their calculations, and showed the jury their math.

Federal Rule of Evidence 1006 explicitly allows a party to "use a *summary, chart, or calculation* to prove the content of voluminous writings . . . that cannot be conveniently examined in court." (emphasis added). That is what Plaintiffs provided. Their damage models summarized the data in their timesheets and their estimates of the necessary variables missing from the timesheets. The damage model also demonstrates the calculations of their estimated unpaid wages using simple arithmetic.

"The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88. TNT "has to 'disprove' the evidence adduced on behalf of" Plaintiffs. *Skipper v. Superior Dairies, Inc.,* 512 F.2d 409, 420 (5th Cir.1975).

2. <u>TNT has not identified any errors in Plaintiffs' damage models, and TNT misrepresents what they reflect.</u>

First, TNT claims that "each exhibit double-counted alleged unpaid overtime for weeks in which Plaintiffs worked in New Mexico, seeking damages under both the FLSA and the NMMWA for the same worktime." (Dkt. 94, *2.) That is not true. The "Unpaid OT Wages" column in each Plaintiff's damage model exhibit summarizes the total amount of unpaid wages he claimed. The "Unpaid Wages in NM" column separately accounts for unpaid wages for weeks in which each

---

and not "clearly erroneous" district court's finding that "based on the testimony of employees, . . . certain groups of employees averaged certain numbers of hours per week" and award of "back pay based on those admittedly approximate calculations")).

the Plaintiff worked overtime in New Mexico. That is because if Plaintiffs had succeeded under the NMMWA, the Court would have needed the jury's finding of the wages due under the NMMWA to apply the appropriate treble damages. As discussed below, to the extent the jury mistakenly double-counted them for Plaintiff Raybion, Plaintiffs do not oppose reducing his award to correct the error.

Second, TNT claims that "[e]ach exhibit asserted twice as many stops for fuel or supplies as any of the Plaintiffs undertook because Plaintiffs . . . did not make stops both traveling to worksites and returning home from worksites . . . ." (*Id.* at *2-3.) Not true. To calculate their estimates of unpaid wages, Plaintiffs used the following formula:

[number of unpaid trips]   x   [estimated average time spent on each trip]   x **[estimated percentage of those trips that were compensable]** x  [1.5 times their regular rate of pay]

(*See* Exs. P-3A, P-3B, and P-3C.) For example, on the first page of Plaintiff Coates's damage model, Exhibit P-3A, the first row states his estimated percentage of compensable trips: 41%. The next row explains how he arrived at that estimate: "At least 22% of trips compensable because picked up and dropped off a rigger. Of the remaining 78%, at least 25% of trips compensable because stopped at yard, gas station, or store to get fuel or other supplies for crane, bringing total to at least 41%." (*Id.*)[8] For Sunday of the week ending February 19, 2017, Mr. Coates identifies one unpaid trip in his timesheet. (*Id.*) He then multiplies his estimate of the time he spent working off the clock for each trip (2.5 hours, identified at the top left of the sheet) by his overtime rate (1.5

---

[8] TNT also argues that the exhibits "are inconsistent with Plaintiffs' testimony" because Coates testified that an estimated 10% of his workdays he was paid for his travel time because he was driving a crane or haul truck, and another 10% of his workdays he was paid for travel time for other reasons. (Dkt. 94, *29.) However, Coates testified that "in [his] summary exhibit, [he has] not put down any time for days when [he] drove just cranes and haul trucks. . . . On days like that, when TNT paid all [his] travel time," he put a zero in the Unpaid Trips column. (Trial Tr., vol. 1, 169:17 – 170:8.)

times $27 per hour), then _discounts the product_ by 59% (multiplying by 0.41) to account for the fact that he did not obtain fuel or supplies or pick up riggers on every trip. (*Id.*) This results in an estimated $41.51 in unpaid wages for that day. (*Id.*)

TNT claims that "Coates testified it took 1.25 hours each way to commute to Pecos (p. 210), yet the Exhibit seeks 2.5 hours, double the actual time, each way for those commutes." (Dkt. 94, *30.) First, Coates testified that it took about an hour and a half just to drive from Midland to Pecos, not counting his stops to obtain fuel or supplies or to pick up riggers. (Trial Tr., vol. 1, 211:9-17.) Second, he testified that after driving to the nearest town, it often took a significant amount of time to drive outside of town to the lease property, then another significant amount of time driving across the unimproved lease roads to arrive at the drilling location. (Trial Tr., vol. 2, 17:13 – 18:21.) Third, and most importantly, he testified that his estimate of unpaid wages is based not on a precise amount of time for each trip—which would be impossible to recall—but on an _estimated average_ of 2.5 hours. (Trial Tr., vol. 1, 146:22 – 147:2; 163:15-20; 186:20-25; 219:1-22.) TNT similarly attacks Plaintiffs Venable's and Raybion's estimates of the average time they were unpaid per trip by arguing that many of those trips would have been shorter than the average. (Dkt. 94, *31.) Of course, that is true; that is the nature of averages.[9] There is no basis to believe that the jury was confused by the concept of averages, nor has TNT demonstrated any instance in which Plaintiffs' damage models conflict with their testimony.[10]

---

[9] TNT also claims that "[t]he trips where [Raybion] did not stop were, necessarily, shorter than 1.75 hours because he did not spend time at the yard or time fueling." (Dkt. 94, *31.) However, Plaintiffs' damage models do not claim _any time_ for trips where they did not perform compensable tasks. As discussed above, they have excluded the non-compensable trips by discounting their total unpaid trips by the estimated percentage of those trips that were non-compensable. The remaining _compensable trips_ appropriately include both the time spent performing compensable preparatory or concluding tasks and the corresponding travel time.

[10] TNT incorrectly asserts that Plaintiff Venable claimed an average of 2.5 hours per unpaid trip

TNT also argues that "Coates agreed that he was paid travel time when he would 'mob in' or 'mob out' of a worksite." (Dkt. 94, *30.) However, Coates only testified that he was paid *when he drove a crane or haul truck*. (Trial Tr., vol. 1, 200:12 – 201:6.) He *did not* testify that he drove a crane or haul truck, rather than a pickup, to and from the jobsite every shift he mobilized or demobilized a crane. For example, TNT cites the week ending April 23, 2017. (*Id.*) The task description copied from Coates's timesheet indicates he mobilized a crane into a location identified as "IPS Coil Tubing, Patterson #298 Hwy 349" on Friday of that week. (Ex. P-3A, *4.) However, the entry also indicates that he started that shift at a different location, identified as "pioneer XBC Giddings 3000 NWTB," presumably having driven there in his company pickup, before moving his crane (identified as 170-05) to the new location. (*Id.*) He would have then had to drive his pickup back home. At any rate, Coates testified that he reviewed his timesheets and that the Unpaid Trips Column reflects the trips he believes he was not paid for his travel time. (Trial Tr., vol. 1, 169:3 – 171:11.) The jury believed him, and TNT's second-guessing invades the jury's province.

Next, TNT argues that Coates's damage model "dramatically overstates how often Coates transported riggers" by estimating he did so on 22% of his jobs. (Dkt. 94, *30.) TNT claims that Coates testified "that there were just eight days where he allegedly was not allowed to put down on his time sheet that he picked up a rigger." (*Id.*) TNT grossly misstates Coates's testimony. Coates testified that he had to transport a rigger on about 20 to 25 percent of his jobs and was not allowed to record that time on his timesheets. (Trial Tr., vol. 1, 174:13 – 175:17.) TNT's counsel, Mr. Jodon, then put Coates to the task of attempting to identify all of the specific dates on which that occurred. (*Id.* at 175:19 – 177:1.) Coates identified eight such instances before stopping to

---

on his damage model. Consistent with his testimony, Venable's damage model uses 2 hours per trip, not 2.5. (*Compare* Trial Tr., vol. 2, 103:13-21, *with* Ex. P-3B, *1 (top left).)

explain, "Those are the ones that I can identify that . . . I specifically remember." (*Id.* at 176:20 – 177:2.) Mr. Jodon asked, "So you can't reconstruct the information on here because you don't remember?" (*Id.* at 177:3-5.) Coates responded, "[t]hese are 39 week's worth of work over six years ago, so no. I mean, which jobs had riggers and which jobs didn't -- no, not really." (*Id.* at 177:6-8.) Since TNT did not keep records of which days Coates transported riggers and did not allow him to record the time in question, *Mt. Clemens* applies and Coates's estimate is sufficient.

TNT also argues that Venable "testified that he worked on Chevron jobs 80% of the time (p.108) and that he was paid travel time for those jobs (p. 121), yet nearly 150 times Exhibit P-3B seeks payment for two full trips for days working on Chevron jobs." (Dkt. 94, *31.) However, when asked whether he "got paid travel in and out to Chevron," Venable responded, "on *some jobs*, I did." (121:9-11 (emphasis added).) And he clarified that when he did get paid on Chevron jobs, he was only paid for part, not all, of his drive time. (123:4 – 124:10.) Consistent with that testimony, Venable's damage model shows many entries on Chevron jobs where he claims only 0.5 unpaid trips per day because he was paid for some, but not all, of his time traveling and stopping to perform compensable tasks. (*E.g.,* Ex. P-3B, *3.)

3. <u>Expert testimony is not required to establish the arithmetic underlying Plaintiffs' estimates of unpaid wages.</u>

TNT claims that the "exhibits further misled the jury with pseudo-mathematical approximations of hours worked that were presented without the benefit of an expert." (Dkt. 94, *10.) TNT offers no authority for this argument. "A witness who is qualified as an expert . . . *may* testify" if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702 (emphasis added). At any rate, "[e]xpert testimony is not necessary to assist jurors with basic arithmetic." *Adv. Drainage Sys., Inc. v. Quality Culvert, Inc.*, 2:12-1121, 2015 WL 1299368, at *8 (S.D. Ohio Mar.

23, 2015) (collecting cases).[11] TNT does not argue that the math underlying the plaintiff's damage models was too technical for the jury to understand without relying on expert testimony. TNT's only elaboration on this argument is that the Unpaid Trips column in each Plaintiff's damage model contains estimated fractions of unpaid trips—0.5 or 0.25, rather than whole numbers. (*Id.*)

Plaintiffs testified that, on many jobs, they were allowed to record on their timesheets and were paid a fixed number of hours that included some, but not all, of their drive time. (Trial Tr., vol. 1, 170:9 – 171:3 (Coates); vol. 2, 123:4 – 124:10 (Venable) 159:6-16; 166:9-24; 173:2 174:4; 176:9-16; 178:23 – 179:13 (Raybion).) Plaintiff Coates testified that, for those days, his damage model reflects 0.25 unpaid trips each way "to signify that [he was] paid some, but not all of that time," and for days in which he made two such partially paid trips it reflects ".5 to represent that [he was] not paid for 25 percent of [his] two trips on that day." (Trial Tr., vol. 1, 171:4-11.)[12] In other words, he estimated that, on average across those jobs, 25 percent of his time performing compensable work and traveling was not paid, which is what his damage model reflects. Plaintiffs Venable and Raybion similarly testified that the Unpaid Trips column of their damage models

---

[11] *See also Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1117 (10th Cir. 2005) ("it is permissible to submit simple statistical calculations such as averages without first being designated as an expert witness"); *Zuniga v. Boeing Co*, 133 Fed. Appx. 570, 581 (10th Cir. 2005) (unpublished) ("Juries are able to make basic inferences from simple statistical information, making an expert unnecessary."); *Culley v. Lincare Inc.*, 215CV00081MCECMK, 2017 WL 3284800, at *7 (E.D. Cal. Aug. 2, 2017) ("rejecting defendant's argument that "analyzing employee time records to determine wage and hour claims on [a] classwide basis constitutes expert testimony"); *LeBeouf v. Manning*, CV 12-2583, 2016 WL 692051, at *2 (E.D. La. Feb. 22, 2016) ("While expert testimony may lend a certain amount of weight to such easy calculations . . . . Plaintiff can prove her lost income by offering her own testimony and other evidence, including her tax returns and payroll records, and then making a simple arithmetic calculation.").

[12] TNT also argues that Coates testified "he was paid travel time when he stayed at a hotel (p. 207-08), yet P-3A includes claims for unpaid trips when he stayed at a hotel." (Dkt. 94, *30) (referring to weeks ending 3/12/17, 5/17/17). However, Coates did not testify that he was paid for *all* his travel time when he stayed at hotels. On the days of the two weeks challenged by TNT that his timesheets indicate he stayed in a hotel, his damage model only claims 0.5 trips per day. (Ex. P-3A, *2, 5.)

reflects the number of trips each day that they estimate they were not paid, based on a review of their timesheets. (*Id.* at 114:6 – 116:6 (Venable); 159:24 – 160:16 (Raybion).) These simple concepts and basic arithmetic did not require expert testimony.

TNT complains that "the exhibits do not include any information regarding the allegedly unpaid activity they performed on each day, the basis for claiming whole or fractional trips, the actual duration of the rips on those days, or the amount of time TNT paid." (Dkt. 94, *10.) But this argument has nothing to do with whether the arithmetic is so complicated that an expert is required to explain it. Rather, TNT's objection, once again, is that Plaintiffs offered estimated averages instead of precise information about each day. As discussed above, the precise information TNT demands is unavailable because TNT did not allow Plaintiffs to record it, so *Mt. Clemens Pottery* allows Plaintiffs to rely on their estimates instead.

### F. Plaintiffs do not oppose reducing Plaintiff Raybion's award.

TNT points out that "Raybion initially testified that his unpaid overtime amount was $22,735.02," and then he corrected that testimony to $21,895.02. (Dkt. 94, *34 (citing Trial Tr., vol. 2, 161:22–162:13).) Raybion also testified that the portion of his total unpaid wages attributable to weeks he worked in New Mexico was $7,042.04. (*Id.*) The jury awarded Raybion $29,770.06—the sum of $22,735.02 and $7,042.04—which appears to mistakenly double-count the $7,042.04 portion.

Therefore, Plaintiffs do not oppose reducing Raybion's award of unpaid wages from $29,770.06 to $21,895.02 and correspondingly reducing his award of liquidated damages from $29,770.06 to $21,895.02.

Consequently, TNT's argument that "travel time is not compensable time under the

NMMWA," (Dkt. 94, *28), is moot.[13] The parties agree, for other reasons, that the jury's verdict only permits damages under the FLSA.

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion.

Respectfully submitted,

**FAIR LABOR LAW**

By: */s/ Aaron Johnson*
Aaron Johnson
State Bar No. 24056961
ajohnson@fairlaborlaw.com
314 E. Highland Mall Blvd, Ste. 401
Austin, Texas 78752
Ph: (512) 277-3505
Ph: (512) 277-3254

**MORELAND VERRETT, P.C.**
Daniel A. Verrett
State Bar No. 24075220
daniel@morelandlaw.com
700 West Summit Drive
Wimberley, Texas 78676
Ph: (512) 782-0567
Fax: (512) 782-0605

**ATTORNEYS FOR PLAINTIFF**

---

[13] In the event the Court finds it appropriate to rule on the issue, Plaintiffs incorporate by reference their prior briefing that travel that falls within the continuous workday is indeed considered compensable work under the NMMWA. (Dkt. 30, *2-6.)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2022, I electronically submitted the foregoing document for filing using the Court's CM/ECF system, which will serve a true and correct copy of the foregoing document upon counsel of record.

*/s/ Aaron Johnson*     
Aaron Johnson